**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESTATE OF ISMAEL GALVAN SOLORIO, IRIS ZENIA SOLORIO, P.Z., A MINOR, ANTHONY LARRY, BRANDON MACK WARE, SHANTELL WARE, SHERRY WARE, FRED MCTEAR, MARIA JOHNSON, J.E.W., A MINOR, BRADLEY FORREST BIBBINS II, B.R.B., A MINOR, G.W.B., A MINOR, CHRISTOPHER GEORGE PAULUS, KYLE JAMES PAULUS, THOMAS CARL GREGORY III, SAM KALLABAT, FADIA KALLABAT, NICHOLAS SAM KALLABAT, KEVIN THOMAS KALLABAT, URSULA MARIAM KALLABAT, WALTER LEMAN THOMAS, KENNETH DEWAYNE BOYER, CHRISTOPHER MICHAEL WIESE, BLAKE WIESE, S.W., A MINOR, JEFFERY BURTON, CHARLES BURTON, JANE BURTON, PATRICK BURTON, KEVIN GUERRA GARCIA, SEAN TANNER PHAM, JOSEPH SANTOLLA, JEANNETTA ROSE SANTOLLA, SARAH MALISSA SANTOLLA, HEWA AHMED MAMAND, DAVID WESLEY TANNER JR., HARRISON KEENAN ELLIFF, DONALD ALAN ELLIFF, MACKENZIE ALAN ELLIFF, JAMES DAVID BLEHM, JOHN LEE BLEHM SR., JOHN LEE BLEHM JR., BRIAN DANIEL FIFER, KELLI FIFER, ROBERT KENT MASON, ROCHELLE LANG, ~~ESTATE OF BALTAZAR MORIN, JR., A.M., A MINOR,~~ JOSEPH LOUIS HEREFORD, JOHN ROBERT HEREFORD, CAROL HEREFORD, JOHN THOMAS HEREFORD, BOBBIE M. MARTINEZ, TRAVIS JAY TERPSTRA, CHRISTOPHER DUANE | **PLAINTIFFS' ~~ORIGINAL~~ FIRST AMENDED COMPLAINT**<br><br>**Case No.:** ~~_____~~ 1:23-cv-02660 |

i

**Style Definition:** TOC 1,MTD1: Space After:  0 pt, Line spacing:  Double

**Style Definition:** TOC 2: Tab stops:  1", Left

MOORE, SHARON MOORE, MELINDA SHEA RUSSETT, M.M., A MINOR, JOSHUA JAMES NICHOLSON, MOUNTAIN SPARROW ROBICHEAU, REBECCA ANN ROBICHEAU, JON ERIC ROBICHEAU, SUSAN MARIE ROBICHEAU, JASMYN AMARA ROBICHEAU, IAN NOVA ROBICHEAU, ROSE MEADOW ALEXANDER, ANTHONY TYLER ROBICHEAU, EMILY ROSE ROBICHEAU, LOGAN WAYNE ROBICHEAU, COOPER ERIC ROBICHEAU, L.J.R., A MINOR, ROBERTO LEON GARCIA, FELIPE L. GARCIA, ELIZABETH L. GARCIA, ROSA L. GARCIA, EDUARDO GARCIA, NICOLI GARCIA, WILEM SPEED WONG, PHILIP EDWARD LORENZ, CHRISTOPHER GENE LLOYD, TIMOTHY JOSEPH O'SULLIVAN SR., JOANN O'SULLIVAN, DOUGLAS JAMES RAGONE, D.J.R., A MINOR, DAVID JAMES RAGONE, DANIEL JOSEPH RAGONE, DENISE ELIZABETH SMITH, SEMELI TOILOLO, JEFFREY PHILIP ARDOIN, COLLIN JAMES BLACK, RONALD DARRIS FYFFE JR., BRITTNEY N. AGEE, ROSELLA FYFFE, RONALD DARRIS FYFFE SR., JOHNATHAN MICHAEL FYFFE, JOYCE MARIE FYFFE, JEREMY CAMPOS FOREMAN, ANTHONY ANDREW FOREMAN, BROOKLYN NICOLE FOREMAN, ROSALVA CAMPOS FOREMAN, JOAQUIN CAMPOS LUQUIN JR., KATIE REBEKAH POLLARD, BENJAMIN MICHAEL HAMEL, JOHN STEVEN WHITWORTH, ERIC BENTLEY WHITWORTH, ESTATE OF RAYMOND NIGEL SPENCER JR.,

ii

LAURA F. SPENCER, VICTORIA E. SPENCER, STEVEN RICHARD YBARRA, MARCUS ADAM CANSECO, ERIC ADAMS, VINCE JAMES WRIGHT JR., NATASHA WRIGHT, DORIS WRIGHT, VINCE WRIGHT SR., QUINTON WRIGHT, JAMES LEE FOREMAN, YANI CRUZ-SANTIAGO, ZACHARY KYLE SPARKS, KEVIN DALE SPARKS, TAE SUK SPARKS, CHRISTOPHER MARK MCDUFFIE, ROCHELLE LYNN MCDUFFIE, KEITH EDWARD WALLEY, STEVEN RAYMOND ROQUE, REBECCAH MICHELE ROQUE, ESTATE OF CHRISTOPHER BRIAN ECKERT, ROSWITHA MANUELA ECKERT, RANDOLPH KEITH BOWERS SR., RANDOLPH KEITH BOWERS JR., KYLE HENRY BOWERS, JESSICA LYNN WATSON, WILLIAM RICHARD SEABREEZE, DEBORAH MARY SEABREEZE, KATHLEEN ANN SEABREEZE, BUNCENCIA KRISTINE BURNEKO, BRIAN ROBERT SCHAR, ESTATE OF RONNIE LEE SANDERS, RUTH ANN SANDERS, ROSHUNDA RENEE SANDERS, RONNIE LEE SANDERS JR., LAKEYIA DESHAY SANDERS, ROBERT CHRISTOPHER ETTINGER, KATHRYN MARIE SMITH, JONATHAN TAYLOR ETTINGER, GREGORY ALLEN SEYMOUR, ZACHARY TYLER HEATH, ROBERT K.P. WETZEL, DONALD WETZEL SR., LINDA WETZEL, SHAWN WETZEL, DONALD WETZEL JR., RYAN WETZEL, CHRISTIAN WETZEL, BRENT MICHAEL HINSON, LUIS CARLOS RIVERA, JOEL J. RIVERA, CALEB J. RIVERA, VALERIE NELSON,

MICHAEL WARREN WOOD, JESUS EDUARDO FERRAS, JOSHUA TRAVIS BOYKIN, JONATHAN MICHAEL CASPER, JANET MICHELLE CASPER, CORY RUSSELL WATSON, ALYSHA WATSON, CHRISTIAN ARTHUR BLAISDELL, JOSHUA JOE CORNELIUS, MELANIE ANN CORNELIUS, TERRY CORNELIUS, SARAH CORNELIUS, JARED CORNELIUS, BELA FRANKLIN PONYI, POSIE WILLIAMS, KENNETH WILLIAMS, PATRICIA PONYI, DEANDRE RUSH, BROOK GORDON CUMMINGS, NOVELLA DAWN CUMMINGS, ESTATE OF KYLE ARNOLD COLNOT, DENISE PAGE COLNOT, KIMBERLY ANNE HIESTAND, DONALD WAYNE FORBIS III, ZSUZSA TOTH, BENEDEK TOTH, TREVOR FORBIS, ATTILA TOTH, DYLAN FORBIS, RAHUL SHARMA, DAVID ERIC HENDRIX, KEITH ALLEN WEYER, ESTATE OF SAMUEL ERNEST PARLIN JR., CYNTHIA PARLIN, SHARONDA LAKESHA ANDERSON, THURSTON MOSES PARLIN, ESTATE OF MBUSI CELE, BORYANA TOVEVA CELE, ESTATE OF JOHANNES STRAUSS, JOEY PETRO STRAUSS, MATTHEW SCOTT RANDAZZO, LISA MARIE RANDAZZO, LOUIS RANDAZZO, JOSHUA RANDAZZO, ANDREA RANDAZZO, AUDREE ROSE RANDAZZO, DAVID MCDONALD SWAN, ANGELA MARIA SWAN, NATHAN MCDONALD SWAN, ELIZABETH THERESA SWAN, BRENDA LEE HALL, LOUIE DANIEL ROYBAL, SAUL AARON WEISS, SAMUEL DELMOND DAVIS, MAGGIE JOE DAVIS, DAMARI JAHYON DAVIS,

iv

| | |
|---|---|
| D.J.D., A MINOR, JASON DANIEL HARRINGTON, JANELLE HARRINGTON, TAYLOR HARRINGTON, ANDREW DAVID ROGERS, JULIE MARTIN, BRIAN MARTIN, THOMAS JOHN HOUSEWRIGHT, JAMES NEIL GRISSOM, ANDRES GARCIA, ROBERT  JEFFERY MCCANN, MICHALENA DANIELLE MCCANN, ROMAN M. MORAN III, ELENOR MARY PUOPOLO, ESTATE OF WILLIAM ROSS PUOPOLO, ANNA BERNARDINE FIDANZATO, FRANK MICHAEL PUOPOLO, ASH REED RICHIE, ALTY GEORGE JAHALAL, PHILLIPPA JOAN MYERS, KENDERIS JARIAN KING, CHRISTOPHER ANDREW HADSALL, ROBERT MARION WESTOVER JR., CHARLES ANTHONY HERNANDEZ JR., VIONETTE HERNANDEZ, MEGAN HERNANDEZ, CHARLES ANTHONY HERNANDEZ III, CHELSEA HERNANDEZ, WILLIAM MICHAEL MEYERS, VALERIE RENEE MEYERS, STEPHEN T. UDOVICH, ADAM STEPHEN UDOVICH, JW TAYLOR, GREGORY ALAN SEELY, KENDRA LYN SEELY, JOSHUA DEAN FEOLA, MATTHEW PAUL SCHAFFER, LUCIA ANN SCHAFFER, AMY JO FINNEGAN, MICHAEL BENJAMIN SIMS, RICHARD ALAN CRAWFORD, TONY THANH PHAM, TUYEN LE PHAM, DANTHU THI PHAM, LARRY L. KAIBETONEY JR., CHANI KAIBETONEY, LETA KAIBETONEY, ELI WAYNE DAVIS, KEITH LAMONT JOHNSON, ROY ESTRELLA, CHRISTOPHER CORDOVA VILLACERAN, JARED | |

WILLIAM BURGESS, ROBERT JOSEPH MITCHELL JR., ALEXANDER LESLIE NICOLL, ~~JARED WILLIAM BURGESS,~~ JAMES WESLEY ADAIR, RICHARD CHAD SANDERS, RICHARD TODD SANDERS, RALPH ERNEST ARZATE, DAVID LEROY MCGINNIS, BARBARA ANNE MCGINNIS, TREVOR FRANCIS MCGINNIS, SCOTT ANTHONY VIEIRA JR., KOREY PAUL KAUFMAN, <u>MCKAYLA RICHELLE DRUMMOND, CHELSEY ELIZABETH STORMS,</u> JOSEPH WILLIAM SELLMAN, EDGAR ESTEBAN <u>FUENTES, ADRIANA FUENTES, GERARDO</u> FUENTES, LAWRENCE ARTHUR PARKHILL, CHUDI OSMOND AREH, JAMES ISMAEL CASTANEDA, DONALD E.E. VANDERLIP II, KEVIN EDWARD DENTON, MICHAEL BENJAMIN SIMS, LEONARD ELI VIGIL III, GREGORY MARK BROWN, CAROLYN DENISE BROWN, S.L.B., A MINOR, STACIANN DUITSMAN, KYLIANN DUITSMAN, THERON RAYE DUITSMAN, KASILYN DUITSMAN, JASON BALLMAN, MONIQUE ORTIZ-WILLIAMS, JAMES GERALD ELLIOTT, DESMON KEITH COSS, JIMMY PRESTON LAUDERDALE JR., JIMMY LAUDERDALE SR., BOBBY LAUDERDALE, BRYAN CHRISTOPHER WATSON, ESTATE OF GREGORY RONALD GOODRICH, BARBARA GOODRICH, MICHAEL JAMES BACHMAN, SHAWN EDWARD KIRKPATRICK, JUSTIN WADE SMITH, RICHARD CLARENCE SMITH, LORIANN BIBBY, FABRIZZIO PANIMBOZA,

FABRICIO SEBASTTIAN
PANIMBOZA, LYDIA ISABEL
YOUNG, WILSON ALBERTO
PANIMBOZA MENDEZ, XAVIER
AUGUSTO PANIMBOZA MENDEZ,
MICHAEL TIMM, PETER BAAH,
MICHAEL J. LEVASSEUR JR.,
KIMBERLY LEVASSEUR, ZERICK
MCCLINN, MELISSA ODDEN, JAMI
HOWE, ESTATE OF JASON
KRISTOFFER CHAPPELL,
STEPHANIE R. DAVIS, ESTATE OF
CHRISTOPHER ALLEN GOLBY,
SONYA MARIE GOLBY, SEAN
FORD, ESTATE OF ERNESTO
MANUEL BLANCO, CARMEN
BLANCO-JIMENEZ, GARY
DWAYNE BETHEL, SCOTT
RICHARD PARKS,

(Addresses filed under Seal)

                    Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN
The Ministry of Foreign Affairs
Imam Khomeini Ave., United Nations St.
Tehran, Iran
1136914811

THE ISLAMIC REVOLUTIONARY
GUARD CORPS ("IRGC")
Armed Forces Headquarters Iran
Tehran – Zone 7 – Shariati
Ghoddoosi Square (Ghaar)
Tehran, Iran

IRANIAN MINISTRY OF
INTELLIGENCE & SECURITY
(a/k/a Vezarat-e Ettela'at Va Amniat-e
Keshvar a/k/a VEVAK a/k/a VAJA)
Second Negarestan St., Pasdaran Ave.
District 4, Tehran, Iran

vii

| | |
|---|---|
| BANK MARKAZI JOMHOURI<br>ISLAMI IRAN<br>(a/k/a the Central Bank of the Islamic<br>Republic of Iran)<br>No. 198<br>Mirdamad Boulevard<br>Mail Box: 15875/7177<br>Tehran, Iran<br><br>BANK MELLI IRAN<br>Ferdowsi Ave.<br>10 Building<br>Mail Box 11365.144<br>Tehran, Iran<br>1135931596<br><br>NATIONAL IRANIAN OIL COMPANY<br>Building No. 3<br>E. Roodsar St., and Ghafarzadeh<br>District 6<br>Tehran, Iran<br>1135931596<br><br>                    Defendants. | |

## **TABLE OF CONTENTS**

I.    NATURE OF THE CASE ............................................................... 2

II.   JURISDICTION AND VENUE ......................................................... 7

    1.    This Court Has Jurisdiction Over All Claims and All Parties. .................... 7

        A.  This Court May Exercise Jurisdiction over the Subject Matter of All Claims Asserted Herein. ......................................................... 7

           i. Foreign Sovereign Immunities Act ...................................... 7

        B.  This Court May Exercise Personal Jurisdiction over All Parties to this Action................................................................................. 8

    2.    Venue is Proper in this Court........................................................ 9

III.   LEGISLATIVE BACKGROUND.................................................................9

IV.    THE DEFENDANTS......................................................................................11

    1.   The Islamic Republic of Iran ......................................................11

    2.   Islamic Revolutionary Guard Corps ..........................................15

    3.   The Iranian Ministry of Intelligence & Security (MOIS)..........17

    4.   Bank Markazi Jomhouri Islami Iran ..........................................21

    5.   Bank Melli Iran ..........................................................................22

    6.   National Iranian Oil Company....................................................26

V.    FACTUAL ALLEGATIONS .........................................................................29

    1.   Iran's Long History of Materially Supporting And Encouraging Acts of
       International Terrorism ................................................................30

    2.   Iran's Sponsorship and Material Support of Terrorism in Iraq....37

    3.   Islamic Revolutionary Guard Corps—Qods Force (IRGC-QF) .................43

    4.   Hezbollah ....................................................................................47

    5.   Iran's Ministry of Defense and Armed Forces Logistics (MODAFL) .......54

    6.   Iran's Terrorism Network Fueled a Deadly Campaign of Terror that Targeted
       Americans in Iraq........................................................................56

    7.   Ansar al Islam .............................................................................60

    8.   Al Qaida Network .......................................................................65

        A.  Abu Musab Zarqawi and the Rise of Al Qa'ida in Iraq ("AQI")..........74

    9.   The Special Groups......................................................................83

        A.  The Badr Corps/Badr Organization ....................................88

        B.  Kata'ib Hizballah ...............................................................89

        C.  Jaysh al Mahdi & The Promised Day Brigades ..................96

        D.  Asa'ib Ahl Al Haq ..............................................................98

E. The Sheibani Network ................................................................ 100

10. Iranian Signature Weapons and Tactics Used in the Terrorist Attacks .... 104

A. Explosively Formed Penetrators ............................................ 105

B. Improvised Rocket Assisted Munitions .............................. 114

C. ~~iranian~~Iranian training & tactics ............................................. 115

11. Iran's Terrorism Network Was Used to Evade Economic Sanctions & Provide Support and Resources to Its Terrorist Agents/Proxies in Iraq ... 116

A. Islamic Republic of Iran Shipping Lines ............................ 117

B. Mahan Air ................................................................................ 121

C. National Iranian Oil Company (NIOC) .............................. 124

D. Khatam al-Anbiya Construction Company & The Headquarters for the Restoration of Holy Shrines ........................................ 125

VI. THE PLAINTIFFS & THE TERRORIST ATTACKS ................................ 133

1. ~~The April~~THE APRIL 9, 2007 ~~Attack – Baghdad, Baghdad Governorate~~ATTACK – BAGHDAD, BAGHDAD GOVERNORATE . 135

A. Plaintiffs The Ismael Galvan Solorio Family ................... 135

B. Plaintiff Anthony Larry ...................................................... 137

C. Plaintiffs The Brandon Mack Ware Family........................ 139

2. THE NOVEMBER 19, 2011 ATTACK – BAGHDAD,  BAGHDAD GOVERNORATE........................................................................ 141

A. Plaintiffs The Bradley Forrest Bibbins II Family .............. 141

3. THE JUNE 6, 2011 ATTACK – JSS LOYALTY, NEW BAGHDAD, BAGHDAD GOVERNORATE.................................................... 143

A. Plaintiffs The Christopher George Paulus _Family_............... 143

~~Family~~ ............................................................................................143

4. THE MAY 30, 2011 ATTACK – NORTH OF COB ADDER, NASIRIYAH....................................................................................... 144

A. Plaintiff Thomas Carl Gregory III .................................... 144

x

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Tab stops: Not at  1"

**Formatted:** Tab stops: Not at  1"

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** All caps

**Formatted:** All caps

**Formatted:** Tab stops: Not at  1"

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Tab stops: Not at  1"

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Tab stops: Not at  1"

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Tab stops: Not at  1"

**Formatted:** Font: Times New Roman, 12 pt

5.  THE MARCH 28, 2011 ATTACK – CAMP VICTORY, BAGHDAD... 146

    A.  Plaintiffs The Sam Kallabat Family............................................ 146

6.  THE FEBRUARY 16, 2011 ATTACK – ROUTE TOMATOES, NEAR SADR CITY, BAGHDAD................................................................. 148

    A.  Plaintiff Walter Leman Thomas ................................................ 148

7.  THE MAY 24, 2010 ATTACK – NUMANIYAH ................................. 149

    A.  Plaintiff Kenneth Dewayne Boyer ............................................ 149

8.  THE MAY 12, 2010 ATTACK – MANSOUR/KHARADA, BAGHDAD ...................................................................................... 150

    A.  Plaintiffs The Christopher Michael Wiese Family ............................ 150

Family ................................................................................... 150

9.  THE FEBRUARY 18, 2010 ATTACK – BAGHDAD GOVERNORATE ...................................................................................... 152

    A.  Plaintiffs the Jeffery Burton Family ......................................... 152

10.  THE JUNE 25, 2009 ATTACK – SHAAB AND UR, ADHAMIYAH DISTRICT, BAGHDAD.................................................................. 153

    A.  Plaintiff Kevin Guerra Garcia .................................................. 153

11.  THE JUNE 22, 2009 ATTACK – ABU GHRAIB, KARKH DISTRICT, BAGHDAD................................................................... 155

    A.  Plaintiff Sean Tanner Pham ..................................................... 155

12.  THE MAY 4, 2009 ATTACK – BASRA, BASRA GOVERNORATE... 156

    A.  Plaintiffs the Joseph Santolla Family........................................ 156

13.  THE FEBRUARY 24, 2009 ATTACK – MOSUL, NINEVEH GOVERNORATE.......................................................................... 158

    A.  Plaintiff Hewa Ahmed Mamand ............................................... 158

14.  THE JANUARY 20, 2009 ATTACK – FOB TALLIL, NASIRIYAH .... 159

    A.  Plaintiff David Wesley Tanner Jr. ........................................... 159

Formatted: Tab stops: Not at 1"

Formatted: Font: Times New Roman, 12 pt

15.    THE JANUARY 20, 2009 ATTACK – MOSUL, NINEVEH
GOVERNORATE...................................................................160

    A.  Plaintiffs The Harrison Keenan Elliff Family....................................160

    B.  Plaintiffs The James David Blehm Family ........................................162

16.    THE OCTOBER 16, 2008 ATTACK – BAQUBAH, DIYALA
GOVERNORATE...................................................................164

    A.  Plaintiffs The Brian Daniel Fifer Family ...........................................164

    B.  Plaintiffs The Robert Kent Mason Family..........................................165

17.    THE OCTOBER 10, 2008 ATTACK – ROUTE JACKSON, EAST
RASHEED DISTRICT, BAGHDAD ...............................................166

    A.  PlaintiffS The Baltazar Morin Jr. Family ..........................................166

18.    THE AUGUST 8, 2008 ATTACK – SADR CITY, BAGHDAD ............168

    A.  Plaintiffs The Joseph Louis Hereford Family.....................................168

19.    THE JULY 20, 2008 ATTACK – SADR CITY, BAGHDAD .................169

    A.  Plaintiff Travis Jay Terpstra .............................................................169

20.    THE MAY 3, 2008 ATTACK – AL KIFL, BABIL GOVERNORATE...171

    A.  Plaintiffs The Christopher Duane Moore Family ...............................171

    B.  Plaintiff Joshua James Nicholson .....................................................172

21.    THE MARCH 28, 2008 ATTACK – SADR CITY, BAGHDAD ...........174

    A.  PLAINTIFFS THE MOUNTAIN SPARROW ROBICHEAU .........174

    FAMILY............................................................................174

22.    THE MARCH 23, 2008 ATTACK – THE INTERNATIONAL ZONE,
BAGHDAD.........................................................................176

    A.  Plaintiffs The Roberto Leon Garcia Family.......................................177

    B.  Plaintiff Wilem Speed Wong ............................................................179

23.    THE MARCH 17, 2008 ATTACK – TAJI, BAGHDAD GOVERNORATE
........................................................................................179

A.  Plaintiff Philip Edward Lorenz .......................................... 179

24.      THE MARCH 12, 2008 ATTACK—TALLIL AIR BASE, DHI QAR
          GOVERNORATE ........................................................................... 181

          A.  Plaintiff Christopher Gene Lloyd ..................................... 181

25.      THE MARCH 3, 2008 ATTACK—SAFWAN, BASRA GOVERNORATE
          ........................................................................................................ 182

          A.  Plaintiffs Timothy Joseph O'Sullivan. SR & JOAN O'Sullivan ....... 182

26.      THE FEBRUARY 2, 2008 ATTACK—BAGHDAD, BAGHDAD
          GOVERNORATE ........................................................................... 184

          A.  Plaintiffs The Douglas James Ragone Family .................. 184

27.      THE NOVEMBER 27, 2007 ATTACK—BAQUBAH, DIYALA
          GOVERNORATE ........................................................................... 186

          A.  Plaintiff Semeli Toilolo .................................................... 186

28.      THE OCTOBER 31, 2007 ATTACK—SADR CITY, BAGHDAD ........ 187

          A.  Plaintiff Jeffrey Philip Ardoin ......................................... 187

29.      THE OCTOBER 7, 2007 ATTACK—JURF SAKHAR,
          ISKANDARIYAH, BABIL GOVERNORATE .................................. 188

          A.  Plaintiff Collin James Black ............................................ 188

30.      THE SEPTEMBER 19, 2007 ATTACK—KADHIMIYA, BAGHDAD . 189

          A.  Plaintiffs The Ronald Darris Fyffe Jr. Family ................. 189

31.      THE JULY 10, 2007 ATTACK—TAJI, BAGHDAD GOVERNORATE
          ........................................................................................................ 193

          A.  Plaintiff Katie Rebekah Pollard ....................................... 193

32.      THE JULY 5, 2007 ATTACK—NEAR JISR DIYALA, BAGHDAD
          GOVERNORATE ........................................................................... 195

          A.  Plaintiff Benjamin Michael Hamel ................................... 195

17.      THE AUGUST 8, 2008 ATTACK – SADR CITY, BAGHDAD ............ 168

          A.  Plaintiffs The Joseph Louis Hereford Family ................... 168

xiii

18.     THE JULY 20, 2008 ATTACK – SADR CITY, BAGHDAD ................169

        A.  Plaintiff Travis Jay Terpstra.............................................169

19.     THE MAY 3, 2008 ATTACK – AL KIFL, BABIL GOVERNORATE ..171

        A.  Plaintiffs The Christopher Duane Moore Family ...............171

        B.  Plaintiff Joshua James Nicholson .......................................172

20.     THE MARCH 28, 2008 ATTACK – SADR CITY, BAGHDAD............174

        A.  PLAINTIFFS THE MOUNTAIN SPARROW ROBICHEAU
        FAMILY ................................................................................174

21.     THE MARCH 23, 2008 ATTACK – THE INTERNATIONAL ZONE,
        BAGHDAD.................................................................................176

        A.  Plaintiffs The Roberto Leon Garcia Family........................177

        B.  Plaintiff Wilem Speed Wong...............................................179

22.     THE MARCH 17, 2008 ATTACK – TAJI, BAGHDAD GOVERNORATE
        ................................................................................................179

        A.  Plaintiff Philip Edward Lorenz ...........................................179

23.     THE MARCH 12, 2008 ATTACK – TALLIL AIR BASE, DHI QAR
        GOVERNORATE.......................................................................181

        A.  Plaintiff Christopher Gene Lloyd.........................................181

24.     THE MARCH 3, 2008 ATTACK – SAFWAN, BASRA GOVERNORATE
        ................................................................................................182

        A.  Plaintiffs Timothy Joseph O'Sullivan Sr. &  Joann O'Sullivan .........182

25.     THE FEBRUARY 2, 2008 ATTACK – BAGHDAD, BAGHDAD
        GOVERNORATE.......................................................................184

        A.  Plaintiffs The Douglas James Ragone Family .....................184

26.     THE NOVEMBER 27, 2007 ATTACK – BAQUBAH, DIYALA
        GOVERNORATE.......................................................................186

        A.  Plaintiff Semeli Toilolo.......................................................186

27.     THE OCTOBER 31, 2007 ATTACK – SADR CITY, BAGHDAD........187

xiv

A.  Plaintiff Jeffrey Philip Ardoin .............................................. 187

28.     THE OCTOBER 7, 2007 ATTACK – JURF SAKHAR,
ISKANDARIYAH, BABIL GOVERNORATE ................................. 188

A.  Plaintiff Collin James Black ........................................... 188

29.     THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA, BAGHDAD. 189

A.  Plaintiffs The Ronald Darris Fyffe Jr. Family ........................ 189

30.     THE AUGUST 5, 2007 ATTACK -- BAGHDAD..........................190

A.  Plaintiffs the Jeremy Campos Foreman Family ........................190

31.     THE JULY 10, 2007 ATTACK – TAJI, BAGHDAD GOVERNORATE
........................................................................................ 193

A.  Plaintiff Katie Rebekah Pollard ....................................... 193

32.     THE JULY 5, 2007 ATTACK – NEAR JISR DIYALA, BAGHDAD
GOVERNORATE.............................................................. 195

A.  Plaintiff Benjamin Michael Hamel ................................... 195

33.     THE JUNE 25, 2007 ATTACK – FOB KALSU, ISKANDARIYAH,
BABIL GOVERNORATE.................................................... 196

A.  Plaintiff Collin James Black ........................................... 196

34.     THE JUNE 24, 2007 ATTACK – TIKRIT, SALAH AL-DIN
GOVERNORATE.............................................................. 197

A.  Plaintiffs The John Steven Whitworth Family.................... 197

35.     THE JUNE 21, 2007 ATTACK –BAGHDAD – SHULA
NEIGHBORHOOD ........................................................... 199

A.  Plaintiffs The Raymond Nigel Spencer Jr. Family ............. 199

36.     THE JUNE 20, 2007 ATTACK – FALLUJAH.......................200

A.  Plaintiff Steven Richard Ybarra.................................... 200

37.     THE JUNE 13, 2007 ATTACK – AL-HAMAMIYAT, SALAH AL-DIN
GOVERNORATE.............................................................201200

A.  Plaintiff Marcus Adam Canseco ................................201200

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

Formatted: Tab stops: Not at  1"

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

xv

38.   THE MAY 26, 2007 ATTACK – BAGHDAD, AMIL NEIGHBORHOOD
......................................................................................................202

     A.  Plaintiff Eric Adams ................................................................ 202

39.   THE MAY 22, 2007 ATTACK – FALLUJAH ......................................204

     A.  Plaintiffs The Vince James Wright Jr. Family ................................. 204

40.   THE MAY 3, 2007 ATTACK – SALMAN PAK – BAGHDAD
     GOVERNORATE...............................................................................205

     A.  Plaintiffs The James Lee Foreman Family ..................................... 205

41.   THE MARCH 27, 2007 ATTACK – FALLUJAH..................................207

     A.  Plaintiffs The Zachary Kyle Sparks Family.................................... 207

42.   THE MARCH 2, 2007 ATTACK – RAMADI, AL ANBAR
     GOVERNORATE...............................................................................209

     A.  Plaintiffs The Christopher Mark McDuffie Family ........................... 209
     Family...............................................................................................209

43.   THE MARCH 1, 2007 ATTACK – NASIRIYAH, DHI
     QAR GOVERNORATE.......................................................................211

     A.  Plaintiff Keith Edward Walley .................................................... 211

44.   THE FEBRUARY 26, 2007 ATTACK – DIWANIYA ..........................212

     A.  Plaintiffs The Steven Raymond Roque Family ................................ 212

45.   THE FEBRUARY 22, 2007 ATTACK – RAMADI, AL ANBAR
     GOVERNORATE...............................................................................214

     A.  Plaintiffs The Christopher Brian Eckert Family .............................. 214

46.   THE FEBRUARY 19, 2007 ATTACK – CAMP TAJI, TARMIYAH,
     BAGHDAD GOVERNORATE.............................................................216

     A.  Plaintiffs The William Richard Seabreeze .................................... 216
     Family...............................................................................................216

47.   THE FEBRUARY 7, 2007 ATTACK – WEST RASHEED, BAGHDAD
     ......................................................................................................218

     A.  Plaintiff Brian Robert Schar....................................................... 218

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

Formatted: Tab stops: Not at  1"

Formatted: Tab stops: Not at  1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

Formatted: Tab stops: Not at  1"

Formatted: Tab stops: Not at  1"

Formatted: Space After:  0 pt

48.    THE FEBRUARY 3, 2007 ATTACK—ROUTE DOVER, SOUTH OF CAMP TAJI, BAGHDAD GOVERNORATE ...................................... 219

       A.   Plaintiffs The Ronnie Lee Sanders Family ................................ 219

49.    THE JANUARY 17, 2007 ATTACK—AMIN—BAGHDAD GOVERNORATE ...................................................................................... 220

       A.   Plaintiffs The Robert Christopher Ettinger .............................. 220
       Family ................................................................................................ 220

50.    THE DECEMBER 30, 2006 ATTACK—ROUTE FURNITURE, BAGHDAD ............................................................................................ 222

       A.   Plaintiff Gregory Allen Seymour ............................................... 222

51.    THE DECEMBER 19, 2006 ATTACK—RAMADI, AL ANBAR GOVERNORATE ...................................................................................... 223

       A.   Plaintiff Zachary Tyler Heath .................................................... 223

52.    THE DECEMBER 15, 2006 ATTACK—AMEL AND BAYAA NEIGHBORHOOD, WEST RASHEED, BAGHDAD ........................... 225

       A.   Plaintiffs The Robert K.P. Wetzel Family ................................. 225

53.    THE DECEMBER 4, 2006 ATTACK—JISR DIYALA, BAGHDAD GOVERNORATE ...................................................................................... 227

       A.   Plaintiff Brent Michael Hinson ................................................. 227

54.    THE NOVEMBER 29, 2006 ATTACK—TIKRIT, SALAH AL-DIN GOVERNORATE ...................................................................................... 228

       A.   Plaintiffs The Luis Carlos Rivera Family ................................. 228

55.    THE NOVEMBER 20, 2006 ATTACK—BASRA, BASRA GOVERNORATE ...................................................................................... 230

       A.   Plaintiff Michael Warren Wood .................................................. 230

56.    THE OCTOBER 17, 2006 ATTACK—ANAH, AL ANBAR GOVERNORATE ...................................................................................... 231

       A.   Plaintiff Jesus Eduardo Ferras ................................................. 231

57.    THE OCTOBER 16, 2006 ATTACK—AL ASAD, ANBAR GOVERNORATE ...................................................................................... 232

A. Plaintiff Joshua Travis Boykin ............................................................ 232

58. THE SEPTEMBER 9, 2006 ATTACK—FOB RUSTAMIYAH, SADR CITY, BAGHDAD ........................................................................................ 233

A. Plaintiffs The Jonathan Michael Casper Family ................................ 233

59. THE AUGUST 18, 2006 ATTACK—SOUTHERN BUHRIZ, DIYALA GOVERNORATE ......................................................................................... 235

A. Plaintiffs The Cory Russell Watson Family ........................................ 235

60. THE AUGUST 1, 2006 ATTACK—NORTH OF TAJI, SALAH AL-DIN GOVERNORATE ......................................................................................... 237

A. Plaintiff Christian Arthur Blaisdell ..................................................... 237

61. THE JULY 31, 2006 ATTACK—ASR LATINA, SOUTH OF AL HILLAH ....................................................................................................... 238

A. A. Plaintiffs The Joshua Joe Cornelius Family ................................... 238

62. THE JUNE 9, 2006 ATTACK—HIT, AL ANBAR GOVERNORATE .. 240

A. Plaintiffs The Bela Franklin Ponyi Family ......................................... 240

63. THE APRIL 30, 2006 ATTACK—MIQDADIYAH, DIYALA GOVERNORATE ......................................................................................... 241

A. Plaintiffs The Brook Gordon Cummings Family ................................. 241

64. THE APRIL 22, 2006 ATTACK—JURF AL SAKHAR, BABIL GOVERNORATE ......................................................................................... 243

A. Plaintiffs The Kyle Arnold Colnot Family .......................................... 243

65. THE APRIL 9, 2006 ATTACK—BABIL GOVERNORATE ................. 244

A. Plaintiffs The Donald Wayne Forbis III Family ................................. 244

66. THE FEBRUARY 7, 2006 ATTACK—HADITHA, AL ANBAR GOVERNORATE ......................................................................................... 246

A. Plaintiff Rahul Sharma ........................................................................ 246

67. THE JANUARY 31, 2006 ATTACK—RAWA, AL ANBAR GOVERNORATE ......................................................................................... 247

A. Plaintiff David Eric Hendrix ................................................................ 247

xviii

68. THE JANUARY 21, 2006 ATTACK—NORTH OF BI'AJ, NINEVEH GOVERNORATE .................................................................................. 249

A. Plaintiff Keith Allen Weyer .......................................................... 249

69. THE JANUARY 16, 2006 ATTACK—BAGHDAD, BAGHDAD GOVERNORATE .................................................................................. 250

A. Plaintiffs The Samuel Ernest Parlin Jr. Family............................. 250

70. THE DECEMBER 22, 2005 ATTACK—BUB AL-SHAM, BAGHDAD .................................................................................................... 251

A. Plaintiff The Estate of Mbusi Cele................................................ 251

B. Plaintiff The Estate of Johannes Strauss ...................................... 253

71. THE NOVEMBER 12, 2005 ATTACK—NW OF AMIRIYA, AL ANBAR GOVERNORATE .................................................................................. 255

A. Plaintiffs The Matthew Scott Randazzo Family ............................ 255

72. THE NOVEMBER 1, 2005 ATTACK—RAMADI, AL ANBAR GOVERNORATE .................................................................................. 257

A. Plaintiffs The David McDonald Swan Family................................ 257

73. THE OCTOBER 20, 2005 ATTACK—HIT, AL ANBAR GOVERNORATE .................................................................................. 258

A. PlaintiffS The Robert Justin Moultrie Family ............................... 258

74. THE OCTOBER 15, 2005 ATTACK—HADITHA, AL ANBAR GOVERNORATE .................................................................................. 260

A. Plaintiff Louie Daniel Roybal ...................................................... 260

75. THE OCTOBER 12, 2005 ATTACK—RAMADI, AL ANBAR GOVERNORATE .................................................................................. 261

A. Plaintiff Saul Aaron Weiss........................................................... 261

76. THE OCTOBER 12, 2005 ATTACK—AL WINDA, BAGHDAD ......... 262

A. Plaintiffs the Samuel Delmond Davis family ............................... 262

77. THE SEPTEMBER 19, 2005 ATTACK—RAMADI, AL ANBAR GOVERNORATE .................................................................................. 264

xix

A. Plaintiffs The Jason Daniel Harrington Family ................................ 264

B. Plaintiffs The David McDonald Swan Family .................................. 265

78. THE SEPTEMBER 11, 2005 ATTACK—DIYALA GOVERNORATE ........................................................................................ 267

A. Plaintiffs The Andrew David Rogers Family .................................. 267

79. THE AUGUST 23, 2005, ATTACK—RAMADI, AL ANBAR GOVERNORATE ................................................................................ 269

A. Plaintiff Thomas John Housewright ............................................... 269

80. THE AUGUST 9, 2005 ATTACK—BAGHDAD, BAGHDAD GOVERNORATE ................................................................................ 270

A. Plaintiff James Neil Grissom .......................................................... 270

81. THE APRIL 25, 2005 ATTACK—ABU GHRAIB, BAGHDAD GOVERNORATE ................................................................................ 271

A. Plaintiff Andres Garcia .................................................................. 271

82. THE APRIL 24, 2005 ATTACK—HIT, AL ANBAR GOVERNORATE ........................................................................................ 272

A. Plaintiffs The Adam Jeffery McCann Family ................................. 272

83. THE APRIL 5, 2005 ATTACK—SOUTHERN BAGHDAD ................. 273

A. Plaintiff Roman M. Moran III ........................................................ 273

84. THE APRIL 2, 2005 ATTACK—ABU GHRAIB, BAGHDAD GOVERNORATE ................................................................................ 275

A. Plaintiffs The William Joseph Puopolo Family .............................. 275

85. THE MARCH 30, 2005 ATTACK—OUTSIDE OF SCANIA ............... 276

A. Plaintiff Ash Reed Richie ................................................................ 276

86. THE MARCH 26, 2005 ATTACK—AR RUTBAH, AL ANBAR GOVERNORATE ................................................................................ 277

A. Plaintiffs The Alty George Jahalal Family .................................... 277

87. THE MARCH 18, 2005 ATTACK—SADR CITY, BAGHDAD ............. 279

xx

A.  Plaintiff Kenderis Jarian King ................................................279

88.   THE MARCH 5, 2005 ATTACK—HIT, AL ANBAR GOVERNORATE
   ....................................................................................................280

   A.  Plaintiff Christopher Andrew Hadsall .................................280

89.   THE FEBRUARY 22, 2005 ATTACK—RAMADI, AL ANBAR
   GOVERNORATE ........................................................................282

   A.  Plaintiff Robert Marion Westover Jr....................................282

90.   THE FEBRUARY 12, 2005 ATTACK—diyalA province, CAMP ECHO
   ....................................................................................................284

   A.  Plaintiffs The Charles Anthony Hernandez Jr. ....................284

   Family ........................................................................................284

91.   THE JANUARY 26, 2005 ATTACK—HADITHA, AL ANBAR
   GOVERNORATE ........................................................................286

   A.  Plaintiffs The William Michael Meyers Family ..................286

92.   THE JANUARY 17, 2005 ATTACK—IN VICINITY OF TAL AFAR,
   NINEVAH GOVERNORATE ......................................................288

   A.  Plaintiffs The Stephen T. Udovich Family ..........................288

93.   THE JANUARY 2, 2005 ATTACK—ASR AMY IN ROUTE TO FOB
   MCKENZIE, NORTHERN IRAQ ...............................................289

   A.  Plaintiff JW Taylor ..............................................................289

94.   THE DECEMBER 21, 2004 ATTACK—DINING FACILITY, FOB
   MAREZ, MOSUL..........................................................................290

   A.  Plaintiffs The Gregory Alan Seely Family ..........................292

   B.  Plaintiff Joshua Dean Feola .................................................294

   C.  Plaintiffs The Matthew Paul Schaffer Family .....................294

   D.  Plaintiff Michael Benjamin Sims .........................................296

   E.  Plaintiff Richard Alan Crawford...........................................297

   F.  Plaintiffs The Tony Thanh Pham Family..............................297

G.  Plaintiffs The Larry L. Kaibetoney Jr. Family...................................299

H.  Plaintiff Eli Wayne Davis .....................................................................300

I.  Plaintiff Keith Lamont Johnson .............................................................301

95.  THE NOVEMBER 17, 2004 ATTACK – FALLUJAH.............................302

A.  Plaintiff Roy Estrella ..............................................................................302

96.  THE NOVEMBER 15, 2004 ATTACK – FALLUJAH.............................303

A.  Plaintiff Christopher Cordova Villaceran ..............................................303

99.  THE NOVEMBER 12, 2004 ATTACK – FALLUJAH.............................311

A.  Plaintiff James Wesley Adair ..................................................................311

100.  THE NOVEMBER 12, 2004 ATTACK – FALLUJAH.............................312

A.  Plaintiffs The Richard Chad Sanders Family..........................................312

101.  THE NOVEMBER 12, 2004 ATTACK – FALLUJAH.............................313

A.  Plaintiff Robert Joseph Mitchell Jr. ........................................................313

102.  THE NOVEMBER 11, 2004 ATTACK – FALLUJAH.............................314

A.  Plaintiff Ralph Ernest Arzate ..................................................................314

103.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH...............................316

A.  Plaintiffs The Derek David McGinnis Family.........................................316

104.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH...............................317

A.  Plaintiff Scott Anthony Vieira Jr. ...........................................................317

105.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH...............................318

A.  Plaintiff Korey Paul Kaufman .................................................................318

106.  THE SEPTEMBER 14, 2004 ATTACK – FALLUJAH ...........................321

A.  Plaintiff Joseph William Sellman ...........................................................321

107.  THE AUGUST 16, 2004 ATTACK – AL KARMAH, AL......................323

ANBAR GOVERNORATE..................................................................................323

A.   Plaintiff Edgar Esteban Fuentes ............................................. 323

B.   Plaintiff Lawrence Arthur Parkhill ...................................... 324

108.   THE AUGUST 5, 2004 ATTACK—AL NAJAF, AL ANBAR ............ 326

GOVERNORATE ........................................................................................ 326

A.   Plaintiff Chudi Osmond Areh .............................................. 326

109.   THE JULY  13, 2004 ATTACK—AL QUAIM, AL ANBAR ................ 327

GOVERNORATE ........................................................................................ 327

A.   Plaintiff James Ismael Castaneda ......................................... 327

110.   THE JULY 7, 2004 ATTACK—CAMP FALLUJAH, AL ................ 328

ANBAR GOVERNORATE ......................................................................... 328

A.   Plaintiff Donald E.E. Vanderlip II ....................................... 328

B.   Plaintiff Korey Paul Kaufman ............................................. 329

C.   Plaintiff Robert Joseph Mitchell Jr. .................................... 330

111.   THE JULY 7, 2004 ATTACK—FALLUJAH .................................... 331

A.   Plaintiff Kevin Edward Denton ............................................ 331

112.   THE JULY 7, 2004 ATTACK—TAL AFAR, NINEVEH ................... 333

GOVERNORATE ........................................................................................ 333

A.   Plaintiff Joshua Dean Feola ................................................. 333

B.   Plaintiff Michael Benjamin Sims .......................................... 334

113.   THE JULY 1, 2004 ATTACK—RAMADI, AL ANBAR .................... 335

GOVERNORATE ........................................................................................ 335

A.   Plaintiff Leonard Eli Vigil III .............................................. 335

114.   THE JUNE 4, 2004 ATTACK—SADR CITY, BAGHDAD ............... 336

A.   Plaintiffs The Gregory Mark Brown Family ........................ 336

115.   THE MAY 29, 2004 ATTACK—RAMADI, AL ANBAR .................... 338

xxiii

GOVERNORATE ........................................................................................ 338

116.   THE MAY 19, 2004 ATTACK—RAMADI, AL ANBAR
       GOVERNORATE ................................................................................ 339

       A.   Plaintiff Jason Ballman ............................................................... 339

117.   THE MAY 14, 2004 ATTACK—FOB KALSU, BABIL
       GOVERNORATE ................................................................................ 341

       A.   Plaintiff The Felicia Flake Family ............................................. 341

118.   THE MAY 12, 2004 ATTACK—KARBALA, KARBALA
       GOVERNORATE ................................................................................ 342

       A.   Plaintiff James Gerald Elliott .................................................... 342

119.   THE APRIL 21, 2004 ATTACK—MAHMOUDIYA,  BAGHDAD
       GOVERNORATE ................................................................................ 343

       A.   Plaintiff Desmon Keith Coss ...................................................... 343

120.   THE APRIL 19, 2004 ATTACK—GHERAI'AT, BAGHDAD ............ 345

       A.   Plaintiffs The Jimmy Preston Lauderdale Jr.—Family ............ 345

121.   THE APRIL 9, 2004 ATTACK—"the good friday  ambush"—ABU
       GHRAIB, BAGHDAD GOVERNORATE ............................................ 346

       A.   Plaintiff Bryan Christopher Watson .......................................... 347

       B.   Plaintiffs The Gregory Ronald Goodrich—Family .................. 348

       C.   Plaintiff Michael James Bachman .............................................. 349

       D.   Plaintiff Shawn Edward Kirkpatrick ......................................... 350

122.   THE APRIL 8, 2004 ATTACK—FALLUJAH ................................... 351

       A.   Plaintiffs The Justin Wade Smith Family ................................. 351

123.   THE APRIL 4, 2004 ATTACK—"the black sunday  attack"—SADR
       CITY, BAGHDAD .............................................................................. 352

       A.   Plaintiffs The Fabrizzio Panimboza Family .............................. 354

       B.   Plaintiff Michael Timm ............................................................... 356

       C.   Plaintiff Peter Baah .................................................................... 357

xxiv

D.  Plaintiffs The Michael J. LeVasseur Jr. Family ................................. 358

124.   THE JANUARY 24, 2004 ATTACK – KHALIDIYAH, AL-ANBAR GOVERNORATE ................................................................................ 359

A.  Plaintiffs The Jason Kristoffer Chappell Family ............................ 359

125.   THE JANUARY 8, 2004 ATTACK – FALLUJAH ............................... 361

A.  Plaintiffs The Christopher Allen Golby Family ............................... 361

126.   THE DECEMBER 28, 2003 ATTACK – QARYAT ASH-SHABABI, SALAH AL-DIN GOVERNORATE ..................................................... 362

A.  Plaintiffs The Ernesto Manuel Blanco Family ................................. 362

127.   THE DECEMBER 23, 2003 ATTACK – 9 NISSAN DISTRICT, BAGHDAD ............................................................................................ 363

A.  Plaintiff Gary Dwayne Bethel ......................................................... 363

128.   THE NOVEMBER 2, 2003 ATTACK – FALLUJAH ......................... 364

A.  Plaintiff Scott Richard Parks ........................................................... 364

VII.  ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM ........................................................................................... 366

VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS ....... 368

IX.   CLAIMS FOR RELIEF ............................................................................... 369

PRAYER FOR RELIEF .............................................................................. 376

43.     THE MARCH 1, 2007 ATTACK – NASIRIYAH, DHI QAR GOVERNORATE .......................................................... 211

A.  Plaintiff Keith Edward Walley ....................................................... 211

44.     THE FEBRUARY 26, 2007 ATTACK – DIWANIYA .......................... 212

A.  Plaintiffs The Steven Raymond Roque Family ................................. 212

45.     THE FEBRUARY 22, 2007 ATTACK – RAMADI, AL ANBAR GOVERNORATE ................................................................................ 214

A.  Plaintiffs The Christopher Brian Eckert Family ............................... 214

xxv

46.     THE FEBRUARY 19, 2007 ATTACK – CAMP TAJI, TARMIYAH, BAGHDAD GOVERNORATE...................................................................216

        A.  Plaintiffs The William Richard Seabreeze Family ............................216

47.     THE FEBRUARY 7, 2007 ATTACK – WEST RASHEED, BAGHDAD ...........................................................................................................218

        A.  Plaintiff Brian Robert Schar..............................................................218

48.     THE FEBRUARY 3, 2007 ATTACK – ROUTE DOVER, SOUTH OF CAMP TAJI, BAGHDAD GOVERNORATE ..........................................219

        A.  Plaintiffs The Ronnie Lee Sanders Family .......................................2197

49.     THE JANUARY 17, 2007 ATTACK – AMIN – BAGHDAD GOVERNORATE...................................................................................220

        A.  Plaintiffs The Robert Christopher Ettinger Family............................220

50.     THE DECEMBER 30, 2006 ATTACK – ROUTE FURNITURE, BAGHDAD....................................................................................222

        A.  Plaintiff Gregory Allen Seymour......................................................222

51.     THE DECEMBER 19, 2006 ATTACK – RAMADI, AL ANBAR GOVERNORATE...................................................................................223

        A.  Plaintiff Zachary Tyler Heath ............................................................223

52.     THE DECEMBER 15, 2006 ATTACK – AMEL AND BAYAA NEIGHBORHOOD, WEST RASHEED, BAGHDAD ...........................225

        A.  Plaintiffs The Robert K.P. Wetzel Family ...........................................225

53.     THE DECEMBER 4, 2006 ATTACK – JISR DIYALA, BAGHDAD GOVERNORATE...................................................................................227

        A.  Plaintiff Brent Michael Hinson ........................................................227

54.     THE NOVEMBER 29, 2006 ATTACK – TIKRIT, SALAH AL-DIN GOVERNORATE...................................................................................228

        A.  Plaintiffs The Luis Carlos Rivera Family ...........................................228

55.     THE NOVEMBER 20, 2006 ATTACK – BASRA, BASRA GOVERNORATE...................................................................................230

A. Plaintiff Michael Warren Wood...........................................................230

56. THE OCTOBER 17, 2006 ATTACK – ANAH, AL ANBAR
GOVERNORATE...................................................................................231

A. Plaintiff Jesus Eduardo Ferras ........................................................231

57. THE OCTOBER 16, 2006 ATTACK – AL ASAD, AL ANBAR
GOVERNORATE...................................................................................232

A. Plaintiff Joshua Travis Boykin.........................................................232

58. THE SEPTEMBER 9, 2006 ATTACK – FOB RUSTAMIYAH, SADR
CITY, BAGHDAD ................................................................................233

A. Plaintiffs The Jonathan Michael Casper Family ...............................233

59. THE AUGUST 18, 2006 ATTACK – SOUTHERN BUHRIZ, DIYALA
GOVERNORATE...................................................................................235

A. Plaintiffs The Cory Russell Watson Family ......................................235

60. THE AUGUST 1, 2006 ATTACK – NORTH OF TAJI, SALAH AL-DIN
GOVERNORATE...................................................................................237

A. Plaintiff Christian Arthur Blaisdell....................................................237

61. THE JULY 31, 2006 ATTACK – ASR LATINA, SOUTH OF AL
HILLAH................................................................................................238

A. Plaintiffs The Joshua Joe Cornelius Family.......................................238

62. THE JUNE 9, 2006 ATTACK – HIT, AL ANBAR GOVERNORATE..240

A. Plaintiffs The Bela Franklin Ponyi Family ...........................................240

63. THE APRIL 30, 2006 ATTACK – MIQDADIYAH, DIYALA
GOVERNORATE...................................................................................2419

A. Plaintiffs The Brook Gordon Cummings Family................................241

64. THE APRIL 22, 2006 ATTACK – JURF AL SAKHAR, BABIL
GOVERNORATE...................................................................................24340

A. Plaintiffs The Kyle Arnold Colnot Family .........................................243

65. THE APRIL 9, 2006 ATTACK –BABIL GOVERNORATE .................244

A. Plaintiffs The Donald Wayne Forbis III Family .................................244

xxvii

66.    THE FEBRUARY 7, 2006 ATTACK – HADITHA, AL ANBAR
GOVERNORATE ................................................................................. 246

    A.  Plaintiff Rahul Sharma ..................................................................... 246

67.    THE JANUARY 31, 2006 ATTACK – RAWA, AL ANBAR
GOVERNORATE ................................................................................. 247

    A.  Plaintiff David Eric Hendrix ............................................................ 247

68.    THE JANUARY 21, 2006 ATTACK – NORTH OF BI'AJ, NINEVEH
GOVERNORATE ................................................................................. 249

    A.  Plaintiff Keith Allen Weyer ............................................................. 249

69.    THE JANUARY 16, 2006 ATTACK – BAGHDAD, BAGHDAD
GOVERNORATE ................................................................................. 250

    A.  Plaintiffs The Samuel Ernest Parlin Jr. Family ................................. 250

70.    THE DECEMBER 22, 2005 ATTACK – BUB AL-SHAM, BAGHDAD
............................................................................................................. 251

    A.  Plaintiffs The Mbusi Cele Family .................................................... 251

    B.  Plaintiffs The Johannes Strauss Family ........................................... 253

71.    THE NOVEMBER 12, 2005 ATTACK – NW OF AMIRIYA, AL ANBAR
GOVERNORATE ................................................................................. 255

    A.  Plaintiffs The Matthew Scott Randazzo Family ............................... 255

72.    THE NOVEMBER 1, 2005 ATTACK – RAMADI, AL ANBAR
GOVERNORATE ................................................................................. 257

    A.  Plaintiffs The David McDonald Swan Family ................................... 257

73.    THE OCTOBER 20, 2005 ATTACK – HIT, AL ANBAR
GOVERNORATE ................................................................................. 258

    A.  PlaintiffS The Robert Justin Moultrie Family ................................... 258

74.    THE OCTOBER 15, 2005 ATTACK – HADITHA, AL ANBAR
GOVERNORATE ................................................................................. 260

    A.  Plaintiff Louie Daniel Roybal ......................................................... 260

75.    THE OCTOBER 12, 2005 ATTACK – RAMADI, AL ANBAR
GOVERNORATE ................................................................................. 2618

xxviii

A.  Plaintiff Saul Aaron Weiss................................................................261

76.    THE OCTOBER 12, 2005 ATTACK – AL WINDA, BAGHDAD.........262

       A.  Plaintiffs the Samuel Delmond Davis family ..................................262

77.    THE SEPTEMBER 19, 2005 ATTACK – RAMADI, AL ANBAR
       GOVERNORATE................................................................................264

       A.  Plaintiffs The Jason Daniel Harrington Family ...............................264

       B.  Plaintiffs The David McDonald Swan Family..................................265

78.    THE SEPTEMBER 11, 2005 ATTACK –- DIYALA GOVERNORATE
       ...........................................................................................................267

       A.  Plaintiffs The Andrew David Rogers Family ...................................267

79.    THE AUGUST 23, 2005, ATTACK – RAMADI, AL ANBAR
       GOVERNORATE................................................................................269

       A.  Plaintiff Thomas John Housewright ...............................................269

80.    THE AUGUST 9, 2005 ATTACK – BAGHDAD, BAGHDAD
       GOVERNORATE................................................................................270

       A.  Plaintiff James Neil Grissom .........................................................270

81.    THE APRIL 25, 2005 ATTACK - ABU GHRAIB, BAGHDAD
       GOVERNORATE................................................................................271

       A.  Plaintiff Andres Garcia ..................................................................271

82.    THE APRIL 24, 2005 ATTACK – HIT, AL ANBAR GOVERNORATE
       ..........................................................................................................2729

       A.  Plaintiffs The Adam Jeffery McCann Family..................................272

83.    THE APRIL 5, 2005 ATTACK – SOUTHERN BAGHDAD.................273

       A.  Plaintiff Roman M. Moran III..........................................................273

84.    THE APRIL 2, 2005 ATTACK – ABU GHRAIB, BAGHDAD
       GOVERNORATE................................................................................275

       A.  Plaintiffs The William Joseph Puopolo Family ...............................275

85.    THE MARCH 30, 2005 ATTACK – OUTSIDE OF SCANIA...............276

xxix

A.  Plaintiff Ash Reed Richie ..................................................................276

86.    THE MARCH 26, 2005 ATTACK – AR-RUTBAH, AL ANBAR
       GOVERNORATE.......................................................................................277

       A.  Plaintiffs The Alty George Jahalal Family .........................................277

87.    THE MARCH 18, 2005 ATTACK – SADR CITY, BAGHDAD............279

       A.  Plaintiff Kenderis Jarian King ..........................................................279

88.    THE MARCH 5, 2005 ATTACK – HIT, AL ANBAR GOVERNORATE
       .................................................................................................................280

       A.  Plaintiff Christopher Andrew Hadsall ...............................................280

89.    THE FEBRUARY 22, 2005 ATTACK – RAMADI, AL ANBAR
       GOVERNORATE.......................................................................................282

       A.  Plaintiff Robert Marion Westover Jr...................................................282

90.    THE FEBRUARY 12, 2005 ATTACK – DIYALA PROVINCE, CAMP
       ECHO.......................................................................................................284

       A.  Plaintiffs The Charles Anthony Hernandez Jr. Family ......................284

91.    THE JANUARY 26, 2005 ATTACK – HADITHA, AL ANBAR
       GOVERNORATE.......................................................................................286

       A.  Plaintiffs The William Michael Meyers Family .................................286

92.    THE JANUARY 17, 2005 ATTACK – IN VICINITY OF TAL AFAR,
       NINEVAH GOVERNORATE .....................................................................288

       A.  Plaintiffs The Stephen T. Udovich Family ..........................................288

93.    THE JANUARY 2, 2005 ATTACK – ASR AMY IN ROUTE TO FOB
       MCKENZIE, NORTHERN IRAQ ..............................................................289

       A.  Plaintiff JW Taylor ............................................................................289

94.    THE DECEMBER 21, 2004 ATTACK – DINING FACILITY, FOB
       MAREZ, MOSUL.......................................................................................290

       A.  Plaintiffs The Gregory Alan Seely Family .........................................292

       B.  Plaintiff Joshua Dean Feola ..............................................................294

       C.  Plaintiffs The Matthew Paul Schaffer Family ...................................294

xxx

D.  Plaintiff Michael Benjamin Sims ................................................296

E.  Plaintiff Richard Alan Crawford ..............................................297

F.  Plaintiffs The Tony Thanh Pham Family ..................................297

G.  Plaintiffs The Larry L. Kaibetoney Jr. Family .........................299

H.  Plaintiff Eli Wayne Davis .......................................................300

I.   Plaintiff Keith Lamont Johnson ...............................................301

95.   THE NOVEMBER 17, 2004 ATTACK – FALLUJAH .........................302

A.  Plaintiff Roy Estrella ...............................................................302

96.   THE NOVEMBER 15, 2004 ATTACK – FALLUJAH .........................303

A.  Plaintiff Christopher Cordova Villaceran ................................303

97.   THE NOVEMBER 14, 2004 ATTACK – FALLUJAH ....................300

A.  Plaintiff Jared William Burgess…………………………….300

98.   THE NOVEMBER 13, 2004 ATTACK – FALLUJAH…………...302

A.   Plaintiff Robert Joseph Mitchell, Jr. …………………………302

B.   Plaintiff Alexander Leslie Nicoll………………………………303

C.   Plaintiff Jared William Burgess………………………………304

D.   Plaintiff Steven Richard Ybarra………………………………305

99.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH .........................311

A.  Plaintiff James Wesley Adair ...................................................311

100.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH .........................312

A.  Plaintiffs The Richard Chad Sanders Family ...........................312

101.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH .........................3139

A.  Plaintiff Robert Joseph Mitchell Jr. ........................................313

102.   THE NOVEMBER 11, 2004 ATTACK – FALLUJAH .........................314

A.  Plaintiff Ralph Ernest Arzate ..................................................314

xxxi

103.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH ..............................316

        A.  Plaintiffs The Derek David McGinnis Family....................................316

104.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH ..............................317

        A.  Plaintiff Scott Anthony Vieira Jr. ........................................................317

105.   THE NOVEMBER 9, 2004 ATTACK – FALLUJAH ..............................318

        A.  Plaintiff Korey Paul Kaufman .............................................................318

106.   THE OCTOBER 12, 2004 ATTACK -- SAMARRA, SALADIN
        GOVERNORATE…………………………………………………….316

        A.  THE MICHAEL RICHARD DRUMMOND FAMILY……………316

107.   THE SEPTEMBER 14, 2004 ATTACK – FALLUJAH ..........................321

        A.  Plaintiff Joseph William Sellman ........................................................321

108.   THE AUGUST 16, 2004 ATTACK – AL-KARMAH, AL ANBAR

        GOVERNORATE…………………………………………………….318

        A.  Plaintiffs The Edgar Esteban Fuentes Family....................................323

        B.  Plaintiff Lawrence Arthur Parkhill .....................................................324

109.   THE AUGUST 5, 2004 ATTACK – AL-NAJAF, AL ANBAR
        GOVERNORATE.................................................................................326

        A.  Plaintiff Chudi Osmond Areh .............................................................326

110.   THE JULY  13, 2004 ATTACK – AL QUAIM, AL ANBAR
        GOVERNORATE.................................................................................327

        A.  Plaintiff James Ismael Castaneda........................................................327

111.   THE JULY 7, 2004 ATTACK – CAMP FALLUJAH, AL ANBAR
        GOVERNORATE.................................................................................328

        A.  Plaintiff Donald E.E. Vanderlip II.......................................................328

        B.  Plaintiff Korey Paul Kaufman .............................................................329

        C.  Plaintiff Robert Joseph Mitchell Jr. ....................................................330

xxxii

112.    THE JULY 7, 2004 ATTACK – FALLUJAH..........................................331

        A.  Plaintiff Kevin Edward Denton ...............................................331

113.    THE JULY 7, 2004 ATTACK – TAL AFAR, NINEVEH
        GOVERNORATE.......................................................................333

        A.  Plaintiff Joshua Dean Feola ..................................................333

        B.  Plaintiff Michael Benjamin Sims...........................................334

114.    THE JULY 1, 2004 ATTACK – RAMADI, AL ANBAR
        GOVERNORATE.......................................................................335

        A.  Plaintiff Leonard Eli Vigil III ...............................................335

115.    THE JUNE 4, 2004 ATTACK – SADR CITY, BAGHDAD...................336

        A.  Plaintiffs The Gregory Mark Brown Family ...........................336

116.    THE MAY 29, 2004 ATTACK – RAMADI, AL ANBAR
        GOVERNORATE.......................................................................338

        A.  Plaintiffs The Daniel Raye Duitsman Family ………………….334

117.    THE MAY 19, 2004 ATTACK – RAMADI, AL ANBAR
        GOVERNORATE.......................................................................339

        A.  Plaintiff Jason Ballman................................................................339

118.    THE MAY 14, 2004 ATTACK – FOB KALSU, BABIL
        GOVERNORATE.......................................................................341

        A.  Plaintiff The Felicia Flake Family ........................................341

119.    THE MAY 12, 2004 ATTACK – KARBALA, KARBALA
        GOVERNORATE.......................................................................342

        A.  Plaintiff James Gerald Elliott...............................................342

120.    THE APRIL 21, 2004 ATTACK – MAHMOUDIYA,  BAGHDAD
        GOVERNORATE.......................................................................343

        A.  Plaintiff Desmon Keith Coss ...............................................343

121.    THE APRIL 19, 2004 ATTACK – GHERAI'AT, BAGHDAD .............345

        A.  Plaintiffs The Jimmy Preston Lauderdale Jr. Family.........................345

xxxiii

122. THE APRIL 9, 2004 ATTACK – "THE GOOD FRIDAY  AMBUSH" –
ABU GHRAIB, BAGHDAD GOVERNORATE ..................................346

    A.  Plaintiff Bryan Christopher Watson...................................347

    B.  Plaintiffs The Gregory Ronald Goodrich Family ..............348

    C.  Plaintiff Michael James Bachman .....................................349

    D.  Plaintiff Shawn Edward Kirkpatrick.................................350

123. THE APRIL 8, 2004 ATTACK – FALLUJAH ..........................351

    A.  Plaintiffs The Justin Wade Smith Family ..........................351

124. THE APRIL 4, 2004 ATTACK – "THE BLACK SUNDAY  ATTACK" –
SADR CITY, BAGHDAD............................................................3528

    A.  Plaintiffs The Fabrizzio Panimboza Family ....................35450

    B.  Plaintiff Michael Timm......................................................356

    C.  Plaintiff Peter Baah ...........................................................357

    D.  Plaintiffs The Michael J. LeVasseur Jr. Family..................358

125. THE JANUARY 24, 2004 ATTACK – KHALIDIYAH, AL  ANBAR
GOVERNORATE......................................................................359

    A.  Plaintiffs The Jason Kristoffer Chappell Family ................359

126. THE JANUARY 8, 2004 ATTACK – FALLUJAH....................361

    A.  Plaintiffs The Christopher Allen Golby Family..................361

127. THE DECEMBER 28, 2003 ATTACK – QARYAT ASH  SHABABI,
SALAH AL-DIN GOVERNORATE .........................................362

    A.  Plaintiffs The Ernesto Manuel Blanco Family...................362

128. THE DECEMBER 23, 2003 ATTACK – 9 NISSAN DISTRICT,
BAGHDAD...............................................................................363

    A.  Plaintiff Gary Dwayne Bethel...........................................363

129. THE NOVEMBER 2, 2003 ATTACK – FALLUJAH ..............364

    A.  Plaintiff Scott Richard Parks.............................................364

VII.  ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL

    TERRORISM.................................................................................366

VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS .......368

IX.   CLAIMS FOR RELIEF .........................................................................369

PRAYER FOR RELIEF .........................................................................376

**INDEX OF ACRONYMS**

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam (a/k/a Ansar al Sunna "AAS")

**AEDPA** – Antiterrorism and Effective Death Penalty Act of 1996

**AIO** – Aerospace Industries Organization

**AQ -** Al Qaida (a/k/a Al-Qaeda or Al-Qa'ida)

**AQI** – Al Qaida in Iraq (a/k/a Al-Qaeda in Iraq or Al-Qa'ida in Iraq)

**ASV** – Armored Security Vehicle

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, *et seq.*

**BAS –** Battalion Aid Station

**BBC** – British Broadcasting Company

**BFV** – Bradley Fighting Vehicle

**CBI –** Central Bank of Iran

**CENTCOM –** United States Central Command

**CID –** Criminal Investigative Command

**CISADA** – Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010

**CITP –** Counter Improvised Explosives Targeting Program

**COP –** Combat Outpost

**DFAC** – Dining Facility

**DIO** – Defense Industries Organization

**EFP** – Explosively formed penetrators

**FinCEN** – Financial Crimes Enforcement Network

**FOB** – Forward Operating Base

**FSIA** – Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq*.

**FTO** – Foreign Terrorist Organization

**HAMAS** – Ḥarakat al-Muqāwamah al-ʾIslāmiyyah Islamic Resistance Movement

**HMMWV** – High Mobility Multipurpose Wheeled Vehicle

**HRHS** – The Headquarters for the Restoration of Holy Shrines

**IAIO** – Iran Aviation Industries Organization

**IAV** – Interim Armored Vehicle

**ICEI** – Imensazen Consultant Engineers Institute

**IED** – Improvised explosive device

**IFV** – Infantry Fighting Vehicle

**IRAM** – Improvised Rocket Assisted Munition

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh"

**ITRSHRA** – Iran Threat Reduction and Syria Human Rights Act of 2012

**JAM** – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**KAA** - Khatam al-Anbiya Construction Company

**KH** – Kata'ib Hizballah

**KRG** – Kurdistan Regional Government

**LMTV** – Light Medium Tactical Vehicle

**LSA –** Logistical Support Area

**MNF-I** – Multi National Forces in Iraq

**MOD** – Ministry of Defense

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MOIS** – The Iranian Ministry of Intelligence and Security a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA"

**MRAP** – Mine-Resistant Ambush Protected

**MSR** – Main Supply Route

**MTC** – Medium Transport Company

**NIOC** – National Iranian Oil Company

**OFAC** – Office of Foreign Assets Control

**OP** – Observation Point

**PDB** – Promised Day Brigades

**PTSD** – Post Traumatic Stress Disorder

**QRF** – Quick Reaction Force

**RJF** – Reformation and Jihad Front

**RPG** – Rocket Propelled Grenade

**SAF** – Small arms fire

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National

**SDT** – Specially Designated Terrorist

**SG –** Special Group

**SVBIED** – Suicide Vehicle-Borne Improvised Explosive Device

**TBI** – Traumatic Brain Injury

**TTP** – Tactics, Techniques, and Procedures

**UBL** – Usama bin Laden

**VBIED** – Vehicle-Borne Improvised Explosive Device

**WMD** – Weapons of Mass Destruction

1

## I.     NATURE OF THE CASE

1.      The Islamic Republic of Iran, by and through the Co-Defendants, systematically provided material support and resources used to commit terrorist attacks against United States Servicemembers, contractors and nationals in Iraq.[1] Defendants' efforts began prior to the 2003 liberation of Iraq and continued through 2011. This material support included money, financial services, weapons, explosives, training, personnel, expert knowledge and assistance, safe haven, and operational support. ~~Defendants'~~Defendants used a network of state agencies, instrumentalities, including Iran's longtime operational proxy Lebanese Hizbollah, to distribute this support upon nine specific terrorist organizations operating in Iraq.

2.      Defendants' strategically distributed Iran's largesse amongst these organizations to disrupt the United Nations-sanctioned peacekeeping mission in Iraq, to corrupt Iraq's budding democracy, and to hasten the withdrawal of Coalition Forces from the region.

3.      Despite the ideological divide between Shia and Sunni Islamic jihadist groups, Iran backed both sects' most extreme adherents, who found common bond in the killing of Americans. Iran used these Iraq-based Sunni and Shia terrorist organizations as its brutally violent vanguard and supported them through a shared logistical, financial and materiel supply network orchestrated by the Co-Defendants.

4.      The Iranian-supported Sunni terrorist organizations operating in Iraq included Al Qaida, Al Qaida in Iraq/The Zarqawi Organization, and Ansar al Sunna/Ansar al Islam.

---

[1] As used herein, the terms "United States' nationals," "nationals of the United States," and "U.S. nationals" shall have the same meaning as set forth in the Immigration and Nationality Act, codified at 8 U.S.C. § 1101(a)(22), which defines the term "national of the United States" as ". . . (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."

5. The Iranian-supported Shia terrorist organizations operating in Iraq included the Badr Corp, Jaysh al-Mahdi, the Promised Day Brigades, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network (Coalition Forces collectively named these Shia militant organizations the "Special Groups.")

6. Hereinafter, these nine specific terrorist organizations are referred collectively as the "Terrorist Groups."[2]

7. The material support provided by Defendants was not only critical to the survival and growth of the Terrorist Groups, but significantly increased their capacity to commit terrorism and maximized the lethality of their attacks against Americans.

8. In order to fund this campaign of terror in Iraq, Iran directed its Co-Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI") and Bank Melli Iran, as well as the National Iranian Oil Company ("NIOC"), to conspire with an assortment of Western financial institutions to evade U.S. and international counterterrorism financing sanctions and money laundering safeguards.

9. Iran's use of these state-owned banks and businesses, with the knowledge and complicity of certain western Banks, allowed Defendants to conduct illicit trade-finance transactions, and illegally disguise financial payments to and from U.S. dollar-denominated accounts, which in turn, Iran used to fund, train, equip, and shelter the terrorist groups operating in Iraq.

10. Iran's terrorism network also included Defendant the Islamic Revolutionary Guard Corps ("IRGC," a U.S.-designated Foreign Terrorist Organization ("FTO") and its subdivision, the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF," a U.S.-designated Specially

---

[2] *See Fishbeck v. Islamic Republic of Iran*, 1:18-cv-2248-CRC, ECF Dkt. No. 127, at p. 2.

Designated Global Terrorist ("SDGT"); Defendant the Ministry of Intelligence and Security ("MOIS," an SDGT and Specially Designated National, "SDN"), and FTO Lebanese Hizbollah.

11.     The Terrorist Groups committed the acts of international terrorism[3] at issue in this Action (the "Terrorist Attacks"), and were materially and substantially supported, directly and/or indirectly, by officers and agents of Defendants within the course and scope of their offices and agencies of the government of Iran.

12.     The Terrorist Attacks intended, and indeed, resulted in the extrajudicial killing, maiming, and personal injuries to Plaintiffs and Plaintiffs' family members.

13.     This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (hereinafter "FSIA") for wrongful death, personal injury and related torts, brought by victims of the Terrorist Attacks killed or injured by the Terrorist Groups in Iraq from 2003 to 2011 (the "Relevant Period").[4]

14.     The Terrorist Attacks did not occur in the course of a declared war; or armed conflict between two or more nations; or an armed conflict between military forces of any origin.

15.     Defendants provided material support to the Terrorist groups to commit deliberated

---

[3] As used herein, the term "international terrorism" shall have the same meaning as set forth at 18 U.S.C. § 2331(1), which defines international terrorism as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

[4] Plaintiffs include surviving victims, the estates of those killed, and the representatives or family members of the United States' nationals, contractors, and members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were either killed or injured by Defendants and/or their agents in Iraq from 2003 to 2011 (the "Relevant Period").

killings that were not authorized by a previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Nor were these killings lawfully carried out under the authority of a foreign nation.

16.    Defendants served as a command, financial, and logistical conduit for various the Terrorist Groups and their activities, specifically including the Terrorist Attacks that killed or injured Plaintiffs and Plaintiffs' family members.

17.    Defendants knowingly supported the Terrorist Groups, and when doing so were fully aware of the groups' designations as terrorists. Iran encouraged and subsidized the Terrorist Groups' targeting of Americans in Iraq, such that terrorist attacks against Americans in Iraq, including Plaintiffs, by the Terrorist Groups were reasonably foreseeable and a natural consequence of Defendants' material support.[5]

18.    As detailed below, Iran directed millions of U.S. dollars in arms, weapons, equipment, and material to Hezbollah, MOIS, the IRGC, and the IRGC-QF, which, in turn, trained, armed, supplied, and funded the Terrorist Groups in carrying out their attacks against Plaintiffs and their family members.

19.    At all relevant times, Defendants intentionally, knowingly and/or recklessly provided material support to Al Qaida, Al Qaida in Iraq/The Zarqawi Organization, Ansar al Sunna/Ansar al Islam; the Badr Corp, Jaysh al-Mahdi, the Promised Day Brigades, Asa'Ib ahl al Haq, Kata'ib Hizballah, and the Sheibani Network, that engaged in acts of international terrorism against the United States and nationals of the United States, including Plaintiffs.

20.    In doing so, Defendants intentionally, knowingly and/or recklessly contributed substantial and material support and resources to persons and/or organizations who posed a

_____

[5] *See Fishbeck v. Islamic Republic of Iran*, 1:18-cv-2248-CRC, ECF Dkt. No. 127, at p. 2.

significant risk of committing acts of terrorism, which threatened the security of nationals of the United States.

21.     Defendants provided this material support to wage a focused and systematic terrorism campaign that targeted U.S. soldiers in Iraq. While Iran could have chosen to use legal diplomatic, political, and humanitarian efforts to influence the outcome of Iraq's emergence from the brutal regime of Saddam Hussein, it instead chose to shower its largesse upon designated Foreign Terrorist Organizations ("FTOs"), which used extraordinary violence to promote Iran's long-term regional goals.[6]

22.     While the Terrorist Attacks span time and location, each was the result of a singular objective, effectuated through a deliberately designed scheme, utilizing a well-organized system and furthering Defendants' common purpose—the extrajudicial killing and maiming of Americans, including Plaintiffs, to influence, intimidate, and affect the conduct and policies of the United States.[7]

23.     Defendants' material support was essential to the Terrorist Groups' operational capacities in Iraq from 2003 through 2011, which they used to commit the Terrorist Attacks against Plaintiffs.

24.     At all times relevant to this Action, including on the dates of the Terrorist Attacks and the date of the filing of this civil Complaint for compensatory, pecuniary, and punitive damages, The Islamic Republic of Iran was designated a State Sponsor of Terrorism for repeatedly providing

---

[6] *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 22 (D.D.C. 2019) ("Among Iran's foreign activities, its campaign in Iraq figures prominently.").

[7] *Id*., at 23 (detailing "the long-held Iranian desire to push the United States out of the Gulf region… while causing the United States continued setbacks in its efforts to promote democracy and stability there." (internal quotations omitted).

support for acts of international terrorism, including the Terrorist Attacks against Plaintiffs herein.

**II.     JURISDICTION AND VENUE**

25. Jurisdiction and venue are proper in this Court.

**1.  THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES.**

26.     This Court has jurisdiction over the subject matter of this Action and Defendants

pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and the FSIA, 28 U.S.C. § 1605(a)(2).

27.     This Court may exercise personal jurisdiction over all parties to this Action.

**A.    THIS COURT MAY EXERCISE JURISDICTION OVER THE SUBJECT MATTER OF ALL CLAIMS ASSERTED HEREIN.**

28.     This Court may exercise its original jurisdiction over claims against the Islamic

Republic of Iran pursuant to 28 U.S.C. § 1330(a). This is a nonjury civil action for relief in

personam in the form of money damages against a foreign state as defined in 28 U.S.C. § 1603(a)[8]

for personal injury or death that was caused by an act, extrajudicial killing, or the provision of

material support or resources for such an act.

***i.      Foreign Sovereign Immunities Act***

29.     28 U.S.C. § 1605A exempts the Islamic Republic of Iran from foreign sovereign

immunity because it is a designated State Sponsor of Terrorism. Further, 28 U.S.C. § 1605A(c)

provides a federal private right of action against a foreign state that is or was a State Sponsor of

Terrorism, and also against any official, employee, or agent of that foreign state while acting within

---

[8] 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality of a foreign state as any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country."  28 U.S.C. § 1603(a)–(b).

the scope of his or her office, employment or agency, for wrongful death, personal injury, and related torts.

  30. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act, and has renewed said designation annually.

  31. Iran was designated as a State Sponsor of Terror at all times during the Relevant Period.

  32. At all relevant times, Plaintiffs were 1) nationals of the United States; 2) members of the U.S. armed forces; 3) employees or contractors of the government of the United States acting in the scope of their employment; and/or 5) the legal representatives of a person described in 1 – 3, as defined under 28 U.S.C. § 1605A(c).

  33. None of the attacks alleged herein occurred within the territory of the Islamic Republic of Iran. This fact renders inapplicable the FSIA's requirement that Plaintiffs afford Defendants an opportunity to arbitrate.

   **B.** **THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL PARTIES TO THIS ACTION.**

  34. Plaintiffs consent to this Court's exercise of personal jurisdiction over them.

  35. This Court has jurisdiction over this matter and over the Defendants pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees and agents.

  36. This Court may exercise personal jurisdiction over the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(b) and the applicable exception to immunity in 28 U.S.C. § 1605A(a)(1). Together, these provide for personal jurisdiction over Iran and agents and

instrumentalities for claims arising under 28 U.S.C. § 1330(a) upon valid service of process under 28 U.S.C. § 1608.

37.     Further, that exercise of personal jurisdiction is reasonable; foreign sovereigns and their extensively controlled instrumentalities are not "persons" under the Fifth Amendment's Due Process Clause. That exercise of personal jurisdiction is consistent with the forum's manifest interest in providing effective means of redress for its residents.

### 2.  VENUE IS PROPER IN THIS COURT.

38.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

39.     Venue is proper in this district as to the Islamic Republic of Iran pursuant to 28 U.S.C. § 1391(f)(4), which provides that civil actions against a foreign state may be brought in the United States District Court for the District of Columbia.

### III.   LEGISLATIVE BACKGROUND

40.     This case is brought by and/or on behalf of U.S. nationals, members of the armed services and government employees/contractors, and/or family members of such persons who were injured and/or killed in certain acts of international terrorism caused by Defendants.

41.     Defendants materially and substantially supported Hezbollah, the Special Groups, Ansar al Islam, Al Qaida, and other terrorists for the purpose of killing, maiming, and/or otherwise injuring U.S. nationals, including Plaintiffs.

42.     In 1996, as part of the AEDPA, Congress amended the FSIA to allow U.S. victims of terrorism to sue designated State Sponsors of Terrorism, such as Iran, for their terrorist acts.[9] Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Public L. No. 110-181, members of the United States armed forces, employees of the U.S. government and individuals

---

[9]  28 U.S.C. § 1605A(a)(1).

performing a contract awarded by the United States Government, acting within the scope of the employee's employment may also bring private claims against State Sponsors of Terrorism.[10]

43.     Congress's purpose in lifting the sovereign immunity under the AEDPA was to "affect the conduct of terrorist states outside the U.S. [by promoting] safety of U.S. citizens who travel overseas."[11]

44.     As a result of the AEDPA, foreign states, such as Iran, cannot assert sovereign immunity where a victim claims money damages for personal injuries or death caused by, among other things, the provision of material support or resources.

45.     Pursuant to 28 U.S.C. § 1605A(a)(1), "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

46.     If a foreign state satisfies one of these, or the several other exceptions to immunity, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."[12]

47.     The FSIA provides an exception to sovereign immunity of foreign states where, inter alia, a foreign state is a designated state sponsor of terrorism (such as Iran) that has engaged in acts of international terrorism, and was so designated at the time of the alleged wrongful conduct

---

[10]  28 U.S.C. §1605A(c).
[11]  44B AM. JUR. 2D *International Law* § 140 (2013).
[12] 28 U.S.C. § 1606.

and is still so designated when the claim is filed.

48.     Specifically, the FSIA permits U.S. courts to maintain jurisdiction over a foreign state where that state engages in an act of terrorism or provides "material support or resources" to a terrorist organization.[13]

49.     The FSIA provides that Plaintiffs may bring an action against non-immune foreign states, such as Iran, in the United States District Court for the District of Columbia if the action is against a foreign state or political subdivision thereof.[14]

50.     The United States designation of the Islamic Republic of Iran as a State Sponsor of Terrorism was in full force and effect throughout the Relevant Time Period, and remains so today.

## IV.     THE DEFENDANTS

### 1.  THE ISLAMIC REPUBLIC OF IRAN

51.     Plaintiffs assert causes of action against Iran. The Islamic Republic directed, planned, and authorized acts of torture, extrajudicial killing, and hostage taking, and provided material support or resources to the Terrorist Groups so that they could commit the Terrorist Attacks, and for the specific purpose of causing extrajudicial killings in Iraq. Iran's actions proximately and directly caused the murders and injuries to Plaintiffs and Plaintiffs' family members in the Terrorist Attacks.

52.     Plaintiffs' deaths and injuries were a natural and probable consequence of Iran's actions as set forth herein. Moreover, such deaths and injuries should have been, and in fact, were foreseeable.

53.     At all times relevant to this Complaint, Iran is and was a foreign state within the

---

[13] *See* 18 U.S.C. § 2339A(b).

[14] 28 U.S.C. § 1391(f).

meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405.

54.     Iran provided material support and resources for the commission of acts of extrajudicial killing, torture and/or hostage taking within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attacks in which Plaintiffs were killed, injured, or maimed, and performed actions that caused the Terrorist Attacks and the harm to Plaintiffs herein.

55.     The Government of Iran is politically and ideologically hostile to the United States and its allies, and consistently provides material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through its Co-Defendants and the FTOs Hezbollah, Al Qaida and Ansar Al Islam. For decades, these FTOs have served as Iran's proxies and agents, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

56.     Throughout the entirety of the United States' liberation and subsequent peacekeeping mission to rebuild Iraq, Iran, through its Co-Defendants, supported a massive international terror campaign against Iraqi citizens and Coalition Forces, including Plaintiffs.

57.     As detailed herein, Iran provided funds, arms, equipment, and material support through Bank Melli Iran, Bank Markazi, NIOC, IRGC, IRGC-QF, and MOIS which, in turn, trained, armed, supplied and funded Hezbollah and the Terrorist Groups—Iran's terrorist agents in Iraq—in carrying out the attacks against Plaintiffs and their family members.

58.     Iran's efforts to kill and maim U.S. nationals in Iraq, and to thwart U.S. policy objectives in Iraq, were readily apparent and widely reported.

12

59.     In fact, Iran's role in funding militant groups that target and kill Coalition[15] and Iraqi forces and innocent American, British, Iraqi and other civilians was a matter of public record.

60.     For example, on October 5, 2005, at a press briefing at the Foreign Office in London, William Patey, the British ambassador to Baghdad, blamed the Islamic Revolutionary Guard for helping supply the technology and weapons which has been used in bomb attacks against British troops in the south which claimed the lives of eight British soldiers and two British civilians.

61. On October 10, 2005, the British Broadcasting Company ("BBC") reported that:

> An armour-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. *The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group,* although Tehran has denied this.

(Emphasis added.)

62.     The BBC followed this with multiple reports in 2006, describing the details from military briefings about Iran's material support to Shi'a militia groups that were targeting and killing British and U.S. forces in Iraq, including Plaintiffs.

63. For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily…

---

[15] "Coalition Forces" refers to the "[…]multinational force under unified command to take all necessary measures to contribute to the maintenance of security and stability in Iraq, including for the purpose of ensuring necessary conditions for the implementation of the timetable and programme as well as to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure[.]" *See* S.C. Res. 1511, ¶ 13, U.N. SCOR, U.N. Doc. S/RES/1511, at 3 (Oct. 16, 2003).

> … "Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.
>
> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people."
>
> "We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device] technology and training to Shia extremist groups in Iraq," he said.

64.     In another example, on September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of *Iranian markings* on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "*elements associated with the Iranian government*."

(Emphasis added).

65.     Iran, through its agents and instrumentalities, including Defendants herein, provided Explosively Formed Penetrators ("EFPs") Rockets, Improvised Explosive Devices ("IEDs"), and Smalls Arms along with other munitions, funding, training, and safe haven that were used to injure and/or kill Plaintiffs.

66.     Because Defendants routinely provided material support to the Terrorist Groups responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the activities of the Terrorist Groups, Iran is directly and/or vicariously liable for the personal injuries caused by the Terrorist Groups.

14

67.     Iran's malign influence within Iraq—including its provision of IEDs, mines, rockets, and similar explosive munitions — to both Shia and Sunni terrorist groups in Iraq has now been firmly established by numerous U.S. government reports, U.S. Treasury sanctions and Executive proclamations, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

## 2.  ISLAMIC REVOLUTIONARY GUARD CORPS

68.     The IRGC was founded in the wake of the 1979 revolution as a branch of the Iranian Armed Forces tasked with protecting the country's Islamic system. From the start, the IRGC was an ideologically driven militia that has exponentially grown its power within Iran's regime, and in turn, aggressively asserts a role in virtually every aspect of Iranian society. The IRGC is a special entity unto itself, part military force, part paramilitary force, and part business conglomerate. Its expanded social, political, military, and economic role has led many analysts to argue that its political power has surpassed even that of the Shi'a clerical system.

69.     The IRGC is comprised of five branches (Ground Forces, Air Force, Navy, Basij Militia, and Qods Force special operations IRGC-QF) in addition to a counterintelligence directorate and representatives of the Supreme Leader.

70.     Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

71.     The IRGC is a vast conglomerate. It controls Iran's missile batteries, its nuclear program, and a business empire.

72.     The IRGC is the spine of the current political structure and a major component in

15

the Iranian economy.[16] It has expanded well beyond its mandate into a socio-military-political-economic force that deeply penetrates Iran's power structure.[17] The IRGC is a central participant in Iran's concerted efforts to sow terror in Iraq.

73.      Even before the U.S. liberation of Iraq in 2003, the IRGC had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps (discussed in more detail below) that was headquartered in Iran in the 1980s and the 1990s.

74.      The IRGC's subversion of Iraq has not been limited to terrorism.

75.      The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

76.      The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

77.      According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq ... Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

78.      The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade EFPs, anti-tank guided missiles, and various rockets, such as the Fajr-5.

---

[16] Central Bank of the Islamic Republic of Iran, *General Information*, http://www.cbi.ir/page/GeneralInformation.aspx (last visited Sept. 12, 2017).

[17] Bruno Greg and Jayshree Bajoria, Iran's Revolutionary Guards, Council on Foreign Relations, Oct. 12, 2011.

79.     The IRGC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b~~).~~) and is owned and controlled by the government of Iran.

80.     Defendant Iran authorized, ratified, and approved the acts of its agency Defendant IRGC.

81.     Accordingly, Defendant Iran is vicariously liable for the acts of Defendant IRGC.

### 3.  THE IRANIAN MINISTRY OF INTELLIGENCE & SECURITY (MOIS)

82.     The Iranian Ministry of Intelligence and Security (a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA," hereinafter "MOIS") is located at Second Negarestan Street, Pasdarsan Avenue, Tehran, Iran.

83.     MOIS headquarters is a facility located in Tehran on the block bounded by Sanati Street on the West, 30th Street on the South, and Iraqi Street on the East.

84.     MOIS is the most powerful and well-supported ministry among all Iranian ministries in terms of logistics, finances, and political support. It is a non-military governmental organization that operates both inside and outside of Iran.

85.     MOIS functions as the Iranian Intelligence Service and, in this capacity, it is the secret police and primary intelligence agency of the Islamic Republic of Iran. It is the part of the Iranian government's security apparatus responsible for the assassination of Iranian political dissidents inside and outside the country.

86.     MOIS uses all means at its disposal to protect the Iran's Islamic "revolutionary" regime, utilizing such methods as infiltrating internal opposition groups, monitoring domestic threats and expatriate dissent, arresting alleged spies and dissidents, exposing conspiracies deemed threatening, and maintaining liaison with other foreign intelligence agencies as well as with organizations that protect the Islamic Republic's interests around the world.

87.     MOIS operates under the direct supervision of Iran's Supreme Leader, Ayatollah Khamenei, who claims to be the leader of the Muslim world. As noted above, MOIS agents are known as "Unknown Soldiers of Imam Zaman," who is the Twelfth Imam in the succession of Islamic leaders of Shi'a Muslims. However, the organization is not bound by Shi'a beliefs. To advance its goals, MOIS recruits individuals regardless of their beliefs.

88.     According to Iran's constitution, all organizations must share information with the Ministry of Intelligence and Security. The ministry oversees all covert operations. The IRGC and IRGC-QF Qods Force share all the information they collect with MOIS.

89.     MOIS and the IRGC-QF coordinate through foreign embassies, "charities," and cultural centers in targeted countries.

90.     Hezbollah is organizationally linked to MOIS, and is used by MOIS as a proxy in Iran's intelligence operations.

91.     In the Middle East, Iran, through MOIS and the IRGC-QF, uses Hezbollah to threaten the United States in Iraq and Afghanistan by backing insurgent groups, including Terrorist Groups who committed the Terrorist Attacks involving Plaintiffs.

92.     Specifically, MOIS acted as a conduit for Iran's provision of funds, training and direction to the Terrorist Groups for their terrorist activities beyond the borders of Iran including the actions relating to the Terrorist Attacks and Plaintiffs' injuries.

93.     MOIS and its agents have routinely been, and are presently designated by the U.S. Treasury as an SDN and SDGT, pursuant to Iranian Financial Sanctions Regulations ("IFSR"), including:

   a. Executive Order 13399 of April 25, 2006, *Blocking Property of Additional Persons in Connection with the National Emergency with Respect to Syria,* sanctioning entities and individuals that:

[H]ave been, involved in the planning, sponsoring, organizing, or perpetrating of: (A) the terrorist act in Beirut, Lebanon, that resulted in the assassination of former Lebanese Prime Minister Rafiq Hariri and the deaths of 22 others; or (B) any other bombing, assassination, or assassination attempt in Lebanon since October 1, 2004, that is related to Hariri's assassination or that implicates the Government of Syria or its officers or agents; (ii) to have obstructed or otherwise impeded the work of the Commission established pursuant to UNSCR 1595; (iii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any such terrorist act, bombing, or assassination attempt, or any person designated pursuant to this order; or (iv) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person designated pursuant to this order.

b.  Executive Order 13460 of February 13, 2008, *Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria*, sanctioning entities and individuals:

[R]esponsible for or otherwise significantly contributing to actions taken or decisions made by the Government of Syria *that have the purpose or effect of undermining efforts to stabilize Iraq* or of allowing the use of Syrian territory or facilities to undermine efforts to stabilize Iraq.

(Emphasis added).

c.  Executive Order 13553 of September 28, 2010, designating MOIS and its agents as an "IRAN-HR" entity, responsible for "serious human rights abuses by the government of Iran. In doing so the United States sought to sanction entities and individuals that:

"[Were] acting on behalf of the Government of Iran (including members of paramilitary organizations) who is responsible for or complicit in, or responsible for ordering, controlling, or otherwise directing, the commission of serious human rights abuses against persons in Iran or Iranian citizens or residents, or the family members of the foregoing, on or after June 12, 2009, regardless of whether such abuses occurred in Iran… materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, [such] activities described… or any person whose property and interests in property are blocked pursuant to this order; or... owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

d.  Executive Order 13606 of April 22, 2012, designating MOIS and its agents as an

19

"HRIT-IR" entity, responsible for "grave human rights abuses by the governments of Iran and Syria via information technology." In doing so, the United States sanctioned entities and individuals that:

> [P]rovided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran or Syria… [or] provided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran… [or] materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of [these] activities… [or] owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."

94.     MOIS has been involved in kidnappings, assassinations, and terrorism since its inception in 1985.

95.     Many of the U.S. State Department reports on global terrorism over the last twenty-five years refer to MOIS as Iran's key facilitator and director of terrorist attacks.

96.     In 1995 and again in 1996, Usama Bin Laden approached MOIS and asked to join forces against the United States. Bin Laden's phone records, obtained by U.S. investigators working on the U.S. embassy bombings in Kenya and Tanzania, show that 10 percent of phone calls made by Bin Laden and his lieutenants were to Iran.

97.     Seif al-Adl, one of AQ's top-ranking leaders at the time, was the liaison between Iranians and AQ; he coordinated meetings with the IRGC's leaders and MOIS officials.

98.     At all times relevant to this action, MOIS acted as an agent of Iran and performed certain acts within the scope of its agency within the meaning of 28 U.S.C. § 1603(b).

99.     U.S. federal courts have consistently held that the IRGC and the MOIS are parts of

the Iranian state itself.[18]

100.    Defendant Iran authorized, ratified, and approved the acts of Defendant MOIS.

101.    Accordingly, Defendant Iran is vicariously liable for the acts of Defendant MOIS.

### 4. BANK MARKAZI JOMHOURI ISLAMI IRAN

102.    Bank Markazi Jomhouri Islami Iran is the Central Bank of Iran. The Central Bank of Iran ("CBI") was established in 1960, and, according to its website, CBI is responsible for the design and implementation of Iran's monetary and credit policies.[19]

103.    CBI is headquartered in Tehran, Iran at Mirdamad Boulevard, No. 198, P.O. Box: 15875/7177.

104.    CBI has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks. For example, in a press release issued by the U.S. Treasury Department in 2007 regarding the designation of the Iranian-owned Bank Saderat as an SDGT, the U.S. Government noted that:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*. (Emphasis added.)

105.    According to the United States' Financial Crimes Enforcement Network ("FinCen"):

---

[18] *See e.g., Rimkus v. Islamic Republic of Iran*, 575 F.Supp.2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (~~both~~Both MOIS and IRGC must be treated as the state of Iran itself for purposes of liability); and *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 11, 105, 115–16 (D.D.C. 2005) (Bates, J.) (same).

[19] *Supra* note 14.

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

106.     CBI is an alter-ego and "agent and instrumentality" of the Iranian government and its Supreme Leader as defined by 28 U.S.C. § 1603, and it has routinely used Iranian banks like the other Defendant Iranian banks as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

107.     Defendant Iran authorized, ratified, and approved the acts of Defendant CBI.

108.     Accordingly, Defendant Iran is vicariously liable for the acts of Defendant CBI.

### 5. BANK MELLI IRAN

109.     Bank Melli Iran was established in 1927 by order of the Iranian Parliament. It is one of the largest banks in Iran.

110.     Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and, as discussed below, even now most are effectively controlled by the Iranian regime.

111.     Bank Melli Iran is headquartered at Ferdowsi Avenue 11354 (intersection between Jomhouri Avenue and Ferdowsi Avenue, District 12), Building 10, Tehran, Iran.

112.     Bank Melli Iran maintains a branch office in Germany, located at Holzbrücke 2, 20459 Hamburg, Germany.

113.     Bank Melli Iran is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

114.     As discussed in detail below, Bank Melli Iran is owned and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603(b)(2).

22

115.    Melli Bank Plc in London was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

116.    Melli Bank Plc was headquartered at 98a Kensington High Street, London, W8 4SG, United Kingdom and, in 2016, moved its head office to Dubai.

117.    The Chairman of Bank Melli Iran serves as the Chairman of the Board of Directors of Melli Bank Plc.

118.    Bank Melli Iran appoints all members of the Board of Directors of Melli Bank Plc.

119.    Melli Bank Plc is dominated and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603, and its property is subject to and available to satisfy any final judgment in this matter pursuant to 28 U.S.C. § 1610.

120.    According to the U.S. government, from 2004-2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained, armed, and funded terrorist groups that targeted and killed and maimed American and Iraqi forces and civilians.

121.    Specifically, according to the U.S. government:

> Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

122.    In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran and Melli Bank Plc were each designated as a SDN pursuant to Executive Order ("E.O.")

23

13382, and included on the Office of Foreign Assets Control's SDN list.20 The U.S. Treasury

Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

123.    A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices... When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

124.    According to the U.S. government, Bank Melli Iran provided banking services to

the IRGC-QF which trained, armed, and funded terrorist groups that targeted, killed, and maimed

American and Iraqi forces and civilians.

---

[20] "The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." *See* U.S. Department of the Treasury, *Terrorism and Financial Intelligence*, https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx (last visited Sept. 5, 2022).

125.     Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

126.     During the Relevant Time Period, Bank Melli Iran financed transactions that purposefully evaded U.S. sanctions on behalf of Mahan Air (an SDGT) and Iran's Ministry of Defense and Armed Forces Logistics.

127.     For example, Bank Melli issued a Letter of Credit to Mahan Airlines (an Iranian airline) in August 2004 to help Mahan Airlines illegally acquire aircraft engines subject to the U.S. embargo.

128.     Bank Melli's financial support and assistance to Mahan Airlines is particularly significant because on October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Airlines provides transportation, funds transfers and personnel travel services to the IRGC-QF."

129.     The U.S. Treasury Department explained Mahan Airline's direct involvement with terrorist operations, personnel movements, and logistics on the IRGC-QF's behalf:

> Mahan Air [has] facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.

25

> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

130. Mahan Airlines was also later identified as the conduit to Iran of thousands of radio frequency modules that were ultimately recovered by Coalition Forces in Iraq from IEDs and EFPs that were used to target Iraqi civilians, U.S. soldiers, and Coalition Forces, including some Plaintiffs herein.

131. In mid-2007, Bank Melli Iran's branch in Hamburg, Germany ("Bank Melli-Hamburg") transferred funds on behalf of Iran's Defense Industries Organization ("DIO").

132. As is further discussed below, DIO is an Iranian government-owned defense manufacturer whose name, logo, and/or product tracking information was stamped on munitions found in weapons caches that were seized from terrorist organizations in Iraq, including large quantities of weapons produced by DIO in 2006 and 2007 (e.g. 107-millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81-millimeter mortars).

133. Defendant Iran authorized, ratified, and approved the acts of Defendant Bank Melli Iran.

134. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant Bank Melli Iran.

### 6. NATIONAL IRANIAN OIL COMPANY

135. The National Iranian Oil Company ("NIOC") is owned and overseen by the Government of Iran through its Ministry of Petroleum, and is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.

136. NIOC is headquartered at Roodsar Street No. 18, Tehran, Iran.

26

137.     NIOC is an "agency or instrumentality" of the Government of Iran as defined by 28 U.S.C. § 1603(b).

138.     In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]."

139.     Pursuant to E.O. 13382, the U.S. Government designated NIOC as an SDN.

140.     The U.S. Government has identified NIOC as an agent or affiliate of the IRGC.

141.     In September 2012, the U.S. Treasury Department handed its report to Congress regarding its determination that NIOC is an agent or affiliate of the IRGC. The report provided that:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012. NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.
>
> Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia [sp], a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

142.     As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbiya has obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

143.     Under the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), the U.S. government determined that that NIOC is an agent or affiliate of the IRGC

27

under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") and section 302 of ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

144.     In addition, the ITRSHRA provided that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[21]

145.     After the events giving rise to the claims herein, the U.S. government withdrew this determination as of 2016.

146.     NIOC used its oil and natural gas business to launder money for the IRGC, often using Defendant Central Bank of Iran for this purpose.

147.     In 2009, West Point's Combating Terrorism Center published a report on the role of NIOC, particularly in the Maysan province in Iraq (Southeast border between Iran and Iraq), and its role in studying U.S. troops movements:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents ... The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of the Iranian border. This part of the border is increasingly the scene of U.S. and Iranian countermoves to support their proxies and patrol the frontier; Iranian intelligence gathering takes place using National Iranian Oil Company helicopters and border guards, while U.S.-Iraqi helicopter-borne joint patrols provide moral and material support to isolated Iraqi border posts and local communities.

148.     Thus, NIOC served a critical function in funding and supporting the IRGC's

---

[21] U.S. Department of the Treasury, *Sanctions*, *See*, https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf (last visited Sept. 12, 2017).

activities.

149.    NIOC also obtained letters of credit from western banks to provide financing and credit to the IRGC.[22]

150.    Defendant Iran authorized, ratified, and approved the acts of Defendant NIOC.

151.    Accordingly, Defendant Iran is vicariously liable for the acts of Defendant NIOC.

**V.      FACTUAL ALLEGATIONS**

152.    "International terrorism is a serious and deadly problem that threatens the vital interests of the United States. … It affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States' citizens, as well as foreign visitors to the United States." [23]

153.    The United States has a clear interest in combating terrorism and protecting its nationals within its borders and abroad.

154.    Iran committed and continues to commit violent attacks against U.S. nationals. Iran commits these attacks via proxy terrorist organizations.

155.    According to the CIA, Iranian leaders view terrorism as an important instrument of foreign policy they use both to advance national goals and to export the regime's Islamic revolutionary ideals.[24]

156.    Further, Iran supports and directs terrorist operations by Hezbollah and desires to

---

[22] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

[23] Justice Against Sponsors of Terrorism Act, §§ 2(a)(1)-(2), Pub. L. 114-222 (2016).

[24] Central Intelligence Agency, Directorate of Intelligence, *Iran: The Uses of Terror*, (Oct. 22, 1987 (approved for release June 1999)), https://www.cia.gov/library/readingroom/docs/DOC_0000259360.pdf.

keep the United States and U.S. nationals as primary terrorist targets.[25]

157.     In June 2007, U.S. Department of State Spokesman, Sean McCormack, delivered a press briefing on Iran's ties to international terrorism. When asked, "What sort of actions Iran could make to bring about a more stable Iraq?" He responded, "Well, for starters, stop supplying money, technology, and training for people who are trying to kill our troops. ... They can stop funding those individuals and groups who are trying to stoke sectarian tensions in Iraq."[26] (Emphasis added).

### 1.  IRAN'S LONG HISTORY OF MATERIALLY SUPPORTING AND ENCOURAGING ACTS OF INTERNATIONAL TERRORISM

158.     For decades, Iran has commodified international terrorism, turning the financing, equipping and training of terrorist organizations (including the Terrorist Groups operating in Iraq) into a comparative advantage for "exporting" its brand of Islamic revolutionary ideals and as a force-multiplier when wielding its power in the region.

159.     Iran has a history of financing, supporting and training terrorists and their affiliates in the perpetration of terrorist attacks against the United States, its citizens and its allies. For example, Hon. Judge John D. Bates found in a lawsuit brought by U.S. victims of the bombing of the U.S. embassies in Nairobi and Dar es Salaam that, "[s]upport from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings…Prior to its meetings with Iranian officials and agents, al Qaeda did not possess the technical expertise required to carry out the embassy bombings."[27]

---

[25] *Id*.

[26] U.S. Department of State, *Sean Womack Daily Press Briefing* (June 27, 2007), https://site-894736.bcvp0rtal.com/detail/videos/archive/video/1807599216/daily-briefing---june-27-2007.

[27] *Wamai v. Republic of Sudan et. al*., No. 1:08-cv-01349-JDB-JMF (D. D.C. Nov. 30, 2011), Memorandum Opinion at 13–14, ECF No. 55.

160.    Similarly, Iran's generous support to the Terrorist Groups in Iraq critically enhanced their operational capacity and sophistication in committing acts of terrorism against Iraqi citizens, Coalition Forces and U.S. nationals, including Plaintiffs.

161.    Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, hostage-taking torture, extrajudicial killings, and assassinations across the globe.

162.    On January 19, 1984, the United States designated Iran a State Sponsor of Terrorism. That designation has remained in force throughout the Relevant Period to this Action.

163.    Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism receive such a designation pursuant to three laws: (1) section 6 (j) of the Export Administration Act; (2) section 40 of the Arms Export Control Act; and (3) section 620A of the Foreign Assistance Act.

164.    Taken together, the main categories of sanctions resulting from designation under these authorities include: (1) restrictions on U.S. foreign assistance; (2) a ban on defense exports and sales; (3) certain controls over exports of dual use items; and (4) miscellaneous financial and other restrictions.

165.    Designation under the above-referenced authorities also implicates other sanction laws that penalize persons and countries engaging in certain trade with state sponsors. Currently there are four recidivist countries designated under these authorities: Iran, North Korea, Cuba, and Syria.[28]

166.    In Iraq, the policies of Iran have been largely successful, "giving Iran an

---

[28] U.S. Department of State, *State Sponsors of Terrorism*,
https://www.state.gov/j/ct/list/c14151.htm (last visited Sept. 5, 2022).

unprecedented degree of influence there at the expense of the United States…" An Iran-friendly Iraq "serves as an opportunity for Iran to evade the increasingly harsh international sanctions regime and to continue financing [FTOs]."[29]

167.   Iran avoided being overtly implicated in acts of international terrorism against U.S. nationals in Iraq by acting through co-conspirators and/or agents, and rewarding its proxies with additional support and cash bounties for specifically targeting and killing U.S. nationals and destroying American vehicles.

168.   Iranian diplomatic, political, and economic networks within Iraq are highly developed and closely linked both to Hezbollah and to the IRGC-QF.

169.   Unclassified Iraqi government Harmony records, collated by the Combating Terrorism Center at West Point, as well as information provided to the Coalition Forces through interrogation of detainees of the Shiite militias, illustrate how Iran sponsored terrorist groups, directly and through Hezbollah (Iran's proxy for more than 30 years), operated in Iraq, including supporting and directing the terrorist groups responsible for the Terrorist Attacks which killed or injured Plaintiffs or their family members.

170.   Planning and preparation by Iran and its agents, including Hezbollah, for their active involvement in supporting terrorist groups and encouraging sectarian violence in Iraq has been underway since at least 2002.

171.   At least as early as the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its

---

[29] Frederick W. Kagan et. al., *Iranian Influence in the Levant, Egypt, Iraq, and Afghanistan*, at 6 (May 2012), http://www.aei.org/wp-content/uploads/2012/05/-iranian-influence-in-the-levant-egypt-iraq-and-afghanistan_171235465754.pdf.

diplomatic, political, and economic ambitions.

172.    When Coalition Forces liberated Iraq in 2003, Iran's IRGC formed the counter-Coalition Ramazan Corps and ordered it to attack U.S. and Iraqi forces. Saddam Hussein's 24-year rule ended on April 9, 2003. The U.S. Department of State reported that, shortly thereafter, individuals with ties to the IRGC may have attempted to infiltrate southern Iraq and elements of the Iranian regime helped members of AAI transit and find safe haven in Iran.

173.    In a Friday prayers sermon in Tehran in May 2003, Secretary General of Iran's powerful Guardian Council Ayatollah Ahmad Jannati publicly encouraged Iraqis to stage and participate in suicide operations against U.S. nationals, including Plaintiffs and Coalition Forces.[30] He went on to encourage the so-called "holy fighters" to "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."[31]

174.    In October 2003, according to the U.S. Defense Intelligence Agency's Joint Intelligence Task Force, U.S. intelligence officials learned that Hezbollah had been planning to set up a resistance movement that would cause mass casualties in Iraq. "Should such mass casualty attacks be considered," the task force wrote, "they [Hezbollah] must first receive approval from Iran."[32]

175.    Soon after the invasion, American intelligence officers gathered information showing that Hezbollah was aiding Iran in gathering intelligence in Iraq on American and British

---

[30]  U.S. *Department* of State, Office of the Coordinator for Counterterrorism, *Patterns of Global Terrorism* (Apr. 29, 2004) http://www.state.gov/j/ct/rls/crt/2003/31644.htm.

[31]  Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[32] Pound, *supra* note 37.

troops, and sending the information to Qods Force commanders in Iran.

176.    U.S. CENTCOM assessed that the Iranians "do not want the U.S. and the coalition to focus attention on Iranian support for terrorist networks or other anti-coalition activities they're involved with," and that "Iran is also trying to ensure it has a great deal of influence in Iraq, and one way of doing that is to supply weapons to anti-coalition groups."[33]

177.    Iranian agencies put the intelligence they gathered to practical use, planning, funding, and training groups to commit attacks in Iraq. In November of 2003, the Iraq Survey Group ("ISG") received information that Iran had formed small groups of fighters to conduct attacks in cities across Iraq. "Iran had reportedly placed a bounty on U.S. forces of U.S. $2,000 for each helicopter shot down, $1,000 for each tank destroyed, and $500 for each U.S. military personnel killed," the ISG reported.[34]

178.    The ISG report further detailed that a senior Iranian cleric in Tehran set up a special 100-member army, known as al Saqar ("eagle" in Arabic), to assassinate high ranking U.S. Officials in Iraq and carry out other terrorist attacks. According to the ISG, The Eagle Army had trained for 30 days at an Iranian terrorist camp.

179.    On December 4, 2003, according to U.S. Intelligence reports, Iranian agents moved 1,000 rocket-propelled grenades and seven boxes of TNT from western Iran to Iraqi resistance groups. A week later, Iran's Qods Force moved military-grade weapons into Iraq in a truck loaded with cement bags under which the arms were hidden. Later that month, Iran drove a red fruit truck- a cover for a consignment of arms, including RPGs, mortars, and Kalashnikov rifles--across the border into Iraq.

---

[33] *Id.*
[34] *Id.*

180.     By January 2004, Hezbollah had some 800 operatives in Iraq, including assassination and sabotage teams.

181.     At the time, a U.S. Special Operations task force wrote that, "The Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S." Other U.S. Intelligence corroborated this, finding that "Hezbollah and Ansar al-Islam were among the most active groups in Iraq, although al Qaeda operatives also were believed to be operating there soon after the invasion."[35]

182.     American and British intelligence concluded that Ansar al-Islam was working closely with Iran, and also al Qaeda, in its terrorist attacks against Coalition Forces. A British defense report noted, "Some elements [of Ansar al-Islam] remain in Iran. Intelligence indicates that elements" of Iran's Islamic Revolutionary Guard Corps "are providing safe haven and basic training to Iran-based AI [Ansar al-Islam] cadres."[36]

183.     A separate report from the British Secret Intelligence Service said that Iranian government agencies were also secretly helping Ansar al-Islam members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces. There were also multiple American intelligence reports identifying Iran as a chief supporter of Ansar al-Islam. U.S. intelligence received information that an Iranian was aiding Ansar al-Islam "on how to build and set up" improvised explosive devices, while at the time U.S. CENTCOM assessed that "AI [Ansar al-Islam] is actively attempting to improve IED effectiveness and sophistication."[37]

184.     In 2005, the Department of State reported that Iran was a safe haven in that known

---

[35] *Id.*
[36] *Id.*
[37] *Id.*

terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.[38]

185.    In 2008, William Burns, U.S. Undersecretary of State for Political Affairs, testified before Congress that it is "Iran's… support for terrorist groups…its efforts to sow violence and undermine stability in Iraq and Afghanistan, including lethal support for groups that are directly responsible for hundreds of U.S. casualties."[39]

186.    As recently as 2015, the State Department stated that "Iran's state sponsorship of terrorism worldwide remained undiminished through the … IRGC-QF, its Ministry of Intelligence and Security, and Tehran's ally Hezbollah, which remained a significant threat to the stability of Lebanon and the broader region."[40]

187.    After the U.S. entered Iraq in 2003, Iran bolstered insurgent groups there—both Sunni and Shia—as they targeted Coalition Forces, Iraqi security forces, and the Iraqi government itself. Iran has often backed opposing parties and movements to secure its interests. By doing so, Iran has been able to rely on different terrorist groups for different activities, increasing Iran's ability to pursue its overarching goals. In October 2017, President Donald Trump stated:

> In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor

---

[38] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 200,* at 21 (2006), https://www.state.gov/documents/organization/65462.pdf.

[39] *U.S. Policy Towards Iran: Hearing Before S. Comm. on Foreign Relations and H. Comm. on* Foreign *Affairs*, 110th Cong. (July 9, 2008) (testimony of William J. Burns, Undersecretary for Political Affairs, U.S. Department of State), https://2001-2009.state.gov/p/us/rm/2008/106817.htm.

[40] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country* Reports *on Terrorism 2015*, at 166 (June 2016), https://2009-2017.state.gov/j/ct/rls/crt/2015/index.htm.

of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks.[41]

### 2. IRAN'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM IN IRAQ

188.    Iran is the world's foremost exporter of global terrorism, and uses various FTOs as its agents or proxies to distribute this deadly product around the globe.

189.    Iran hedges its support across multiple, sometimes adversarial, proxies and violent non-state militant groups that are coordinated through Hezbollah, MOIS, and the IRGC. Iran's agents advise or embed with its proxy groups, often masked by purported charitable, business, or diplomatic "font" companies, giving Iran the cover necessary to authorize, plan, and commit terrorist attacks, including those that killed or injured Plaintiffs or members of Plaintiffs' families.

190.    Iran's diversification of the recipients in it material support worked to solidify an operational nexus between the Terrorist Groups—al Qaeda ("AQ"), al Qaeda in Iraq ("AQI"), Ansar al Islam/Ansar al Sunna ("AAI/AAS"), Hezbollah, The Badr Organization/Badr Corps, Iraq-based Shia Militia Jaysh al-Mahdi ("JAM") and its splinter cells  known as "Special Groups" (including the Promised Day Brigades ("PDB"), Kata'ib Hezbollah (KH), Asa'ib Al Haq ("AAH"), and The Sheibani Network ("SN")).

191.    These terrorist groups were components of Iran's terrorism network in Iraq and perpetrated the attacks against Plaintiffs, and Iranian support for these groups was official policy of the Iranian government.

192.    Officials at the highest levels and within the course and scope of their positions within the Islamic Republic's state structure knew and approved of Defendants' conduct and participation in Iran's material support given to each of these terrorist groups.

---

[41] "Remarks by President Trump on Iran Strategy," The White House (October 13, 2017).

193.    With the assistance of Defendants NIOC, Bank Melli, and Bank Markazi, Iran provided the Terrorist Groups material support primarily through the IRGC, the IRGC-QF, MOIS, and Iran's Lebanon-based terror proxy, Hezbollah. These entities worked directly and indirectly with the Terrorist Groups that perpetrated the attacks against Plaintiffs in Iraq.

194.    At various times, multiple U.S. agencies have designated these entities as Specially Designated Terrorist ("SDT") entities and/or Foreign Terrorist Organizations ("FTO"). Numerous references to such designations appear throughout this brief. Such designations are the result of a review of a significant body of source information, including both classified and open source information, that the entity supports terrorism.

195.    To qualify for this designation, the proposed designee must be: (1) owned or controlled by designated persons or entities; (2) acting for or on behalf of designated persons or entities; (3) assisting or sponsoring designated persons or acts of terrorism; (4) providing material, financial, or technological support for designated persons or acts of terrorism; (5) providing financial or other services to or in support of designated persons or acts of terrorism; or (6) otherwise associated with designated persons.

196.    The evidentiary record to support a designation undergoes several rounds of review for legal sufficiency. Due to this rigorous review, many potential designees that undergo the review process are ultimately not designated.

197.    No legal challenge to a designation has ever entirely succeeded.

198.    A majority of designations assigned to Defendants IRGC (including IRGC-QF), MOIS, NIOC, Bank Melli, and Bank Markazi are based specifically upon their support to the Terrorist Group at issue here, and/or for their actions taken on behalf of Iran's terrorism network to further Iran's goals in Iraq from 2003 to 2011.

199.    To understand the relationship between the co-Defendants and the state-sponsored nature of their actions, it is necessary to understand who commands this entire terrorism apparatus. Iran's political and religious institutions are overseen by a single person, the Supreme Leader, who has the authority to make any religious or political decision. The Supreme Leader's power is unmatched and unchecked. Iran's political structure is divided into two parts: (1) a formal governmental structure, and (2) a revolutionary structure. The Supreme Leader bears full responsibility for actions taken by the set of institutions under his control (including co-Defendants) and provides directives to both institutions, which "he rarely allows to be publicly revealed." Accordingly, the institutions controlled by the Supreme Leader also do not publicly report their actions and have long been engaged in illegal activities.

200.    Iran's command and control over its terrorism network that orchestrates terrorist attacks, including the Terrorist Attacks at issue in this Action, is diagrammed here:

39



201.     Iran's support of terrorist groups in Iraq was described in the U.S. State Department's 2005 Country Reports on Terrorism, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

202.     Iran furthers its terrorism-based foreign policy through a number of key Iranian Proxies including Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), the IRGC, the IRGC-QF, Hezbollah/Hizbollah, NIOC, KAA, Mahan Air, and Special Groups.

203.     In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system in which the Iranians are providing their allies within Iraq, these special groups, with the munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

204.     On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

205.     Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate

Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*

Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad.* In early May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*

(Emphasis added).

206.    To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of FTOs and Special Groups, and infiltrated and co-opted Iraqi security forces in an effort to kill or maim U.S. nationals, including Plaintiffs, and to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.

207.    According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

208.    Iran did not just act on its own. As part of its strategy of sophisticated and clandestine use of terrorism, Iran preferred not to act directly against the Coalition Forces in Iraq. Rather, Iran relied on various other entities, including Defendants named herein, to act on Iran's behalf and at Iran's discretion and guidance. Moreover, without the funding provided to these organizations by Iran, they would not be able to carry out the volume, consistency, frequency,

scale, and lethality of the acts of international terrorism they currently, and in the past, routinely perpetrated, including the Terrorist Attacks that killed, maimed, or otherwise injured Plaintiffs or Plaintiffs' family members.

### 3. ISLAMIC REVOLUTIONARY GUARD CORPS—QODS FORCE (IRGC-QF)

209.    The highest echelons of the Iranian government and the highest echelons of Hezbollah have worked together to organize a violent, resistance movement in Iraq. The IRGC-QF, with direct assistance from Iran, has established and funded this movement.

210.    Ayatollah Khomeini established the IRGC-QF in 1979 to protect Iran's Islamic Revolution and export it beyond Iran's borders. The commander of the IRGC-QF reports directly to Iran's Supreme Leader, Ayatollah Ali Khomeini.

211.    The Qods Force is the IRGC unit tasked with extraterritorial operations. It trains and equips Islamic revolutionary groups around the Middle East. The IRGC-QF typically provides this paramilitary instruction in Iran and Sudan. At times, the IRGC-QF plays a more direct role in the military operations of the forces it trains, including pre-attack planning and other operation-specific military advice.

212.    The Qods Force operates worldwide covertly to conceal Iran's participation in terrorist activities.

213.    Iran, through the Qods Force, gains access to countries and conceals its involvement in international terrorism therein by cloaking its operations with the appearance of legitimacy, mainly through civilian, charity, or religious oriented institutions or entities.[42]

---

[42]As an example, the Qods Force used the Iranian Red Crescent to operate in the Balkans during the 1990s to provide assistance to the Bosnian Muslims against the Serb, and to Hizbollah during the 2006 Lebanon War. *See, e.g., U.S. Embassy Cables: Iran Abuses Iranian Red Crescent to Send Agents and Weapons Overseas,* THE GUARDIAN (Oct. 23, 2008), https://www.theguardian.com/world/us-embassy-cables-documents/174875.

214.    Since 2003, Iran has been materially supporting acts of international terrorism by advising, organizing, training, funding, and equipping FTOs and Special Groups, and other terrorists to kill, maim, or otherwise injure U.S. nationals, among others. To do this, Iran enlisted (and continues to enlist) the IRGC-QF to provide such support to these FTOs and Special Groups.

215.    This material support has made these FTOs, Special Groups and other terrorists more effective and lethal than they ever could have been without such assistance.

216.    In October 2007, the United States designated the IRGC-QF a SDGT pursuant to E.O. 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added).

217.    In late 2003, the Qods Force began flooding Iraq with EFPs – lethal roadside bombs that fire a molten copper slug capable of piercing armor. These EFPs wreaked havoc on American troops, accounting for nearly twenty percent of U.S. service personnel deaths. EFPs require skilled assembly and rely on sophisticated sensors. According to General Stanley McChrystal, then head of Joint Special Operations Command, "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The EFPs killed hundreds of Americans."[43]

---

[43]    Dexter Filkins, *The Shadow Commander*, THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

218.    On October 25, 2007, when the U.S. Department of Treasury designated IRGC-QF as SDGT under E.O. 13224, the Department cited the IRGC-QF's material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command as evidence of Iran seeking to inflict casualties on U.S. and NATO forces.[44]

219.    From 1998 until his death in January 2020, the IRGC-QF was commanded by General Qasem Soleimani, who reported directly to Supreme Leader Ayatollah Ali Khamenei. Soleimani was directly responsible for Iranian policy in Iraq. The United States designated Soleimani three times for his roles in the IRGC.

220.    The IRGC-QF set up different regional commands for its worldwide activities. The First Corps, also referred to as the "Ramazan Headquarters," "Ramazan Corps," or "Department 9000," and headquartered in Tehran, was (and is) focused on implementing Iranian government policy in Iraq.

221.    Pursuant to instructions from IRGC-QF, Hezbollah formed Unit 3800. Unit 3800 operates in parallel to IRGC-QF's Unit 9000, and was tasked by the IRGC-QF with recruiting, radicalizing and training Iraqi militants and organizing several Iraqi terrorist/insurgency militias, called Special Groups. Through its efforts in organizing and supporting Iraqi terror groups, Hezbollah's Unit 3800 coordinated with the IRGC-QF to implement Iranian policy in Iraq. These two "subagencies" of the IRGC-QF and Hezbollah, respectively, were responsible for directing and orchestrating a sophisticated terror campaign against U.S. service members in Iraq.

222.    According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who

---

[44] U.S. Department of The Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

previously served as the Deputy Commanding General for MNF-I in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran." General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq ... Our intelligence reveals that senior leadership in Iran is aware of this activity."

223.    The Qods Force infiltrates its adversaries by disguising operatives, some may appear to be retired officers in civilian functions, but who actively facilitate IRGC operations. Iran used this tactic to provide financial aid to terrorist groups in Iraq by using the civilian or religious cover of its operatives, specifically embedded with Iranian state owned-entities and agencies, including its diplomatic missions, The Headquarters for the Restoration of Holy Shrines (Setad-e Bazsazi-ye Atabat-e Ali-yat, hereinafter "HRHS"), and Khatam al-Anbiya AA (discussed in detail below).

224.    Finally, the IRGC in its entirety was designated an FTO in April 2019. The State Department stated, "the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."[45] That same month, the White House released the "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization" formally announcing the Administration's plan to "designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a FTO under Section 219 of the Immigration and Nationality Act." The Statement further provided:

> [T]he Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the ***IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft.*** The IRGC is the Iranian government's primary means of directing and implementing its global

---

[45] U.S. Department of State, Designation of the Islamic Revolutionary Guard Corps (Apr. 8, 2019).

terrorist campaign. This designation will be the first time that the United States has ever named a part of another government as an FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. This action will significantly expand the scope and scale of our maximum pressure on the Iranian regime. It makes crystal clear the risks of conducting business with, or providing support to, the IRGC. If you are doing business with the IRGC, you will be bankrolling terrorism.[46]

225.    On April 15, 2019, the Treasury Department's designation of the IRGC and the IRGC-QF as an FTO took effect.[47] Although the designation of the IRGC and IRGC-QF as an FTO is relatively recent, the designation was routinely endorsed by U.S. policymakers citing the IRGC's support for terrorism in Iraq over the last two decades. When designating the IRGC as an FTO, the U.S. Treasury confirmed:

> **The Iranian regime is responsible for the deaths of <u>at least 603 American service members in Iraq since 2003</u>**. This accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011, and is in addition to the many thousands of Iraqis killed by the IRGC's proxies.

(Emphasis added.)[48]

### 4. HEZBOLLAH

226.    Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

227.    Hezbollah is probably the most prominent and "successful" group developed with

---

[46] "Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization," The White House (April 8, 2019) (emphasis added).
[47] *Counter Terrorism Designations; IRGC Foreign Terrorist Organization Designation*, U.S. Department of the Treasury (Apr. 15, 2019).
[48] U.S. Department of State, *Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019).

the assistance of the IRGC-QF.

228.     From its inception, Hezbollah has enjoyed significant financial and material aid from Iran. The IRGC-QF, in particular, played a critical role in Hezbollah's foundation and its funding and training.

229.     On June 25, 2016, the Secretary General of Hezbollah, Sheikh Hassan Nasrallah, claimed that, "We are open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." Nasrallah stated that, "[a]s long as Iran has money, we have money… Just as we receive the rockets that we use to threaten Israel, we are receiving our money. No law will prevent us from receiving it…"[49]

230.     Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty-nine people), and the 1994 bombing of a Jewish community center (killing eighty five people). Hezbollah assisted al Qaida affiliated terrorists in the Khobar bombings in Saudi Arabia on June 25, 1996 (which killed 19 U.S. service members) and in the bombing of the U.S. embassies in Nairobi and Dar es Salaam on August 7, 1998 (which killed 224 and injured approximately 5000 people).

231.     Hezbollah is a Shi'a Islamist militant group based in Lebanon, funded by Iran, and formed in 1982. Its leaders are followers of Ayatollah Khomeini and Ayatollah Khamenei, and its

---

[49] Majid Rafizadeh, *In first, Hezbollah confirms all financial support comes from Iran*, Al Arabiya English (June 25, 2016), https://english.alarabiya.net/en/2016/06/25/In-first-Hezbollah-s-Nasrallah-confirms-all-financial-support-comes-from-Iran.html.

forces are trained and organized by a contingent of 1,500 Revolutionary Guards. Hezbollah's military strength has grown so significantly that its paramilitary wing, the Jihad Council, is considered more powerful than the Lebanese Army. Hezbollah relied almost exclusively on Iranian largesse, which funds at least $100 to $200 million a year or more.[50] The U.S. Department of State estimates that Hezbollah has tens of thousands of supporters and members worldwide. While Hezbollah is based in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon, its activities make evident the group is capable of operating around the globe, particularly in Iraq.

232.    Despite Shi'a ideologies, Iran and Hezbollah have supported and worked with Sunni and other terrorist organizations to effectuate their broader goal of exporting terror around the globe and destabilizing western involvement and influence in the Middle East. According to the New York Times:

> In an interview, Sheikh Naim Qassem, Hezbollah's deputy secretary general, proudly acknowledged his organization's efforts to pass its rich militant experience to other Iranian aligned forces. "Every group anywhere in the world that works as we work, with our ideas, is a win for the party," he said. "It is natural: All who are in accordance with us in any place in the world, that is a win for us because they are part of our axis and a win for everyone in our axis."[51]

233.    Hezbollah received "massive material and technical support from the Iranian government"[52] in the planning and perpetrating the terrorist attack which killed 241 Marines in Beirut in 1983.

---

[50] U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran* (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

[51] Ben Hubbard, *Hezbollah: Iran's Middle East Agent, Emissary and Hammer,* N.Y. TIMES (Aug. 27, 2017).

[52]  *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d. 46, 58 (D. D.C. 2003).

234.    The Iranian regime provides "extensive financial support for terrorists generally and in support for al Qaeda and Hezbollah in particular."[53]

235.    Iran "created Hizballah… [and] has been the sponsor of Hizballah since its inception, providing funding, training, leadership and advice via Hizballah's leadership councils…Hizballah has received from Iran $100 million to $500 million in direct financial support annually…Hizballah served as a terrorist proxy for Iran, created specifically for the purpose of serving as a front for Iranian terrorism, in effect, a cover name for terrorist operations run by Iran's IRGC around the world."[54]

236.    As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated an SDT by the United States. It has maintained that designation since that time.

237.    Hezbollah was designated an FTO by the United States on October 8, 1997, and it has retained that designation since that time.

238.    On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated SDGT by the United States. It has maintained that designation since that time.

239.    According to a December 20, 2004 Washington Post article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran." (Emphasis added).

240.    Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Iraqi citizens, and Multi National Forces in Iraq ("MNF-I").

---

[53] *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 97-98 (S.D.N.Y. Dec. 22, 2011).

[54] *Id.*

241.    At Iran's request, Hezbollah leader Hassan Nasrallah established Unit 3800.

242.    Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the Special Groups.

243.    By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

244.    According to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—in 2007 the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (who is discussed in greater detail below), up to $3,000,000.00 in U.S. currency every month.

245.    Hezbollah's terrorist attacks include the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which U.S. Navy diver Robert Stethem was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hezbollah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and in the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires. In 2000, Hezbollah operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. Although the non-combatant survived, on November 1, 2001, Israeli Army Rabbi Israel Weiss pronounced the three soldiers dead. The surviving non-combatant and the bodies of the Israeli soldiers were returned to Israel in a prisoner exchange with Hezbollah in 2004.[55]

---

[55] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2015*, at 369 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

246.     Hezbollah carried out two attacks against UN Interim Force Peacekeepers in Lebanon; an attack in late July 2011 that wounded six French citizens, and a second attack, days later, which injured three French soldiers. Also, in 2011, four Hezbollah members were indicted by the UN-based Special Tribunal for Lebanon, an international tribunal investigating the 2005 assassination of Lebanese Prime Minister Rafik Hariri. A fifth Hezbollah member, Hassan Habib Merhi, was indicted in October 2013.

247.     In January 2012, Thai police detained Hezbollah operative Hussein Atris on immigration charges as he was attempting to depart Thailand. Atris, a SDGT, was convicted of possessing bomb-making materials by a Thai court in September 2013 and sentenced to two years and eight months in prison. He was released in September 2014 and is believed to reside in Lebanon. In July 2012, a suspected Hezbollah operative was detained by Cypriot authorities for allegedly helping plan an attack against Israeli tourists on the island. On March 21, 2013, a Cyprus court found the operative guilty of charges based on his surveillance activities of Israeli tourists.

248.     Hezbollah was also responsible for the July 2012 attack on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport in Bulgaria, near the city of Burgas. The explosion killed five Israelis and one Bulgarian, and injured 32 others.

249.     In May 2013, Hezbollah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying support for Syrian President Bashar al-Assad. Hezbollah's support for the Assad regime continues in 2018.

250.     In 2015, the group also continued its operations against Israel. In January, Hezbollah fired rockets on an Israeli convoy, killing two Israeli soldiers. In a speech in Tehran in August, Hezbollah Deputy Secretary General Shaykh Na'im Qasim declared Israel, the United States, and Takfiri groups as enemies of Islam and urged Muslims to fight against these enemies.

In December, Hezbollah leader Nasrallah threatened attacks in revenge for the death of senior Hezbollah militant Samir Kuntar. Nasrallah claimed orders had already been given and fighters on the ground were preparing attacks.

251.    In May 2015, Cypriot authorities arrested dual Lebanese-Canadian national Hussein Bassam Abdallah after finding 8.2 tons of liquid ammonium nitrate in the basement of a residence in Larnaca. Abdallah admitted to Cypriot authorities he was a member of Hezbollah. He was charged on five offenses, including participation in a terrorist organization and providing support to a terrorist organization, by the Republic of Cyprus and sentenced to six years in prison on June 29, 2015.

252.    Hezbollah's longevity and lethality are due almost entirely to the continuous support of the IRGC, IRGC-QF and MOIS, and Iran has sought to duplicate this "success" with other groups, especially in Iraq. As Iran's primary external terrorist proxy, Hezbollah has for many years played a central role in Iran's use of international terrorism and militancy by acting at Iran's direction while allowing Iran to maintain plausible deniability.

253.    Through the IRGC and MOIS, Iran has trained, indoctrinated, substantially funded, and helped run Hezbollah's operations. Indeed, in 2014, General Amir Ali Hajizade, head of the IRGC Aerospace Force, explained that, "the IRGC and Hezbollah are a single apparatus joined together."[56]

254.    Iran continues to provide Hezbollah with funding, training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid. Such support and material are crucial to Hezbollah's continued terrorist operations. Moreover, the support is

---

[56] U.S. Department of State Bureau of Counterterrorism, *Country Reports on Terrorism 2014.* (June 2015), at p. 286).

substantial.

255.    United States District Courts have found, in numerous lawsuits related to international acts of terrorism sponsored or directed by Iran, that Hezbollah is, in fact, an arm of the IRGC and a key component to Iran's modus operandi of sponsoring and/or directing international terrorism aimed primarily against the United States and its allies.[57]

256.    Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq during the Relevant Period.

### 5. IRAN'S MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS (MODAFL)

257.    In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") as an FTO stating it controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007.

258.    MODAFL is the principal procurement arm of Iran's military and terror apparatus.

259.    MODAFL operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO"), and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.

260.    The AIO was designated on June 28, 2005 for weapons proliferation.

261.    The MAPNA group is also a key component of MODAFL and the IRGC's procurement chain.

262.    Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the

---

[57] *See, e.g., Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135–36 (D. D.C. 2011); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D. D.C. 2014).

MAPNA Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

263.    Pursuant to the Arms Export Control Act and the Export Administration Act, MODAFL was sanctioned in November 2000 for its involvement in missile technology proliferation activities.

264.    The U.S. government explained the basis for the designation as follows:

> The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.
>
> MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group and the Shahid Bakeri Industries Group, which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab-3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382-designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

265.    Formally, the IRGC is a subordinate directorate of MODAFL.

266.    The IRGC uses MODAFL to both procure and develop weapons and equipment for its use. To facilitate this process, Defendant Bank Markazi maintained a Eurodollar credit facility at a Western bank's branch in Dubai.

267.    Tellingly, Hamas, Lebanese Hezbollah, and the Palestinian Islamic Jihad maintain

55

representative offices in Tehran, in part to help coordinate Iranian financing and training.[58]

268.    The DIO, the AIO, and Defense Technology and Science Research Centre are all subordinate to MODAFL, giving it operational control over Iran's ballistic missile development program.[59]

269.    As a result, MODAFL entities' illicit procurement activities have resulted in a series of ongoing U.S. sanctions.[60]

270.    Moreover, Iran continues to provide material support, including resources and guidance, to multiple terrorist organizations in Iraq, including all of the Terrorist Groups that perpetrated the acts of international terrorism alleged herein, that undermine the stability of the Middle East and Central Asia. [61]

### 6.   IRAN'S TERRORISM NETWORK FUELED A DEADLY CAMPAIGN OF TERROR THAT TARGETED AMERICANS IN IRAQ

271.    On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad less than three weeks later, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

272.    Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a peacekeeping and nation building, rather than a warfighting function.  American troops' primary purpose was to create

---

[58] *Id.*

[59]  Steven R. Ward, *Immortal: A Military History of Iran and Its Armed Forces* 320 (2009).

[60] The United States has sanctioned MODAFL pursuant to the Arms Export Control Act, the Export Administration Act (in November 2000), and Executive Order 13382 (in October 2007).

[61]  U. S. Department of State, *2016 International Narcotics Control Strategy Report*, https://www.state.gov/j/inl/rls/nrcrpt/2016/vol2/253407.htm (last visited Sept. 12, 2017).

the political and security conditions conducive to Iraqi democracy.  The official end of major combat operations was significant because it allowed civilian reconstruction teams to enter the country.

273.    The U.S. liberation of Iraq was watched closely by Iran and its terrorist proxy Hezbollah.  Even before the invasion began, as early as September 2002, Iran and Hezbollah plotted to undermine the anticipated U.S. presence in Iraq.  Immediately after Saddam's government fell in April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad Mugniyeh, to Iraq.  Mugniyeh's assignment was to contact Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a terrorist organization modeled on Hezbollah capable of carrying out sophisticated attacks on Americans in Iraq.  Mugniyeh contacted Sadr shortly thereafter, and the two immediately began work on creating the terrorist organization that later would become known as Jaysh al-Mahdi.  An Israeli intelligence report confirmed in October 2003 that Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.

274.    Iran, however, did not limit its support of anti-American terrorism in Iraq to Iran's traditional Shiite terrorist proxies like Hezbollah.  Iran, through the "sinister genius" of IRGC terrorist mastermind Qassem Soleimani, also supported the burgeoning Sunni terrorist insurgency against Americans in Iraq. This insurgency was led by a litany of IRGC assets, including the top two Sunni leaders of the Iraqi terrorism campaign: Saif al-Adel, al-Qaeda's military chief who coordinated its campaign, including support for al-Qaeda-in-Iraq, from his Qods Force-provided safe haven in Iran, and Abu Musab al-Zarqawi, the al-Qaeda operative who led al-Qaeda-in-Iraq on the ground and co-led Ansar al-Islam with Mullah Krekar, another IRGC asset.  Al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam, between them, accounted for a substantial portion of Sunni

terrorist attacks on Americans in Iraq from 2003 through the present, with AQI ultimately becoming ISIS. The common thread connecting the overall Iranian strategy was that, as one analyst explained, "Iran would do everything it could to ensure that America's experiment [in Iraq] turned into a smoldering failure."[62]

275.     It is likely that Qassem Soleimani's support of Shiite and Sunni terrorists in Iraq collectively accounted for more Americans killed or injured in terrorist violence after 9/11, and more than any other single designated terrorist.  As Karim Sadjadpour of the Carnegie Endowment for International Peace explained in an interview, given Soleimani's support for anti-American terror:

> That's why you have … one, if not two, generations of American military forces whom if you were to ask them, who is your worst adversary in the world, ***the person you see as the greatest threat to the United States***? Even when Osama bin Laden was living and Baghdadi [the leader of ISIS] was living, they would have still said ***Qassem Soleimani***.

(Emphasis added.) [63]

276.     Since 2003, Sunni terrorists have repeatedly attacked American service members and civilians working to rebuild Iraq and support its elected government. Iran provided material support for those attacks, which killed or injured Plaintiffs.

277.     Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them. Each worked in concert with their sectarian allies and shared resources, personnel, and operational plans.

---

[62] Karim Sadjadpour, *The Sinister Genius of Qassem Soleimani*, Wall St. J. (Jan. 10, 2020) ("Sadjadpour, *Sinister Genius*").
[63] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

278.    Iran's multi-faceted support for Sunni terrorists in Iraq is consistent with bin Laden's "grand alliance" approach to anti-American terror. In fact, bin Laden himself portrayed al-Qaeda as the leader of a broader coalition drawing from other terrorist organizations in Pakistan and Afghanistan and supported by a latticework of jihadist affiliates and allies around the world.[64]

279.    Iran's support for multiple components of bin Laden's "syndicate" ensured that its support for Sunni terrorist groups had maximum effect. Due to the mutually reinforcing ties between the IRGC, al-Qaeda, AQI, and Ansar al-Islam, support for any one benefited the others – and vice versa.

280.    Iran recognized those interrelationships and so spread its support across multiple Sunni terrorist groups targeting Americans in Iraq. In doing so, Iran was able to achieve its intended effect: wide-ranging terrorist attacks against Americans, executed mostly by the Sunni terrorist group AQI, but supported by (and sometimes jointly committed with) other Iranian terrorist allies (e.g., AQI jointly committing a suicide bombing attack with al-Qaeda or Ansar al Islam).

281.    Like Iran's use of Shiite proxies, the IRGC's use of Sunni proxies was consistent with Iran's twin strategic goals: to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public Iranian role inside Iraq. Rather than openly engage in armed conflict with the U.S. or other Coalition Forces, Iran usually attempted to present an Iraqi face to its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence there.

282.    From 2003 through the present, Iran was responsible for increasingly lethal attacks on U.S. forces in Iraq and, as one example, provided Sunni terrorist proxies with the capability to

---

[64] *The al Qaeda-Taliban Connection*.

assemble explosives designed to defeat armored vehicles.

283.     Against that backdrop, in the following section Plaintiffs identify the principal Iraq-based terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

### 7. ANSAR AL ISLAM

284.     From its beginning, Iran did not confine its support of anti-U.S. national fighters to Shi'a groups. Iran also supported Ansar al Islam (a/k/a Ansar al Sunna, "AAI"), a radical terrorist group with close ties to Al Qaida.

285.     In the 1990s, Al Qaida developed a close relationship with Iran and the IRGC. Usama bin Laden and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and Ahmad Vahidi (then commander of IRGC Qods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Usama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[65]

286.     AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to Al Qaida and Iran. Although the group's initial membership was primarily Kurdish, it grew to comprise a large number of Sunni Arabs, including Iraqis, Saudis, and Yeminis.

287.     Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded Ansar al Islam in December 2001 (at that time, with funding and logistical support from Al Qaida and Usama bin Laden). However, the group has significant, life-sustaining ties to Iran.

288.     AAI seeks to transform Iraq into an Islamic state. AAI operates primarily in

---

[65]*Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 110-111 (S.D.N.Y. Dec. 22, 2011).

northern Iraq, but maintains a presence in western and central Iraq. AAI expanded its operations into Syria in 2011.

289.    AAI has a number of aliases, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; and Supporters of Islam in Kurdistan.

290.    AAI was established in 2001 in Iraqi Kurdistan with the merger of two violent Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan. AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern party of Iraq, western Iraq-Anbar province, and in the areas surrounding and including Mosul and Kirkuk since 2003.

291.    In 2001, AAI seized control of several villages near the town of Halabja and established an administration ruled by Shari'a Law. As part of Operation Iraqi Freedom, Coalition and Kurdish forces routed AAI from northern Iraq.

292.    Coalition airstrikes destroyed AAI's base in northern Iraq (Iraqi Kurdistan) in late March 2003, and the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Counterterrorist operations suggest many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under leader Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

293.    During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, coalition forces in Mosul captured a senior Ansar leader, Aso Hawleri. A week later, Lt. Gen. Norton Schwartz, who

at the time was Director, the Joint Staff, Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that Ansar al Islam had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

294.    From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100 civilians and injuring over 130 more. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals. AAI openly cooperated with AQ; however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established by AQ. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from AAI in early 2007 because its members wished to take a harder line against AQ) to form an anti-Coalition umbrella organization called the Reformation and Jihad Front ("RJF"). The RJF was a pan-Islamist organization that challenged AQ for leadership of the Iraqi Sunni Islamist movement.

295.    AAI claimed responsibility for the beheading of twelve Nepalese hostages and the kidnapping and beheading of an Iraqi who was employed as a mechanic for the American forces at the Mosul airport. AAI targeted Iraqi Kurds for alleged collaboration with the U.S. In September 2003, members of the Jaysch Ansar al-Sunna beheaded three Iraqi Kurdish militiamen in retaliation for the cooperation by Kurdish political parties with the U.S. in Iraq.

296.    U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe

haven and basic training to Iran-based [AAI] cadres.'" (brackets in original).[66]

297.    On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on Forward Operating Base Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S. soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar al-Sunna, claimed credit for the attack. This Terrorist Attack resulted in the death, maiming or injury of certain Plaintiffs, who are referred to below.

298.    Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[67] American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IEDs.[68]

299.    In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an Ansar al Islam safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities. According to Iraqi intelligence officers, captured Ansar al-Sunna militants have admitted to receiving assistance from Iranian officials.

300.    Iran played a significant role in supporting AAI. Iran openly allowed the group to

---

[66] Pound, *supra* note 27.

[67] *Id.*

[68] *Id.*

operate along its borders despite the group's alleged affiliation with the AQ network. AAI was tasked with conducting checks on cars leaving their stronghold going into Iran, indicating coordination with the Islamic Republic.

301.     According to a document from Iraqi intelligence dated June 13, 2002 and seized by U.S. forces in Iraq, it was reported from a trust-worthy source that Mullah Kraykar (Krekar), the head of the AAI organization arrived in Iran for negotiations with several Iranian officials. The information indicated that the purpose of the visit was to confirm a unified strategy and to guarantee continuous Iranian support to that group.

302.     According to other sources Mullah Krekar spent many years in Iran and was arrested in Amsterdam after a flight from Tehran.

303.     AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadis to Iraq.

304.     Over the course of 2007-2008, AAI moved increasingly away from the RJF and strengthened its ties to AQ. It coordinated with AQ on several attacks against U.S. and PUK troops and began to adopt AQ's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

305.     On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured by U.S. forces in Baghdad and remains in prison. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim. In March 2012, a Norwegian court convicted Iraqi citizen and AAI founder Mullah Krekar (aka Najmuddin Faraj Ahmad) of issuing threats and inciting terrorism, and sentenced him to six years in prison. Living in Norway on a long-term resident permit, Krekar appealed, and in December 2012, an appeals court affirmed his convictions

64

for issuing threats and intimidating witnesses, but reversed his conviction for inciting terrorism. The appeals court reduced his prison sentence to two years and 10 months. He was released from prison in late January 2015, but was arrested again shortly after for praising the January 2015 Charlie Hebdo attacks in Paris in a TV interview.

306. AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and wounded 147. In 2012, the group claimed responsibility for the bombing of the Sons of Martyrs School in Damascus, which was occupied by Syrian security forces and pro-government militias; seven people were wounded in the attack. In 2014, AAI claimed responsibility for attacks near Kirkuk, Tikrit, and Mosul, Iraq; primarily directed against Iraqi police and security forces and, in one instance, an oil field.

307. The U.S. Department of Treasury designated AAI a Specially Designated Terrorist Group under E.O 13224 on February 20, 2003.

308. The U.S. Department of State designated AAI an FTO on March 22, 2004.

309. Australia, New Zealand, Canada, and the European Union have designated AAI as a terrorist organization. The U.S. Treasury Department designated Mullah Krekar as an individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

### 8. AL QAIDA NETWORK

310. Al Qaida (a/k/a al-Qaeda, a/k/a al-Qa'ida, "AQ") is a designated foreign terrorist organization, widely recognized as such by all civilized nations and the United Nations, and is neither a legitimate "military force" nor a recognized sovereign state.

65

311.    The United States has designated AQ, including its branches, subsidiaries and "franchisees" (Including al-Qa'ida in Iraq ("AQI")) as a foreign terrorist organization and a specially designated global terrorist.

312.    Usama bin Laden formed al-Qaeda in the late 1980s in Afghanistan in response to the Soviet occupation of Afghanistan. For decades, al-Qaeda has been a Sunni Islamist terrorist organization with the purpose of destroying the United States.

313.    Following the Soviet withdrawal from Afghanistan, Usama bin Laden began to transform al-Qaeda into a transnational terrorist group capable of launching attacks around the world. Bin Laden declared war on the United States in a published fatwa (religious decree) in 1996.24 In 1998, he declared a global jihad, calling on all Muslims to kill Americans at any opportunity.

314.    Commencing in the early 1990s and continuing until at least 2011, the Islamic Republic of Iran provided significant, indispensable, funding, weapons, safe haven, training, intelligence, centers for command and control, undocumented transport between Afghanistan, Iraq and Pakistan across its borders and other significant material support.

315.    Iran was an indispensable accomplice and provided significant financial and material support in AQ's terrorist attacks against American, European and Iraqi civilians and soldiers from at least 1991 until 2011.

316.    On June 30 1989, General Omar Hassan al-Bashir led a coup d'état toppling the exiting regime in Sudan. The radical Salafi cleric, Hassan Abd Allah al-Turabi served as the "intellectual architect" or "the power behind the throne", sometimes officially as leader of the National Islamic Front and sometimes as speaker of the parliamentary assembly.

317.    In 1990-1991, Turabi founded the Popular Arab and Islamic Congress, which

included representatives from the Palestine Liberation Organization, Hamas, Egyptian Islamic Jihad, Al Qaeda, Algerian Islamic Jihad, Hezbollah, Abu Nidal Group, and the Islamic Revolutionary Guard Corps.

318.    In 1991, the Kingdom of Saudi Arabia expelled AQ leader Usama bin Laden ("UBL") and UBL moved his base of operations to Sudan.

319.    The Sudanese army protected Bin Laden's home in Khartoum and his terrorist training bases within the country as well as providing AQ with access to the international and United States financial networks. -In addition, Sudan provided AQ with 200 Sudanese passports, allowing AQ operatives to travel under fictitious identities.

320.    Turabi brought together UBL and leaders of the IRGC Qods Force and leaders of Hezbollah. Commencing in April 1991, Turabi hosted meetings bringing together leaders from AQ, Hezbollah, and Iranian and Sudanese officials. -According to AQ Shura council member Abu Hajer al-Iraqi, the purpose of these meetings was to focus on common enemies, the West and the United States.

321.    In 1991, Hezbollah opened a base of operations in Khartoum, Sudan.

322.    On December 13, 1991, Iranian President Ali Akbar Hashemi Rafsanjani arrived in Khartoum, Sudan for a six-day visit, by a delegation of 157 members, including Mohsen Rezai then Commander of the IRGC, Iranian Intelligence Minister Ali Fallahian and Iranian Defense Minister Ali Akbar Torkan. Various agreements were signed between Iran and Sudan, pursuant to which, inter alia, Iran delivered $300 million of Chinese weapons and 2000 IRGC operatives were sent to train Sudan's Popular Defense Forces.

323.    According to the 9/11 Commission Report, in late 1991 or 1992, discussions in Sudan between AQ and Iranian operatives led to an agreement to cooperate in providing support -

67

specifically, training - for actions carried out primarily against Israel and the United States. Not long afterward, senior AQ operatives and trainers traveled to Iran to receive training in explosives.

324.    The 9/11 Commission reported that ""[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."[69]

325.    Iran was a valuable connection for UBL and AQ, and AQ was highly beneficial to Iran, given AQ's extreme and violent position against America and its animosity against the Kingdom of Saudi Arabia. Iran and Hezbollah played significant roles in the buildup of AQ's terrorist capabilities.

326.    As a result of the creation of this terrorist alliance, AQ leader Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with Minister Ali Fallahian, other officers of Iran Ministry of Intelligence and Security ("MOIS"), and Qods Force Commander Ahmad Vahidi.

327.    Throughout the 1990s, the Al Qaeda-Iran-Hezbollah terrorist training arrangement continued. Hezbollah leader Imad Mughniyah coordinated these training activities, including training of AQ personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

328.    AQ operative Ali Mohammed provided security for one prominent meeting between Hezbollah's chief external operations officer, Imad Mughniyah, and Bin Laden in Sudan. Mohammed testified at this plea hearing that "Hezbollah provided explosives training for AQ and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks."

329.    Iran trained Saif al-Adel, head of AQ security, and other AQ members, including

---

[69] The 9/11 Comm. Rpt. (2004) at p. 61.

Shura council members, at Hezbollah training camps in the mid-1990s. ~AQ leader Mustafa Hamid

was one of AQ's primary points of contact with IRGC. He negotiated the agreement between AQ

and Iran, which secured safe transit between Iran and Afghanistan and to Iraq for AQ members.

330.    This facility was used by AQ in planning and perpetrating the terrorist attacks

conducted against U.S. civilians, diplomats and servicemen and women, such as: the suicide

bombing of U.S. Air force personnel and their families in Khobar, Saudi Arabia; the U.S.

embassies in Nairobi and Dar es Salaam; and the World Trade Center on September 11, 2001.

331.    On June 25, 1996, Iranian-backed Hezbollah terrorists, with the support of AQ,

bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S.

servicemen and wounding approximately 500 others. FBI investigators concluded: the operation

was undertaken on direct orders from senior Iranian government leaders; the bombers had been

trained and funded by the IRGC in Lebanon's Bekaa Valley; and senior members of the Iranian

government, including Ministry of Defense, Ministry of Intelligence and Security and the Supreme

Leader's office, had selected Khobar as the target and commissioned Hezbollah to carry out the

operation.

332.    AQ was involved in the planning and preparations for the Khobar Towers bombing.

UBL tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the operation,

bin Laden was, according to NSA intercepts, congratulated on the telephone.[70]

333.    The 9/11 Commission examined classified CIA documents establishing that IRGC-

Qods Force commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al

Mugassil, a Saudi-born AQ operative.

334.    Two months later, in August 1996, UBL would cite the Khobar Towers bombing

---

[70] The 9/11 Comm. Rpt. (2004) at p. 60.

in his first fatwa, a "Declaration of War Against the Americans Occupying the Land of the Two Holy Places": "The crusader army became dust when we detonated al Khobar…" (Emphasis added).

335.    Iran aided, abetted and conspired with Hezbollah, UBL, and AQ to launch the large-scale bombing attacks against the United States embassies in Nairobi and Dar es Salaam on August 7, 1998. Prior to their meetings with Iranian officials and agents, Bin Laden and AQ did not possess the technical expertise required to carry out the embassy bombings. Iran, through Hezbollah, provided explosives training to Bin Laden and AQ and rendered direct assistance to AQ operatives.[71]

336.    As stated in the 9/11 Report, "Iran made a concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the USS Cole…"  For example, Iranian officials facilitated the travel of AQ members – including at least 8 of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at AQ's terrorist training camps.[72]

337.    U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel Usama bin Laden in May 1996. Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited bin Laden to join him in Afghanistan. UBL then relocated to Afghanistan with the assistance of the Iranian intelligence services.[73]

338.    Iran provided material support to AQ after the 9/11 attacks in several ways, most significantly by providing safe haven to AQ leaders and operatives, keeping them safe from retaliation by U.S. forces that had invaded Afghanistan. According to the U.S. Treasury Department press release, January 16, 2009, in late 2001, while in Tehran, AQ senior operative

---

[71] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139 (D.D.C. Nov. 28, 2011).

[72] The 9/11 Comm. Rpt. (2004) at pp. 240-241.

[73] *Id*. at 65.

Mustafa Hamid negotiated with the Iranians to relocate al Qaeda families to Iran after the 9/11 attacks.

339.    In the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous AQ leaders, operatives, and their families. The Iran-Afghanistan safe passageway, established earlier to get AQ recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of AQ fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these AQ fighters and their families entering Iran.

340.    Among the high-level AQ officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden and the man who would soon lead "al Qaeda in Iraq," Abu Musab al Zarqawi.

341.    In late 2001, Sa'ad bin Laden facilitated the travel of UBL's family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for AQ and was part of a small group of AQ members involved in managing AQ from Iran.

342.    By 2002, AQ had established in Iran its 'management council,' a body that Usama bin Laden reportedly tasked with providing strategic support to the organization's leaders in Pakistan. Key members of the council included Saif al-Adel, Sulayman Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, and Mahfouz Ould al-Walid (a.k.a. Abu Hafs al-Mauritani). All five senior operators remained influential over the next several years and retained close ties to bin Laden. Adel organized groups of fighters to overthrow Hamid Karzai's regime in Afghanistan and provided support for the May 12, 2003 terrorist attacks in Riyadh.

343.    The Iranian regime offered AQ this safe haven in order to advance its own interests. Having AQ operatives in the country gave Iran a bargaining chip and important leverage with the

71

U.S. and Saudi Arabia. In addition, it enabled Iran to protect itself from a possible attack against targets in Iran. The deal enabled Iran to cause chaos in Iraq and thus preventing it from becoming a Muslim democratic regime, which would endanger the security of the Iranian regime by the example and influence it would pose to the tens of thousands of Iranian pilgrims who visit the Shiite shrines in Iraq each year.

344.    The agreement was reached between IRGC Qods Force commander Qassem Soleimani and AQ senior commander Abu Hafs al-Mauritani at Iran's Zahedan (near the Pakistani and Afghanistan border) during December 2001.

345.    In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said, "we see disturbing signs that Al Qaeda has established a presence in both Iran and Iraq."[74]

346.    Senior AQ members continued to conduct terrorist operations from inside Iran. For example, the U.S. intercepted communications from Saif al Adel, then in Mashad, Iran, to AQ assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. AQ leaders in Iran planned and ordered the Riyadh bombing.

347.    On September 2, 2022, "A recently surfaced photograph of three of Al Qaeda's top leaders, including Saif al Adel – the man many believe to be the successor to emir Ayman al Zawahiri – shows that they were present in the Iranian capital of Tehran. Numerous U.S. government designations have previously outlined the presence of senior Al Qaeda leaders in Iran, but this photo offered rare visual proof." In the photograph with Saif al Adel are senior al AQ leaders, Abu Muhammad al Masri, and Abu al Khayr al Masri. The authenticity of the photograph

---

[74] David Johnston, *Threats and Responses: Washington; Top U.S. Officials Press Case Linking Iraq to Al Qaeda,* N.Y. TIMES (Feb. 12, 2003), http://www.nytimes.com/2003/02/12/world/threats-responses-washington-top-us-officials-press-case-linking-iraq-al-qaeda.html.

was independently confirmed by two U.S. intelligence officers, and determined to depict these AQ senior leaders in Tehran circa 2015. Muhammad al Masri was killed in Tehran on August 7, 2020, and Khayr al Masri died in a drone strike in Syria on February 26, 2017.[75]



348.    In addition, CIA Director General Michael Hayden noted that Usama Bin Laden understood that Iran was providing safe harbor to AQ. For example – he quoted communications between senior AQ commanders and bin Laden, found on bin Laden's computer: "everybody is threatened – as long as he moves – by a missile…There is an idea preferred by some of the brothers to avoid attrition [loss of staff, leaders, and the organization's old elites] the idea is that some brothers will travel to 'safe' areas with their families, just for protection.  The author offers some ideas for safe havens: Sind, Baluchistan, Iran. Two months later bin Laden agrees they should be

---

[75] Bill Roggio, "Rare Photo Surfaces of Top Al Qaeda leaders Inside Iran," The Long War Journal, Sept. 2, 2022, available at: https://www.longwarjournal.org/archives/2022/09/rare-photo-surfaces-of-top-al-qaeda-leaders-inside-iran.php

taking refuge in safer areas."[76]

349.    After the September 19, 2008 attack on the American embassy in Sana'a, Yemen, which killed 19 people, Ayman al Zawahiri sent a letter to the IRGC (which was intercepted) that stated: "Al-Qaeda's leadership pays tribute to Iran's generosity, stating that without its 'monetary and infrastructure assistance' it would have not been possible for the group to carry out the terror attacks.[77] (Emphasis added).

350.    Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command General David Petraeus stated that: AQ "[c]ontinues to use Iran as a key facilitation hub, where facilitators connect AQ's senior leadership to regional affiliates..."[78]

### A.    ABU MUSAB ZARQAWI AND THE RISE OF AL QA'IDA IN IRAQ ("AQI")

351.    In 1999, Abu Musab Zarqawi founded and was the operational leader of Al Tawhid al Jihad (a/k/a Jund al-Islam), an organization with close personal and organizational links to the AQ network. UBL provided Zarqawi $200,000 to set up a training camp in Afghanistan near the border with Iran. In 2000, a Jordanian court sentenced him in absentia to fifteen years of hard labor for his role in the AQ millennial terror plot targeting Western interests in Jordan.

352.    On September 23, 2001, Tawhid (together with Iranian-sponsored AAI) took hostage, tortured and murdered (the majority of whom were beheaded) 42 Peshmerga security

---

[76] Michael W. Hayden, AMERICAN INTELLIGENCE IN THE AGE OF TERROR – PLAYING TO THE EDGE 339-340 (2016).

[77] Con Coughlin, *Iran receives al Qaeda praise for role in terrorist attacks*, THE TELEGRAPH (Nov. 23, 2008, http://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-Qaeda-praise-for-role-in-terrorist-attacks.html).

[78] U.S. Military Academy, *Combating Terrorism at West Point* (Apr. 2017), https://ctc.usma.edu/v2/wp-content/uploads/2017/04/CTC-Sentinel_Vol10Iss4.pdf.

officers in the Iraqi Kurd border town (on the border with Iran).

353.    In early 2002, Zarqawi escaped from U.S. forces in Afghanistan to Iran with other AQ leaders and operatives. While staying in Iran, Zarqawi operated under the control of the IRGC and the Qods Force. Intelligence officials claimed that the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq to establish AQI.

354.    Several months later, Zarqawi returned to the AAI camp in northern Iraq, run by his Jund al-Islam/Tawhid lieutenants.

355.    On September 24, 2003, the U.S. Treasury designated Zarqawi and several of his associates as Specially Designated Global Terrorists, stating that Zarqawi not only has "ties" to Hezbollah, but that plans were in place for his deputies to meet with both Hezbollah and Asbat al Ansar (a Lebanese Sunni terrorist group tied to AQ). [79]

356.    In 2004, Zarqawi changed the name of his group from Al Tawhid to AQI.

357.    U.S. Department of Treasury ~~designed~~designated Tawhid al Jihad as an FTO and SDGT on October 15, 2004.[80] The OFAC SDN designation was updated on December 1, 2004 to the other known names of AQI.[81]

358.    MOIS and IRGC-QF are under the general command of Section 101, also called the Leader's Intelligence and Security office. They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes,

---

[79] *Supra* note 37.

[80] U.S. Department of the Treasury, *Recent OFAC Actions* (Oct. 15, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041015.aspx.

[81] U.S. Department of the Treasury, *Recent OFAC Actions* (Dec. 1, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/pages/20041201.aspx.

primarily via acts of international terrorism).[82]

359.    Department 15 of MOIS handles liaison responsibilities with foreign terror groups while the IRGC relies on its Qods Force for many of the same functions.[83]

360.    On June 10, 2003, American intelligence officials asserted that MOIS and the IRGC Qods Force are deeply involved in supporting AQ.[84]

361.    In December 2006, two Qods force agents were arrested in Baghdad, possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information… [and] information about importing modern specially shaped explosive charges into Iraq. Officials were particularly concerned by the fact that the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[85] An American intelligence official said these documents "show how the Qods Force … is working with individuals affiliated with Al Qaeda in Iraq and Ansar Al Sunna."[86] One

[82]   Stratfor, Iranian Intelligence and Regime Preservation (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

[83]  William Tucker, *A Reported Shift in Iran's IRGC*, IN HOMELAND SECURITY (Sept. 29, 2015), http://inhomelandsecurity.com/a-reported-shift-in-irans-irgc/; Stratfor Report, *Iranian Intelligence and Regime Preservation* (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

[84]  *U.S. says Iran harbors al Qaeda 'associate'*, WASHINGTON TIMES (June 10, 2003, http://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/).

[85]  *Iraq Expels 2 Iranians Detained by U.S.*, WASHINGTON POST (Dec. 30 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/12/29/AR2006122901510.html).

[86]  *Iran's Secret Plan For Mayhem*, NEW YORK SUN, (Jan. 3 2007, http://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/).

of the IRGC Qods Force detainees was, according to General Stanley McChrystal, Mohsen Chizari, commander of Qods Force's Operations and Training staff.[87]

362.    Iranian involvement in Iraq with the Sunni terrorists was known in military and intelligence circles since the Fallujah uprising in March of 2004.

363.    Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah and elsewhere throughout Sunni dominated Anbar province.

364.    On February 16, 2012, the U.S. Department of Treasury designated MOIS, indicating that it has facilitated AQ operatives in Iran and provided them with documents, identification cards, and passports. The Treasury also stated that MOIS provided money and weapons to AQI (a terrorist group designated under E.O. 13224).) and negotiated prisoner releases of AQ operatives.[88]

365.    Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, stated on July 28, 2011 "that Iran is the leading state sponsor of terrorism in the world today. By exposing Iran's secret deal with al-Qa'ida, allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism. Today's action [designating the following AQ terrorists and others] also seeks to disrupt this key network and deny al-Qa'ida's senior leadership much-needed support…Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan."[89] Among terrorists designated were

---

[87] Michael Weiss and Hassan, ISIS: INSIDE THE ARMY OF TERROR 53 (2015).

[88] U.S. Department of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

[89] U.S. Department of the Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (Jul. 28, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx.

the following:

    a.  Ezedin Abdel Aziz Khalil, a prominent AQ facilitator, who has been operating under a secret agreement between AQ and the Iranian government. The Iranian regime has permitted Khalil to operate within its borders since 2005 and maintain a relationship with him. Khalil moved money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of AQ senior leaders. He was responsible for moving significant amounts of money via Iran for onward passage to AQ leadership in Iraq and Afghanistan.

    b.  Muhsin al-Fadhli, who was considered then an AQ leader in the Gulf countries. Al-Fadhli is so trusted within AQ that he was one of the few terrorists with foreknowledge of the 9/11 attacks. When he was first designated in 2005, al-Fadhli was considered an al Qaeda leader in the Gulf who provided support to Iraq-based fighters for attacks against the U.S.-led Coalition. Al-Fadhli was also a major facilitator for deceased AQI leader Abu Musab al Zarqawi. Al-Fadhli began working with AQ's Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from AQ leader Yasin al-Suri later that year.

    c.  AQ leader Yasin al Suri, along with five other terrorist operatives who use Iranian soil to move funds and recruits from Iran's neighboring Gulf countries to South Asia and elsewhere. Al Suri's network assists senior AQ operatives in Iraq and Pakistan.

366.    On February 6, 2014, the U.S. Treasury Department designated senior AQ member Jafar al-Uzbeki, part of an AQ network which operates in Iran "with the knowledge of Iranian authorities."[90] The U.S. Treasury added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria."[91]

---

[90] U.S. Department of the Treasury, *Treasury Targets Networks Linked to Iran* (Feb. 6 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2287.aspx.

[91] *Id.*

367.    **Suicide Bombings.**  The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy, which al-Qaeda itself learned from Iran and Hezbollah.  Al-Qaeda exported its suicide-bombing expertise to al-Qaeda-in-Iraq and Ansar al-Islam through their joint syndicate in Iraq, and in so doing played a pivotal leadership and operational role in every al-Qaeda-in-Iraq and/or Ansar al-Islam suicide bombing in Iraq during the relevant period.  For that reason, every suicide bombing alleged in this case was planned and committed by al-Qaeda.

368.    Al-Qaeda planned and committed suicide bombings in Iraq by mounting a coordinated communications campaign to persuade Sunni terrorists in Iraq (including Arab and Kurdish groups) to embrace suicide attacks against Americans. This campaign included messages touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of al-Qaeda-in-Iraq and Ansar al-Islam leadership.

369.    Al-Qaeda used this message – and the moral authority conveyed by bin Laden's 2003 fatwa authorizing "martyrdom operations" – to establish al-Qaeda-in-Iraq's and Ansar al-Islam's organizational posture toward suicide bombing. Those efforts convinced both groups to begin participating in, and claiming credit for, al-Qaeda-planned suicide attacks in Iraq. Without al-Qaeda's involvement, neither al-Qaeda-in-Iraq and/or Ansar al-Islam leadership nor either group's rank-and-file commanders would have embraced suicide bombing as a permissible tactic against Coalition forces in Iraq.

370.    To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps in Afghanistan and Pakistan that converted disaffected recruits into suicide bombers at an industrial scale for use against American targets in a number of countries, including in Iraq. In collaboration with its affiliates, al-Qaeda created and designed a process for identifying

candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal the explosives in a Suicide vehicle-borne-improvised explosive device ("suicide VBIED"), navigate a checkpoint, and detonate for maximum impact.

371.    Under al-Qaeda's standard training procedure for suicide bombers, each suicide bomber swore fealty to al-Qaeda. Al-Qaeda emphasized declarations of fealty to ensure the suicide bomber's commitment to al-Qaeda's and its allies' shared jihad by creating a psychological "point of no return" for the bomber. Suicide bombers who completed al-Qaeda's training course were officially viewed by al-Qaeda as al-Qaeda operatives and given all the stature in jihadist circles that such a title provided.

372.    Under al-Qaeda's standard operating procedure for the deployment of suicide bombers, each suicide bomber was to be accompanied by an al-Qaeda agent who served as a minder and spiritual mentor – usually an al-Qaeda operative – who would stay with the suicide bomber in the days prior to the attack to "build up" the bomber, accompany the bomber to the target on the day of the attack, and egg the bomber on to commit the attack. In many instances, the al-Qaeda, al-Qaeda-in-Iraq, and/or Ansar al-Islam minder also possessed a secondary initiation device so that the minder could also detonate the bomb if the would-be suicide bomber had second thoughts. Thus, on information and belief, at least one al-Qaeda operative played a direct role in the detonation of each suicide bomb attack in this case, in addition to the suicide bomber himself or herself (who was also an al-Qaeda operative).

373.    To carry out their joint suicide bombing campaign, al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam relied upon a series of dual-hatted al-Qaeda/al-Qaeda-in-Iraq, al-Qaeda/Ansar al-Islam, and al-Qaeda-in-Iraq/Ansar al-Islam terrorists to support the key nodes of the training and

recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Abu Musab al-Zarqawi was the most prominent such terrorist, as he was a member of al-Qaeda who was also the founder and leader of al-Qaeda-in-Iraq and the co-leader of Ansar al-Islam. In this three-hatted role, Zarqawi operated several training camps in Iran, and also facilitated travel of al-Qaeda-in-Iraq and Ansar al-Islam terrorists to Afghanistan and Pakistan through Iran for training at the al-Qaeda camps in Afghanistan and Pakistan.

374.    Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers, and the bombs they detonated, in support of al-Qaeda-in-Iraq's and Ansar al-Islam's jihad against Americans in Iraq. This suicide attack infrastructure included: (1) high-level meetings between representatives of al-Qaeda, al-Qaeda-in-Iraq and/or Ansar al-Islam; (2) joint al-Qaeda/al-Qaeda-in-Iraq and/or al-Qaeda/Ansar al-Islam safe houses and ratlines to support the deployment of suicide bombers inside Iraq; (3) joint al-Qaeda/al-Qaeda-in-Iraq and al-Qaeda/Ansar al-Islam explosives factories, in which al-Qaeda and its allies prepared suicide vests and suicide VBIEDs; and (4) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for increasing the likelihood that a particular attacker would carry out his or her attack, as well as incentivizing the next generation of suicide bombers.

375.    IEDs. Al-Qaeda training and expertise, in combination with that of the IRGC, was also essential to the successful adaptation of sophisticated IED types and attack strategies by Sunni terrorists in Iraq. Al-Qaeda developed sophisticated techniques for refining fertilizer into ammonium nitrate, marrying the ammonium nitrate with a lethal triggering device and delivery system, and training terrorists how to move, deploy, and maximize the lethality of the resulting

fertilizer bombs, which were delivered via IED or suicide bomber. As Senator Charles Schumer stated in 2004, "truck bombs using [calcium ammonium nitrate ("CAN") fertilizer] are the weapon of choice of al-Qaida."

376.    At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to building sophisticated bombs, including through the process of converting CAN fertilizer into bombs to attack Western targets, having used the technique in every major area of operations for al-Qaeda-affiliated terrorists since 9/11, including, but not limited to, attacks in Indonesia, Turkey, Syria, Yemen, Iraq, Afghanistan, and Pakistan. After 9/11, al-Qaeda supported fertilizer-based bomb strategies in every theater in which it engaged in terrorist attacks against America and its allies. As one journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertiliser packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[92]

377.    Al-Qaeda regularly instructed terrorist operatives from its Iraqi affiliates, in person (at camps in Afghanistan, Pakistan, and Iran) and in writing, regarding CAN fertilizer bombs.  For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan in 2004 instructed that military explosives were often impractical to acquire, and instructed jihadists to instead use home-made explosives, including ammonium nitrate bombs derived from CAN fertilizer.

378.    Attacks on Helicopters. Al-Qaeda's planning of the Sunni terrorist campaign against Americans in Iraq also emphasized tactics designed to shoot down American helicopters, including Black Hawks, Chinooks, Apaches, and Cobras. Al-Qaeda's role was essential because Sunni extremists native to Iraq lacked tactical experience successfully targeting American

---

[92] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

helicopters prior to their training from al-Qaeda. Al-Qaeda's anti-helicopter training was renowned in jihadist circles, having successfully trained terrorists in Somalia with a substantial history of downing American helicopters, including the "Black Hawk Down" incident during the Battle of Mogadishu in 1993, and a litany of successful attacks in Iraq from 2003 through 2008 (killing many of the Plaintiffs in this case) and Afghanistan since 9/11.

379.     Shooting down a helicopter with an RPG requires precise training and is one of the most challenging attack types for an unskilled terrorist to execute. Consequently, al-Qaeda's specialized skills, experience, and training had an outsized impact on the constellation of Sunni terrorists who were trained at al-Qaeda and al-Qaeda affiliate camps in Iraqi Kurdistan and Afghanistan. On information and belief, al-Qaeda deployed trainers into Iraq for the specific purpose of teaching al-Qaeda-in-Iraq and Ansar al-Islam terrorists how to execute attacks targeting helicopters.

### 9.   THE SPECIAL GROUPS

380.     Iran opposes U.S. peacekeeping efforts and initiated acts of international terrorism against U.S. nationals, Coalition Forces, and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

381.     Iran, through its proxies and/or agents acting within the scope of their employment, agency, and direction from Iran, provided substantial material support and/or resources that facilitated acts of torture, extrajudicial killing and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

382.     Iran's support for the Special Groups is now well established. The IRGC-QF attempted to develop the Special Groups into a network similar to Hezbollah – a highly-lethal network that relied upon the Iranian regime to survive. The purpose of the IRGC-QF in developing these Special Groups was to create highly lethal networks that relied upon the Iranian regime to

83

survive, and thus, were controlled, either directly or indirectly, by Iran.

383.    Iran leveraged (and continues to do so) its control and dominion over the IRGC, the IRGC-QF, and Hezbollah, and through those entities, provided the Special Groups with training (in Iran), weapons, safe harbor, U.S. currency, and intelligence, including those Special Groups responsible for the Terrorist Attacks which killed, maimed, or otherwise injured Plaintiffs.[93] The training provided to the Special Groups while they were in Iran included tactics and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated IEDs.[94]

384.    These Special Groups returned to Iraq after receiving their Iran-supported training, maintaining their group's organization. Thus, each Special Group consisted of Iraqi civilians who trained together in Iran on how to use IEDs, EFPs, mortars, rockets, as well as intelligence, sniper, and kidnapping operations.

385.    The Special Groups operate throughout Iraq and, at all relevant times, remained under the control of Iran, through its proxies and/or agents, MOIS, IRGC, IRGC-QF, and Hezbollah.

386.    During the Relevant Period, the IRGC-QF supplied the Special Groups with an estimated funding stream of at least $750,000 to $3 million (U.S. Dollars) a month.

387.    Utilizing the training, weapons and funding provided by Defendants, either directly or indirectly, the Special Groups planned and executed a string of bombings, kidnappings, sectarian murders, and more against Iraqi civilians, Coalition Forces and U.S. nationals, including

---

[93]  U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran*, at 3 (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

[94] U.S. Department of Defense, *Iranian Government Behind Shipping Weapons to Iraq*, http://archive.defense.gov/news/newsarticle.aspx?id=1289 (last visited Sept. 13, 2017).

Plaintiffs.

388.     Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. and international peacekeeping efforts in Iraq as a potential threat to its regime.

389.     Rather than cooperate with the U. S. and Coalition Forces authorized by the U.N. to bring peace, democracy and stability to Iran, or alternatively to openly and directly engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. and U.N. peacekeeping efforts by unleashing massive waves of terrorism and sectarian violence in Iraq, in part, by targeting U.S. Nationals, including Plaintiffs, through the Special Groups that Iran controlled.

390.     President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

391.     On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

392.     The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability."[95]

393.     After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization (discussed further below).

394.     In addition to its coordination with the Badr Organization, Iran, through its agent the IRGC-QF, formed the Ramezan Corps intended to operate specifically in Iraq. The Ramezan Corps cultivated, armed, trained and supported several Shi'a terror groups in Iraq that the U.S.

---

[95] S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

military later termed "Special Groups."

395.    Although a June 7, 2004 U.N. Security Council Resolution expressly assigned Coalition Forces in Iraq the task of helping Iraq "by preventing and deterring terrorism," Iran set out to target Coalition Forces and U.S. nationals, including Plaintiffs, and force them out of Iraq. (emphasis added).[96]

396.    After Coalition Forces invaded, Iranian intelligence services penetrated Iraq rapidly and thoroughly. The goal of their collection efforts was finding out what weapons U.S. troops were carrying and what kind of body armor they were wearing. Iranian agents also sought information on the location of U.S. Army and intelligence bases; on the routes traveled by U.S. convoys; on the operations of the Special Forces' elite Delta Force; and on the plans of the U.S. military and intelligence inside Iraq. The Iranians preferred not to be directly implicated in attacks on U.S. forces, but instead offered bounties to Iraqis for killing Americans, shooting down U.S. helicopters, and destroying American tanks.[97]

397.    The number and sophistication of Special Groups increased in 2005, as the Iranian regime deployed Hezbollah to train Iraqi civilians in Iran.

398.    In 2007, the Special Groups further escalated the number of mortar and rocket attacks against U.S. national targets, including Plaintiffs, in the Baghdad International Zone. The accuracy of this indirect fire improved because of the training and weapons these Special Groups received from Iran.

399.    In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were present at the request of the sovereign government of Iraq and participants in an

---

[96] S.C. Res. 1546, U.N. Doc. S/RES/1546.

[97] Pound, *supra* note 27.

internationally sanctioned peace keeping mission pursuant to the U.N. Security Council Resolution acting under Chapter VII of the U.N Charter, Iran embarked on a policy of terrorism, extrajudicial killings and murder, kidnapping and torture to thwart those efforts.

400.    During the Relevant Period, the conduct of MOIS IRGC, IRGC-QF, Hezbollah, AAI, AQ, the Special Groups, and other Iranian-supported terrorists in the extrajudicial  killing, injuring, and kidnapping and hostage taking of U.S. nationals, Coalition Forces, and civilians were conducted by operatives who did not carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts. In fact, Hezbollah, the IRGC, IRGC-QF, AAI, AQ, the Special Groups and other Iranian supported terrorists acted in flagrant violation of, inter alia, the Geneva Convention Articles 48, 51(2)[98] and 52(2) of Additional Protocol I; Article 4(2)(d) of Additional Protocol II[99] and Article 147 of the Geneva Convention on the Protection of Civilian Persons in Time of War (Fourth Geneva Convention 1949), as well as United Nations Security Council Resolution 1373.[100]

401.    Because of the perceived unreliability and value of the post-Hussein regime Iraqi

---

[98]  Article 51(2) of Additional Protocol I prohibits acts or threats of violence where the primary purpose is to spread terror among the civilian population.

[99]  The prohibition of acts or threats of violence aimed at terrorizing the civilian population is further supported by the wider prohibition of acts of terrorism in Article 4(2)(d) of Additional Protocol II. The UN Secretary-General noted that violations of Article 4 of Additional Protocol II have long been considered violations of customary international law. UN Secretary-General, *Report on the establishment of a Special Court for Sierra Leone*; ICTR Statute, Article 4(d) (cited in Vol. II, Ch. 1, § 545).

[100]  United Nations Security Council, *Prevention and Suppression of Financing Terrorist Acts*, (Sept. 28, 2001), http://www.un.org/en/sc/ctc/specialmeetings/2012/docs/United%20Nations%20Security%20Council%20Resolution%201373%20(2001).pdf (passing unanimously to reaffirm various UN resolutions).

currency, Special Groups and other terrorists in Iraq used U.S. currency almost exclusively.

402.     Iran facilitated and enabled the terrorist attacks launched against U.S. Nationals, including the Plaintiffs and others, on a massive scale which would not have been possible without Iran's provision of hundreds of thousands of munitions, advanced technologies, training, funding, intelligence, safe harbor and other material support detailed herein.

403.     Without the massive funding and material support from Iran, Special Groups and other Iranian proxies would not have been able to conduct the thousands of acts of international terrorism on the scale and with the lethality they achieved, including the Terrorist Attacks which resulted in the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

### A.     THE BADR CORPS/BADR ORGANIZATION

404.     The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

405.     From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

406.     Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

407.     The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

408.     Before 2003, the Badr Corps served as Iran and Hezbollah's most important surrogate inside Iraq, acting as a *de facto* arm of the IRGC-QF.

409.     The Badr Corps received training and weapons from Iran through the IRGC and Hezbollah.

410.     After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr

88

Organization, and many of its operatives joined the newly formed Iraqi security forces.

411.    Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

412.    Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hizballah (discussed below).

413.    "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest Qods Force command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

414.    Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corps agents and operatives.

415.    It was through the Badr Corps that the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g., the Iraqi Ministry of Interior Intelligence structure) during the Relevant Period.

**B.      KATA'IB HIZBALLAH**

416.    Kata'ib Hizballah ("KH") has functioned as Iran's go-to terror group in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks. KH is a radical Shi'a Islamist group, an Iraqi terrorist organization, and an anti-Western establishment responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since at least 2007. KH has ideological ties to Lebanese Hezbollah and may have received support from that group.

89

417.    KH has a number of aliases, including Hezbollah Brigades; Hezbollah Brigades in Iraq; Hezbollah Brigades-Iraq; KH; Kata'ib Hezbollah; Kheta'ib Hezbollah; Khattab Hezballah; Hezbollah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizbollah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; and Katibut Karbalah.

418.    KH was formed in 2006 and came to prominence in 2007 for attacks against Coalition Forces and U.S. nationals, including Plaintiffs, and its online propagandizing of those attacks. The IRGC-QF established it as a vehicle to deploy its most experienced operators and its most sensitive equipment. Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City and throughout the south.

419.    The IRGC-QF positioned one of its own, Abu Mahdi al-Muhandis (aka Jamal al-Ibrahimi), as the leader of KH. Under al-Muhandis, KH developed as a compact movement of less than 400 personnel that was firmly under IRGC Qods Force control and maintains relatively good operational security.

420.    In June 2011, five U.S. soldiers were killed in a rocket attack in Baghdad when KH assailants fired between three and five rockets at U.S. military base Camp Victory.

421.    In 2015, Iran continued to be deeply involved in the conflict in Syria, working closely with the Assad regime to counter the Syrian opposition, and also in Iraq where Iran continued to provide support to militia groups, including the FTO KH. Iranian-backed groups, including KH, continued to operate in Iraq during 2015, which exacerbated sectarian tensions in Iraq and contributed to human rights abuses against primarily Sunni civilians. KH and other Iraqi Shi'a militias associated with the IRGC have been brought into the Iraqi government's Popular Mobilization Forces. The inclusion of KH, a designated FTO, in the Popular Mobilization Forces enlisted by the Iraqi Government in the effort against the Islamic State of Iraq and the Levant

("ISIL," aka "ISIS" or "Daesh"), threatens to undermine counterterrorism objectives.

422.    On June 24, 2009, the United States designated KH an FTO.

423.    The State Department's notice of KH's FTO designation stated:

> Kata'ib Hizballah is a radical Shia Islamist group with an anti-Western establishment and jihadist ideology ***that has conducted attacks against Iraqi, U.S., and Coalition targets in Iraq. Kata'ib Hizballah has ideological ties to Lebanese Hizballah and gained notoriety in 2007 with attacks on U.S. and Coalition forces designed to undermine the establishment of a democratic, viable Iraqi state***. The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hizbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.[101]

424.    KH was simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007."[102]

425.    The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

426.    The U.S. Treasury Department's 2009 press release announcing KH's designation explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces . . ."[103]

427.    The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against

---

[101] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Designation of Kata'ib Hizbollah*, (July 2, 2009), https://2009-2017.state.gov/r/pa/prs/ps/2009/july/125582.htm (emphasis added).
[102] Exec. Order 13,224.
[103] *Supra* note 83.

innocents to intimidate and to undermine a free and prosperous Iraq."[104]

428.    The U.S Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to KH and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."[105]

429.    The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.[106]

430.    Furthermore, the 2009 U.S. Treasury Department press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.[107]

431.    One of the hard drives contained 35 attack videos edited with the KH logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon broadcast several videos showing KH conducting multiple attacks against U.S. nationals and Coalition Forces in Iraq.

432.    Immediately preceding the government of Iraq's approval of the United States-Iraq

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*

92

security agreement in late November 2008, KH posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the government of Iraq if it signed the security agreement with the United States.

433.    In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against U.S. nationals in Iraq—including KH's use of EFPs:

> [A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

434.    As noted above—and as stated by the U.S. Treasury Department in its July 2009 press release—throughout 2008, Al-Manar, Lebanon Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops in Iraq. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

435.    Although KH's leadership remains in flux, one individual reportedly associated with the group is Abu Mahdi al-Muhandis. According to an inquiry published by Kuwaiti daily al-Rai on June 4, 2016, during the 1980's, Abu Mahdi al-Muhandis received an Iranian citizenship from the Iranian regime as part of his prominent role in the Badr Corps.[108]

436.    Prior to his death, in January 2020, KH's leader, Abu Mahdi al-Muhandis, was wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti

---

[108] *See* http://www.alraimedia.com/ar/article/special-reports/2016/06/04/684698/nr/nc (last visited Sept. 13, 2017) (Arabic translation available).

Emir in 1985. In an interview with Hezbollah-affiliated media on January 3 2017, Abu Mahdi al-Muhandis admitted that he cooperated with Hezbollah top commanders Imad Moughniyeh and Mustafa Badreddine from the early 80's. According to him, this cooperation included training opposition Iraqi Shiite groups to fight Saddam Hussein regime and the U.S. troops in Iraq from 2003 onward.[109]

437.     The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation. That press release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces. Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.
>
> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon

---

[109] Middle East Media Research Institute TV Monitor Project, *Clip #5829*, https://www.memri.org/tv/abu-mahdi-al-muhandis-deputy-commander-popular-mobilization-units-optimism-over-liberation-mosul (last visited Sept. 12, 2017).

completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al-Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.[110]

438.    In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno confirmed that KH operatives had gone to Iran for special training and then returned to Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC."[111]

439.    In June 2011, it was estimated that KH membership exceeded 1,000 people in Iraq.

440.    Senior Iraqi Intelligence officials have stated that KH receives unlimited funding from Iran, allowing KH operatives to be paid $300-$500 per month.

441.    On January 3, 2020, KH leader Abu Mahdi al-Muhandis, was killed in a U.S. drone strike while travelling in a vehicle near Baghdad airport. In the vehicle with him, and also killed, was IRGC-QF commander Qasem Soleimani. Immediately following the strike, the U.S. Department of Defense publicly stated:

At the direction of the President, the U.S. military has taken decisive defensive action to protect U.S. personnel abroad by killing Qasem Soleimani, the head of the Islamic Revolutionary Guard Corps-Quds Force,

---

[110] U.S. Department of the Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009), https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx.
[111] Jim Loney, *Iran-backed force threatens U.S. Iraq bases - general*, Reuters, July 13, 2010, https://in.reuters.com/article/idINIndia-50093520100713.

95

a U.S.-designated Foreign Terrorist Organization… ***General Soleimani was actively developing plans to attack American diplomats and service members in Iraq and throughout the region. General Soleimani and his Quds Force were responsible for the deaths of hundreds of American and coalition service members and the wounding of thousands more***… This strike was aimed at deterring future Iranian attack plans.[112]

(Emphasis added).

## C.   JAYSH AL MAHDI & THE PROMISED DAY BRIGADES

442.   Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.

443.   JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship of terrorist activities."[113] Prior to September 11, 2001, Mughniyah was ranked number one on the FBI's Most Wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

444.   JAM expanded its territorial control of mixed or predominantly Shi'a

---

[112] Statement by the Department of Defense, Immediate Release, (Jan. 2, 2020), available at: https://www.defense.gov/News/Releases/Release/Article/2049534/statement-by-the-department-of-defense/

[113] "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008.  Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities." *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 106-107 (S.D.N.Y. Dec. 22, 2011).

neighborhoods and displaced or killed the local Sunni population.

445.    JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

446.    In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house . . . about 20 miles east of Baghdad . . . They arrested one of our division's most valued targets, . . . [who] acted as a link between Iran and the [JAM]. He was the main Shia conduit in that region for getting Iranian EFPs and rockets into Baghdad, . . ."[114]

447.    Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

448.    The PDB has received funding, training, and weapons from the IRGC and is one of the Special Groups.

449.    It is estimated that the PDB had approximately 5,000 active members in June 2011.

450.    The PDB actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

451.    For example, in June 2011, the PBD claimed responsibility for 52 attacks on U.S. Forces.

452.    On June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. service members were killed.

---

[114] Kimberly Kagan, THE SURGE: A MILITARY HISTORY (ENCOUNTER BROADSIDES) 50 (2010).

453.    PDB's headquarters is located in Sadr City, Baghdad, and the groups' main areas of operation include southern Iraq, and Baghdad.

### D.    ASA'IB AHL AL HAQ

454.    Asa'ib Ahl Al Haq ("AAH" or the "League of the Righteous") terrorist organization is a Shi'a Special Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

455.    AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

456.    AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

457.    AAH fought alongside Hezbollah in the 2006 Lebanon-Israeli War.

458.    During the Relevant Period, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

459.    Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

460.    Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

461.    In October 2006, AAH used mortars to attack Coalition Forces at Forward Operating Base Falcon.

462.    In May of 2007, AAH operatives attacked the Iraqi Finance Ministry, kidnapping British contractor, Peter Moore, and his four bodyguards. AAH released Moore in December 2009

in exchange for the Iraqi government's release of its leader Qais al-Khazali, but not before murdering Moore's four bodyguards.

463.    In October 2009, AAH used mortars to attack the U.S. Consulate in Al Hillah, Babil, Iraq.

464.    In October 2011, AAH claimed responsibility for a roadside bomb that killed the last American to die before the U.S. withdrawal in Iraq in November 2011.

465.    Hezbollah and the IRGC-QF provided JAM, PDB, KH, AAH, and other Shi'a groups with a variety of weapons and training used to target U.S. nationals, including Plaintiffs, and Coalition Forces engaged in their post-2003 peacekeeping mission.

466.    These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions ("IRAMs"), as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, Rocket Propelled Grenade ("RPG") launchers and other small arms.

467.    The training and weapons provided by Iran and its agents resulted in an increased lethality and effectiveness of the Terrorist Attacks, and included sophisticated tell-tale tactics that had not previously been seen in Iraq prior to infusion of Iranian agents, Hezbollah and the IRGC-QF in 2003.

468.    On January 3, 2020, AAH was designated as a Foreign Terrorist Organization on January 3, 2020. In doing so, the U.S. State Department, detailed just some of AAH's activities in Iraq, stating:

> AAH and its leaders **are violent proxies of the Islamic Republic of Iran… Acting on behalf of their masters in Tehran, they use violence and terror to further the Iranian regime's efforts to undermine Iraqi sovereignty. AAH is extensively funded and trained by Iran's Islamic Revolutionary Guard Corps (IRGC) Quds Force,** an entity that was part of the IRGC designation as an FTO in April 2019[…] AAH, led by Qays and Laith al-Khazali, is an Iran-backed, militant organization that has claimed responsibility for more than 6,000 attacks against U.S. and Coalitions forces

99

since its creation in 2006. AAH has carried out highly sophisticated operations, including mortar attacks on an American base, the downing of a British helicopter, and an attack on the Karbala Provincial Headquarters that resulted in the capture and murder of five American soldiers […] Today's actions notify the U.S. public and the international community that this group is a terrorist organization and its leaders, the Khazali brothers, who have participated in its terrorist acts, are SDGTs.[115]

### E.      THE SHEIBANI NETWORK

469.    The Sheibani Network is another Iranian-supported Shia Special Group operating in Iraq that uses material support and resources provided by Defendants to plan, commit, or authorize attacks against U.S. nationals.

470.    Like KH, The Sheibani Network (SN), traces its emergence back to the Badr Corps, and Iran's early support for it and SCIRI in their efforts to destabilize Iraq while under the Sunni Ba'athist regime of Saddam Hussein.[116]

471.    During that time, the Badr Corps established smuggling routes and ratlines running between Iran and Iraq to support SCIRI and its operations against the regime. Iran tapped those with this prior smuggling experience and so, after 2003, senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011. This included Abu Mahdi al-Muhandis, who later led KH (discussed above), and Abu Mustafa al-Sheibani, who became a key smuggler of Iranian weapons and funds.

472.    In 2003, Iran directed Al-Sheibani to leave the Badr Organization and build a new militant group to attack Americans, the Sheibani Network. Iran provided Sheibani with $40 million in seed money to build his network and "he went on to finance and supply other key networks and

---

[115] U.S. State Department, *Terrorist Designations of Asa'ib Ahl al-Haq and Its Leaders, Qays and Laith al-Khazali* (January 3, 2020).
[116] Joel D. Rayburn et al. eds., *The U.S. Army in the Iraq War* Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 14.

remained a key node in the Quds Force's controlled distribution of advanced weaponry."[117]

473.    Based in Baghdad, but supervised from nearby Baktaran, Iran, Sheibani's group developed extensive smuggling routes for moving weapons, relief supplies, men, money, and propaganda from Iran into Iraq to resource Badr activities in Baghdad, Diyala, and Wasit. By the summer of 2003, SN was disrupting Coalition Force operations, particularly those of the U.S. Army's 4th Infantry Division. SN's smuggling networks and Iran's involvement with the Badr Organization would later be instrumental in funneling lethal support such as EFPs into Iraq used against Coalition Forces.[118]

474.    In 2007, taking advantage of Coalition Forces' renewed focus against Sunni militants elsewhere, Shi'a militants increased their attacks in the first half of the year, conducting at least 65 EFP attacks against Coalition troops in April alone. These attacks were connected to well-established networks of Iranian-sponsored militants smuggling EFP devices and other weapons across the Iran-Iraq border in the south and in the Diyala Valley.

475.    Abu Mustafa al-Sheibani and his brother Abu Yaser al-Sheibani were the most active EFP smugglers at the time and moved the Iranian weapons through Maysan and Wasit Provinces to deliver them to JAM and other militant groups.

476.    In addition to the border crossings near Amarah and Kut, Coalition analysts suspected the Sheibani brothers and other smugglers were using routes through the vast marshes that spanned the border south of Amara, just as they had done in their shadowy war against Saddam's regime during and after the Iran-Iraq War.

---

[117] *The U.S. Army in the Iraq War* Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 65.
[118] *The U.S. Army in the Iraq War* Volume 1 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 181.

477.     Though Coalition special operators were able to capture Abu Yaser al-Sheibani on April 20, 2007, the incidence of EFP attacks nevertheless increased as the summer approached, eventually rising to 99 attacks during July 2007.[119]

478.     In early July, JAM leader Muqtada al-Sadr fled Iraq and sought refuge in Iran to avoid capture. Al-Sadr left JAM under the command of Abu Mustafa al-Sheibani who took over the group back in Iraq. JAM immediately mounted large-scale indirect fire attacks in Baghdad. Coalition Forces increased their operations in response to these JAM attacks, focusing on longtime JAM sanctuaries in Baghdad and elsewhere, and forcing Al-Sheibani to flee to Iran as well.[120]

479.     On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran. In designating Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. ***The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers***. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. ***Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network***.
>
> Al-Sheibani's network – consisting of several hundred

---

[119] The U.S. Army in the Iraq War Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 222.
[120] The U.S. Army in the Iraq War Volume 2 (Washington, D.C: Office of the Chief of Staff of the U.S. Army, 2019), p. 230.

members – conducted IED attacks against Americans in the Baghdad region. ***As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran***. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early May 2007, ***Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.***

Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. ***Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Force***s in southern Iraq, particularly British forces.

(Emphasis added).[121]

480.    During his interrogation by Coalition Forces after he was captured, AAH leader Qais Khazali alleged that Sheibani's "resistance group belongs to" Ayatollah Khamenei and said that the members of Sheibani's network were "well-trained" and "specialize in attacks against CF [Coalition Forces]."[122] Indeed, SN operatives became known as master placers of EFPs and IEDs, and for their precision rocket and mortar attacks on Coalition bases. Even more so, SN was considered masterful with smuggling and assembling EFPs, and supplied these munitions to JAM and the other Special Groups.

481.    Iran also employed SN to target and assassinate Iraqi police and government officials who opposed its efforts in Iraq. Iran selected SN specifically for these operations due to

---

[121] U.S. Department of Treasury Press Release, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (January 9, 2008).
[122] *See* Multi-National Force – Iraq, Shi'a SDE, "Tactical Interrogation Report: Qais Hadi Said al-Khazali," May 30, 2008, p. 2.

the specialized training Iran provided to the group, via Hezbollah, for types of complex and high-profile killings.

482.    SN's peripatetic operations meant that al-Sheibani mainly sought sanctuary in Iran, avoiding detection and capture. But while Khazali was in prison, SN assisted AAH with the delicate balancing act of trying to negotiate his release while still attacking U.S. Forces.

483.    In 2010, Al-Sheibani reportedly returned to Iraq from Tehran to join AAH.[123]

484.    Later, in approximately May 2013, Al-Sheibani founded yet another pro-IRGC Iraqi militia, Kata'ib Sayyid al Shuhada (KSS) with the support of the Badr organization and KH, and purportedly traveled with 500 Iraqi militants to Syria to fight alongside the Iranian-backed regime there.[124] KSS expanded its presence in Iraq with the rise of ISIS, and operates as a member of the Iraq Popular Mobilization Forces designated as Brigade 14, which was, until his death in January 2020, tacitly commanded by IRGC-QF Commander General Qassem Soleimani.[125] KSS is still presently being funded by the IRGC-QF.[126]

## 10. IRANIAN SIGNATURE WEAPONS AND TACTICS USED IN THE TERRORIST ATTACKS

485.    Iran has continually and purposefully provided material support to terrorist groups in Iraq by way of funding, weapons, training, safe haven, travel and transportation, intelligence, expert advisors, and assistance in attack planning.

486.    Indeed, over the years, Iranian transfers to state and nonstate actors have included: communications equipment; small arms (e.g., assault rifles, sniper rifles, machine guns, mortars,

---

[123] *See* https://www.counterextremism.com/extremists/abu-mustafa-al-sheibani (last visited May 2, 2022).
[124] *Id.*
[125] *Id.*
[126] *Kata'ib Sayyid al-Shuhada*, Mapping Militants, Stanford University Cntr. For Intl. Sec. & Coop (last modified July 2019).

and rocket-propelled grenades (RPGs)) and ammunition; artillery systems, including battlefield rockets and launchers; armored vehicles; equipment for unmanned explosives boats; UAVs; ground-attack aircraft; and C/SRBMs and associated technology. Iran provides such weapons to a wide array of actors.

487.    In Iraq in particular, Defendants have provided: advanced rockets; small arms; automatic weapons; RPGs; 60mm-120mm mortars; 107-mm, 122-mm and 240-mm rockets; advanced large-caliber sniper rifles; improvised explosive devices (IEDs), including explosively-formed penetrators (EFPs), explosives and component parts for IEDs and improvised rocket assisted munitions (IRAMs), including critical targeting, triggering and detonating mechanisms, antiaircraft weapons, and more.[127]

488.    In 2012, the Small Arms Survey found that, of the weapons recovered in arms caches in Iraq in 2008 and 2009, including more than 30,000 small arms, light weapons, and rounds of light weapons ammunition and more than 500,000 rounds of small-caliber ammunition, 29% were Iranian in origin.

### A.    EXPLOSIVELY FORMED PENETRATORS

489.    One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing and deployment of EFPs and IEDs.

490.    IED is a term commonly used by the U.S. military as shorthand for a roadside bomb. The Terrorist Groups consistently sought to attempt to improve IED effectiveness and sophistication.[128]

---

[127] U.S. State Department, "Country Reports on Terrorism, 2009," August 2010, p. 193

[128] Pound, *supra* note 27.

491.     EFPs, IEDs, and other WMDs were typically smuggled from Iran to Iraq, and the IRGC-QF played a vital role in that process.

492.     Additionally, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups, Al Qaida, and Ansar al Islam to deploy EFPs and IEDs. Iran, through Hezbollah, the IRGC-QF, and MOIS provided EFP and IED component to Iraqi insurgents and paid them up to $200 U.S. to use these weapons against U.S. soldiers in Iraq.

493.     The number of EFPs used against Coalition Forces and U.S. nationals rose at a rate of 150% between January 2006 and December 2006, and increased every month between November 2006 and January 2007.

494.     EFPs are a particularly effective form of manufactured IED and are sometimes known as a "shaped charge," usually made with a manufactured concave copper disk and a high explosive packed behind the liner.



495.     The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised"

explosive devices but professionally manufactured and specifically designed to target U.S. nationals, including Plaintiffs, and Coalition Forces' armor. These EFPs cannot be made without specific machinery, access to which Iran controls, and without which Special Groups and other terrorist organizations could not obtain or use these munitions.

496.    EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

497.    In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices), ultimately setting off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug, traveling at over a mile per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq even up to 300 feet away.

498.    Metallurgic analysis by U.S. technicians helped confirm the high-purity copper EFP liners were not generally produced in Iraq.

499.    Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

500.    To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

501.    The hydraulic press machinery was transported to Iran by Iran's national maritime carrier, Islamic Republic of Iran Shipping Line ("IRISL").

502.    This munitions manufacturing process is critical to the design and concomitant

107

lethality of the weapon and is controlled by Iran.

503.     EFPs are far more sophisticated than homemade explosive devices such as traditional improvised explosive devices, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

504.     One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed penetrators (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

505.     Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq. As documented by the U.S. State Department in its 2006 Country Reports on Terrorism regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces, "Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks."[129]

506.     As reported by the New York Times on March 26, 2007, U.S. Army officials believe that terrorists first began using EFPs in Iraq in August 2003.

507.     In December 2003, Coalition Forces recovered radio equipment that was most likely intended for use with EFPs in Iraq.

508.     In 2004, in an attempt to pacify the Sadr City area of Baghdad (the notorious

---

[129] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2006*, at 369 (April 2007), https://www.state.gov/j/ct/rls/crt/2006/.

stronghold of JAM and epicenter of the Shia Sadrist movement) the U.S. Army's 2nd Battalion, 5th Cavalry Regiment, 1st Cavalry Division conducted several weapons "buy-back" programs, including one in early 2004 during which it came across one of the first identified EFPs.

509.    In December 2004, Coalition Forces recovered passive infrared sensors modified for use with EFPs.

510.    Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005 when the two countries issued diplomatic protests, the official identification of specific attacks as EFP attacks was not first publicly disclosed until 2010.

511.    As early as 2006, CF had amassed substantial physical evidence linking Iran to EFPs emplaced all over Iraq, not just in Baghdad and Basrah, but also some as far as from the capital as Rutba (263 miles west), Mosul (258 miles north), and Kirkuk. These attacks mostly occurred in areas with large concentration of Shia militia members (Special Groups).

512.    A May 2006 Multi-National Force- Iraq Deputy Chief of Staff for Intelligence Support report entitled "31May Iranian Support," describes key findings linking Iranian "operatives with Lebanese Hizballah trainers," who together "introduced Explosively Formed Projectile technology into Iraq."

513.    The report found that physical evidence linking Iran to EFPs in Iraq was obtained as early as May 2003, when Coalition Forces intercepted a fishing vessel operated by Lebanese Hezbollah while it was attempting to smuggle IED materials into a Palestinian port. The TNT found in the intercepted vessel bore identical factory markings and a manufacturing date ("2000") as weapons caches containing TNT recovered by Iraqi police in al Amarah, Iraq, in 2006.

514.    The same report found that an Iranian electronics firm purchased a large shipment of radio modules in 2000, and these same modules were later found in remote-control firing

devices used with EFPs in Iraq.

515.    The report ends by highlighting the particular lethality and unique effectiveness of EFP attacks, showing that, between June 2004 and April 2006, EFPs accounted for approximately 1% of all IED attacks in Iraq, but were responsible for nearly 23% of the U.S. military's IED-related deaths.

516.    In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.* (emphasis added).[130]

517.    Also, in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force-Iraq stated, "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."[131]

518.    Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence

---

[130] *Id.*
[131] John Hendron and Alex Chadwick, *Pentagon: Iran Training Shiite Militias in Iraq*, NPR, August 24, 2006, https://www.npr.org/templates/story/story.php?storyId=5703572.

officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Qods Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.... The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran.

519.    In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, confirmed that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran. The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

520.    That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S. Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

521.    According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities

111

continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC) -Qods Force, continued to provide Iraqi militants with Iranian produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

522.    Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that Iran will cease lethal aid.

523.    These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan ...

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality

112

of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

524.    Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying "[F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian."

525.    Further, the State Department's 2011 *Country Reports on Terrorism* reported:

Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Qods Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

526.    Iran also introduced other weapons into Iraq for the purpose of supporting terrorist attacks on U.S. nationals and coalition personnel, including Plaintiffs. These included 81 mm mortars (the remainder of the region uses 82 mm mortars), repainted 107 mm rockets imported into Iran from China and marked for sale in the open markets, 60 mm canisters filled with Iranian-manufactured mortar rounds, 240 mm rockets, IRAMs, RPG-7s, RPG-29s, and RKG-3 armor penetrating anti-tank grenades deployed by the Terrorist Groups in various acts of international terrorism, including the Terrorist Attacks wherein Plaintiffs and/or Plaintiffs' family members were killed, maimed, or otherwise injured.

527.    The presence of these weapons shows a high level of sophistication of the Iranian

113

arms flow into Iraq as the purchases are made by the Iranian regime.

### B.   IMPROVISED ROCKET ASSISTED MUNITIONS

528.    In addition to EFPs, Iran also provided material support to the Terrorist Groups by training and providing them with Improvised Rocket Assisted Munitions (IRAM).

529.    Along with EFPs, IRAMs were a signature weapon of terrorists in Iraq and supplied by the IRGC.

530.    An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal, ball bearings, and propelled by rockets, most commonly 107 mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.



531.    According to The Joint Improvised Explosive Device Defeat Organization of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

114

Team concluded that Special Group criminals utilized 14 IRAMs, fired from a cargo truck, with 14 improvised rocket tubes setup in the bed with remote initiation to attack FOB Loyalty on April 28.[132]

532.    Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not publicly disclosed until 2010.

533.    IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

### C.    IRANIAN TRAINING & TACTICS

534.    In addition to transferring specific weaponry, Iran created specialized training

---

[132] Bill Roggio, "Mahdi Army Uses 'Flying IEDs' In Baghdad," The Long War Journal, June 28, 2008, available at: https://www.longwarjournal.org/archives/2008/06/mahdi_army_uses_flyi.php (last accessed July 4, 2018).

programs for its terror proxy groups, which included: (1) a basic paramilitary skills and weapons course, offering introductory training on mortars, improvised explosive devices, and firearms;  (2) an advanced paramilitary course that provided training in advanced operations and tactics, logistics and support, and information operations;  and (3) a master-trainer course to create a subset of Iraqi fighters that could take these combat skills and teach them to Iraqis locally.[133]  To advance in the training program, Iraqi recruits made multiple trips to Iran or camps in Lebanon maintained by Hezbollah.[134]

535.    All of the foregoing material support provided to Terrorist Groups, including those that perpetrated the Terrorist Attacks that resulted in the death, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members, was provided by Iran for attacks on Coalition Forces and U.S. nationals, including Plaintiffs, or was financed and facilitated in substantial part by Iran.

### 11. IRAN'S TERRORISM NETWORK WAS USED TO EVADE ECONOMIC SANCTIONS & PROVIDE SUPPORT AND RESOURCES TO ITS TERRORIST AGENTS/PROXIES IN IRAQ

536.    Because Iran is under numerous sanctions issued by other countries, it continues to evade those sanctions by operating clandestinely through agents of Iran, including the Islamic Republic of Iran Shipping Lines, Mahan Air, and the National Iranian Oil Company.

537.    Iran obtains and provides weapons and other material support to Terrorist Groups and other terrorist organizations through agents and proxies that are nothing more than extensions of the Iranian regime.

538.    Congress and successive Administrations have enacted several laws and executive

---

[133] U.S. Department of State, Country Reports on Terrorism 2007 (April 2008).
[134] U.S. Congress, Senate Committee on Armed Services, The Situation in Iraq and Progress by the Government of Iraq in Meeting Benchmarks and Achieving Reconciliation: Hearing before the Committee on Armed Services, 110th Cong., 2d sess., April 8-10, 2008, Statements of Gen. David H. Petraeus and Ambassador Ryan Crocker).

orders that imposed sanctions on countries and firms that sell WMD technology and military equipment to Iran. Despite these efforts, Iran continued to evade sanctions.

539.     In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

540.     In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

541.     Iran used proxies and agents as tools to circumvent sanctions, including IRISL, NIOC, KAA, and Mahan Air.

542.     IRISL, NIOC, KAA, Mahan Air, and other Iranian government and IRGC fronts serve as financial, physical, and logistical conduits for Iran and its terroristic goals. At all relevant times, these agents and proxies of Iran acted in concert with Defendants.

### A.     ISLAMIC REPUBLIC OF IRAN SHIPPING LINES

543.     As Iran's national maritime carrier, IRISL135 is an agent and instrumentality of Iran.

544.     IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.

545.     For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups like the Taliban and Hezbollah….

---

[135] IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

546.     The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

547.     The cargo included DIO[136] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

548.     DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

549.     An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") Iran Teyfouri.

550.     In September 2008, the U.S. Treasury Department designated IRISL an SDN, stating: "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

551.     The Treasury Department further noted that:

[i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

---

[136] DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the European Union since 2008. He was later sanctioned by the U.S. on January 17, 2016. *See*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32010D0644 (last visited Sept. 13, 2017).

552.     In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V Monchegorsk and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

553.     Egyptian authorities were alerted by the U.S. Navy and the M/V Monchegorsk was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

554.     Munitions, believed to be headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

555.     In October 2009, U.S. troops boarded a German-owned freighter, the M/V Hansa India, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

556.     The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim Coalition Forces and U.S. nationals, including Plaintiffs.

557.     The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization.

558.     The M/V Hansa India was registered to the Hamburg-based shipping company Leonhardt & Blumberg, but had been under charter to IRISL for several years.

559.     In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V Francop, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with

munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

560.    The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

561.    The M/V Francop, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

562.    Because the DIO, as discussed infra, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

563.    Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

564.    The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

565.    During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107-millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81-millimeter mortars with DIO lot markings and 2006 production dates.

566.    There can be no question that IRISL facilitated shipments of military cargo to FTOs and Special Groups, including those responsible for carrying out the Terrorist Attacks that killed, maimed, and/or injured Plaintiffs or Plaintiffs' family members.

567.    IRISL did, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations controlled and/or otherwise substantially and materially supported by Iran and responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs. However, IRISL was not Iran's only means of passing weapons on to the Terrorist Groups, weapons used to commit acts of international terrorism, including the Terrorist Attacks carried out against Plaintiffs and/or Plaintiffs' family members.

### B.    MAHAN AIR

568.    Mahan Airlines was founded in 1991 and began passenger air travel services in June 1992 as the first Iranian "private" airline. Since 1997, Mahan Airlines has also provided air cargo operations.

569.    Mahan Airlines operates under the name "Mahan Air" and uses the Tehran Imam Khomeini International Airport and Mehrabad International Airport as its main business hubs.

570.    As of November 2016, Mahan Air owned at least 60 passenger and cargo aircraft, and, in ~~additional~~addition to domestic flights, flew to 52 destinations in Europe, Asia and the Middle East.

571.    Mahan Air publicly acknowledges that it is wholly–owned by Mol-Al-Movahedin Charity.

572.    The Mol-A-Movahedin Charity is managed and controlled by the IRGC.

573.    Mahan Air is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

574.    On October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force."

575.    According to the U.S. government, Mahan Air (1) "facilitated the covert travel of

121

suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and (3) "transported personnel, weapons and goods on behalf of Hezbollah [sic]." (Brackets in original).

576.    The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGCQF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

577.    Under-Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

578.    During a press conference, Under-Secretary for Terrorism and Financial Intelligence David S. Cohen said that "Mahan Air's close coordination with the Qods Force – secretly ferrying operatives, weapons and funds on its flights – reveals yet another facet of the IRGC's extensive infiltration of Iran's commercial sector to facilitate its support for terrorism."

579.    The U.S. Department of Treasury further highlighted that Mahan Air provided travel services to Qods Force personnel to fly to and from Iran and for military training.

580.    The airline facilitated arms shipments and "covert travels" to Iraq of suspected Qods

Force members who were responsible for targeting Coalition Forces.

581.     Mahan Air was also later identified as the conduit to Iran of thousands of radio frequency modules recovered by Coalition Forces in Iraq from IEDs that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.[137]

582.     Coalition Forces recovered these modules from IED devices in Iraq that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.

583.     The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

584.     In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

585.     In short, at the direction of Iran, Mahan Air transported weapons, personnel, and technology into Iraq on behalf of the IRGC-QF and Hezbollah, and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

586.     Mahan Air, in its supporting, albeit crucial, role of exporting terrorism, and the materials and instruments thereof for Iran, is an agent and instrumentality of Iran.

587.     Due to the role played by Mahan Air, Iran was able to effectuate global jihad and commit acts of terrorism much more effectively and conveniently during the Relevant Period, including the time in which the Terrorist Attacks at issue were committed.

588.     Since 2012, Mahan Air has multiple daily flights from Tehran, Mashhad, Isfahan, Shiraz and Abadan to Damascus. These flights use Iraqi air space and carry weapons, equipment and Revolutionary Guard personnel to be used on the ground in Syria in support of Iranian-backed

---

[137] *See* Superseding Indictment in *United States v. Larijani*, *available at:* https://www.justice.gov/opa/file/837996/download (last visited Sept. 13, 2017).

operations.

589.     Since fighting began in Syria, the Iraqi Special Groups linked to the Qods Force have been sent by bus through Basra to Abadan and from there are transferred to Damascus with Mahan aircraft. According to reports obtained from the IRGC, these groups include the Special Groups: Badr Corps., KH, AAH, as well as the FTO Hezbollah. As they were in Iraq, these terrorist groups, now operating in Syria, are commanded by the IRGC and have been directly linked to the massacres of Aleppo and killings of Syrian civilians.

**C.     NATIONAL IRANIAN OIL COMPANY (NIOC)**

590.     Defendant NIOC is not a state agency, operation, or program of the Iranian Government. Rather, it is a front-company for the IRGC, and therefore an agent and instrumentality of Iran.

591.     At all relevant times, the NIOC was controlled by Iran through the IRGC.

592.     NIOC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

593.     In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [government of Iran]."

594.     Pursuant to E.O. 13382, the United States designated NIOC as an SDN.

595.     The United States has identified NIOC as an agent or affiliate of the IRGC.

596.     Under the ITRSHRA, the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the CISADA and section 302 of the ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

597.     During the Relevant Period, the NIOC not only was under IRGC control, but it also

124

served a critical function in supporting the IRGC's activities.

598.    The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co., and Kala Naft[138] are all subsidiaries of the NIOC.

599.    As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

600.    Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oil field equipment from the U.S.

### D.    KHATAM AL-ANBIYA CONSTRUCTION COMPANY & THE HEADQUARTERS FOR THE RESTORATION OF HOLY SHRINES

601.    Iran also logistically and financially supports terrorist groups through proxies of Iran, including, but not limited to Khatam al-Anbiya Construction Company (a/k/a Khatam al-Anbiya Construction Headquarters, Qaragah-e Sazandegi-ye Khatam al-Anbiya, or "Seal of the Prophets," hereinafter referred to as "KAA"), and The Headquarters for the Restoration of the Holy Shrines ("HRHS"), both Qods Force front entities, as well as their agents and subsidiaries.

602.    KAA serves to help the IRGC disguise its funding and operations, including IRGC-Qods Force terror activities.

603.    KAA is a large Iranian corporation, controlled by the IRGC, and serves to help the IRGC funnel money, material, and personnel to its operations.

604.    KAA was originally founded by the IRGC as an engineering wing to assist in the

---

[138] Kala Naft was designated as a Specially Designated National (SDN) by the United States Treasury on June 16, 2010. U.S. Department of the Treasury, *Recent OFAC Actions* (June 16, 2010), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100616.aspx.

building of fortifications during the Iran-Iraq War (1980-1989) and to rebuild after the conflict. Since then, it has diversified into mechanical engineering, energy, mining, and defense.

605.    KAA is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b), and, as a designated IRGC entity, is owned and controlled by the government of Iran.

606.    IRGC Commander-in-Chief, Brigadier General Abdolreza Abed, serves as KAA's council chairman.

607.    KAA functions as the IRGC's engineering and logistical arm, conducting a range of civil engineering activities, such as road and dam construction, the manufacturing of pipelines to transport water, oil, gas (within and outside Iran's borders), mining operations, agriculture, and telecommunications.

608.    On October 25, 2007, KAA was designated by the U.S. Treasury Department under E.O. 13382 for extensively assisting IRGC to gain financial support for IRGC activities.

609.    The U.S. Treasury designated nine IRGC-affiliated entities, including KAA, and five IRGC-affiliated individuals as derivative designations of the IRGC.

610.    On June 23, 2008, the European Union also designated IRGC-affiliated companies, including KAA, for their support to Iranian ballistic missile and nuclear programs.

611.    On June 9, 2010, the U.N. Security Council designated KAA in the 1929 Resolution for its involvement with Iranian military and nuclear activities.139

612.    On February 10, 2010, The U.S. Department of the Treasury took further action to implement then-existing U.S. sanctions against the IRGC by designating an individual and four

---

[139] United Nations, *Security Council Imposes Additional Sanctions on Iran, Voting 12 in Favour to 2 Against, with 1 Abstention,* (June 9 2010), https://www.un.org/press/en/2010/sc9948.doc.htm.

companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters. This action focused in particular on KAA, considered an arm of the IRGC designated pursuant to E.O. 13382 in 2007. At the time, Treasury stated:

> Today's designations include IRGC General Rostam Qasemi, who is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. -Khatam al-Anbiya is owned or controlled by the IRGC and is involved in the construction of streets, highways, tunnels, water conveyance projects, agricultural restoration projects, and pipelines. Treasury also today designated four companies that are owned or controlled by, or that act on behalf of, Khatam al-Anbiya.
>
> As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. "Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.

613.   In 2011, the British and Japanese governments both listed KAA as an entity of concern due to its involvement in the proliferation of WMDs, missiles, and biological, chemical, and nuclear weapons.

614.   KAA also owns and controls Ghorb Karbala (a/k/a Gharargah Karbala, Gharargah Sazandegi Karbala-Moasseseh Taha, or Ghorb-e Karbala), an entity also listed in an annex to U.N. Security Council Resolution 1929 of June 9, 2010, as an entity of Iran's IRGC, with a role "in Iran's proliferation-sensitive nuclear activities and the development of nuclear weapon delivery systems."

615.   Companies that are owned or controlled by KAA, or that act on its behalf, and directly support its efforts include: Fater Engineering Institute, Imensazen Consultant Engineers Institute (ICEI), Makin Institute, and Rahab Institute.

127

616.    By 2010, KAA had become a massive holding firm with control of more than 812 registered companies inside and outside of Iran and the recipient of over 1,700 Iranian-government contracts, many awarded on a no-bid basis.

617.    KAA has undertaken infrastructure development projects in Iraq, Syria, and Lebanon, extending its services as a tool of the IRGC and Iran.

618.    KAA was operating on the ground in Iraq during the entire Relevant Time period.

619.    No later than October 2006, western media outlets were reporting that KAA was involved in hidden and unlawful economic activities beyond the borders of Iran.

620.    On May 7, 2008, Mohammad Reza Pourzeyai, then KAA deputy head, announced that KAA had built a railway line connecting Iraq's Basra and Iran's Khorramshar.

621.    KAA also performed due diligence and planned a project for building a water pipeline from the Iraqi border to the middle of Syria, a distance of approximately 256 kilometers, and also designed a project for building an oil pipeline from Iran's Abadan refinery to Basra, Iraq.

622.    KAA also undertook efforts to renovate the Mosul Dam in Iraq. KAA's work on Dam projects around the globe is a known conduit through which the IRGC moves its operatives into foreign countries.

623.    On December 13, 2011, then commander of KAA, Abu al-Qassem Mozaffari, confirmed that KAA operates in Iraq, Syria and Lebanon.

624.    From 2002 through 2007, Defendant Banks sent and received payments totaling nearly USD $100 million for KAA, and supplied financial services and other material support to many KAA subsidiaries.

625.    KAA, under the guise of various construction development projects in Iraq, in concert with other agents of Iran, provided the means by which Iran and other Defendants were

able to supply raw materials, currency, weapons, and munitions used by the Special Groups and other terrorist organizations to effectuate Iran's campaign of terror in Iraq.

626. A critical IRGC agent, subsidiary and Iranian-proxy is the HRHS.

627. HRHS was established in 2003, purportedly to renovate the Shiite shrines in Iran and in Iraq. In order to do so, HRHS enlisted the assistance of KAA.

628. According to its charter, as listed on its website, HRHS was authorized by the Islamic regime to, among other things, renovate Shiite shrines in Iraq and to coordinate between the Iranian regime and Iraqi government organizations and NGOs.

629. HRHS does not hide its links to the Qods Force; a provincial official in the HRHS told Iranian media that the organization is affiliated with the Qods Force.

630. Prior to his death in January 2020, the commander of the Qods Force, Qassem Soleimani, along with the Supreme Leader's representative to the Qods Force both sat on HRHS's Board of Trustees. The four other board members include HRHS head Hassan Pelarak, and three senior clerics who are members of the Supreme Leader's office. Thus, the Supreme Leader and his top general responsible for external operations control HRHS.

631. Hassan Pelarak is a former mining executive and former IRGC commander, and, according to Iranian media, has served in the Qods Force.

632. All HRHS heads have served as Qods Force officers. Pelarak's predecessors, Hassan Danaeifar, who was Iran's ambassador to Iraq from 2010 to 2017, and Mansour Haghighatpour, who is now a former parliamentarian, have been Qods Force officers. In 2008, Soleimani touted Danaeifar's Qods Force credentials in a famous message passed along to General David ~~Patracus~~Petraeus, commander of U.S. forces in Iraq.

633. It is no coincidence that Qassem Soleimani sat on HRHS's Board of Trustees, and

129

that the organization's Directors have been Qods Force officers; the unit uses the infrastructure of the HRHS to funnel weapons, manpower, money, equipment, and supplies into Iraq.

634.    HRHS publishes on its website that it renovates Shiite shrines in Najaf, Karbala, Kadhimiya, Samarra, and other places.

635.    HRHS claims to have spent millions of dollars on more than 200 projects in Iraq and further plans to develop projects valued at approximately $1.6 billion.

636.    HRHS also claims that its finances are charitable donations from citizens, as well as government, private, and quasi-government entities.

637.    HRHS embraces and supports the Special Groups. The direct link between HRHS and the Special Groups is concretely reflected on its official website of the HRHS Samarra office.[140]

638.    HRHS considers the Special Groups to be "Defenders of the Shiite Holy Shrines in Iraq," as stated on websites controlled by the IRGC-QF.[141]

639.    HRHS is nothing more than a front for the IRGC-QF, whose mission is to support the Iranian-backed terror groups in Iraq, disrupt the stability of free and democratic Iraq, and expand Iranian influence in the country.

640.    HRHS and KAA worked closely together in Iraq.

641.    HRHS worked in cooperation with the IRGC-QF-affiliated KAA to perform construction work on the Zahra Shrine in Najaf, Iraq. This project involved the HRHS subsidiary,

---

[140] *See* http://setadsamarra.ir/ (last visited Sept. 13, 2017) (translation available).

[141] *Introduction with the Brigades of the Defenders of the Shiite Holy Shrines Operating in Iraq*, OWEIS, Iran (January 12, 2015), http://oweis.ir/ (Farsi web address and translation available). *Marking the Fourth Anniversary of the [Assassination of] Martyr Hassan Shateri*, Tasnim News, Tehran (February 16, 2007), https://www.tasnimnews.com/fa/news/ (Farsi web address and translation available).

Kowsar Engineering.

642.    Under the guise of serving the faithful, KAA and HRHS act as a pipeline for the Qods Force, whose mission is to support the Iranian-backed Iraqi network and expand Iranian influence in the country.

643.    KAA and HRHS, much like its IRGC affiliates, work closely with the well-known FTO, Hezbollah. This relationship was highlighted following the assassination of IRGC-QF senior commander Hassan Shateri (a/k/a Hesam Khoshnevis) in February 2013.

644.    Shateri was deployed to Lebanon by KAA to lead its Lebanese branch, while at the same time serving as senior IRGC-QF commander.

645.    Shateri's role in the Lebanese branch of KAA extended far beyond construction projects into extensive terror activities. On August 3, 2010, the U.S. Department of Treasury designated Hassan Shateri "for providing technical support to Hizballah's reconstruction efforts in Lebanon and to the expansion of the terrorist group's private communications network. Khoshnevis [Shateri] also operates as President Ahmadinejad's personal representative in Lebanon."

646.    Shateri arrived in Lebanon after the Lebanon War of 2006 in order to: (1) rehabilitate Hezbollah's operational infrastructure damaged during the conflict; (2) to replace Hezbollah's lost arsenal; and (3) to rebuild its missile sites close to the demarcation line with Israel. Shateri served as a Special Representative of the IRGC, sitting on Hezbollah's Central Command where he helped shape Hezbollah's policies with advice from Secretary-General Hassan Nasrallah.

647.    Prior to working in Lebanon, Shateri operated in Afghanistan, where his mission was to renovate regions that were damaged during fighting with Coalition Forces in

Afghanistan.142

648.    Between his services in Afghanistan and Lebanon, Shateri was operating in Iraq.143

649.    Though his detailed activities in Iraq were concealed, the Supreme Leader's Representative to the Qods Force, Ali Shirazi, mentioned Shateri's time there, saying he was dispatched to Iraq as part of his extensive service for the Islamic Revolution.144

650.    In or around February 2013, after Shateri's assassination, Hezbollah published details that showed that KAA functioned as a cover for Qods Force insurgent activities.

651.    As of July 2007, both Defendant Bank Melli and Bank Mellat were headed by UNSCR 1737 designee and former IRGC Commander Rahim Safavi.

652.    Defendant Bank Melli and Bank Mellat also provided material support to KAA and its subsidiaries by handling their letters of credit. These letters of credit are primarily used to finance KAA's purchase of equipment and services from overseas suppliers.

653.    KAA subsidiaries serviced by Defendant Bank Melli and Bank Mellat include the designated entities Ghorb Nooh, Sepasad, Sahel Consultant Engineers and Gharargah Sazandegi Ghaem.

654.    KAA and HRHS' activities in Iraq, from 2003 until the present, provided the perfect vehicle through which Iran smuggled and disguised raw materials, currency, weapons, and

---

142 *Where and How Volunteers for Fighting ISIS are Trained*, Masregh News, Tehran (June 23, 2014), https://www.mashreghnews.ir/news/ (Farsi web address and translation available).

143 Dexter Filkins, *The Shadow Commander,* THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

144 Will Fulton, *The Assassination of Iran Quds Force General Hassan Shateri in Syria* (Feb. 28, 2013), https://www.criticalthreats.org/analysis/the-assassination-of-iranian-quds-force-general-hassan-shateri-in-syria#_edn77efea9b2d5a1d9d20e5cb794c934c9632.

munitions used by the Terrorist Groups to effectuate Iran's campaign of terror in Iraq.

## VI.    THE PLAINTIFFS & THE TERRORIST ATTACKS

655.    At issue in this case are terrorist attacks perpetrated by AQ, AAI, the Special Groups, other terrorist organizations, including the FTOs, SDGTs, SDTs, SDNs and other terrorists with known links to Iran which killed or injured Plaintiffs (the "Terrorist Attacks").

656.    During the Relevant Period, the injuries and deaths caused by Defendants to Plaintiffs were the result of acts of international terrorism committed, planned, or authorized by organizations designated as foreign terrorist organizations pursuant to Section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Iran funded, aided and abetted such foreign terrorist organizations by, at least, knowingly providing funding and other substantial and material support to the Terrorist Groups who committed such acts of international terrorism.

657.    Further, none of the Terrorist Attacks occurred in the course of (1) a declared war; (2) an armed conflict, whether or not war had been declared between two or more nations; or (3) an armed conflict between military forces of any origin.

658.    All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

659.    Without Iran's conduct, support, control and authority described herein, the Terrorist Groups, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks would not have had the funding or material support necessary to carry out these Terrorist Attacks.

660.    Plaintiffs are individuals who were injured or killed in the Terrorist Attacks that

133

occurred in Iraq, and who, as a result, experienced physical and mental pain and suffering and emotional distress. Some Plaintiffs are decedents, whose anticipated personal representatives and Estates,[145] bring claims for the named individuals who were killed in those attacks, as well as all heirs thereof. Other Plaintiffs are family members of the victims of the Terrorist Attacks and have experienced injuries including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

661.    Iran goes to great lengths to hide the fact that it funds terrorism, including funding the Special Groups and terrorists that perpetrated the terrorist attacks that resulted in the death or injury of Plaintiffs.

662.    Additionally, even utilizing the utmost diligence, it can take months, or even years, before the terrorist group who perpetrated an act of international terrorism, or the type of weapon/explosive used by a terrorist group in a terrorist attack, can be identified.

663.    Here, Plaintiffs did not know and did not have reason to know of their potential claims against Defendants until recently, and have worked diligently to adequately investigate and pursue their claims.

664.    As it concerns Plaintiffs' claims, and as outlined above, Iran has fraudulently concealed its involvement with any of the Terrorist Groups and terrorists responsible for perpetrating the Terrorist Attacks. Iran has further denied the fact it provided material support and resources to the Terrorist Groups responsible for perpetrating the Terrorist Attacks. As such, the doctrine of equitable tolling applies to this Action and all Plaintiffs.

---

[145] In some instances, families are in the process of establishing estates and the identified family members, as the Anticipated Personal Representatives, bring these actions, individually, and on behalf of the anticipated estates of their deceased family members and all heirs thereof.

665.    On June 13, 2016, a Class Action Complaint was filed in the District of Columbia captioned *Alan Burks, et al. v. Islamic Republic of Iran, et al.*, Case. No. 1:16-cv-1102, "bring[ing] this class action pursuant to 28 U.S.C. § 1605A of the Foreign Sovereign Immunities Act ("FSIA") for wrongful death, personal injury, and related torts on behalf of a class consisting of all United States nationals, members of the United States armed forces, or employees of the United States Government acting within the scope of their employment, injured or killed by an EFP, and no other form of improvised explosive device, after June 1, 2005, their estates, and immediate family members[.]" Should Defendants appear in this case and raise affirmative defenses, the doctrine of American Pipe tolling should apply to the claims of possible class members.

666.    Pursuant to the Servicemembers Civil Relief Act (SCRA). "[t]he period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns." 50 U.S.C.A. § 3936.

667.    The following Plaintiffs are United States' nationals, members of the U.S. armed forces, or government contractors injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals, members of the U.S. armed forces, or contractors:

## 1. THE APRIL 9, 2007 ATTACK – BAGHDAD, BAGHDAD GOVERNORATE

### A.    PLAINTIFFS THE ISMAEL GALVAN SOLORIO FAMILY

668.    Plaintiff Ismael Galvan Solorio was a citizen of the United States and domiciled in the State of Arizona at the time of his death.

135

669.     On April 9, 2007, Ismael Galvan Solorio, age 21, was serving in the United States military in Iraq.

670.     At approximately 3:15 p.m. on April 9, 2007, Ismael Galvan Solorio was travelling in the first vehicle of a four-vehicle convoy from the A Company, 2nd Battalion, 17th Field Artillery Regiment1. The convoy was traveling south in the southbound lane of Route Wild in southeastern Baghdad, when Mr. Solorio's vehicle, an M1114 Up-Armored HMMWV, was struck by an EFP.

671.     The EFP penetrated the right side of the vehicle, grievously injuring Ismael Solorio, and killing PFC Brian L. Holden and PVT Brett A. Walton

672.     Ismael Galvan Solorio survived the blast but sustained serious injuries to his neck. He passed away from his injuries shortly after evacuation to Camp Rustamiyah.

673.     Approximately an hour and a half after the attack, there was a secondary explosion approximately 100 meters south of the EFP attack, injuring members of the Quick Reaction Force that had responded to secure the scene and assist in the evacuation of those wounded and killed by the EFP.

674.     A Weapons Intelligence Team (WIT) investigated the blast and concluded that it was a complex two-stage attack designed to lethally target the first vehicle in the convoy, and then initiate the second attack targeting the larger force of first responders.

675.     The April 9, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

676.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which

136

the Special Groups increased their operational capacity and obtained the permissive environment used to attack and kill U.S. service members in Iraq, including Mr. Solorio.

677.     Defendant Iran has been found civilly liable for the April 9, 2007 Terrorist Attack. *See William Lee, et al., v. Islamic Republic of Iran*, Case No. 1:19-cv-830-APM (DDC 2023), at ECF 77, at pp. 43-45.

678.     Plaintiff Iris Zenia Solorio is a citizen of the United States and domiciled in the state of New Mexico. She is the widow of Ismael Galvan Solorio.

679.     Plaintiff Iris Zenia Solorio brings an action individually, and on behalf of the Estate of Ismael Galvan Solorio, and all heirs thereof, as its legal representative.

680.     Plaintiff P.Z., a minor, represented by her legal guardian Iris Zenia Solorio is a citizen of the United States and domiciled in the state of New Mexico. She is the daughter of Ismael Galvan Solorio and Iris Zenia Solorio.

681.     As a result of the April 9, 2007 Terrorist Attack, and the injuries suffered by Ismael Galvan Solorio, including the conscious pain and suffering and, ultimately, the death of Ismael Galvan Solorio, Plaintiffs Iris Zenia Solorio and P.Z., a minor, have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Ismael Galvan Solorio's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Ismael Galvan Solorio, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

### B.     PLAINTIFF ANTHONY LARRY

682.     Plaintiff Anthony Larry is a citizen of the United States and domiciled in the State of New Mexico.

683.     On April 9, 2007, Anthony Larry, age 25, was serving in the United States

137

military in Iraq.

684.     Anthony Larry was in the back passenger seat of a M1114 Up-Armored HMMWV, the last vehicle the of the four-vehicle convoy targeted by the EFP on Route Wild. After the EFP exploded, Mr. Larry assisted in evacuating Ismael Solorio and the recovery of the bodies of those killed from the HMMWV.

685.     The April 9, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

686.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Larry.

687.     Defendant Iran has been found civilly liable for the April 9, 2007 Terrorist Attack. *See William Lee, et al., v. Islamic Republic of Iran*, Case No. 1:19-cv-830-APM (DDC 2023), at ECF 77, at pp. 43-45.

688.     As a result of the attack, Anthony Larry sustained PTSD including suffering from depression, anxiety, sleep issues, hypervigilance, and other symptoms.

689.     Anthony Larry has undergone outpatient medical and psychological care and treatment for his symptoms of PTSD. He continues to receive ongoing treatment for his psychological injuries in this attack.

690.     As a result of the April 9, 2007 Terrorist Attack, and the injuries he suffered, Anthony Larry has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic

138

damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### C.   PLAINTIFFS THE BRANDON MACK WARE FAMILY

691.   Plaintiff Brandon Mack Ware is a citizen of the United States and is domiciled in the State of Texas.

692.   On April 9, 2007, Brandon Mack Ware, age 22, was serving in the U.S. military in Iraq.

693.   Mr. Ware was with his Quick Reaction Force (QRF) platoon, which responded to the scene of EFP attack involving Plaintiffs Solorio and Larry. While securing the attack scene, Mr. Ware and others in the QRF attempted to resuscitate those injured in the attack and recovered the bodies of the soldiers killed in the blast.

694.   While doing so, Mr. Ware's QRF platoon was attacked by an explosive device, later assessed to be a hand grenade, which injured the first responders.

695.   The April 9, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

696.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Brandon Mack Ware.

697.   Defendant Iran has been found civilly liable for the April 9, 2007 Terrorist Attack. *See William Lee, et al., v. Islamic Republic of Iran,* Case No. 1:19-cv-830-

APM (DDC 2023), at ECF 77, at pp. 43-45.

698.     As a result of the attack, Brandon Mack Ware sustained PTSD including suffering from depression, anxiety, and other symptoms.

699.     Brandon Mack Ware has undergone inpatient and outpatient medical and psychological care and treatment for his symptoms of PTSD. He continues to receive ongoing treatment for his psychological injuries in this attack.

700.     As a result of the April 9, 2007 Terrorist Attack, and the injuries he suffered, Brandon Mack Ware has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

701.     Plaintiff Shantell Ware is a citizen of the United States and is domiciled in the State of Texas. She is the wife of Brandon Mack Ware.

702.     Plaintiff Sherry Ware is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Brandon Mack Ware.

703.     Plaintiff Fred McTear is a citizen of the United States and is domiciled in the State of Texas. He is the father of Brandon Mack Ware.

704.     Plaintiff Maria Johnson is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Brandon Mack Ware.

705.     Plaintiff J.E.W, a minor, represented by his legal guardian Brandon Mack Ware is a citizen of the United States and is domiciled in the State of Texas. He is the son of Brandon Mack Ware.

706.     As a result of the April 9, 2007 Terrorist Attack, and the injuries suffered by Brandon Mack Ware, Plaintiffs Shantell Ware, Sherry Ware, Fred McTear, Maria Johnson, and J.E.W, a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 2.   THE NOVEMBER 19, 2011 ATTACK – BAGHDAD,   BAGHDAD GOVERNORATE

### A.     PLAINTIFFS THE BRADLEY FORREST BIBBINS II FAMILY

707.     Plaintiff Bradley Forrest Bibbins II is a citizen of the United States and domiciled in the State of Michigan.

708.     On November 19, 2011, Bradley Forrest Bibbins II, age 24, was serving in the U.S. military in Iraq.

709.     Mr. Bibbins was the Tank Commander of ~~a~~an M915A tractor-trailer in a convoy of many vehicles traveling northbound on MSR Tampa when the convoy was struck by an IED.

710.     The November 19, 2011 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

711.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Bibbins.

712.     As a result of the attack, Bradley Forrest Bibbins II suffered from

injuries including a TBI, hearing loss, PTSD, and Major Depressive Disorder.

713.     Bradley Forrest Bibbins II received initial medical treatment at the CSH at Al Assad Airbase and was later evaluated by medical providers at Camp Arifjan. He has continued to receive treatment for tinnitus, TBI including testing and rehabilitation, and PTSD.

714.     As a result of the November 19, 2011 Terrorist Attack, and the injuries he suffered, Bradley Forrest Bibbins II has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

715.     Plaintiff B.R.B, a minor, represented by his legal guardians, Bradley Bibbins and Traci Bibbins, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Bradley Forrest Bibbins II and Traci Bibbins.

716.     Plaintiff G.W.B, a minor, represented by his legal guardians, Bradley Bibbins and Traci Bibbins, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Bradley Forrest Bibbins II and Traci Bibbins.

717.     As a result of the November 19, 2011 Terrorist Attack, and the injuries suffered by Bradley Forrest Bibbins II, Plaintiffs B.R.B and G.W.B. have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

142

### 3.  THE JUNE 6, 2011 ATTACK – JSS LOYALTY, NEW BAGHDAD, BAGHDAD GOVERNORATE

#### A.  PLAINTIFFS THE CHRISTOPHER GEORGE PAULUS FAMILY

718.  Plaintiff Christopher George Paulus is a citizen of the United States and domiciled in the State of Wisconsin.

719.  On June 6, 2011, Christopher George Paulus, age 27, was serving in the U.S. military in Iraq.

720.  Mr. Paulus was sleeping in his Containerized Housing Unit (CHU) at JSS Loyalty when an Improvised Rocket-Assisted Mortar (IRAM) landed near his sleeping quarters and woke him up. A second IRAM or rocket landed near him, knocking him unconscious. The attack wounded at least thirty people and killed six including Christopher Brook Fishbeck and Robert P. Hartwick.

721.  The June 6, 2011 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

722.  The Iranian/Hezbollah-trained and supported Special Group, FTO KH, claimed responsibility for the June 6, 2011 Terrorist Attack that resulted in injury to Mr. Paulus, and posted a video of the attack through its official communications channels.

723.  Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Paulus.

724.  As a result of the attack, Christopher George Paulus suffered from TBI, recurring migraines, a neck injury and burn scars, and symptoms of PTSD including but not limited

143

to depression, sleep issues, anxiety, hypervigilance, paranoia, suicidal ideations, and alcohol abuse.

725.     Christopher George Paulus was initially evaluated for his injuries at the CSH at Camp Loyalty, where he failed a Military Acute Concussion Evaluation (MACE) test, and was confined to quarters for 72 hours. He was later diagnosed with TBI and PTSD and has received extensive medical treatment including numerous hospitalizations due to PTSD and TBI. He also has received inpatient treatment several times at Milwaukee VA hospital for symptoms of PTSD.

726.     As a result of the June 6, 2011 Terrorist Attack, and the injuries he suffered, Christopher George Paulus has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

727.     Plaintiff Kyle James Paulus is a citizen of the United States and is domiciled in the State of Wisconsin. He is the brother of Christopher George Paulus.

728.     As a result of the June 6, 2011 Terrorist Attack, and the injuries suffered by Christopher George Paulus, Plaintiff Kyle James Paulus has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 4. THE MAY 30, 2011 ATTACK – NORTH OF COB ADDER, NASIRIYAH

#### A.     PLAINTIFF THOMAS CARL GREGORY III

729.     Plaintiff Thomas Carl Gregory III is a citizen of the United States and is domiciled in the State of Washington.

730.    On May 30, 2011, Thomas Carl Gregory III, age 25, was serving in the U.S. military in Iraq.

731.    Mr. Gregory was the vehicle commander positioned as rear security in a convoy of 60 vehicles when an EFP detonated near his vehicle causing severe injury to Mr. Gregory and his squad.

732.    The May 30, 2011, Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

733.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Gregory.

734.    As a result of the attack, Thomas Carl Gregory III was knocked unconscious and suffered a TBI and ruptured left eardrum.

735.    Thomas Carl Gregory III received extensive medical treatment for his injuries. He was treated by a medic after the attack and then at the FOB Hospital. Since his end of service, he has been treated at VA medical facilities and by private healthcare providers.

736.    As a result of the May 30, 2011 Terrorist Attack, and the injuries he suffered, Thomas Carl Gregory III has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and

post-judgment interest.

**5. THE MARCH 28, 2011 ATTACK – CAMP VICTORY, BAGHDAD**

    **A.    PLAINTIFFS THE SAM KALLABAT FAMILY**

737.    Plaintiff Sam Kallabat is a citizen of the United States and is domiciled in the State of Michigan.

738.    On March 28, 2011, Sam Kallabat, age 45, was employed as a subcontractor with AECOM Technology, f/k/a McNeil Technologies, Inc., working for the U.S. Department of Defense as a Senior Special Advisor.

739.    Mr. Kallabat was meeting with Iraqi Generals and military personnel at Camp Victory when a rocket struck a nearby concrete slab, sending shrapnel to Mr. Kallabat.

740.    The March 28, 2011 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

741.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members and contractors in Iraq, Mr. Kallabat.

742.    As a result of the attack, Sam Kallabat suffered multiple shrapnel wounds to his right leg, chronic PTSD, and Type II diabetes.

743.    Sam Kallabat was initially rushed to Sather Air Base in Baghdad, Iraq for emergency surgery. He was then transported to Dubai, UAE for additional surgeries and further medical care. Mr. Kallabat remained in Dubai for ongoing rehabilitation until April 24, 2011 when he was cleared to return to the United States. Since arriving in the United

States, he has undergone considerable treatment including therapy, medications and counseling.

744.    As a result of the March 28, 2011 Terrorist Attack, and the injuries he suffered, Sam Kallabat has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

745.    Plaintiff Fadia Kallabat is a citizen of the United States and is domiciled in the State of Michigan. She is the wife of Sam Kallabat.

746.    Plaintiff Nicholas Sam Kallabat is a citizen of the United States and is domiciled in the State of Michigan. He is the son of Sam Kallabat.

747.    Plaintiff Kevin Thomas Kallabat is a citizen of the United States and is domiciled in the State of Michigan. He is the son of Sam Kallabat.

748.    Plaintiff Ursula Mariam Kallabat is a citizen of the United States and is domiciled in the State of Michigan. She is the daughter of Sam Kallabat.

749.    As a result of the March 28, 2011 Terrorist Attack, and the injuries suffered by Sam Kallabat, Plaintiff's spouse, Fadia Kallabat, son, Nicholas Sam Kallabat, son, Kevin Thomas Kallabat, and daughter Ursula Mariam Kallabat, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

147

**6. THE FEBRUARY 16, 2011 ATTACK – ROUTE TOMATOES, NEAR SADR CITY, BAGHDAD**

    **A.     PLAINTIFF WALTER LEMAN THOMAS**

750.    Plaintiff Walter Leman Thomas is a citizen of the United States and is domiciled in the State of Florida.

751.    On February 16, 2011, Walter Leman Thomas, age 22, was serving in the U.S. military in Iraq.

752.    Mr. Thomas was in a vehicle travelling in Sadr City in Baghdad when his vehicle was struck by an EFP that went through the front of the vehicle. Mr. Thomas was on a mission to patrol the area to deter insurgents from attacking.

753.    The February 16, 2011 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

754.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Thomas.

755.    As a result of the attack, Walter Leman Thomas suffered a TBI, a macular hole inside his left eye that required surgery and caused vision loss, PTSD, depression, and anxiety.

756.    Walter Leman Thomas received extensive medical treatment at a TBI clinic at Fort Riley, in Kansas, while still in the military. He also sought further treatment in Orlando, Florida and Georgia at VA hospitals after he returned home from Iraq for PTSD, and has seen neurologists for memory loss treatment.

757.     As a result of the February 16, 2011 Terrorist Attack, and the injuries he suffered, Walter Leman Thomas has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 7.  THE MAY 24, 2010 ATTACK – NUMANIYAH

#### A.     PLAINTIFF KENNETH DEWAYNE BOYER

758.     Plaintiff Kenneth Dewayne Boyer is a citizen of the United States and is domiciled in the State of Louisiana.

759.     On May 24, 2010, Kenneth D. Boyer, age 24, was serving in the U.S. military in Iraq.

760.     Mr. Boyer was on patrol with his unit near Numaniyah when his vehicle was struck by an EFP.

761.     The May 24, 2010 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

762.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Boyer.

763.     As a result of the attack, Kenneth Dewayne Boyer suffered multiple shrapnel wounds to the buttocks, posterior and back of his legs. He also had contusions on his arms and lower extremities. Mr. Boyer continues to treat for knee injuries from the attack as

well as PTSD.

764.    Kenneth Dewayne Boyer received extensive medical treatment following the attack. He was treated by a medic then stabilized at FOB Scania before being medically evacuated to Baghdad for additional treatment of his wounds. After his deployment he continued to treat at Fort Polk and later received treatment at VA medical facilities.

765.    As a result of the May 24, 2010 Terrorist Attack, and the injuries he suffered, Kenneth Dewayne Boyer has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 8.  THE MAY 12, 2010 ATTACK – MANSOUR/KHARADA, BAGHDAD

#### A.    PLAINTIFFS THE CHRISTOPHER MICHAEL WIESE FAMILY

766.    Plaintiff Christopher Michael Wiese is a citizen of the United States and is domiciled in the State of Hawaii.

767.    On May 12, 2010, Christopher Michael Wiese, age 29, was serving in the U.S. military in Iraq.

768.    Mr. Wiese was on patrol, traveling on Route Tampa from Camp Taji to FOB Camp Victory, when an IED detonated under his convoy.

769.    The May 12, 2010 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

770.    Iran, by and through its Co-Defendants, provided logistical support,

150

weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Wiese.

771.     As a result of the attack, Christopher Michael Wiese suffered a head injury resulting in a TBI, a neck and back injury, tinnitus and PTSD.

772.     Christopher Michael Wiese received extensive medical treatment after his end of service at, but not limited to, the Cincinnati VA, Great Lakes Healthcare System, Carle Hospital, Pacific Islands Healthcare and other VA medical facilities.

773.     As a result of the May 12, 2010 Terrorist Attack, and the injuries he suffered, Christopher Michael Wiese has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

774.     Plaintiff Blake Wiese is a citizen of the United States and is domiciled in the State of Illinois. He is the son of Christopher Michael Wiese.

775.     Plaintiff S.W., a minor, represented by her legal guardian Christopher Michael Wiese, is a citizen of the United States and is domiciled in the State of Illinois. She is the daughter of Christopher Michael Wiese.

776.     As a result of the May 12, 2010 Terrorist Attack, and the injuries suffered by Christopher Michael Wiese, Plaintiffs Blake Wiese and S.W., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest

151

and post-judgment interest.

### 9. THE FEBRUARY 18, 2010 ATTACK – BAGHDAD GOVERNORATE

#### A. PLAINTIFFS THE JEFFERY BURTON FAMILY

777.    Plaintiff Jeffery Burton is a citizen of the United States and is domiciled in the State of Kansas.

778.    On February 18, 2010, Jeffery Burton, age 27, was serving in the U.S. Army in Iraq.

779.    On February 18, 2010, Jeffery Burton's unit, and lead vehicle in a 30-50 logistics vehicle convoy, struck a triple array EFP while traveling on Route Pluto towards FOB Hammer in Baghdad, Iraq.

780.    The February 18, 2010 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

781.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Burton.

782.    As a result of the February 18, 2010 Terrorist Attack, Mr. Burton was knocked unconscious, suffered a TBI, severe shrapnel injuries throughout his body, broken left wrist and arm bones, partial amputation of multiple digits on his left hand, and continues to suffer from PTSD.

783.    Jeffery Burton has received extensive medical treatment. He was stabilized and flown to Landstuhl, then returned to the United States. He has undergone

152

considerable treatment including surgeries, therapy and medications.

784.     As a result of the February 18, 2010 Terrorist Attack, and the injuries he suffered, Jeffery Burton has past and future noneconomic damages, including severe physical and mental pain, suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

785.     Plaintiff Charles Burton is a citizen of the United States and is domiciled in the State of Kansas. He is the father of Jeffery Burton.

786.     Plaintiff Jane Burton is a citizen of the United States and is domiciled in the State of Kansas. She is the mother of Jeffery Burton

787.     Plaintiff Patrick Burton is a citizen of the United States and is domiciled in the State of Nebraska. He is the brother of Jeffery Burton.

788.     As a result of the February 18, 2010 Terrorist Attack, and the injuries suffered by Jeffery Burton, Plaintiff's father Charles Burton, mother Jane Burton, and brother Patrick Burton, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**10. THE JUNE 25, 2009 ATTACK – SHAAB AND UR, ADHAMIYAH DISTRICT, BAGHDAD**

**A.     PLAINTIFF KEVIN GUERRA GARCIA**

789.     Plaintiff Kevin Guerra Garcia is a member of the armed forces and is domiciled in the State of Texas.

153

790.     On June 25, 2009, Kevin Guerra Garcia, age 22, was serving in the U.S. military in Iraq.

791.     Mr. Garcia was driving a Humvee in a four-vehicle convoy leaving FOB Shield in East Baghdad headed towards the main freeway when his vehicle was struck by an EFP.

792.     The June 25, 2009 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

793.     The Special Group Promised Day Brigades (PDB) has claimed responsibility for the June 25, 2009 Terrorist Attack that resulted in injury to Mr. Garcia.

794.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Garcia.

795.     As a result of the attack, Kevin Guerra Garcia suffered severe injuries including shrapnel to his neck and shoulder resulting in nerve damage to his right arm, and PTSD.

796.     Kevin Guerra Garcia received extensive medical treatment. Mr. Garcia was medically evacuated from the scene to the CSH at Camp Liberty where he underwent surgery to remove the shrapnel from his body. He received further treatment including but not limited to medical evacuation to Germany.

797.     As a result of the June 25, 2009 Terrorist Attack, and the injuries he suffered, Kevin Guerra Garcia has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future

154

economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 11.   THE JUNE 22, 2009 ATTACK – ABU GHRAIB, KARKH DISTRICT, BAGHDAD

#### A.   PLAINTIFF SEAN TANNER PHAM

798.   Plaintiff Sean Tanner Pham is a citizen of the United States and is domiciled in the State of Pennsylvania.

799.   On June 22, 2009, Sean Tanner Pham, age 20, was serving in the U.S. military in Iraq.

800.   Mr. Pham was conducting security just outside of Liberty on Route Michigan near the Nahia Council building in Baghdad when a suicide car bomb (SVBIED) hit a civilian vehicle and then exploded about 10-15 meters from his vehicle. The blast caused him to hit his head in the vehicle, causing injury and knocking him unconscious.

801.   The June 22, 2009 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

802.   119.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Pham.

803.   As a result of the attack, Sean Tanner Pham suffered a concussion with loss of consciousness, a TBI, chronic post-traumatic headaches, memory loss, tinnitus, abrasions of the left and right knee and exacerbated PTSD.

804.     Sean Tanner Pham received extensive medical treatment following the attack when he was transported to Liberty Aid Station to ensure no bleeding and then evacuated to 115th CSH and Riva Ridge TMC CSC where he was evaluated for bleeding and head injury, finally being transported to Balad TBI Center for one week of TBI assessment. Upon returning to the U.S., Mr. Pham was diagnosed and treated for PTSD and TBI and subsequently endured months of polytrauma occupational therapy at Corporal Michael J. Crescenz VAMC in Pennsylvania.

805.     As a result of the June 22, 2009 Terrorist Attack, and the injuries he suffered, Sean Tanner Pham has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 12.   THE MAY 4, 2009 ATTACK – BASRA, BASRA GOVERNORATE

### A.     PLAINTIFFS THE JOSEPH SANTOLLA FAMILY

806.     Plaintiff Joseph Santolla is a citizen of the United States and is domiciled in the State of Virginia.

807.     On May 4, 2009, Joseph Santolla, age 46, was serving in the U.S. military in Iraq.

808.     Mr. Santolla was the Truck Commander in an M1551 Humvee that was the third vehicle in a four-vehicle convoy in downtown Basra when the convoy was struck with a 2-3 array EFP.

809.     The May 4, 2009 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from

Iran and its Co-Defendants.

810. Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Santolla.

811. As result of the attack, Joseph Santolla suffered tinnitus, hearing loss, and a TBI, resulting in motor nerve damage, peripheral neuropathy of the left and right upper extremities, numbness in his extremities, and tremors. He also suffers from PTSD and sleep apnea as a result of the attack.

812. Joseph Santolla received extensive medical treatment. He was first treated at FOB Charlie and returned to duty, but when his injuries worsened, he was sent to the Green Zone for additional treatment. He has undergone considerable treatment since then and continues to treat with therapy and medications.

813. As a result of the May 4, 2009 Terrorist Attack, and the injuries he suffered, Joseph Santolla has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

814. Plaintiff Jeannetta Rose Santolla is a citizen of the United States and is domiciled in the State of Virginia. She is the wife of Joseph Santolla.

815. Plaintiff Sarah Malissa Santolla is a citizen of the United States and is domiciled in the State of Virginia. She is the daughter of Joseph Santolla.

157

816.     As a result of the May 4, 2009 Terrorist Attack, and the injuries suffered by Joseph Santolla, Plaintiff's wife Jeannetta Rose Santolla, and daughter Sarah Malissa Santolla, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 13. THE FEBRUARY 24, 2009 ATTACK – MOSUL, NINEVEH GOVERNORATE

### A. PLAINTIFF HEWA AHMED MAMAND

817.     Plaintiff Hewa Ahmed Mamand is a permanent resident of the United States and is domiciled in  the State of Virginia.

818.     On February 24, 2009, Hewa Ahmed Mamand, age 27, was an Iraqi national employed as a subcontractor with Northrup Grumman Worldwide, a subcontractor to Global Linguist Solutions Inc., working for the U.S. Department of State and serving as an interpreter/translator.

819.     Mr. Mamand was seated in a police station in Mosul when he was struck with small arms fire.

820.     The February 24, 2009 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

821.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members and contractors in Iraq, including

158

Mr. Mamand.

822.    As a result of the attack, Hewa Ahmed Mamand suffered multiple gunshot wounds, severing his spine, resulting in lower limb paralysis and intestinal damage.

823.    Hewa Ahmed Mamand received emergency medical treatment on scene and was medically evacuated to Mosul and stabilized, then transferred to a hospital in Erbil, Iraq. He was later approved for transfer to the United States. Since arriving in the United States, he has undergone considerable treatment including multiple surgeries, therapy, medications and counseling.

824.    As a result of the February 24, 2009 Terrorist Attack, and the injuries he suffered, Hewa Ahmed Mamand has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 14.   THE JANUARY 20, 2009 ATTACK – FOB TALLIL, NASIRIYAH

####   A.    PLAINTIFF DAVID WESLEY TANNER JR.

825.    Plaintiff David Wesley Tanner Jr. is a citizen of the United States and is domiciled in the State of Massachusetts.

826.    On January 20, 2009, David Wesley Tanner Jr., age 37, was serving in the U.S. military in Iraq.

827.    Mr. Tanner was attacked at FOB Tallil, in Nasiriyah, when several rockets were launched at the base and exploded near him, knocking him unconscious.

828.    The January 20, 2009 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran

and its Co-Defendants.

829.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Tanner.

830.    As a result of the attack, David Wesley Tanner Jr. suffered a head injury resulting in a TBI, a lower back injury, herniated discs, a compressed neck injury, a left shoulder injury and tinnitus.  Mr. Tanner now suffers from PTSD and migraines from the attack.

831.    David Wesley Tanner Jr. received medical treatment at the Medical Center in Tallil at Camp Adder in the weeks following the attack. Since his end of service, he has continued his treatment at VA medical facilities, including, but not limited to, Jamaica Plains, Boston VA, Edith Norse and VA facilities in Connecticut.

832.    As a result of the January 20, 2009 Terrorist Attack, and the injuries he suffered, David Wesley Tanner Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**15.  THE  JANUARY  20,  2009  ATTACK  –  MOSUL,  NINEVEH GOVERNORATE**

**A.    PLAINTIFFS THE HARRISON KEENAN ELLIFF FAMILY**

833.    Plaintiff Harrison Keenan Elliff is a citizen of the United States and is domiciled in the State of Texas.

834.    On January 20, 2009, Harrison Keenan Elliff, age 21, was serving in the U.S. military in Iraq.

160

835.    Mr. Elliff was on patrol with his unit, stopped at a security checkpoint in Mosul, when an anti-tank grenade was thrown under his vehicle and detonated.

836.    The January 20, 2009 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

837.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Elliff.

838.    As a result of the attack, Harrison Keenan Elliff suffered embedded shrapnel in his lower right back and navel area, requiring surgical removal. He also suffered a laceration of his liver, neuropathy of the lower back, right buttock and right leg from the shrapnel injury. Mr. Elliff now suffers from PTSD from the attack.

839.    Harrison K. Elliff received extensive medical treatment for his injuries. He was sent by medevac to LSA Anaconda in Balad, where surgery was performed. Since his end of service, he has received medical treatment at various VA medical facilities.

840.    As a result of the January 20, 2009 Terrorist Attack, and the injuries he suffered, Harrison K. Elliff has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

841.    Plaintiff Donald Alan Elliff is a citizen of the United States and is

domiciled in the State of Texas. He is the father of Harrison K. Elliff.

842.  Plaintiff Mackenzie Alan Elliff is a citizen of the United States and is domiciled in the State of West Virginia. He is the brother of Harrison K. Elliff.

843.  As a result of the January 20, 2009 Terrorist Attack, and the injuries suffered by Harrison K. Elliff, Plaintiffs Donald Alan Elliff and Mackenzie Alan Elliff have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### B.  PLAINTIFFS THE JAMES DAVID BLEHM FAMILY

844.  Plaintiff James David Blehm is a citizen of the United States and is domiciled in the State of Missouri.

845.  On January 20, 2009, James David Blehm, age 32, was serving in the U.S. military in Iraq.

846.  Mr. Blehm was on patrol with his unit, stopped at a security checkpoint in Mosul, when an anti-tank grenade was thrown under his vehicle and detonated.

847.  The January 20, 2009 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

848.  Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Blehm.

849.  As a result of the attack, James David Blehm suffered a concussion

162

resulting in a TBI and migraines. He also suffered an injury to his left knee, back and shoulders, tinnitus and PTSD from the attack.

850.    James David Blehm received medical treatment at his base for his injuries after the attack and later received continued care at VA medical facilities after his end of service.

851.    As a result of the January 20, 2009 Terrorist Attack, and the injuries he suffered, James David Blehm has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

852.    Plaintiff John Lee Blehm Sr. is a citizen of the United States and is domiciled in the State of Arizona. He is the father of James David Blehm.

853.    Plaintiff John Lee Blehm Jr. is a citizen of the United States and is domiciled in the State of Arizona. He is the brother of James David Blehm.

854.    As a result of the January 20, 2009 Terrorist Attack, and the injuries suffered by James David Blehm, Plaintiffs John Lee Blehm Sr. and John Lee Blehm Jr. have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 16.   THE OCTOBER 16, 2008 ATTACK – BAQUBAH, DIYALA GOVERNORATE

#### A.   PLAINTIFFS THE BRIAN DANIEL FIFER FAMILY

855.   Plaintiff Brian Daniel Fifer is a citizen of the United States and is domiciled in the State of California.

856.   On October 16, 2008, Brian Daniel Fifer, age 27, was serving in the U.S. military in Iraq.

857.   Mr. Fifer was in the motor pool at FOB Warhorse when it was struck by rockets.

858.   The October 16, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

859.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Fifer.

860.   As a result of the attack, Brian Daniel Fifer suffered injuries to his back, tinnitus, PTSD, anxiety, and depression.

861.   Brian Daniel Fifer received extensive medical treatment consisting of physical therapy, counseling, and was prescribed medications; his medical treatment is ongoing.

862.   As a result of the October 16, 2008 Terrorist Attack, and the injuries he suffered, Brian Daniel Fifer has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no

164

less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

863.     Plaintiff Kelli Fifer is a citizen of the United States and is domiciled in the State of California. She is the sister of Brian Fifer.

864.     As a result of the October 16, 2008 Terrorist Attack, and the injuries suffered by Brian Daniel Fifer, Plaintiff's sister Kelli Fifer has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### B.     PLAINTIFFS THE ROBERT KENT MASON FAMILY

865.     Plaintiff Robert Kent Mason, formerly known as Robert Mason Swindle Jr., is a citizen of the United States and is domiciled in the State of California.

866.     On October 16, 2008, Robert Kent Mason, age 23, was serving in the U.S. military in Iraq.

867.     Robert Kent Mason was in the motor pool at FOB Warhorse when it was struck by rockets.

868.     The October 16, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

869.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Mason.

870.     As a result of the attack, Robert Kent Mason suffered a TBI, migraines, photophobia, loss of smell, tinnitus, hearing loss, PTSD, and injuries to his back and neck.

871.     Robert Kent Mason received extensive medical treatment from the medic on scene then subsequently at the medical facility on base. Since returning to the United States Mr. Mason has been treated with physical therapy, counseling, medications, and received injections.

872.     As a result of the October 16, 2008 Terrorist Attack, and the injuries he suffered, Robert Kent Mason has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

873.     Plaintiff Rochelle Lang is a citizen of the United States and is domiciled in the State of California. She is the sister of Robert Kent Mason.

874.     As a result of the October 16, 2008 Terrorist Attack, and the injuries suffered by Robert Kent Mason, Plaintiff's sister, Rochelle Lang, has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**17.   THE OCTOBER 10, 2008 ATTACK – ROUTE JACKSON, EAST RASHEED DISTRICT, BAGHDAD**

**A.     PLAINTIFFS THE BALTAZAR MORIN JR. FAMILY**

875.     Baltazar Morin Jr. was a citizen of the United States and was domiciled in the State of Texas at the time of his death.

876.     On October 10, 2008, Baltazar Morin Jr., age 19, was serving in the U.S. military, in Iraq.

877.     Mr. Morin was performing his duties as the Turret Gunner in his

Humvee while leading a convoy on Route Jackson in the Al Daura market, south of Baghdad, when an EFP explosion ripped through his vehicle.

878.1. The October 10, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

879. Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Morin.

880. As a result of the attack, he sustained significant injuries due to the ground blast fragments impacting the left side of his face and jaw, resulting in the loss of teeth. He also sustained a TBI, neck and back injuries, spinal cord injury, injury to the cervical intervertebral disk, and a concussion. He subsequently suffered from migraines, headaches, tinnitus, PTSD and Major Depressive Disorder.

881. Mr. Morin underwent significant medical treatment for his injuries, and received medical treatment until his untimely death on October, 27, 2020.

882. Plaintiff Courtney Hernandez is a citizen of the United States and is domiciled in the State of Texas and brings an action on behalf of the Estate of Baltazar Morin, Jr., and all heirs thereof, as its legal representative.

883. Plaintiff A.M., a minor, represented by her legal guardian Courtney Hernandez, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Baltazar Morin Jr. and Courtney Hernandez.

884. As a result of the October 10, 2008 Terrorist Attack, and the injuries suffered by Baltazar Morin Jr., Plaintiffs Courtney Hernandez as legal representative of the Estate of Baltazar Morin, Jr. and  A.M., a minor, has incurred past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of

167

~~solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.~~

**~~18.~~17.      THE AUGUST 8, 2008 ATTACK – SADR CITY, BAGHDAD**

**A.      PLAINTIFFS THE JOSEPH LOUIS HEREFORD FAMILY**

~~885.~~875.   Plaintiff Joseph Louis Hereford is a citizen of the United States and is domiciled in the State of Texas.

~~886.~~876.   On August 8, 2008, Joseph Louis Hereford, age 25, was serving in the U.S. military in Iraq.

~~887.~~877.   Mr. Hereford was on patrol with his unit in Sadr City when his vehicle was struck by an EFP followed by a small arms fire sniper attack.

~~888.~~878.   The August 8, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~889.~~879.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hereford.

~~890.~~880.   As a result of the attack, Joseph Louis Hereford suffered a head injury resulting in a TBI. Mr. Hereford also suffers from PTSD from the attack.

~~891.~~881.   Joseph Louis Hereford received medical treatment by a medic after returning to base and was sent for further evaluation at a hospital for his head injury. After his end of service, Mr. Hereford received continued medical care at VA medical facilities.

~~892.~~882.   As a result of the August 8, 2008 Terrorist Attack, and the injuries he

suffered, Joseph Louis Hereford has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

893.883.    Plaintiff John Robert Hereford is a citizen of the United States and is domiciled in the State of Texas. He is the father of Joseph Louis Hereford.

894.884.    Plaintiff Carol Hereford is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Joseph Louis Hereford.

895.885.    Plaintiff John Thomas Hereford is a citizen of the United States and is domiciled in the State of Texas. He is the brother of Joseph Louis Hereford.

896.886.    Plaintiff Bobbie M. Martinez is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Joseph Louis Hereford.

897.887.    As a result of the August 8, 2008 Terrorist Attack, and the injuries suffered by Joseph Louis Hereford, Plaintiffs John Robert Hereford, Carol Hereford, John Thomas Hereford, and Bobbie M. Martinez have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

19.18.    **THE JULY 20, 2008 ATTACK – SADR CITY, BAGHDAD**

A.    **PLAINTIFF TRAVIS JAY TERPSTRA**

898.888.    Plaintiff Travis Jay Terpstra is a citizen of the United States and is domiciled in the State of Texas.

169

899.889.   On July 20, 2008, Travis Jay Terpstra, age 29, was serving in the U.S. military in Iraq.

900.890.   Mr. Terpstra and his platoon had just completed an overnight watch and patrol mission along Route Pluto, near the area surrounding Sadr City and Baghdad and were headed back to COP Apache in a four-vehicle convoy when an EFP struck the Stryker in which they were riding. Mr. Terpstra was standing in the squad leader's hatch in the "Stryker" Armored Combat Vehicle and was knocked unconscious from the blast.

901.891.   The July 20, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

902.892.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Terpstra.

903.893.   As a result of the attack, Travis Jay Terpstra suffered from concussion, headaches, tinnitus, TBI and PTSD.

904.894.   Travis Jay Terpstra received medical treatment at the aid station in Baghdad and continues care with the VA for his psychological treatment and medications.

905.895.   As a result of the July 20, 2008 Terrorist Attack, and the injuries he suffered, Travis Jay Terpstra has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-

170

judgment interest.

20.19.   **THE MAY 3, 2008 ATTACK – AL KIFL, BABIL GOVERNORATE**

A.   **PLAINTIFFS THE CHRISTOPHER DUANE MOORE FAMILY**

906.896.   Plaintiff Christopher Duane Moore is a citizen of the United States and is domiciled in the State of Texas.

907.897.   On May 3, 2008, Christopher Moore, age 25, was serving in the U.S. military in Iraq.

908.898.   Mr. Moore was attacked while on combat patrol on the main supply route in Al Kifl, Babil, Iraq when his vehicle was struck by an EFP.

909.899.   The May 3, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

910.900.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Moore.

911.901.   As a result of the attack, Christopher Duane Moore suffered shrapnel wounds to his right shoulder, arm, and thigh, as well as a TBI, memory issues, photophobia, hearing loss, tinnitus, cervicalgia, and PTSD.

912.902.   Christopher Moore received medical treatment immediately following the attack as he suffered from a head injury and shrapnel injuries to his right shoulder, arm, and thigh. He was medically evacuated to the Combat Support Hospital in Baghdad and also received extensive medical treatment at The University of North Carolina at Chapel Hill

171

Medical Center.

913 903.    As a result of the May 3, 2008 Terrorist Attack, and the injuries he suffered, Christopher Moore has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

914 904.    Plaintiff Sharon Moore is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Christopher Moore.

915 905.    Plaintiff Melinda Shea Russett is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Christopher Moore.

916 906.    Plaintiff M.M, a minor, represented by her legal guardians Christopher Moore and Sharon MooreAnnabelle Austin, is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Christopher Moore.

917 907.    As a result of the May 3, 2008 Terrorist Attack, and the injuries suffered by Christopher Moore, Plaintiffs Sharon Moore, Melinda Shea Russett, and M.M., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest

**B.    PLAINTIFF JOSHUA JAMES NICHOLSON**

918 908.    Plaintiff Joshua J. Nicholson is a citizen of the United States and is domiciled in the State of Virginia.

919 909.    On May 3, 2008, Joshua J. Nicholson, age 23, was serving in the U.S.

172

military in Iraq.

920.910.    Mr. Nicholson was attacked while on combat patrol on the main supply route in Al Kifl, Babil, Iraq when his vehicle was struck by an EFP.

921.911.    The May 3, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

922.912.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Nicholson.

923.913.    As a result of the attack, Joshua Nicholson suffers photophobia, migraines, hearing loss, tinnitus, PTSD, TBI, left knee injuries, back and neck injuries, memory loss, and scars received from shrapnel.

924.914.    Joshua Nicholson received medical treatment immediately following the attack as he suffered shrapnel injuries to his right hand and shrapnel in his leg. He suffered notable swelling to the back of his head and was medically evacuated to the Combat Support Hospital in Baghdad. He continues to be treated for his injuries with the VA and private medical providers.

925.915.    As a result of the May 3, 2008 Terrorist Attack, and the injuries he suffered, Joshua Nicholson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

173

21.20.      **THE MARCH 28, 2008 ATTACK – SADR CITY, BAGHDAD**

   A.      **PLAINTIFFS THE MOUNTAIN SPARROW ROBICHEAU FAMILY**

926.916.    Plaintiff Mountain Sparrow Robicheau is a citizen of the United States and domiciled in the State of Maine.

927.917.    On March 28, 2008, Mountain Robicheau, age 29, was serving in the U.S. military in Iraq.

928.918.    Mr. Robicheau was on convoy with his unit in Sadr City when his vehicle was hit by an EFP.

929.919.    The March 28, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

930.920.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Robicheau.

931.921.    As a result of the attack, Mountain Sparrow Robicheau lost consciousness after the blast and sustained other physical injuries, including shrapnel wounds to both legs, 2nd and 3rd degree burns on his arms and face, frequent headaches, TBI and PTSD.

932.922.    Mountain Sparrow Robicheau received initial medical treatment at Combat Outpost (COP) Calhoun and was then air medevac'd to the CSH in Baghdad. He was then transferred to the hospital in Balad, and later air medevac'd to Landstuhl Regional Military Hospital in Germany. He was returned Stateside to Brooke Army Medical Center in San Antonio, Texas for several months of inpatient and outpatient treatment. He continues to undergo treatment

for his injuries at the Togus VA Medical Center in Augusta, Maine.

933.923.   As a result of the March 28, 2008 Terrorist Attack, and the injuries he suffered, Mountain Sparrow Robicheau has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

934.924.   Plaintiff Rebecca Ann Robicheau is a citizen of the United States and is domiciled in the State of Maine. She is the wife of Mountain Sparrow Robicheau.

935.925.   Plaintiff Jon Eric Robicheau is a citizen of the United States and is domiciled in the State of Maine. He is the father of Mountain Sparrow Robicheau.

936.926.   Plaintiff Susan Marie Robicheau is a citizen of the United States and is domiciled in the State of Maine. She is the mother of Mountain Sparrow Robicheau.

937.927.   Plaintiff Jasmyn Amara Robicheau is a citizen of the United States and is domiciled in the State of Maine. She is the sister of Mountain Sparrow Robicheau.

938.928.   Plaintiff Ian Nova Robicheau is a citizen of the United States and is domiciled in the State of Connecticut. He is the brother of Mountain Sparrow Robicheau.

939.929.   Plaintiff Rose Meadow Alexander is a citizen of the United States and is domiciled in the State of Maine. She is the sister of Mountain Sparrow Robicheau.

940.930.   Plaintiff Anthony Tyler Robicheau is a citizen of the United States and is domiciled in the State of Maine. He is the son of Mountain Sparrow Robicheau.

941.931.   Plaintiff Emily Rose Robicheau is a citizen of the United States and is domiciled in the State of Maine. She is the daughter of Mountain Sparrow Robicheau.

942.932.   Plaintiff Logan Wayne Robicheau is a citizen of the United States and is domiciled in the State of Maine. He is the son of Mountain Sparrow Robicheau.

943.933.   Plaintiff Cooper Eric Robicheau is a citizen of the United States and is domiciled in the State of Maine. He is the son of Mountain Sparrow Robicheau.

944.934.   Plaintiff L.J.R., a minor, represented by his legal guardians Mountain Sparrow Robicheau and Rebecca Ann Robicheau, is a citizen of the United States and is domiciled in the State of Maine. He is the son of Mountain Sparrow Robicheau and Rebecca Ann Robicheau.

945.935.   As a result of the March 28, 2008 Terrorist Attack, and the injuries suffered by Mountain Sparrow Robicheau, Plaintiffs Rebecca Ann Robicheau, Jon Eric Robicheau, Susan Marie Robicheau, Jasmyn Amara Robicheau, Ian Nova Robicheau, Rose Meadow Alexander, Anthony Tyler Robicheau, Emily Rose Robicheau, Logan Wayne Robicheau, Cooper Eric Robicheau, and L.J.R., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 22.21.      THE MARCH 23, 2008 ATTACK – THE INTERNATIONAL ZONE, BAGHDAD

946.936.   On March 23, 2008, the U.S. Embassy in Baghdad was attacked by a barrage of 107-mm rockets. The rockets originated from Sadr City, an established JAM/Special Group sanctuary and staging area for rocket attacks. The attack killed a U.S. government contractor, and injured several others, including Plaintiffs RobetoRoberto Leon Garcia and Wilem Speed Wong.

947.937.   U.S. government press briefings surrounding the March 23, 2008 Terrorist Attack reported that, "Indirect fire attacks fueled by Iranian-backed special groups criminals that

targeted the Baghdad neighborhoods and the International Zone." The press ~~breifings~~briefings also detailed the seizure of large caches of weapons in Iraq, including 107-mm rockets like the kind used in the March 23, 2008 Terrorist Attack, that originated from Iran and were "assessed to have been produced in Iran sometime in 2007."

~~948.~~938.   The March 23, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~949.~~939.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Garcia and Mr. Wong.

~~950.~~940.   Defendants Iran, IRGC, MOIS, Bank Melli and Bank Markazi have been found civilly liable for the March 23, 2008 Terrorist Attack. *See Estate of Fishbeck, et al., v. Islamic Republic of Iran, et al.*, Case No. 1:18-cv-2248-CRC (DDC 2023), at ECF 127, 136 & 137.

### A.   PLAINTIFFS THE ROBERTO LEON GARCIA FAMILY

~~951.~~941.   Plaintiff Roberto Leon Garcia is a citizen of the United States and is domiciled in the State of Illinois.

~~952.~~942.   On March 23, 2008, Roberto Leon Garcia, age 49, was serving in the U.S. military in Iraq.

~~953.~~943.   Mr. Garcia was in the embassy compound of the International Zone in Baghdad when he was attacked with 107-mm rockets.

~~954.~~944.   As a result of the attack, Roberto Leon Garcia suffered loss of hearing,

177

tinnitus, and injuries to his lower back, neck, arthritis in his right hand, and PTSD.

955.945.   Roberto Leon Garcia was examined/treated at the Combat Support Hospital, and since his return to the United States has endured years of extensive physical therapy, acupuncture, counseling and medication.

956.946.   As a result of the March 23, 2008 Terrorist Attack, and the injuries he suffered, Roberto Leon Garcia has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

957.947.   Plaintiff Felipe L. Garcia is a citizen of the United States and is domiciled in the State of Illinois. He is the brother of Roberto Leon Garcia.

958.948.   Plaintiff Elizabeth L. Garcia is a citizen of the United States and is domiciled in the State of California. She is the sister of Roberto Leon Garcia

959.949.   Plaintiff Rosa L. Garcia is a citizen of the United States and is domiciled in the State of Illinois. She is the sister of Roberto Leon Garcia.

960.950.   Plaintiff Eduardo Garcia is a citizen of the United States and is domiciled in the State of New Mexico. He is the brother of Roberto Leon Garcia.

961.951.   Plaintiff Nicoli Garcia is a citizen of the United States and is domiciled in the State of Illinois. He is the son of Roberto Leon Garcia.

962.952.   As a result of the March 23, 2008 Terrorist Attack, and the injuries suffered by Roberto Leon Garcia, Plaintiff's brother Felipe L. Garcia, sister Elizabeth L. Garcia, sister Rosa L. Garcia, brother Eduardo Garcia, and son Nicoli Garcia have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium,

178

loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### B.   PLAINTIFF WILEM SPEED WONG

963.953.   Plaintiff Wilem Speed Wong is a citizen of the United States and is domiciled in the State of New York.

964.954.   On March 23, 2008, Wilem Speed Wong, age 37, was serving in the U.S. military in Iraq.

965.955.   Mr. Wong was in the embassy compound of the International Zone in Baghdad during the March 23, 2008 rocket attack.

966.956.   As a result of the attack, Wilem Speed Wong suffered injuries to both his knees, left hip, lower back, and suffers from PTSD.

967.957.   Wilem Speed Wong received extensive medical treatment first on scene and since then has continued to treat with physical therapy, counseling and medications.

968.958.   As a result of the March 23, 2008 Terrorist Attack, and the injuries he suffered, Wilem Speed Wong has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 23.22.   THE MARCH 17, 2008 ATTACK – TAJI, BAGHDAD GOVERNORATE

### A.   PLAINTIFF PHILIP EDWARD LORENZ

969.959.   Plaintiff Philip Edward Lorenz formerly known as Philip Edward Lopez, is a citizen of the United States and is domiciled in the State of California.

179

970 960.   On March 17, 2008, Philip Edward Lorenz, age 38, was serving in the U.S. military in Iraq.

971 961.   Mr. Lorenz was the gunner of a five-vehicle patrol traveling in Taji when they were attacked by an EFP. On the right side of the truck, he saw a flash and heard an explosion on the right side of his headset. The force of the blast knocked him down into the turret causing him injury.

972 962.   The March 17, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

973 963.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Lorenz.

974 964.   As a result of the attack, Philip Edward Lorenz suffered cranial nerve damage, a TBI, cognitive injury, hearing loss, tinnitus, right eye vision disturbance secondary to traumatic maculopathy, compression of the nasal lacrimal duct, shrapnel wounds, chronic pain from cervical and thoracic spine injuries, PTSD, depression, anxiety, addiction, photophobia, migraines, right side tremors, Parkinson's disease, sleep issues, night terrors, and hypervigilance.

975 965.   Philip Edward Lorenz received extensive medical treatment at numerous facilities including, but not limited to the San Francisco VA Health Care System, the Santa Rosa VA Clinic, the Asheville VA Medical Center, the Durham VA Health Care System, and the Richmond VA Medical Center.

180

976.966.   As a result of the March 17, 2008 Terrorist Attack, and the injuries he suffered, Philip Edward Lorenz has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

24.23.     **THE MARCH 12, 2008 ATTACK – TALLIL AIR BASE, DHI QAR GOVERNORATE**

A.   **PLAINTIFF CHRISTOPHER GENE LLOYD**

977.967.   Plaintiff Christopher Gene Lloyd is a citizen of the United States and is domiciled in the State of Oregon.

978.968.   On March 12, 2008, Christopher Gene Lloyd, age 21, was serving in the U.S. military in Iraq.

979.969.   Mr. Lloyd was a passenger in an armored Chevrolet Silverado when the Tallil Air Base came under rocket attack with thirteen 107mm rockets. The second rocket hit his vehicle. Mr. Lloyd suffered serious personal injuries and burns. The attack severely injured Mr. Joel Tavera and killed three other U.S. service members.

980.970.   The March 12, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

981.971.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Lloyd.

982.972.    As a result of the attack, Christopher Gene Lloyd suffered burns to his face, neck, chest, and legs, fractures to his right ear, right eye socket, and left forehead, hearing loss, loss of consciousness, TBI, and PTSD.

983.973.    Christopher Gene Lloyd received extensive medical treatment and was initially treated at the Combat Support Hospital (CSH) in Balad, transferred to Ibn Sina Hospital in Baghdad, and was then medically evacuated by Black Hawk helicopter to Landstuhl Regional Medical Center (LRMC) in Germany. He was discharged from LRMC and transported to Madigan AMC at Ft. Lewis in San Antonio, Texas. He continued to receive medical treatment at Madigan Army Medical Center, Tacoma, Washington, and Naval Medical Center, Portsmouth, Virginia.

984.974.    As a result of the March 12, 2008 Terrorist Attack, and the injuries he suffered, Christopher Gene Lloyd has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

25.24.    THE MARCH 3, 2008 ATTACK – SAFWAN, BASRA GOVERNORATE

A.    PLAINTIFFS TIMOTHY JOSEPH O'SULLIVAN, SR & JOAN AND JOANN O'SULLIVAN

985.975.    Plaintiff Timothy Joseph O'Sullivan, Sr. is a citizen of the United States and is domiciled in the State of Florida. He is the father of Timothy Joseph O'Sullivan Jr.

986.976.    Plaintiff Joann O'Sullivan is a citizen of the United States and is domiciled in the State of Florida. She is the mother of Timothy Joseph O'Sullivan Jr.

987.977.    On March 3, 2008, Plaintiffs' son, Timothy Joseph O'Sullivan, Jr., age 36, was serving in the U.S. Air Force as a Senior Advisor to British Forces stationed in Basra, Iraq. At the time, Mr. O'Sullivan held the rank of Captain, O-3.

182

988.978.   Timothy O'Sullivan, Jr. was performing his duties as the Senior Advisor to British forces while traveling in an armored Warrior Infantry Fighting Vehicle ("IFV") as part of a five-vehicle convoy. He was traveling in a British vehicle when it was hit and destroyed by a massive EFP explosion.

989.979.   The March 3, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

990.980.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Timothy O'Sullivan, Jr.

991.981.   As a result of the EFP attack, Plaintiffs, Mr. and Mrs. O'Sullivan'sPlaintiffs' son, Timothy, O'Sullivan Jr., suffered significant physical and psychological injuries due to the concussive blast of the EFP explosion including TBI, internal bleeding, and injuries to his upper extremities. Timothy O'Sullivan, Jr.He also suffers from PTSD, back pain, and hearing loss.

992.982.   Timothy O'Sullivan, Jr. received extensive medical treatment for his injuries, including orthopedic surgical procedures on his right wrist and hand. He received treatment at various hospitals in Basra, Iraq; Kuwait City, Kuwait; Landstuhl, Germany; Tampa, Florida; and Dayton, Ohio. Mr. Sullivan is currently being treated for TBI.

993.983.   As a result of the March 3, 2008 attack and multiple rocket attacks, and the injuries suffered by their son, Plaintiffs Timothy Joseph O'Sullivan, Sr. and Joann O'Sullivan have past and future noneconomic damages, including severe mental anguish,

183

extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 26.25.    THE FEBRUARY 2, 2008 ATTACK – BAGHDAD, BAGHDAD GOVERNORATE

#### A.    PLAINTIFFS THE DOUGLAS JAMES RAGONE FAMILY

994.984.    Plaintiff Douglas James Ragone is a citizen of the United States and is domiciled in the State of Michigan.

995.985.    On February 2, 2008, Douglas James Ragone, age 23, was serving in the U.S. military in Iraq.

996.986.    Mr. Ragone was a passenger in an M1151 Humvee when his vehicle was struck by an EFP.

997.987.    The February 2, 2008 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

998.988.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Ragone.

999.989.    As a result of the attack, Douglas James Ragone suffered a concussion, nausea, disorientation, ruptured eardrums, hearing loss, tinnitus, back and neck injuries, eyesight issues, speech issues, migraines, memory issues, TBI, anxiety, sleep issues, night terrors, and PTSD.

1000.990. Douglas James Ragone received medical treatment at the Army Field Hospital in Balad the day of the attack and was again evaluated the following day at the BIAP

Clinic at Sather AB for a ruptured ear and symptoms of concussion and TBI. He has also received medical and psychological treatment at Hennepin County Medical Center, IHA Neurology Consultants, and St. Joseph Mercy Livingston.

~~1001.~~991. As a result of the February 2, 2008 Terrorist Attack, and the injuries he suffered, Douglas James Ragone has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~1002.~~992. Plaintiff D.J.R., a minor, represented by his legal guardians Douglas James Ragone and Anna Ragone is a citizen of the United States and is domiciled in the State of Michigan. He is the son of Douglas James Ragone.

~~1003.~~993. Plaintiff David James Ragone is a citizen of the United States and is domiciled in the State of Michigan. He is the father of Douglas James Ragone.

~~1004.~~994. Plaintiff Daniel Joseph Ragone is a citizen of the United States and is domiciled in the State of Michigan. He is the brother of Douglas James Ragone.

~~1005.~~995. Plaintiff Denise Elizabeth Smith is a citizen of the United States and is domiciled in the State of Michigan. She is the sister of Douglas James Ragone.

~~1006.~~996. As a result of the February 2, 2008 Terrorist Attack, and the injuries suffered by Douglas James Ragone, Plaintiffs D.J.R., a minor, David James Ragone, Daniel Joseph Ragone, and Denise Elizabeth Smith have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount

185

of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 27.26.    THE NOVEMBER 27, 2007 ATTACK – BAQUBAH, DIYALA GOVERNORATE

#### A.    PLAINTIFF SEMELI TOILOLO

1007.997.  Plaintiff Semeli Toilolo is a citizen of the United States and is domiciled in  the State of Texas.

1008.998.  On November 27, 2007, Semeli Toilolo, age 29, was serving in the U.S. military  in Iraq.

1009.999.  Mr. Toilolo was walking while on route patrol in Baqubah when he was approached by a female who detonated a suicide bomb.

1010.1000.    The November 27, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1011.1001.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Toilolo.

1012.1002.    As a result of the attack, Semeli Toilolo suffered a concussion resulting in a TBI, embedded shrapnel in his left arm and multiple shrapnel injuries to his lower extremities. He also suffers from PTSD and nightmares from the attack.

1013.1003.    Semeli Toilolo received extensive medical treatment, requiring surgery in Balad after the attack for shrapnel and ball bearing fragments in his lower right leg and ankle. After his deployment he received additional medical treatment for retained shrapnel

186

at Madigan Army Medical Center at Fort Lewis. He has continued his medical care since his end of service at VA medical facilities.

1014.1004.      As a result of the November 27, 2007 Terrorist Attack, and the injuries he suffered, Semeli Toilolo has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**28.27.      THE OCTOBER 31, 2007 ATTACK – SADR CITY, BAGHDAD**

**A.      PLAINTIFF JEFFREY PHILIP ARDOIN**

1015.1005.      Plaintiff Jeffrey Philip Ardoin is a citizen of the United States and is domiciled in the State of Texas.

1016.1006.      On October 31, 2007, Jeffrey Philip Ardoin, age 32, was serving in the U.S. military in Iraq.

1017.1007.      Mr. Ardoin was on patrol with his unit in Sadr City, Baghdad, when his vehicle was struck by an EFP.

1018.1008.      The October 31, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1019.1009.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr.

Ardoin.

~~1020.~~1010.        As a result of the attack, Jeffrey Philip Ardoin suffered shrapnel to his left leg and PTSD.

~~1021.~~1011.        Jeffrey Philip Ardoin received extensive medical treatment on scene followed by surgical treatment and months of physical therapy. Mr. Ardoin has continued to treat for his injuries including physical therapy, counseling, and medications.

~~1022.~~1012.        As a result of the October 31, 2007 Terrorist Attack, and the injuries he suffered, Jeffrey Philip Ardoin has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## ~~29.~~28.      THE OCTOBER 7, 2007 ATTACK – JURF SAKHAR, ISKANDARIYAH, BABIL GOVERNORATE

### A.    PLAINTIFF COLLIN JAMES BLACK

~~1023.~~1013.        Plaintiff Collin James Black is a citizen of the United States and is domiciled in  the State of Ohio.

~~1024.~~1014.        On October 7, 2007, Collin James Black, age 20, was serving in the U.S. military  in Iraq.

~~1025.~~1015.        Mr. Black was on route clearance patrol with his unit by the Euphrates River in Iskandariyah when his vehicle triggered an IED in the road that blew up, damaging his vehicle, briefly dazing him and causing him injury.

~~1026.~~1016.        The October 7, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1027.1017.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Black.

1028.1018.    As a result of the attack, Collin James Black suffered a torn eardrum, tinnitus, head injury resulting in a TBI, and exacerbated PTSD.

1029.1019.    Collin James Black received extensive medical treatment at Chillicothe VA Medical Center.

1030.1020.    As a result of the October 7, 2007 Terrorist Attack, and the injuries he suffered, Collin James Black has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 30.29.    THE SEPTEMBER 19, 2007 ATTACK – KADHIMIYA, BAGHDAD

### A.    PLAINTIFFS THE RONALD DARRIS FYFFE JR. FAMILY

1031.1021.    Plaintiff Ronald Darris Fyffe Jr. is a citizen of the United States and is domiciled in the State of Kentucky.

1032.1022.    On September 19, 2007, Ronald Darris Fyffe Jr., age 20, was serving in the U.S. military in Iraq.

1033.1023.    Mr. Fyffe was in the lead vehicle of a convoy in the Kadhimiya district of Baghdad that was approaching an Iraqi checkpoint when his vehicle was struck by an EFP.

189

1034.1024.     The September 19, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1035.1025.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Fyffe.

1036.1026.     As a result of the attack, Ronald Darris Fyffe Jr. suffered shrapnel injuries to both legs causing ligament and tendon damage, a shattered knee, nerve damage, a pituitary gland bleed, injuries to his ears, hearing loss, tinnitus, migraines, stomach issues, PTSD, and a back injury.

1037.1027.     Ronald Darris Fyffe Jr. received extensive medical treatment for his injuries and was taken to the Green Zone and stabilized then transported to Landstuhl Regional Medical Center. Mr. Fyffe was then sent to Walter Reed Medical Center where he spent almost a year recovering. He has undergone multiple surgeries, as well as extensive physical therapy, counseling and medications.

1038.1028.     As a result of the September 19, 2007 Terrorist Attack, and the injuries he suffered, Ronald Darris Fyffe Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1039.1029.     Plaintiff Brittney N. Agee is a citizen of the United States is domiciled in the State of Kentucky. She is the wife of Ronald Darris Fyffe Jr.

1040.1030.     Plaintiff Rosella Fyffe is a citizen of the United States and is domiciled in the State of Kentucky. She is the mother of Ronald Darris Fyffe Jr.

1041.1031.     Plaintiff Ronald Darris Fyffe Sr. is a citizen of the United States and is domiciled in the state of Kentucky. He is the father of Ronald Darris Fyffe Jr.

1042.1032.     Plaintiff Johnathan Michael Fyffe is a citizen of the United States and is domiciled in the state of North Carolina. He is the brother of Ronald Darris Fyffe Jr.

1043.1033.     Plaintiff Joyce Marie Fyffe is a citizen of the United States and is domiciled in the state of Kentucky. She is the sister of Ronald Darris Fyffe Jr.

1044.1034.     As a result of the September 19, 2007 Terrorist Attack, and the injuries suffered by Ronald Darris Fyffe Jr., Plaintiff's wife Brittney N. Agee, mother Rosella Fyffe, father Ronald Darris Fyffe Sr., brother Johnathan Michael Fyffe, and sister Joyce Marie Fyffe, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 30. THE AUGUST 5, 2007 ATTACK – BAGHDAD

### A.     PLAINTIFFS THE JEREMY CAMPOS FOREMAN FAMILY

1.     Plaintiff Jeremy Campos Foreman is a citizen of the United States and is domiciled in the State of Texas.

2.     On August 5, 2007, Jeremy Campos Foreman, age 30, was serving in the U.S. military, in Iraq.

3.    Mr. Foreman and his unit were conducting a security patrol in a residential area in Baghdad when his vehicle was hit with an RPG, propelling the vehicle into the air causing damage to the ramp and rendering the vehicle inoperable. The RPG blast caused internal damage to Mr. Foreman's gluteus maximus, shrapnel injuries, temporary loss of vision, sciatic nerve damage, degenerative disc disease, TBI, migraines, sleep apnea, bilateral knee neuropathy and PTSD.

4.    The August 5, 2007, Terrorist Attack was planned, committed and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

5.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Foreman.

6.    As a result of the attack, Jeremy Campos Foreman suffered internal damage on his gluteus maximus, shrapnel injuries, temporarily loss of vision, sciatic nerve damage, degenerative disc disease. He was later diagnosed with TBI, migraines, sleep apnea, bilateral knee neuropathy and PTSD.

7.    Jeremy Campos Foreman received extensive medical treatment at the scene, which included a full body check, shrapnel removal, and bandaging of wounds. Since returning to the United States, he has been treated with therapy, counseling, and medications.

8.    As a result of the August 5, 2007, Terrorist Attack, and the injuries he suffered,

Jeremy Campos Foreman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

9.    Plaintiff Anthony Andrew Foreman is a citizen of the United States and is domiciled in the State of Arizona. He is the son of Jeremy Campos Foreman.

10.    Plaintiff Brooklyn Nicole Foreman is a citizen of the United States and is domiciled in the State of Arizona. She is the daughter of Jeremy Campos Foreman.

11.    Plaintiff Rosalva Campos Foreman is a citizen of the United States and is domiciled in the State of Arizona. She is the mother of Jeremy Campos Foreman.

12.    Plaintiff Joaquin Campos Luquin Jr. is a citizen of the United States and is domiciled in the State of Arizona. He is the brother of Jeremy Campos Foreman.

13.    As a result of the August 5, 2007 Terrorist Attack, and the injuries suffered by Jeremy Campos Foreman, Plaintiffs Anthony Andrew Foreman, Brooklyn Nicole Foreman, Rosalva Campos Foreman, and Joaquin Campos Luquin Jr., have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, for each of them, plus pre-judgment interest and post-judgment interest.

### 31.   THE JULY 10, 2007 ATTACK – TAJI, BAGHDAD GOVERNORATE

### A.    PLAINTIFF KATIE REBEKAH POLLARD

1045.1035.        Plaintiff Katie Rebekah Pollard is a citizen of the United States and

193

is domiciled in the State of Alabama. She is the sister of Daniel Wayne Segers.

1046.1036.     On July 10, 2007, Daniel Wayne Segers, age 20, was serving in the U.S. military in Iraq.

1047.1037.     Daniel Wayne Segers was serving as an Infantryman at the time of the attack and was located in the gunner position in a Humvee located outside the west gate of Observation Point (OP) Cavalier near FOB Taji, Iraq. Mr. Segers was on overwatch / force protection along with several other Humvees and Bradley vehicles when an Iranian two-stage RPG-7 round penetrated the back passenger side door of the Humvee in which Mr. Segers was located. The initial stage of the RPG-7 penetrated the Humvee, but the second stage did not explode and was found in the back floorboard of the Humvee after the attack.

1048.1038.     The blast from the RPG-7 penetrator caused Plaintiff's brother, Daniel Wayne Segers to strike his head and body inside the Humvee, sustaining serious physical injuries, including damage to his liver, stomach, rectum, penis, right side, right knee, right hand, corneal lacerations to his right eye, bladder, a concussion, TBI, as well as taking more than 100 pieces of shrapnel all over his body.  Additionally, he suffers from PTSD, depression, anxiety, violent attacks in his sleep, insomnia, suicidal ideation and attempts.

1049.1039.     The July 10, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1050.1040.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Segers.

194

~~1051.~~1041.    As a result of the July 10, 2007 Terrorist Attack, and the injuries suffered by her brother Daniel Wayne Segers, Plaintiff, Katie Rebekah Pollard, has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 plus pre-judgment interest and post-judgment interest.

## 32. THE JULY 5, 2007 ATTACK – NEAR JISR DIYALA, BAGHDAD GOVERNORATE

### A.    PLAINTIFF BENJAMIN MICHAEL HAMEL

~~1052.~~1042.    Plaintiff Benjamin Michael Hamel is a citizen of the United States and is domiciled in the State of New Hampshire.

~~1053.~~1043.    On July 5, 2007, Benjamin Michael Hamel, age 21, was serving in the U.S. military in Iraq.

~~1054.~~1044.    Mr. Hamel was on mounted patrol conducting route security traveling on Route Jennifer in Jisr when his vehicle was struck by an IED. Mr. Hamel was the gunner in the Bradley and the explosion lifted him from the gunner seat before landing and striking his head on the hatch.

~~1055.~~1045.    The July 5, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1056.~~1046.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hamel.

195

1057.1047.     As a result of the attack, Benjamin Michael Hamel suffered a concussion later diagnosed as a TBI, neck and back injuries, left knee injury later diagnosed as compartment syndrome, tinnitus and PTSD.

1058.1048.     Benjamin Michael Hamel received medical treatment by a medic following the attack and was given medication for the pain. Mr. Hamel sought treatment back at Fort Benning for TBI and PTSD symptoms. He continues treatment with the VA and private medical providers for the injuries to his left leg.

1059.1049.     As a result of the July 5, 2007 Terrorist Attack, and the injuries he suffered, Benjamin Michael Hamel has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**33.   THE JUNE 25, 2007 ATTACK – FOB KALSU, ISKANDARIYAH, BABIL GOVERNORATE**

**A.     PLAINTIFF COLLIN JAMES BLACK**

1060.1050.     Plaintiff Collin James Black is a citizen of the United States and is domiciled in the State of Ohio.

1061.1051.     On June 25, 2007, Collin James Black, age 20, was serving in the U.S. military in Iraq.

1062.1052.     Mr. Black was sitting on his bed at his base at FOB Kalsu in Iskandariyah when a 240-millimeter Iranian rocket exploded on his base and hit the container housing unit across from him. The shrapnel from the rocket and over pressure from the blast caused his housing unit to collapse and his windows explode, causing him injury.

1063.1053.     The June 25, 2007 Terrorist Attack was planned, committed,

196

and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1064.1054.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Black.

1065.1055.    As a result of the attack, Collin James Black suffered glass injuries to his hands, a TBI, and PTSD.

1066.1056.    Collin James Black received medical treatment and therapy at Chillicothe VA Medical Center.

1067.1057.    As a result of the June 25, 2007 Terrorist Attack, and the injuries he suffered, Collin James Black has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 34.  THE JUNE 24, 2007 ATTACK – TIKRIT, SALAH AL-DIN GOVERNORATE

#### A.    PLAINTIFFS THE JOHN STEVEN WHITWORTH FAMILY

1068.1058.    Plaintiff John Steven Whitworth is a citizen of the United States and is domiciled in the State of Alabama.

1069.1059.    On June 24, 2007, John Steven Whitworth, age 22, was serving in the U.S. military in Iraq.

197

1070. 1060.     Mr. Whitworth was with his unit on a logistics run heading toward Baghdad. About forty-five minutes into the run, they were hit by an IED, and he was knocked unconscious.

1071. 1061.     The June 24, 2007 Terrorist Attack was planned, committed, and/or authorized by FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1072. 1062.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Whitworth.

1073. 1063.     As a result of the attack, John Steven Whitworth suffered a back injury, a TBI, hearing loss, tinnitus, shrapnel wounds, PTSD, depression, anxiety, migraines, photophobia, a brain bleed, memory issues, and nightmares.

1074. 1064.     John Steven Whitworth received extensive medical treatment at Anaconda LSA in Balad, Landstuhl Regional Medical Center, Martin ACH, Tuscaloosa VA Medical Center, Birmingham VA Health Care System, Cincinnati VA Medical Center and Lexington VA Health Care System.

1075. 1065.     As a result of the June 24, 2007 Terrorist Attack, and the injuries he suffered, John Steven Whitworth has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1076.1066.        Plaintiff Eric Bentley Whitworth is a citizen of the United States and is domiciled in the State of Alabama. He is the son of John Steven Whitworth.

1077.1067.        As a result of the June 24, 2007 Terrorist Attack, and the injuries suffered by John Steven Whitworth, Plaintiff Eric Bentley Whitworth has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 35. THE JUNE 21, 2007 ATTACK –BAGHDAD – SHULA NEIGHBORHOOD

### A. PLAINTIFFS THE RAYMOND NIGEL SPENCER JR. FAMILY

1078.1068.        Plaintiff Raymond Nigel Spencer Jr. was a citizen of the United States and was domiciled in the State of California at the time of his death.

1079.1069.        On June 21, 2007, Raymond Nigel Spencer Jr., age 23, was serving in the U.S. military in Iraq.

1080.1070.        Mr. Spencer was on patrol with his unit in the Shula Neighborhood in Baghdad when his vehicle was struck by an EFP and SAF.

1081.1071.        Raymond Nigel Spencer Jr. was killed in the attack.

1082.1072.        The June 21, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1083.1073.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the

199

permissive environment used to attack and kill U.S. service members in Iraq, including Mr. Spencer.

1084.1074.    Plaintiff Laura F. Spencer is a citizen of the United States and is domiciled in the State of Pennsylvania. She is the mother of Raymond Nigel Spencer Jr. and brings an action individually, and on behalf of the anticipated Estate of Raymond Nigel Spencer Jr. and all heirs thereof, as its legal representative.

1085.1075.    Plaintiff Victoria E. Spencer is a citizen of the United States and is domiciled in the State of Pennsylvania. She is the sister of Raymond Nigel Spencer Jr.

1086.1076.    As a result of the June 21, 2007 Terrorist Attack, and the injuries suffered by, including the conscious pain and suffering and, ultimately, the death of Raymond Nigel Spencer Jr., Plaintiffs Laura F. Spencer and Victoria E. Spencer have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Raymond Nigel Spencer Jr.'s society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Raymond Nigel Spencer Jr., and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

**36.   THE JUNE 20, 2007 ATTACK – FALLUJAH**

**A.   PLAINTIFF STEVEN RICHARD YBARRA**

1087.1077.    Plaintiff Steven Richard Ybarra is a citizen of the United States and is domiciled in the State of California.

1088.1078.    On June 20, 2007, Steven Richard Ybarra, age 23, was serving in the U.S. military in Iraq.

1089.1079.    Mr. Ybarra was on patrol with his unit north of Fallujah setting up for security, when his vehicle hit an IED pressure plate, detonating the IED.

200

1090.1080.        The June 20, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1091.1081.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Ybarra.

1092.1082.        As a result of the attack, Steven Richard Ybarra suffered from a TBI, tinnitus, and PTSD.

1093.1083.        Steven Richard Ybarra received extensive medical treatment at the scene of the attack and was then medically evacuated to a combat support hospital in Fallujah.

1094.1084.        As a result of the June 20, 2007 Terrorist Attack, and the injuries he suffered, Steven Ybarra has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 37. THE JUNE 13, 2007 ATTACK – AL-HAMAMIYAT, SALAH AL-DIN GOVERNORATE

#### A.    PLAINTIFF MARCUS ADAM CANSECO

1095.1085.        Plaintiff Marcus Adam Canseco is a citizen of the United States and is domiciled in the State of Texas.

1096.1086.        On June 13, 2007, Marcus Adam Canseco, age 25, was serving in the U.S. military in Iraq.

1097.1087.        Mr. Canseco was on patrol with his unit when his vehicle was struck

by an IED.

1098.1088.    The June 13, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1099.1089.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Canseco.

1100.1090.    As a result of the attack, Marcus Adam Canseco suffered PTSD, TBI with associated symptoms, smoke inhalation, left hand lacerations, and injuries to his left knee and back.

1101.1091.    Marcus Adam Canseco was initially treated at the Combat Support Hospital where he was held for several days. Following his return to the United States, Mr. Canseco has undergone extensive medical treatment including therapy, counseling, and medications.

1102.1092.    As a result of the June 13, 2007 Terrorist Attack and the injuries he suffered, Marcus Adam Canseco has past and future noneconomic damages, including severe physical and mental pain, suffering and loss of enjoyment of life, past and future economic damages including medical expenses, lost income and benefits, loss of earning capacity in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**38. THE MAY 26, 2007 ATTACK – BAGHDAD, AMIL NEIGHBORHOOD**

### A.    PLAINTIFF ERIC ADAMS

1103.1093.    Plaintiff Eric Adams is a citizen of the United States and is

domiciled in the State of Texas.

1104.1094.     On May 26, 2007, Eric Adams, age 24, was serving in the U.S. military in Iraq.

1105.1095.     Mr. Adams was the Truck Commander of a M1151 Humvee that was heading north towards RTE Irish in the Amil neighborhood of Baghdad when his convoy was struck by an EFP.

1106.1096.     The May 26, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1107.1097.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Adams.

1108.1098.     As a result of the attack, Eric Adams suffered shrapnel wounds resulting in myalgia, arthralgia, and painful scarring. He also suffered injuries to his neck and left knee, as well as TBI and headaches.

1109.1099.     Eric Adams received extensive medical treatment. He was first treated and evaluated at the 28th Combat Support Hospital and placed on light duty for one week then returned to normal duty. He has since continued to treat using therapy and medications.

1110.1100.     As a result of the May 26, 2007 Terrorist Attack, and the injuries he suffered, Eric Adams has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no

less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 39. THE MAY 22, 2007 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE VINCE JAMES WRIGHT JR. FAMILY

~~1111.~~1101.   Plaintiff Vince James Wright Jr. is a citizen of the United States and is domiciled in the State of Georgia.

~~1112.~~1102.   On May 22, 2007, Vince James Wright Jr., age 21, was serving in the U.S. military in Iraq.

~~1113.~~1103.   Mr. Wright was on patrol with his unit in Fallujah when his vehicle was struck by an IED.

~~1114.~~1104.   The May 22, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1115.~~1105.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Wright.

~~1116.~~1106.   As a result of the attack, Vince James Wright Jr. suffered a concussion and TBI with subsequent migraines and memory loss. Mr. Wright also suffers from PTSD from the attack.

~~1117.~~1107.   Vince James Wright Jr. received extensive medical treatment after his deployment at McDonald Army Health Center, Naval Medical Center Portsmouth. Mr. Wright has continued his treatment at VA medical facilities since his end of service.

~~1118.~~1108.   As a result of the May 22, 2007 Terrorist Attack, and the injuries he suffered, Vince James Wright  has past and future noneconomic damages, including severe

physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1119.1109.	Plaintiff Natasha Wright is a citizen of the United States and is domiciled in the State of Georgia. She is the wife of Vince James Wright Jr.

1120.1110.	Plaintiff Doris Wright is a citizen of the United States and is domiciled in the State of Georgia. She is the mother of Vince James Wright Jr.

1121.1111.	Plaintiff Vince Wright Sr. is a citizen of the United States and is domiciled in the State of Georgia. He is the father of Vince James Wright Jr.

1122.1112.	Plaintiff Quinton Wright is a citizen of the United States and is domiciled in the State of Georgia. He is the brother of Vince James Wright Jr.

1123.1113.	As a result of the May 22, 2007 Terrorist Attack, and the injuries suffered by Vince James Wright Jr., Plaintiffs Natasha Wright, Doris Wright, Vince Wright Sr. and Quinton Wright have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**40.  THE MAY 3, 2007 ATTACK – SALMAN PAK – BAGHDAD GOVERNORATE**

**A.	PLAINTIFFS THE JAMES LEE FOREMAN FAMILY**

1124.1114.	Plaintiff James Lee Foreman is a citizen of the United States and is domiciled in  the State of New York.

1125.1115.	On May 3, 2007, James Lee Foreman, age 25, was serving in the U.S. military in Iraq.

1126.1116.    Mr. Foreman was the gunner in the turret of a Humvee in a convoy of approximately four Humvees. Their Quick Reaction Force (QRF) had been called out to assist Iraqi Army / Iraqi Police and were headed down Route Wild when the Humvee ahead of them and his Humvee were struck by an EFP.

1127.1117.    The May 3, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1128.1118.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. James Lee Foreman.

1129.1119.    As a result of the attack, James Lee Foreman suffered loss of consciousness, difficulty concentrating, eyes not tracking, and other injuries and symptoms as a result of his exposure to the blast forces as the EFP struck the two Humvees. He sustained shrapnel injuries and burns to the right side of his body, fractured ribs, bruised lung, liver laceration, and more. He also sustained a TBI with symptoms including but not limited to memory loss, cognitive reasoning issues, and headaches. He was also diagnosed with PTSD including irritability, anger issues, hypervigilance, sleep issues, depression, and other symptoms.

1130.1120.    James Lee Foreman received medical treatment including evaluation at FOB Hammer by Brigade medical staff. He was then sent home for two to three weeks and then placed on light duty when he returned to Iraq. He was later diagnosed with

206

TBI and underwent occupational therapy at Ft. Benning and other military medical facilities.

~~1131.~~1121.    As a result of the May 3, 2007 Terrorist Attack, and the injuries he suffered, James Lee Foreman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~1132.~~1122.    Plaintiff Yani Cruz-Santiago is a citizen of the United States and is domiciled in the State of New York. She is the wife of James Lee Foreman.

~~1133.~~1123.    As a result of the May 3, 2007 Terrorist Attack, and the injuries suffered by James Lee Foreman, Plaintiff Yani Cruz-Santiago has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**41.  THE MARCH 27, 2007 ATTACK – FALLUJAH**

**A.    PLAINTIFFS THE ZACHARY KYLE SPARKS FAMILY**

~~1134.~~        1124.  Plaintiff Zachary Kyle Sparks is a citizen of the United States and is domiciled in the State of Georgia.

~~1135.~~14.    On March 27, 2007, Zachary Kyle Sparks, age 20, was serving in the U.S. military in Iraq.

~~1136.~~15.    Mr. Sparks was on patrol with his unit on the outside of Fallujah in Albu Issa when he was struck by small arms fire in his leg.

1137.16.    The March 27, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1138.17.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Sparks.

1139.18.    As a result of the attack, Zachary Kyle Sparks suffered a gunshot wound to his right leg, tinnitus, atrial defibrillation, PTSD, a TBItraumatic brain injury, depression, anxiety, sleep apnea, and migraines. Mr. Sparks still has bullet fragments in his leg.

1140.19.    Zachary Kyle Sparks received extensive medical treatment on scene, and then was transported to TQ Surgical, Al Taqaddum, Iraq, for further treatment. Since returning to the United States, he has been treated with therapy, counseling, and medications.

1141.20.    As a result of the March 27, 2007 Terrorist Attack, and the injuries he suffered, Zachary Kyle Sparks has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1142.21.    Plaintiff Kevin Dale Sparks is a citizen of the United States and is

domiciled in the State of Georgia. He is the father of Zachary Kyle Sparks.

22.    Plaintiff Tae Suk Sparks is a citizen of the United States and is domiciled in the State of Georgia. She is the mother of Zachary Kyle Sparks

23.    As a result of the March 27, 2007 Terrorist Attack, and the injuries suffered by Zachary Kyle Sparks, Plaintiff's father, Kevin Dale Sparks, hasand mother, Tae Suk Sparks, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, for each of them, plus pre-judgment interest and post-judgment interest.

1143.

## 42. THE MARCH 2, 2007 ATTACK – RAMADI, AL ANBAR GOVERNORATE

### A.    PLAINTIFFS THE CHRISTOPHER MARK MCDUFFIE FAMILY

1144.1124.    Plaintiff Christopher Mark McDuffie is a citizen of the United States and is domiciled in  the State of Alabama.

1145.1125.    On March 2, 2007, Christopher Mark McDuffie, age 29, was serving in the U.S. military  in Iraq.

1146.1126.    In the early morning hours of March 2, 2007, Mr. McDuffie was inside of a Humvee / Joint EOD Response Vehicle along with 5 other vehicles in downtown Ramadi when his vehicle was struck by an IED. Staff Sergeant Dustin Gould and Hospitalman Lucas Emch were killed as a result of the explosion.

1147.1127.    The March 2, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its

209

Co-Defendants.

1148.1128.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. McDuffie.

1149.1129.      As a result of the attack, Christopher Mark McDuffie suffered from fractured orbital bones; fractures to both feet and ankles; ruptured ear drums; concussion; shrapnel wounds including left knee; injury, damage, and loss of teeth; and severe damage to both feet and legs resulting in more than 58 surgeries and permanent mobility issues. He also sustained PTSD from the attack including but not limited to mood swings, anxiety, and panic attacks.

1150.1130.      Christopher Mark McDuffie received extensive medical treatment including initial treatment at the CSH at Ramadi for removal of shrapnel, was medically evacuated to Balad Air Force Base, and then flown by Blackhawk helicopter to Landstuhl Regional Medical Center in Germany. He was later returned stateside and underwent inpatient treatment and numerous surgeries at Walter Reed Army Medical Center for approximately six months and treatment at Georgetown University Medical Center.

1151.1131.      As a result of the March 2, 2007 Terrorist Attack, and the injuries he suffered, Christopher Mark McDuffie has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1152.1132.        Plaintiff Rochelle Lynn McDuffie is a citizen of the United States and is domiciled in the State of Alabama. She is the wife of Christopher Mark McDuffie.

1153.1133.        As a result of the March 2, 2007 Terrorist Attack, and the injuries suffered by Christopher Mark McDuffie, Plaintiff Rochelle Lynn McDuffie has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 43. THE MARCH 1, 2007 ATTACK – NASIRIYAH, DHI QAR GOVERNORATE

#### A.    PLAINTIFF KEITH EDWARD WALLEY

1154.1134.        Plaintiff Keith Edward Walley is a citizen of the United States and domiciled in the State of Wisconsin.

1155.1135.        On March 1, 2007, Keith Edward Walley, age 36, was serving in the U.S. military in Iraq.

1156.1136.        Mr. Walley was riding in a Humvee that was part of a large convoy when his vehicle was struck by a multi-array copper EFP.

1157.1137.        The March 1, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1158.1138.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr.

211

Walley.

1159.1139.        As a result of the attack, Keith Edward Walley suffered depression and other symptoms associated with PTSD and was later diagnosed with PTSD.

1160.1140.        Keith Edward Walley has received medical care and treatment for PTSD since he returned from Iraq.

1161.1141.        As a result of the March 1, 2007 Terrorist Attack, and the injuries he suffered, Keith Edward Walley has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 44. THE FEBRUARY 26, 2007 ATTACK – DIWANIYA

### A.    PLAINTIFFS THE STEVEN RAYMOND ROQUE FAMILY

1162.1142.        Plaintiff Steven Raymond Roque is a citizen of the United States and is domiciled in the State of California.

1163.1143.        On February 26, 2007, Steven Raymond Roque, age 41, was serving in the U.S. military in Iraq.

1164.1144.        Mr. Roque was on patrol with his unit traveling north of Scania near FOB Echo, Diwaniya, when his security convoy vehicle was struck by an EFP.

1165.1145.        The February 26, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1166.1146.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the

212

permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Roque.

1167. 1147.        As a result of the attack, Steven Raymond Roque suffered a head injury resulting in a TBI and tinnitus. Mr. Roque now suffers from PTSD, blurred vision in his left eye, migraines, vertigo, and memory issues from the attack.

1168. 1148.        Steven Raymond Roque received medical treatment after his end of service at Loma Linda Veterans Medical Center and other VA medical facilities.

1169. 1149.        As a result of the February 26, 2007 Terrorist Attack, and the injuries he suffered, Steven Raymond Roque has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1170. 1150.        Plaintiff Rebeccah Michele Roque is a citizen of the United States and is domiciled in the State of California. She is the daughter of Steven Raymond Roque.

1171. 1151.        As a result of the February 26, 2007 Terrorist Attack, and the injuries suffered by Steven Raymond Roque, Plaintiff Rebeccah Michele Roque has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

213

## 45. THE FEBRUARY 22, 2007 ATTACK – RAMADI, AL ANBAR GOVERNORATE

### A. PLAINTIFFS THE CHRISTOPHER BRIAN ECKERT FAMILY

1172.1152.     Plaintiff Christopher Brian Eckert was a citizen of the United States and was a resident of the State of New York at the time of his death.

1173.1153.     On February 22, 2007, Christopher Brian Eckert, age 18, was serving in the U.S. military in Iraq.

1174.1154.     Mr. Eckert was the driver of an up armored HMMWV in a convoy on patrol from Camp Ramadi to Camp Corregidor when an IED detonated near his vehicle.

1175.1155.     Plaintiff Christopher Brian Eckert sustained physical and psychological injuries in the attack. Staff Sergeant Joshua R. Hager, Private First Class Travis Wayne Buford, and Private First Class Rowan D. Walter were killed in the attack.

1176.1156.     The February 22, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1177.1157.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Eckert.

1178.1158.     Defendants Iran, IRGC, MOIS, Bank Melli and Bank Markazi have been found civilly liable for the February 22, 2007 Terrorist Attack. *See Estate of Fishbeck, et al., v. Islamic Republic of Iran, et al.*, Case No. 1:18-cv-2248-CRC (DDC 2023), at ECF 127, 136 & 137

1159.     Plaintiff Roswitha Manuela Eckert, is the mother of Christopher Brian

214

Eckert. She is a citizen of Germany, is domiciled in New York and has been a permanent resident alien of the United States since May 12, 1971.

1179. 1160.    Plaintiff, Roswitha Manuela Eckert, brings an action both individually and on behalf of the Estate of Christopher Brian Eckert, and all heirs thereof, as its legal representative.

1180. 1161.    Plaintiff, Randolph Keith Bowers Sr. is a citizen of the United States and is domiciled in the State of North Carolina. He is the stepfather of Christopher Brian Eckert.

1181. 1162.    Plaintiff Randolph Keith Bowers Jr. is a citizen of the United States and is domiciled in the State of New York. He is the brother of Christopher Brian Eckert.

1182. 1163.    Plaintiff Kyle Henry Bowers is a citizen of the United States and is domiciled in the State of Georgia. He is the brother of Christopher Brian Eckert.

1183. 1164.    Plaintiff Jessica Lynn Watson is a citizen of the United States and is domiciled in the State of Texas. She is the stepsister of Christopher Brian Eckert.

1184. 1165.    The February 22, 2007 Terrorist Attack was a demonstration of extreme and outrageous conduct by Defendants which intentionally or recklessly caused Plaintiff Roswitha Manuela Eckert and other Plaintiff family members severe emotional distress As a result of the February 22, 2007 Terrorist Attack, and the injuries suffered by Christopher Brian Eckert including the conscious pain and suffering and, ultimately, the death of Christopher Brian Eckert, Plaintiffs Roswitha Manuela Eckert, individually, and as legal representative of the Estate of Christopher Brian Eckert, Randolph Keith Bowers Sr., Randolph Keith Bowers Jr., Kyle Henry Bowers, and Jessica Lynn Watson have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Christopher Brian Eckert's society, services, companionship, comfort, protection, instruction, advice and

counsel, loss of earnings, income, interest, and net accumulation to the estate of Christopher Brian Eckert, and the survivorship of his claims for personal injury and related pain and suffering prior to his death, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

### 46. THE FEBRUARY 19, 2007 ATTACK – CAMP TAJI, TARMIYAH, BAGHDAD GOVERNORATE

#### A. PLAINTIFFS THE WILLIAM RICHARD SEABREEZE FAMILY

1185.1166.      Plaintiff William Richard Seabreeze is a citizen of the United States and is domiciled in the State of FloridaTexas.

1186.1167.      On February 19, 2007, Mr. Seabreeze, age 25, was serving in the U.S. military in Iraq.

1187.1168.      Mr. Seabreeze was awakened by SAF and RPG fire and attempted to make his way to the roof when he was knocked unconscious. A suicide car bomb (SVBIED) had breached the gate of the base and detonated in front of the building in which he was sleeping.

1188.1169.      The February 19, 2007 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1189.1170.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Seabreeze.

1190.1171.      As a result of the attack, William Richard Seabreeze suffered a ruptured globe in his left eye, extensive shrapnel wounds, scarring, PTSD, Adjustment Disorder, post concussive syndrome, exacerbated lumbar strain, facial pain, and numbness and tingling of

216

his extremities.

1191. 1172.      Mr. Seabreeze received extensive medical treatment at the 332nd EMDG Air Force Theater Hospital in Balad, Iraq; Landstuhl Regional Medical Center in Landstuhl, Germany; Walter Reed Army Medical Center in Washington, D.C.; VA Medical Center in Washington, D.C.; and at James A. Haley Veterans' Hospital in Tampa, Florida, where he continues to receive treatment.

1192. 1173.      As a result of the February 19, 2007 Terrorist Attack, and the injuries he suffered, Mr. Seabreeze has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1193. 1174.      Plaintiff Deborah Mary Seabreeze is a citizen of the United States and is domiciled in the State of Florida. She is the wife of Mr. Seabreeze.

1194. 1175.      Plaintiff Kathleen Ann Seabreeze is a citizen of the United States and is domiciled in the State of Florida Maryland. She is the mother of Mr. Seabreeze.

1195. 1176.      Plaintiff Buncencia Kristine Burneko is a citizen of the United States and is domiciled in the State of Maryland. She is the sister of Mr. Seabreeze.

1196. 1177.      As a result of the February 19, 2007 Terrorist Attack, and the injuries suffered by William Richard Seabreeze, Plaintiffs Deborah Mary Seabreeze, Kathleen Ann Seabreeze, and Buncencia Kristine Burneko have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

217

### 47. THE FEBRUARY 7, 2007 ATTACK – WEST RASHEED, BAGHDAD

#### A.     PLAINTIFF BRIAN ROBERT SCHAR

~~1197.~~1178.     Plaintiff Brian Robert Schar is a citizen of the United States and is domiciled in the State of Colorado.

~~1198.~~1179.     On February 7, 2007, Brian Robert Schar, age 24, was serving in the U.S. military in Iraq.

~~1199.~~1180.     Mr. Schar was on patrol with his unit in the West Rasheed district of Baghdad when his vehicle was struck by an EFP.

~~1200.~~1181.     The February 7, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1201.~~1182.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Schar.

~~1202.~~1183.     As a result of the attack, Brian Robert Schar suffered a concussion, a TBI which resulted in amnesia and the inability to walk well for a few days, PTSD, and a left shoulder injury.

~~1203.~~1184.     Brian Robert Schar received extensive medical treatment initially on scene and was then taken back to base for additional treatment, including therapy and medications.

~~1204.~~1185.     As a result of the February 7, 2007 Terrorist Attack, and the injuries he suffered, Brian Robert Schar has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic

damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 48. THE FEBRUARY 3, 2007 ATTACK – ROUTE DOVER, SOUTH OF CAMP TAJI, BAGHDAD GOVERNORATE

#### A.     PLAINTIFFS THE RONNIE LEE SANDERS FAMILY

~~1205.~~1186.     Plaintiff Ronnie Lee Sanders was a citizen of the United States and was domiciled in the State of North Carolina at the time of his death.

~~1206.~~1187.     On February 3, 2007, Ronnie Lee. Sanders, age 26, was serving in the U.S. military in Iraq.

~~1207.~~1188.     Mr. Sanders was the tank commander in a Palletized Load System (PLS) (Truck and a self-loading trailer), as part of a larger convoy along Route Dover, south of Camp Taji, when their vehicle was struck by a multiple array EFP.

~~1208.~~1189.     Ronnie Lee Sanders was killed in the attack.

~~1209.~~1190.     The February 3, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1210.~~1191.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to attack and kill U.S. service members in Iraq, including Mr. Sanders.

~~1211.~~1192.     Plaintiff Ruth Ann Sanders is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Ronnie Lee Sanders.

~~1212.~~1193.     Plaintiff Ruth Ann Sanders brings an action individually, and on

behalf of the Estate of Ronnie Lee Sanders, and all heirs thereof, as its legal representative.

1213.

1214.1194.     Roshunda Renee Sanders is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Ronnie Lee Sanders.

1215.1195.     Ronnie Lee Sanders Jr. is a citizen of the United States and is domiciled in the State of Louisiana. He is the son of Ronnie Lee Sanders.

1216.1196.     Lakeyia Deshay Sanders is a citizen of the United States and is domiciled in the State of Texas. She is the daughter of Ronnie Lee Sanders.

1217.1197.     As a result of the February 3, 2007 Terrorist Attack, and the injuries suffered by Ronnie Lee Sanders, including the conscious pain and suffering and, ultimately, the death of Ronnie Lee Sanders, Plaintiffs Ruth Ann Sanders, Rachel Tswana Sanders, R.S.1, a minor, R.S.2, a minor, Roshunda Renee Sanders, Ronnie Lee Sanders Jr., and Lakeyia Deshay Sanders have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Ronnie Lee Sanders' society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Ronnie Lee Sanders, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

**49.  THE JANUARY 17, 2007 ATTACK – AMIN – BAGHDAD GOVERNORATE**

   **A.   PLAINTIFFS THE ROBERT CHRISTOPHER ETTINGER FAMILY**

1218.1198.     Plaintiff Robert Christopher Ettinger is a citizen of the United States and is domiciled in  the State of Michigan.

1219.1199.     On January 17, 2007, Robert Christopher Ettinger, age 30, was

220

serving in the U.S. military in Iraq.

1220.1200.    Mr. Ettinger was the vehicle commander on mounted patrol in a M1117 Armored Security Vehicle (ASV) with his unit driving North on Route Pluto heading toward FOB Loyalty in the New Baghdad District when their ASV was struck by an EFP.

1221.1201.    The January 17, 2007 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1222.1202.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Robert Christopher Ettinger.

1223.1203.    As a result of the attack, Robert Christopher Ettinger suffered shrapnel injuries and burns to the right side of his body, fractured ribs, bruised lung, liver laceration, and other injuries. He also sustained PTSD including major depressive disorder, anxiety, and other symptoms.

1224.1204.    Robert Christopher Ettinger received extensive medical treatment including treatment at FOB Rustamiyah, was then medically evacuated to the Emergency Room at Baghdad, surgical debridement of wounds at Landstuhl, and then inpatient and outpatient treatment at Walter Reed Army Medical Center. He continues to receive ongoing treatment for his physical and psychological injuries in this attack.

1225.1205.    As a result of the January 17, 2007 Terrorist Attack, and the injuries he suffered, Robert Christopher Ettinger has past and future noneconomic damages,

including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1226.1206.    Plaintiff Kathryn Marie Smith is a citizen of the United States and is domiciled in the State of Michigan. She is the mother of Robert Christopher Ettinger.

1227.1207.    Plaintiff Jonathan Taylor Ettinger is a citizen of the United States and is domiciled in the State of Michigan. He is the brother of Robert Christopher Ettinger.

1228.1208.    As a result of the January 17, 2007 Terrorist Attack, and the injuries suffered by Robert Christopher Ettinger, Plaintiffs Kathryn Marie Smith and Jonathan Taylor Ettinger have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 50. THE DECEMBER 30, 2006 ATTACK – ROUTE FURNITURE, BAGHDAD

### A.    PLAINTIFF GREGORY ALLEN SEYMOUR

1229.1209.    Plaintiff Gregory Allen Seymour is a citizen of the United States and is domiciled in  the State of North Carolina.

1230.1210.    On December 30, 2006, Gregory Allen Seymour, 29, was serving in the U.S. military  in Iraq.

1231.1211.    Mr. Seymour was on a routine checkpoint mission in a convoy traveling on Route Furniture outside of Baghdad when a copper-lined, multiple array EFP was detonated near his vehicle. They were travelling in a four-vehicle convoy, with Mr. Seymour

in the third vehicle. He sat in the front right passenger seat of the Humvee.

1232.1212.    The December 30, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1233.1213.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Seymour.

1234.1214.    As a result of the attack, Gregory Allen Seymour suffered a TBI and shrapnel wounds to his face, neck and chest. He also underwent a partial amputation of the upper part of his left ear, has keloid scars on his neck, chest and ear, and continues to suffer from migraines.

1235.1215.    Gregory Allen Seymour received medical treatment at FOB Rustamiyah in Baghdad and continues to receive care.

1236.1216.    As a result of the December 30, 2006 Terrorist Attack, and the injuries he suffered, Gregory Allen Seymour has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 51. THE DECEMBER 19, 2006 ATTACK – RAMADI, AL ANBAR GOVERNORATE

### A.    PLAINTIFF ZACHARY TYLER HEATH

1237.1217.    Plaintiff Zachary Tyler Heath is a citizen of the United States and is

223

domiciled in the State of Ohio.

~~1238.~~1218.     On December 19, 2006, Zachary Tyler Heath, age 19, was serving in the U.S. military in Iraq.

~~1239.~~1219.     Mr. Heath was on patrol with his unit fortifying a building they were occupying in Ramadi when they were ambushed by SAF and mortars. As they were bringing sandbags into the building, an IED buried in the floor detonated, knocking Mr. Heath unconscious.

~~1240.~~1220.     The December 19, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1241.~~1221.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Heath.

~~1242.~~1222.     As a result of the attack, Zachary Tyler Heath suffered a TBI, hearing loss, back injury, and PTSD.

~~1243.~~1223.     Zachary Tyler Heath received medical treatment immediately following the explosion by the corpsmen and later by the battalion medical officer. He continues to treat with the VA and private medical providers.

~~1244.~~1224.     As a result of the December 19, 2006 Terrorist Attack, and the injuries he suffered, Zachary Tyler Heath has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000.000.00, plus pre-judgment interest and post-judgment

224

interest.

## 52. THE DECEMBER 15, 2006 ATTACK – AMEL AND BAYAA NEIGHBORHOOD, WEST RASHEED, BAGHDAD

### A.    PLAINTIFFS THE ROBERT K.P. WETZEL FAMILY

1245. 1225.    Plaintiff Robert K.P. Wetzel is a citizen of the United States and is domiciled in the State of Colorado.

1246. 1226.    On December 15, 2006, Robert K.P. Wetzel, age 22, was serving in the U.S. military in Iraq.

1247. 1227.    Mr. Wetzel was on patrol with his unit in West Rasheed, Baghdad, when his convoy was attacked by small arms fire and his vehicle was struck by an EFP.

1248. 1228.    The December 15, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1249. 1229.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Wetzel.

1250. 1230.    As a result of the attack, Robert K.P. Wetzel suffered a TBI with subsequent seizures, tinnitus and PTSD.

1251. 1231.    Robert K.P. Wetzel received extensive medical treatment at, but not limited to, Fairchild Air Force Base in Washington. After his end of service, he continued his treatment at VA medical facilities and private healthcare providers.

1252. 1232.    As a result of the December 15, 2006 Terrorist Attack, and the injuries he suffered, Robert K.P. Wetzel has past and future noneconomic damages, including

225

severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1253. 1233.    Plaintiff Donald Wetzel Sr. is a citizen of the United States and is domiciled in the State of Montana. He is the father of Robert K.P. Wetzel.

1254. 1234.    Plaintiff Linda Wetzel is a citizen of the United States and is domiciled in the State of Montana. She is the mother of Robert K.P. Wetzel.

1255. 1235.    Plaintiff Shawn Wetzel is a citizen of the United States and is domiciled in the State of Montana. He is the brother of Robert K.P. Wetzel.

1256. 1236.    Plaintiff Donald Wetzel Jr. is a citizen of the United States and is domiciled in the State of Montana. He is the brother of Robert K.P. Wetzel.

1257. 1237.    Plaintiff Ryan Wetzel is a citizen of the United States and is domiciled in the State of Montana. He is the brother of Robert K.P. Wetzel.

1258. 1238.    Plaintiff Christian Wetzel is a citizen of the United States and is domiciled in the State of Montana. He is the brother of Robert K.P. Wetzel.

1259. 1239.    As a result of the December 15, 2006 Terrorist Attack, and the injuries suffered by Robert K.P. Wetzel, Plaintiffs Donald Wetzel Sr., Linda Wetzel, Shawn Wetzel, Donald Wetzel Jr., Ryan Wetzel and Christian Wetzel have noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

226

### 53.   THE DECEMBER 4, 2006 ATTACK – JISR DIYALA, BAGHDAD GOVERNORATE

#### A.   PLAINTIFF BRENT MICHAEL HINSON

~~1260.~~1240.        Plaintiff Brent Michael Hinson is a citizen of the United States and domiciled in the State of Florida.

~~1261.~~1241.        On December 4, 2006, Brent Hinson, age 22, was serving in the U.S. military in Iraq.

~~1262.~~1242.        Mr. Hinson was riding in the rear of an M2 Bradley Infantry Fighting Vehicle as part of a mounted patrol in Jisr Diyala, a southeastern neighborhood of Baghdad, when an EFP struck his vehicle. The explosion caused fuel to spray into the troop compartment, in turn igniting the interior on fire. The explosion also caused such damage to the vehicle that the occupants were unable to open the doors and escape the burning vehicle. Mr. Hinson remained trapped in the vehicle as it burned and filled with smoke. Eventually, although injured, Mr. Hinson and the other occupants were able to escape the burning vehicle.

~~1263.~~1243.        The December 4, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1264.~~1244.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hinson.

~~1265.~~1245.        As a result of the attack, Brent Michael Hinson suffered shrapnel wounds on both of his legs, burns on his lower left side, loss of consciousness, a TBI, and PTSD.

227

1266.1246.      Brent Michael Hinson received extensive medical treatment including first aid at the scene of the attack and then he was medically evacuated to the CSH at FOB Rustamiyah for further wound care and treatment.

1267.1247.      As a result of the December 4, 2006 Terrorist Attack, and the injuries he suffered, Brent Michael Hinson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income, and loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 54. THE NOVEMBER 29, 2006 ATTACK – TIKRIT, SALAH AL-DIN GOVERNORATE

#### A.      PLAINTIFFS THE LUIS CARLOS RIVERA FAMILY

1268.1248.      Plaintiff Luis Carlos Rivera is a citizen of the United States and is domiciled in the State of Oregon.

1269.1249.      On November 29, 2006, Luis Carlos Rivera, age 19, was serving in the U.S. military in Iraq.

1270.1250.      Mr. Rivera was on patrol with his unit in Tikrit, positioned as the gunner in a Humvee. An IED was thrown at his vehicle, bouncing off his turret and detonating near Mr. Rivera.

1271.1251.      The November 29, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1272.1252.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used

228

to kill and injure U.S. service members in Iraq, including Mr. Rivera.

1273. 1253.        As a result of the attack, Luis Carlos Rivera suffered a head injury resulting in a TBI, tinnitus and hearing loss. Mr. Rivera now suffers from PTSD, migraines and sleep apnea from the attack.

1274. 1254.        Luis Carlos Rivera received extensive medical treatment at Womack Army Medical Center, Evans Army Community Hospital and VA medical facilities after his end of service.

1275. 1255.        As a result of the November 29, 2006 Terrorist Attack, and the injuries he suffered, Luis Carlos Rivera has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1276. 1256.        Plaintiff Joel J. Rivera is a citizen of the United States and is domiciled in the State of Kansas. He is the brother of Luis Carlos Rivera.

1277. 1257.        Plaintiff Caleb J. Rivera is a citizen of the United States and is domiciled in the State of Arizona. He is the brother of Luis Carlos Rivera.

1278. 1258.        Plaintiff Valerie Nelson is a citizen of the United States and is domiciled in the State of Kansas. She is the sister of Luis Carlos Rivera.

1279. 1259.        As a result of the November 29, 2006 Terrorist Attack, and the injuries suffered by Luis Carlos Rivera, Plaintiffs Joel J. Rivera, Caleb J. Rivera and Valerie Nelson have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic

229

damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**55. THE NOVEMBER 20, 2006 ATTACK – BASRA, BASRA GOVERNORATE**

    **A.    PLAINTIFF MICHAEL WARREN WOOD**

~~1280.~~1260.    Plaintiff Michael Warren Wood is a citizen of the United States and is domiciled in the State of Wisconsin.

~~1281.~~1261.    On November 20, 2006, Michael Warren Wood, age 21, was serving in the U.S. military in Iraq.

~~1282.~~1262.    Mr. Wood was running a security convoy with his platoon on MSR Tampa near Basra when an EFP detonated in the median of the road next to his vehicle.

~~1283.~~1263.    The November 20, 2006, Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1284.~~1264.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Wood.

~~1285.~~1265.    As a result of the attack, Michael Warren Wood suffered a concussion, TBI, and lacerations to head, face, hands and arm. Mr. Wood also suffers from PTSD related to this attack.

~~1286.~~1266.    Michael Warren Wood received extensive medical treatment immediately following the attack for his shrapnel wounds and concussion. Once Mr. Wood and

his unit made it back to Camp Navistar, he was able to be treated further by the clinic on base for his injuries. He continues to treat his injuries with the VA and private medical providers.

1287.1267.    As a result of the November 20, 2006 Terrorist Attack, and the injuries he suffered, Michael Warren Wood has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 56.  THE OCTOBER 17, 2006 ATTACK – ANAH, AL ANBAR GOVERNORATE

### A.    PLAINTIFF JESUS EDUARDO FERRAS

1288.1268.    Plaintiff Jesus Eduardo Ferras is a citizen of the United States and is domiciled in the State of Florida.

1289.1269.    On October 17, 2006, Jesus Eduardo Ferras, age 35, was serving in the U.S. military in Iraq.

1290.1270.    Mr. Ferras was the front seat passenger (as vehicle commander) of a Humvee in Anah, Al Anbar Governorate, returning to COP Rawah when an RPG penetrated his vehicle.

1291.1271.    The October 17, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1292.1272.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used

231

to kill and injure U.S. service members in Iraq, including Mr. Ferras.

1293.1273.     As a result of the attack, Jesus Eduardo Ferras suffered a hematoma in his left buttocks and injuries to his back, and left hip. He suffers from sciatic nerve pain, severe and often debilitating lower back and left hip pain, and struggles with headaches, insomnia, sleep apnea, and PTSD.

1294.1274.     Jesus Eduardo Ferras was medically evacuated then put on quarters rest. Since then, he has undergone considerable treatment, including extensive therapy, medications, and multiple injections.

1295.1275.     As a result of the October 17, 2006 Terrorist Attack, and the injuries he suffered, Jesus Eduardo Ferras has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 57. THE OCTOBER 16, 2006 ATTACK – AL ASAD, AL ANBAR GOVERNORATE

### A.     PLAINTIFF JOSHUA TRAVIS BOYKIN

1296.1276.     Plaintiff Joshua Travis Boykin is a citizen of the United States and is domiciled in the State of Colorado.

1297.1277.     On October 16, 2006, Joshua Travis Boykin, age 23, was serving in the U.S. military in Iraq.

1298.1278.     Mr. Boykin was in a convoy traveling on ASR Uranium with his unit from Al Asad to Baghdad when his vehicle was struck by an IED. Mr. Boykin was the rear dismount on the driver's side of the Humvee.

1299.1279.     The October 16, 2006 Terrorist Attack was planned, committed,

and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1300.~~1280.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Boykin.

~~1301.~~1281.     As a result of the attack, Joshua Travis Boykin suffered a TBI, tinnitus, a lower back injury and PTSD.

~~1302.~~1282.     Joshua Travis Boykin received medical treatment at the combat support hospital in Baghdad and continues care with the VA for his TBI, psychological treatment and medications.

~~1303.~~1283.     As a result of the October 16, 2006 Terrorist Attack, and the injuries he suffered, Joshua Travis Boykin has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 58.  THE SEPTEMBER 9, 2006 ATTACK – FOB RUSTAMIYAH, SADR CITY, BAGHDAD

#### A.     PLAINTIFFS THE JONATHAN MICHAEL CASPER FAMILY

~~1304.~~1284.     Plaintiff Jonathan Michael Casper is a citizen of the United States and is domiciled in the State of Georgia.

~~1305.~~1285.     On September 9, 2006, Jonathan Michael Casper, age 20, was serving in the U.S. military in Iraq.

~~1306.~~1286.     Mr. Casper was on his bunk in his barracks when a rocket came

233

through the roof and exploded a few feet in front of him.

~~1307.~~1287.    The September 9, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1308.~~1288.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Casper.

~~1309.~~1289.    As a result of the attack, Jonathan Michael Casper suffered severe injuries including retained shrapnel, TBI, right side skull fracture, seizures, migraines, tinnitus, PTSD, and insomnia.

~~1310.~~1290.    Jonathan Michael Casper received extensive medical treatment at FOB Rustamiyah Aid Station, 10th CSH North, Landstuhl Regional Medical Center in Germany, Walter Reed Army National Medical Center in Bethesda, Maryland, Athens Neurological Associates in Athens, Georgia, James A. Haley VA Medical Center in Tampa, Florida, Charlie Norwood VA Medical Center in Augusta, Georgia, St. Mary's Hospital in Athens, Georgia, Barrow Regional Medical Center in Winder, Georgia, and continuing treatment at Athens VA Community Based Outpatient Clinic in Athens, Georgia.

~~1311.~~1291.    As a result of the September 9, 2006 Terrorist Attack, and the injuries he suffered, Jonathan Michael Casper has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss

of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1312.1292.     Plaintiff Janet Michelle Casper is a citizen of the United States and is domiciled in the State of Georgia. She is the mother of Jonathan Michael Casper.

1313.1293.     As a result of the September 9, 2006 Terrorist Attack, and the injuries suffered by Jonathan Michael Casper, Plaintiff Janet Michelle Casper has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 59. THE AUGUST 18, 2006 ATTACK – SOUTHERN BUHRIZ, DIYALA GOVERNORATE

#### A.     PLAINTIFFS THE CORY RUSSELL WATSON FAMILY

1314.1294.     Plaintiff Cory Russell Watson is a citizen of the United States and is domiciled in the State of Utah.

1315.1295.     On August 18, 2006, Cory Russell Watson, age 20, was serving in the U.S. military in Iraq.

1316.1296.     Mr. Watson was on patrol with his unit on Route Detroit in Southern Buhriz when his vehicle was struck by an EFP.

1317.1297.     The August 18, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1318.1298.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance,

235

with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Watson.

1319.1299.    As a result of the attack, Cory Watson suffered a TBI, migraines, tinnitus, degenerative disc disease and PTSD.

1320.1300.    Cory Watson has received extensive medical treatment for the injuries he sustained. Following the attack, he received treatment from his platoon medic at FOB Warhorse. After his deployment, Mr. Watson received further care at Evans Army Hospital and mental health services for his PTSD in Fort Carson. After his end of service, he continued his treatment at VA hospitals and private health providers at several locations in Utah.

1321.1301.    As a result of the August 18, 2006 Terrorist Attack, and the injuries he suffered, Cory Watson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1322.1302.    Plaintiff Alysha Watson is a citizen of the United States and is domiciled in the State of Utah. She is the former spouse of Cory Russell Watson.

1323.1303. As a result of the August 18, 2006 Terrorist Attack, and the injuries suffered by Cory Russell Watson, Plaintiff Alysha Watson has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of

services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**60.  THE AUGUST 1, 2006 ATTACK – NORTH OF TAJI, SALAH AL-DIN GOVERNORATE**

**A.     PLAINTIFF CHRISTIAN ARTHUR BLAISDELL**

~~1324.~~1304.        Plaintiff Christian Arthur Blaisdell is a citizen of the United States and is domiciled in the State of Wisconsin.

~~1325.~~1305.        On August 1, 2006, Christian Arthur Blaisdell, age 22, was serving in the U.S. military in Iraq.

~~1326.~~1306.        Mr. Blaisdell was on patrol with his unit on MSR Tampa, north of Taji, when an IED detonated on his convoy followed by an RPG attack.

~~1327.~~1307.        The August 1, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1328.~~1308.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Blaisdell.

~~1329.~~1309.        As a result of the attack, Christian Arthur Blaisdell suffered a shrapnel injury to his right wrist and hand, resulting in carpal tunnel and neuropathy. He also suffered a TBI with migraines, a back injury requiring surgery with subsequent sciatica and left leg issues. Mr. Blaisdell now suffers from PTSD from the attack.

~~1330.~~1310.        Christian Arthur Blaisdell received medical treatment the Combat Support Hospital in Taji, where his open wounds were stabilized. He was then transported to

237

Landstuhl Regional Medical Center for surgery and treatment. He has continued treatment for his injuries at VA medical facilities since his end of service.

1331.1311.    As a result of the August 1, 2006 Terrorist Attack, and the injuries he suffered, Christian Arthur Blaisdell has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**61.  THE JULY 31, 2006 ATTACK – ASR LATINA, SOUTH OF AL HILLAH**

  **A.    A. PLAINTIFFS THE JOSHUA JOE CORNELIUS FAMILY**

1332.1312.    Plaintiff Joshua Joe Cornelius is a citizen of the United States and is domiciled in the State of Texas.

1333.1313.    On July 31, 2006, Joshua Joe Cornelius, age 22, was serving in the U.S. military in Iraq.

1334.1314.    Mr. Cornelius was on standard patrol on ASR Latina, South of Al Hillah when his vehicle was struck by an EFP.

1335.1315.    The July 31, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1336.1316.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Cornelius.

238

1337.1317.         As a result of the attack, Joshua Joe Cornelius suffered shrapnel wounds to his hands and face, resulting in partial loss of use in his right hand, PTSD, and TBI.

1338.1318.         Joshua Joe Cornelius received extensive medical treatment and was medically evacuated to the 10th Combat Support Hospital in Baghdad. He also received medical and psychological treatment at Darnall Army Medical Center at Fort Hood and is currently receiving care at the Dallas VA Medical Center, Dallas, Texas.

1339.1319.         As a result of the July 31, 2006 Terrorist Attack, and the injuries he suffered, Joshua Joe Cornelius has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1340.1320.         Plaintiff Melanie Ann Cornelius is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Joshua Joe Cornelius.

1341.1321.         Plaintiff Terry Cornelius is a citizen of the United States and is domiciled in the State of Texas. He is the father of Joshua Joe Cornelius.

1342.1322.         Plaintiff Sarah Cornelius is a citizen of the United States and is domiciled in the State of Texas. She is the sister of Joshua Joe Cornelius.

1343.1323.         Plaintiff Jared Cornelius is a citizen of the United States and is domiciled in the State of Texas. He is the brother of Joshua Joe Cornelius.

1344.1324.         As a result of the July 31, 2006 Terrorist Attack, and the injuries suffered by Joshua Joe Cornelius, Plaintiffs Melanie Ann Cornelius, Terry Cornelius, Sarah Cornelius, and Jared Cornelius  have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and

239

past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 62. THE JUNE 9, 2006 ATTACK – HIT, AL ANBAR GOVERNORATE

#### A. PLAINTIFFS THE BELA FRANKLIN PONYI FAMILY

1345.1325.    Plaintiff Bela Franklin Ponyi is a citizen of the United States and is domiciled in the State of Illinois.

1346.1326.    On June 9, 2006, Bela Franklin Ponyi, age 23, was serving in the U.S. military in Iraq.

1347.1327.    Mr. Ponyi was on patrol with his unit in Hit, positioned in the turret of the vehicle, when his vehicle was struck by an IED.

1348.1328.    The June 9, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1349.1329.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Ponyi.

1350.1330.    As a result of the attack, Bela Franklin Ponyi was struck by shrapnel and suffered a back injury, knee injury, hearing loss and a TBI. Mr. Ponyi also suffers from PTSD from the attack.

1351.1331.    Bela Franklin Ponyi received extensive medical treatment after his deployment and end of service at, but not limited to, Captain James A. Lovell Federal Health Center, Evanston VA Clinic, Fort Knox Health Clinic, Landstuhl Regional Medical Center and Ten Broeck Hospital Du Pont.

240

1352.1332.      As a result of the June 9, 2006 Terrorist Attack, and the injuries he suffered, Bela Franklin Ponyi has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1353.1333.      Plaintiff Posie Williams is a citizen of the United States and is domiciled in the State of Alabama. She is the mother of Bela Franklin Ponyi.

1354.1334.      Plaintiff Kenneth Williams is a citizen of the United States and is domiciled in the State of Alabama. He is the stepfather of Bela Franklin Ponyi.

1355.1335.      Plaintiff Patricia Ponyi is a citizen of the United States and is domiciled in the State of Michigan. She is the stepmother of Bela Franklin Ponyi.

1356.1336.      Plaintiff Deandre Rush is a citizen of the United States and is domiciled in the State of Alabama. He is the brother of Bela Franklin Ponyi.

1357.1337.      As a result of the June 9, 2006 Terrorist Attack, and the injuries suffered by Bela Franklin Ponyi, Plaintiffs Posie Williams, Kenneth Williams, Patricia Ponyi and Deandre Rush, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 63. THE APRIL 30, 2006 ATTACK – MIQDADIYAH, DIYALA GOVERNORATE

#### A.    PLAINTIFFS THE BROOK GORDON CUMMINGS FAMILY

1358.1338.      Plaintiff Brook Gordon Cummings is a citizen of the United States and is domiciled in  the State of Washington.

241

1359.1339.        On April 30, 2006, Brook Gordon Cummings, age 26, was serving in the U.S. military in Iraq.

1360.1340.        Mr. Cummings was on a route clearance mission heading to Miqdadiyah. He was a passenger in the first of a four-vehicle convoy. Just before they entered the city, an IED exploded shattering the bulletproof window beside him.

1361.1341.        The April 30, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1362.1342.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Cummings.

1363.1343.        As a result of the attack, Brook Gordon Cummings suffered exacerbations of previous injuries: back, nerve damage, TBI, hearing loss, tinnitus, PTSD, depression, anxiety, sleep apnea, migraines, and photophobia.

1364.1344.        Brook Gordon Cummings received extensive medical treatment at Madigan Army Hospital and from the VA Puget Sound Healthcare System at facilities in the American Lake Division.

1365.1345.        As a result of the April 30, 2006 Terrorist Attack, and the injuries he suffered, Brook Gordon Cummings has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and

post-judgment interest.

1366.1346.      Plaintiff Novella Dawn Cummings is a citizen of the United States and is domiciled in the State of Washington. She is the wife of Brook Gordon Cummings.

1367.1347.      As a result of the April 30, 2006 Terrorist Attack, and the injuries suffered by Brook Gordon Cummings, Plaintiff Novella Dawn Cummings has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solarium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 64.  THE APRIL 22, 2006 ATTACK – JURF AL SAKHAR, BABIL GOVERNORATE

### A.     PLAINTIFFS THE KYLE ARNOLD COLNOT FAMILY

1368.1348.      Plaintiff Kyle Arnold Colnot was a citizen of the United States and was domiciled in the State of California at the time of his death.

1369.1349.      On April 22, 2006, Kyle Arnold Colnot, age 23, was serving in the U.S. military in Iraq.

1370.1350.      Mr. Colnot was the tank commander in a Humvee in a convoy on Alternate Supply Route (ASR) Lorrie in Jurf Al Sakhar southwest of Baghdad when his vehicle was struck by an IED.

1371.1351.      Kyle Arnold Colnot was killed in the attack.

1372.1352.      The April 22, 2006 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1373.~~1353.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to attack and kill U.S. service members in Iraq, including Mr. Colnot.

~~1374.~~1354.    Plaintiff Denise Page Colnot is a citizen of the United States and is domiciled in the State of California. She is the mother of Kyle Arnold Colnot.

~~1375.~~1355.    Plaintiff Denise Page Colnot brings an action individually, and on behalf of the Estate of Kyle Arnold Colnot, and all heirs thereof, as its legal representative.

~~1376.~~1356.    Plaintiff Kimberly Anne Hiestand is a citizen of the United States and is domiciled in the State of California. She is the widow of Kyle Arnold Colnot.

~~1377.~~1357.    As a result of the April 22, 2006 Terrorist Attack, and the injuries suffered by Kyle Arnold Colnot, including the conscious pain and suffering and, ultimately, the death of Kyle Arnold Colnot, Plaintiffs Denise Page Colnot, and Kimberly Anne Hiestand have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Kyle Arnold Colnot's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Kyle Arnold Colnot, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

## 65.  THE APRIL 9, 2006 ATTACK –BABIL GOVERNORATE

### A.    PLAINTIFFS THE DONALD WAYNE FORBIS III FAMILY

~~1378.~~1358.    Plaintiff Donald Wayne Forbis III is a citizen of the United States and is domiciled in the State of California.

1379.1359.     On April 9, 2006, Donald Wayne Forbis III, age 24, was serving in the U.S. military in Iraq.

1380.1360.     Mr. Forbis was on a mission with his unit just south of Baghdad when he was attacked with mortars.

1381.1361.     The April 9, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1382.1362.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Forbis.

1383.1363.     As a result of the attack, Donald Wayne Forbis III suffered a TBI, myopia, rectal bleeding, tinnitus, migraines, and has PTSD.

1384.1364.     Donald Wayne Forbis III received extensive medical treatment, and was seen initially by the medic, who diagnosed him with a concussion and placed him on light duty. Upon returning to the U.S., Mr. Forbis has continued to treat for his injuries with counseling, therapy and medications.

1385.1365.     As a result of the April 9, 2006 Terrorist Attack, and the injuries he suffered, Donald Wayne Forbis III has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

245

1386. 1366.        Plaintiff Zsuzsa Toth is a citizen of the United States and is domiciled in the State of California. She is the mother of Donald Wayne Forbis III.

1387. 1367.        Plaintiff Benedek Toth is a citizen of the United States and is domiciled in the State of California. He is the stepfather of Donald Wayne Forbis III.

1388. 1368.        Plaintiff Trevor Forbis is a citizen of the United States and is domiciled in the State of Arizona. He is the brother of Donald Wayne Forbis III.

1389. 1369.        Plaintiff Attila Toth is a citizen of the United States and is domiciled in the State of California. He is the brother of Donald Wayne Forbis III.

1390. 1370.        Plaintiff Dylan Forbis is a citizen of the United States and is domiciled in the State of California. He is the son of Donald Wayne Forbis III.

1391. 1371.        As a result of the April 9, 2006 Terrorist Attack, and the injuries suffered by Donald Wayne Forbis III, Plaintiff's mother Zsuzsa Toth, stepfather Benedek Toth, brother Trevor Forbis, brother Attila Toth, and son Dylan Forbis, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 66. THE FEBRUARY 7, 2006 ATTACK – HADITHA, AL ANBAR GOVERNORATE

### A. PLAINTIFF RAHUL SHARMA

1392. 1372.        Plaintiff Rahul Sharma is a citizen of the United States and is domiciled in the State of Texas.

1393. 1373.        On February 7, 2006, Rahul Sharma, age 22, was serving in the U.S. military in Iraq.

1394.1374.    Mr. Sharma was on patrol with his unit outside of Haditha when his vehicle was struck by an IED.

1395.1375.    The February 7, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1396.1376.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Sharma.

1397.1377.    As a result of the attack, Rahul Sharma suffered a TBI, tinnitus, migraines, and injuries to his lower back, right shoulder, and both knees.

1398.1378.    Rahul Sharma received extensive medical treatment on scene, and then was transported back to base for further treatment. He has since treated with physical therapy, counseling and medications.

1399.1379.    As a result of the February 7, 2006 Terrorist Attack, and the injuries he suffered, Rahul Sharma has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**67.  THE JANUARY 31, 2006 ATTACK – RAWA, AL ANBAR GOVERNORATE**

**A.  PLAINTIFF DAVID ERIC HENDRIX**

1400.1380.    Plaintiff David Eric Hendrix is a citizen of the United States and is domiciled in the State of Tennessee.

247

1401.1381.       On January 31, 2006, David Eric Hendrix, age 28, was serving in the U.S. military in Iraq.

1402.1382.       Mr. Hendrix was unloading gravel from a dump truck for road construction when he struck a pressure plate IED, causing it to detonate under his vehicle.

1403.1383.       The January 31, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1404.1384.       Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hendrix.

1405.1385.       As a result of the attack, David Eric Hendrix suffered a neck injury, back injury and tinnitus. Mr. Hendrix also suffers from PTSD, depression and anxiety from the attack.

1406.1386.       David Eric Hendrix received extensive medical treatment for treatment and pain management of his neck and back injury at VA facilities, including, but not limited to, Tennessee Valley Healthcare, St. Louis VA Medical Center, Memphis VA and Central Arkansas VA Health Center.

1407.1387.       As a result of the January 31, 2006 Terrorist Attack, and the injuries he suffered, David Eric Hendrix has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

248

**68.   THE JANUARY 21, 2006 ATTACK – NORTH OF BI'AJ, NINEVEH GOVERNORATE**

**A.   PLAINTIFF KEITH ALLEN WEYER**

~~1408.~~1388.      Plaintiff Keith Allen Weyer is a citizen of the United States and is domiciled in the State of Indiana.

~~1409.~~1389.      On January 21, 2006, Keith Allen Weyer, age 26, was serving in the U.S. military in Iraq.

~~1410.~~1390.      Mr. Weyer was conducting area reconnaissance when his Abrams M1A2 drove over an IED that detonated in the center of the tank.

~~1411.~~1391.      The January 21, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1412.~~1392.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Weyer.

~~1413.~~1393.      As a result of the attack, Keith Allen Weyer suffered cuts and bruises, a TBI and PTSD.~~–~~

~~1414.~~1394.      Keith Allen Weyer received medical treatment at the aid station on FOB Apache directly following the incident, at Evans Army Community Hospital on Fort Carson, Colorado and at Martin Army Community Hospital on Fort Benning, Georgia. He also receives physical and psychological care from the VA of Northern Indiana Health Care System.

~~1415.~~1395.      As a result of the January 21, 2006 Terrorist Attack, and the injuries he suffered, Keith Allen Weyer has past and future noneconomic damages, including severe

249

physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**69.  THE JANUARY 16, 2006 ATTACK – BAGHDAD, BAGHDAD GOVERNORATE**

**A.    PLAINTIFFS THE SAMUEL ERNEST PARLIN JR. FAMILY**

1416.1396.    Plaintiff Samuel Ernest Parlin Jr. was a citizen of the United States and was domiciled in the State of Georgia at the time of his death.

1417.1397.    On January 16, 2006, Samuel Ernest Parlin Jr., age 63, was a U.S. citizen employed by DynCorp International ("DyncorpDynCorp") working for the U.S. Department of State in Iraq.

1418.1398.    Mr. Parlin was a passenger in a fully armored (Class VI) Chevrolet Suburban enroute from BIAP to the Baghdad Hotel through the Green Zone when his vehicle was struck by an IED.

1419.1399.    Samuel Ernest Parlin Jr. was killed in the attack.

1420.1400.    The January 16, 2006 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1421.1401.    701.696.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to attack and kill U.S. service members in Iraq, including Mr. Parlin.

1422.1402.    Plaintiff Cynthia Parlin is a citizen of the United States and is

250

domiciled in the State of Georgia. She is the widow of Samuel Ernest Parlin Jr.

1423.1403.     Plaintiff Cynthia Parlin brings an action individually, and on behalf of the Estate of Samuel Ernest Parlin Jr., and all heirs thereof, as its legal representative.

1424.1404.     Plaintiff Sharonda Lakesha Anderson is a citizen of the United States and is domiciled in the State of Georgia. She is the daughter of Samuel Ernest Parlin Jr.

1425.1405.     Plaintiff Thurston Moses Parlin is a citizen of the United States and is domiciled in the State of Georgia. He is the son of Samuel Ernest Parlin Jr.

1426.1406.     As a result of the January 16, 2006 Terrorist Attack, and the injuries suffered by Samuel Ernest Parlin Jr., including the conscious pain and suffering and, ultimately, the death of Samuel Ernest Parlin Jr., Plaintiffs Cynthia Parlin, Sharonda Lakesha Anderson, and Thurston Moses Parlin have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Samuel Ernest Parlin Jr.'s society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Samuel Ernest Parlin Jr., and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

## 70.   THE DECEMBER 22, 2005 ATTACK – BUB AL-SHAM, BAGHDAD

### A.   PLAINTIFF THE ESTATE OF MBUSI CELE

1427.1407.     Mbusi Cele was a South African citizen and was domiciled in South Africa.

1428.1408.     On December 22, 2005, Mbusi Cele, age 32, was employed as a private contractor for DynCorp Technical Services performing a contract awarded by the United States Government, acting within the scope of the employee's employment.

1429.1409.     Mr. Cele was performing his duties in the gun truck, which was the

last vehicle in a four-vehicle convoy. As the convoy passed a police station in Bub Al-Sham, Iraq, they were attacked by between seven to nine Daisy-Chained EFPs which exploded a mere eight feet from his vehicle.

1430. 1410.    The December 22, 2005 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1431. 1411.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members and contractors in Iraq, including Mr. Cele.

1432. 1412.    As a result of the attack, Mbusi Cele suffered severe injuries to his left arm, ultimately leading to him losing his left arm.

1433. 1413.    Mbusi Cele received extensive medical treatment, undergoing multiple surgeries to his arm including amputation.

1434.    Plaintiff Boryana Toveva Cele, the wife of Mbusi Cele, brings an action on behalf of the Estate of Mbusi Cele, and all heirs thereof, as its legal representative.

1435. 1414.    As a result of the December 22, 2005 Terrorist Attack, and the injuries suffered by Mbusi Cele, the Estate of Mbusi Cele has noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, and loss of earning capacity, in an amount of no less than $3520,000,000.00, plus pre-judgment interest and post-judgment interest.

1415.    Plaintiff Boryana Toveva Cele is a citizen of Bulgaria and is domiciled in

252

South Africa. She is the widow of Mbusi Cele.

1416.    Plaintiff Boryana Toveva Cele brings an action individually, and on behalf of the Estate of Mbusi Cele, and all heirs thereof, as its legal representative.

1417.    The December 22, 2005 Terrorist Attack was a demonstration of extreme and outrageous conduct by Defendants which, intentionally or recklessly caused Plaintiff Boryana Teveva Cele severe emotional distress. As a result of the December 22, 2005 Terrorist Attack, and the injuries suffered by Mbusi Cele, Plaintiff's widow Boryana Toveva Cele has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### B.    PLAINTIFF THE ESTATE OF JOHANNES STRAUSS

1436.1418.    Johannes Strauss was a Republic of South Africa national and was domiciled in South Africa at the time of his death.

1437.1419.    On December 22, 2005, Johannes Strauss, age 38, was serving as a private contractor for DynCorp Technical Services performing a contract awarded by the United States Government, acting within the scope of the employee's employment.

1438.1420.    Mr. Strauss was performing his duties in the gun truck, which was the last vehicle in a four-vehicle convoy. As the convoy passed a police station in Bub Al-Sham, Iraq, they were attacked by between seven to nine Daisy-Chained EFPs which exploded a mere eight feet from his vehicle.

1439.1421.    Johannes Strauss was killed in the attack.

1440.1422.    The December 22, 2005 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received

material support from Iran and its Co-Defendants.

1441. 1423.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq and contractors, including Mr. Strauss.

1424.        Plaintiff Joey Petro Strauss, is a citizen of the wifeRepublic of South Africa and is domiciled in South Africa. She is the widow of Johannes Strauss,.

1442. 1425.        Plaintiff Joey Petro Strauss brings an action individually, and on behalf of the anticipated Estate of Johannes Strauss, and all heirs thereof, as its legal representative.

1443. 1426.        The December 22, 2005 Terrorist Attack was a demonstration of extreme and outrageous conduct by Defendants which intentionally or recklessly caused Plaintiff Joey Petro Strauss severe emotional distress. As a result of the December 22, 2005 Terrorist Attack, and the injuries suffered by Johannes Strauss, including the conscious pain and suffering and, ultimately, the death of Johannes Strauss, the Estate of JohannesPlaintiff Joey Petro Strauss has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, and past and future economic damages, including medical expenses, funeral expenses, loss of Johannes Strauss's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Johannes Strauss, and his survivorship, in an amount of no less than $35,000,000.00 for Plaintiff individually and for the Estate, plus pre-judgment interest and post-judgment interest.

254

**71. THE NOVEMBER 12, 2005 ATTACK – NW OF AMIRIYA, AL ANBAR GOVERNORATE**

**A.    PLAINTIFFS THE MATTHEW SCOTT RANDAZZO FAMILY**

1444.1427.        Plaintiff Matthew Scott Randazzo is a citizen of the United States and is domiciled in the State of Texas.

1445.1428.        On November 12, 2005, Matthew Scott Randazzo, age 20, was serving in the U.S. military in Iraq.

1446.1429.        Mr. Randazzo was with his squad observing the main supply routes. He was driving the first vehicle of a four-vehicle convoy when a pressure plate-triggered IED exploded.

1447.1430.        The November 12, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1448.1431.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Randazzo.

1449.1432.        As a result of the attack, Matthew Scott Randazzo suffered a severe injury to his upper and lower right arm and PTSD.

1450.1433.        Matthew Scott Randazzo received extensive medical treatment at Fallujah Surgical, Landstuhl Regional Medical Center, NMMC (Walter Reed), and Hines VA.

1451.1434.        As a result of the November 12, 2005 Terrorist Attack, and the injuries he suffered, Matthew Scott Randazzo has past and future noneconomic damages,

including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1452.1435.    Plaintiff Lisa Marie Randazzo is a citizen of the United States and is domiciled in the State of Illinois. She is the mother of Matthew Scott Randazzo.

1453.1436.    Plaintiff Louis Randazzo is a citizen of the United States and is domiciled in the State of Illinois. He is the father of Matthew Scott Randazzo.

1454.1437.    Plaintiff Joshua Randazzo is a citizen of the United States and is domiciled in the State of Indiana. He is the brother of Matthew Scott Randazzo.

1455.1438.    Plaintiff Andrea Randazzo is a citizen of the United States and is domiciled in the State of Indiana. She is the sister of Matthew Scott Randazzo.

1456.1439.    Plaintiff Audree Rose Randazzo is a citizen of the United States and is domiciled in the State of Illinois. She is the daughter of Matthew Scott Randazzo.

1457.1440.    As a result of the November 12, 2005 Terrorist Attack, and the injuries suffered by Matthew Scott Randazzo, Plaintiffs Lisa Marie Randazzo, Louis Randazzo, Joshua Randazzo, Andrea Randazzo, and Audree Rose Randazzo have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 72.  THE  NOVEMBER  1,  2005  ATTACK  –  RAMADI,  AL  ANBAR GOVERNORATE

### A.  PLAINTIFFS THE DAVID MCDONALD SWAN FAMILY

1458.1441.        Plaintiff David McDonald Swan is a citizen of the United States and is domiciled in the State of New York.

1459.1442.        On November 1, 2005, David McDonald Swan, age 44, was serving in the U.S. military in Iraq.

1460.1443.        Mr. Swan was on patrol with his unit in Ramadi when his vehicle was struck by an RPG near the vehicle's engine compartment.

1461.1444.        The November 1, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1462.1445.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Swan.

1463.1446.        As a result of the attack, David McDonald Swan suffered a head injury resulting in a TBI, a knee injury, tinnitus and PTSD.

1464.1447.        David McDonald Swan was treated by a medic at the scene of the attack and later received follow-up treatment after his end of service at VA medical facilities.

1465.1448.        As a result of the November 1, 2005 Terrorist Attack, and the injuries he suffered, David McDonald Swan has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and

past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1466.1449.   Plaintiff Angela Maria Swan is a citizen of the United States and is domiciled in the State of Missouri. She is the former spouse of David McDonald Swan.

1467.1450.   Plaintiff Nathan McDonald Swan is a citizen of the United States and is domiciled in the State of New York. He is the son of David McDonald Swan.

1468.1451.   Plaintiff Elizabeth Theresa Swan is a citizen of the United States and is domiciled in the State of New York. She is the daughter of David McDonald Swan.

1469.1452.   As a result of the November 1, 2005 Terrorist Attack, and the injuries suffered by David McDonald Swan, Plaintiffs Angela Maria Swan, Nathan McDonald Swan and Elizabeth Theresa Swan have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 73. THE OCTOBER 20, 2005 ATTACK – HIT, AL ANBAR GOVERNORATE

#### A. PLAINTIFFS THE ROBERT JUSTIN MOULTRIE FAMILY

1470.1453.   Robert Justin Moultrie is a citizen of the United States and is domiciled in the State of Alabama.

1471.1454.   On October 20, 2005, Robert Justin Moultrie, age 25, was serving in the U.S. military in Iraq.

1472.1455.   Mr. Moultrie was on base performing trash burning duties when

258

incoming mortars began blasting the base.

1473. 1456.    The October 20, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1474. 1457.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Moultrie.

1475. 1458.    As a result of the attack, Robert Justin Moultrie suffered depression, adjustment disorder with anxiety, PTSD, and a TBI.

1476. 1459.    Robert Justin Moultrie received medical treatment for his injuries at Landstuhl Regional Medical Center, Darnall Army Medical Center and Atlanta VA Medical Center.

1477. 1460.    Plaintiff Brenda Lee Hall is a citizen of the United States and is domiciled in the State of Florida. She is the mother of Robert Justin Moultrie.

1478. 1461.    As a result of the October 20, 2005 Terrorist Attack, and the injuries suffered by Robert Justin Moultrie, Plaintiff Brenda Lee Hall has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

259

### 74. THE OCTOBER 15, 2005 ATTACK – HADITHA, AL ANBAR GOVERNORATE

#### A.   PLAINTIFF LOUIE DANIEL ROYBAL

~~1479.~~1462.      Plaintiff Louie Daniel Roybal is a citizen of the United States and is domiciled in the State of Wisconsin.

~~1480.~~1463.      On October 15, 2005, Louie Daniel Roybal, age 26, was serving in the U.S. military in Iraq.

~~1481.~~1464.      Mr. Roybal was on patrol with his unit in Haditha when his vehicle was struck by an IED.

~~1482.~~1465.      The October 15, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1483.~~1466.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Roybal.

~~1484.~~1467.      As a result of the attack, Louie Daniel Roybal suffered a concussion and head injury resulting in a TBI, damage to his ear drum and tinnitus. Mr. Roybal also suffers from PTSD, migraines and sleep disorders from the attack.

~~1485.~~1468.      Louie Daniel Roybal received medical treatment from a medic at the combat support hospital after the attack and continued his treatment after his end of service at VA medical facilities.

~~1486.~~1469.      As a result of the October 15, 2005 Terrorist Attack, and the injuries he suffered, Louie Daniel Roybal has past and future noneconomic damages,

260

including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 75. THE OCTOBER 12, 2005 ATTACK – RAMADI, AL ANBAR GOVERNORATE

#### A. PLAINTIFF SAUL AARON WEISS

~~1487.~~1470.     Plaintiff Saul Aaron Weiss is a citizen of the United States and is domiciled in the State of Pennsylvania.

~~1488.~~1471.     On October 12, 2005, Saul Aaron Weiss, age 26, was serving in the U.S. military in Iraq.

~~1489.~~1472.     Mr. Weiss was on patrol with his unit in Ramadi when his vehicle was struck by an IED followed by an exchange of SAF.

~~1490.~~1473.     The October 12, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1491.~~1474.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Weiss.

~~1492.~~1475.     As a result of the attack, Saul Aaron Weiss suffered loss of vision in his left eye, amputation of his right pinky finger, a TBI, migraines and tinnitus. Mr. Weiss also suffers from PTSD, anxiety, depression and sleep disorders from the attack.

~~1493.~~1476.     Saul Aaron Weiss received extensive medical treatment in Baghdad

261

at Ibn Sina Combat Hospital for stabilization of his open wounds and was then medically evacuated to Walter Reed National Military Medical Center for surgery and continued treatment. He has continued his treatment since his end of service at VA medical treatment facilities.

1494. 1477.     As a result of the October 12, 2005 Terrorist Attack, and the injuries he suffered, Saul Aaron Weiss has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 76.   THE OCTOBER 12, 2005 ATTACK – AL WINDA, BAGHDAD

#### A.   PLAINTIFFS THE SAMUEL DELMOND DAVIS FAMILY

1495. 1478.     Plaintiff Samuel Davis is a citizen of the United States and is domiciled in the State of Georgia.

1496. 1479.     On October 12, 2005, Samuel Davis, age 24, was serving in the U.S. military in Iraq.

1497. 1480.     Mr. Davis was attacked when an IED detonated under his vehicle near Al Winda, Baghdad, Iraq.

1498. 1481.     The October 12, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1499. 1482.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Davis.

1500. 1483.     As a result of the attack, Samuel Davis suffered a head injury, TBI,

262

PTSD, memory loss, paranoia, migraines, anxiety, and depression.

1501.1484.    Samuel Davis received medical treatment at the scene of the attack and has undergone therapy for his PTSD, TBI, memory loss, paranoia, anxiety, and depression. Samuel Davis was prescribed medication for his migraines and TBI.

1502.1485.    As a result of the October 12, 2005, Terrorist Attack, and the injuries he suffered, Samuel Davis has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1503.1486.    Plaintiff Maggie Joe Davis is a citizen of the United States and is domiciled in the State of Georgia. She is the wife of Samuel Delmond Davis.

1504.1487.    Plaintiff Damari Jahyon Davis is a citizen of the United States and is domiciled in the State of Georgia. He is the son of Samuel Delmond Davis.

1505.1488.    Plaintiff D.J.D., a minor, represented by his legal guardian Samuel Delmond Davis is a citizen of the United States and is domiciled in the State of Georgia. He is the son of Samuel Delmond Davis.

1506.1489.    As a result of the October 12, 2005 Terrorist Attack, and the injuries suffered by Samuel Delmond Davis, Plaintiffs, Maggie Joe Davis, Damari Jahyon Davis, and D.J.D., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 77. THE SEPTEMBER 19, 2005 ATTACK – RAMADI, AL ANBAR GOVERNORATE

#### A. PLAINTIFFS THE JASON DANIEL HARRINGTON FAMILY

1507.1490.	Plaintiff Jason Daniel Harrington is a citizen of the United States and is domiciled in the State of Colorado.

1508.1491.	On the morning of September 19, 2005, Jason Daniel Harrington, age 23, was serving in the U.S. Army in Iraq.

1509.1492.	On September 19, 2005, Jason Daniel Harrington was in a Humvee in a two-vehicle convoy in Ramadi, Al Anbar Governorate, responding to an IED explosion that had killed four fellow soldiers. As the convoy neared the scene, an IED exploded, disabling one of the vehicles. Once Mr. Harrington's unit began to tow the disabled Humvee using the other vehicle, they were attacked with a second IED, disabling the second vehicle and knocking out communications. Mr. Harrington and his fellow soldiers were then attacked with multi-directional SAF from the structures in the village.

1510.1493.	The September 19, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1511.1494.	Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Harrington.

1512.1495.	As a result of the September 19, 2005 Terrorist Attack, Jason Daniel Harrington sustained injuries to his shoulder, upper and lower back, a TBItraumatic brain injury, headaches, tinnitus, back pain, and PTSDand post-traumatic stress disorder.

1513.1496.    Jason Daniel Harrington received extensive medical treatment. He was initially provided ibuprofen and returned to duty. Since then, he has undergone considerable treatment, including surgery, therapy, and medication for his injuries.

1514.1497.    As a result of the September 19, 2005 Terrorist Attack, and the injuries he suffered, Jason Daniel Harrington has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1515.1498.    Plaintiff Janelle Harrington is a citizen of the United States and is domiciled in the State of Colorado. She is the wife of Jason Harrington.

1516.1499.    Plaintiff Taylor Harrington is a citizen of the United States and is domiciled in the State of Colorado. She is the daughter of Jason Harrington.

1517.1500.    As a result of the September 19, 2005 Terrorist Attack, and the injuries suffered by Jason Daniel Harrington, Plaintiff's wife Janelle Harrington, and daughter Taylor Harrington, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**B.    PLAINTIFFS THE DAVID MCDONALD SWAN FAMILY**

1518.1501.    Plaintiff David McDonald Swan is a citizen of the United States and is domiciled in the State of New York.

1519.1502.    On September 19, 2005, David McDonald Swan, age 44, was serving in the U.S. military in Iraq.

265

1520.1503.     Mr. Swan was on patrol with his unit in Ramadi, investigating suspicious activity, when a vehicle in his convoy was struck by an IED.

1521.1504.     The September 19, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1522.1505.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Swan.

1523.1506.     As a result of the attack, David McDonald Swan suffers from PTSD.

1524.1507.     David McDonald Swan received medical treatment after his end of service at VA medical facilities.

1525.1508.     As a result of the September 19, 2005 Terrorist Attack, and the injuries he suffered, David McDonald Swan has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1526.1509.     Plaintiff Angela Maria Swan is a citizen of the United States and is domiciled in the State of Missouri. She is the former spouse of David McDonald Swan.

1527.1510.     Plaintiff Nathan McDonald Swan is a citizen of the United States and is domiciled in the State of New York. He is the son of David McDonald Swan.

266

1528.1511.     Plaintiff Elizabeth Theresa Swan is a citizen of the United States and is domiciled in the State of New York. She is the daughter of David McDonald Swan.

1529.1512.     As a result of the September 19, 2005 Terrorist Attack, and the injuries suffered by David McDonald Swan, Plaintiffs Angela Maria Swan, Nathan McDonald Swan and Elizabeth Theresa Swan have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 78.   THE SEPTEMBER 11, 2005 ATTACK — DIYALA GOVERNORATE

#### A.   PLAINTIFFS THE ANDREW DAVID ROGERS FAMILY

1530.1513.     Plaintiff Andrew David Rogers is a citizen of the United States and is domiciled in the State of Tennessee.

1531.1514.     On September 11, 2005, Andrew Rogers, age 19, was serving in the U.S. military in Iraq.

1532.1515.     Mr. Rogers was returning to base with his convoy from a night patrol in Jisr Naft on Route Titan when his vehicle was struck by an IED while in Diyala, Iraq.

1533.1516.     The September 11, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1534.1517.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Rogers.

1535.1518.    As a result of the attack, Andrew David Rogers suffered a head injury now diagnosed as a TBI, migraines, memory loss, hearing loss, and PTSD.

1536.1519.    Andrew David Rogers received extensive medical treatment at the combat support hospital at FOB Caldwell. Mr. Rogers was then flown to Baghdad and transferred to Landstuhl, Germany. From there he was then flown to Walter Reed Medical Center in Bethesda, Maryland then he was transferred again to Martin Army Medical Hospital in Fort Benning, Georgia. Mr. Rogers is still being treated for the injuries he sustained.

1537.1520.    As a result of the September 11, 2005 Terrorist Attack, and the injuries he suffered, Andrew David Rogers has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1538.1521.    Plaintiff Julie Martin is a citizen of the United States and is domiciled in the State of Tennessee. She is the mother of Andrew David Rogers.

1539.1522.    Plaintiff Brian Martin is a citizen of the United States and is domiciled in the State of Tennessee. He is the father of Andrew David Rogers.

1540.1523.    As a result of the September 11, 2005 Terrorist Attack, and the injuries suffered by Andrew David Rogers, Plaintiffs Julie Martin and Brian Martin have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

268

**79. THE AUGUST 23, 2005, ATTACK – RAMADI, AL ANBAR GOVERNORATE**

**A. PLAINTIFF THOMAS JOHN HOUSEWRIGHT**

~~1541.~~1524.    Plaintiff Thomas John Housewright is a citizen of the United States and is domiciled in the State of Tennessee.

~~1542.~~1525.    On August 23, 2005, Thomas John Housewright, age 31, was serving in the U.S. military in Iraq.

~~1543.~~1526.    Mr. Housewright was on patrol at the OP Hotel in Ramadi, guarding the front entrance, when the base was attacked by small arms fire, RPG's and a VBIED suicide bomber.

~~1544.~~1527.    The August 23, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1545.~~1528.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Housewright.

~~1546.~~1529.    As a result of the attack, Thomas John Housewright suffered a corneal abrasion, lacerations to the head and face, a TBI resulting in migraines and short-term memory loss.

~~1547.~~1530.    Thomas J. Housewright upon returning to the U.S., received extensive medical treatment at Martin Army Community Hospital. He continued his treatment at Landstuhl Regional Medical Center and Winn Army Community Hospital.

~~1548.~~1531.    As a result of the August 23, 2005, Terrorist Attack, and the

269

injuries he suffered, Thomas John Housewright has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**80. THE AUGUST 9, 2005 ATTACK – BAGHDAD, BAGHDAD GOVERNORATE**

**A.      PLAINTIFF JAMES NEIL GRISSOM**

1549.1532.      Plaintiff James Neil Grissom is a citizen of the United States and is domiciled in the State of Arkansas.

1550.1533.      On August 9, 2005, James Grissom, age 46, was serving in the U.S. military in Iraq.

1551.1534.      Mr. Grissom was with his unit executing an escort mission in Baghdad when they took on SAF and were struck by a VBIED.

1552.1535.      The August 9, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1553.1536.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Grissom.

1554.1537.      As a result of the attack, James Grissom suffered hearing loss in his left ear, tinnitus, and PTSD.

1555.1538.      James Grissom received medical care for his hearing loss and is

270

now required to use a hearing aid. He has also received psychological treatment for his PTSD.

~~1556.~~1539.     As a result of the August 9, 2005 Terrorist Attack, and the injuries he suffered, James Grissom has past and future noneconomic damage, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgement interest and post-judgement interest.

## 81.  THE APRIL 25, 2005 ATTACK - ABU GHRAIB, BAGHDAD GOVERNORATE

### A.     PLAINTIFF ANDRES GARCIA

~~1557.~~1540.     Plaintiff Andres Garcia is a citizen of the United States and is domiciled in the State of California.

~~1558.~~1541.     On April 25, 2005, Andres Garcia, age 20, was serving in the U.S. military in Iraq.

~~1559.~~1542.     Mr. Garcia was conducting route security on the outskirts of Baghdad in Abu Ghraib when his vehicle was struck by an anti-tank mine. Inside the vehicle, he was slammed into the side as the vehicle was knocked on its side. He was momentarily knocked out. Upon regaining his senses, he saw smoke, fire, and pieces of the vehicle's suspension everywhere.

~~1560.~~1543.     The April 25, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1561.~~1544.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance,

with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Garcia.

1562.1545.    As a result of the attack, Andres Garcia was diagnosed with PTSD, a mild TBI, migraines, and tinnitus.

1563.1546.    Andres Garcia received medical treatment at the Log Base Seitz in Iraq and the VA San Diego Healthcare System.

1564.1547.    As a result of the April 25, 2005 Terrorist Attack, and the injuries he suffered, Andres Garcia has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 82.   THE APRIL 24, 2005 ATTACK – HIT, AL ANBAR GOVERNORATE

### A.    PLAINTIFFS THE ADAM JEFFERY MCCANN FAMILY

1565.1548.    Adam Jeffery McCann is a citizen of the United States and is domiciled in the State of Ohio.

1566.1549.    On April 24, 2005, Adam Jeffery McCann, age 19, was serving in the U.S. military in Iraq.

1567.1550.    Adam Jeffery McCann was serving as an infantry machine gunner conducting house-to-house clearing when his patrol came under mortar attack. He and five other patrol members were injured in the attack.

1568.1551.    The April 24, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

272

1569.1552.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. McCann.

1570.1553.    As a result of the attack, Adam Jeffery McCann sustained a cut left Achilles tendon, severed right tibia, shrapnel wounds to his neck, PTSD, anxiety attacks, depression, and other symptoms.

1571.1554.    Plaintiff Robert Jeffery McCann is a citizen of the United States and is domiciled in the State of Ohio. He is the father of Adam Jeffery McCann.

1572.1555.    Plaintiff Michalena Danielle McCann is a citizen of the United States and is domiciled in the State of Ohio. She is the sister of Adam Jeffery McCann.

1573.1556.    As a result of the April 24, 2005 Terrorist Attack, and the injuries suffered by Adam Jeffery McCann, Plaintiffs Robert Jeffery McCann and Michalena Danielle McCann have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 83.  THE APRIL 5, 2005 ATTACK – SOUTHERN BAGHDAD

### A.    PLAINTIFF ROMAN M. MORAN III

1574.1557.    Plaintiff Roman M. Moran III is a citizen of the United States and is domiciled in the State of Texas.

1575.1558.    On April 5, 2005, Roman M. Moran III, age 36, was serving in the U.S. military in Iraq.

1576.1559.    Mr. Moran was on patrol with his unit in Southern Baghdad when

273

his vehicle was struck by a VBIED.

1577. 1560.     The April 5, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1578. 1561.     Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Moran.

1579. 1562.     As a result of the attack, Roman M. Moran III suffered loss of consciousness, a foot and ankle fracture, fibula, rib and radial fracture. He also suffered a shoulder SLAP tear, shrapnel wounds and a TBI. Mr. Moran continues to suffer from tinnitus, hearing loss and PTSD.

1580. 1563.     Roman M. Moran III received extensive medical treatment by medics at the scene of the attack then medically evacuated to the 95th CSH. He was then sent to William Beaumont Army Medical Center for additional treatment of his injuries and continues to treat at WBAMC, Fort Bliss and VA medical facilities.

1581. 1564.     As a result of the April 5, 2005 Terrorist Attack, and the injuries he suffered, Roman M. Moran III has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 84. THE APRIL 2, 2005 ATTACK – ABU GHRAIB, BAGHDAD GOVERNORATE

#### A.    PLAINTIFFS THE WILLIAM JOSEPH PUOPOLO FAMILY

~~1582.~~1565.    William Joseph Puopolo is a citizen of the United States and is domiciled in the State of Florida.

~~1583.~~1566.    On April 2, 2005, William Joseph Puopolo, age 28, was serving in the U.S. military in Iraq.

~~1584.~~1567.    William Joseph Puopolo was at FOB Abu Ghraib when it was attacked by VBIEDs, mortars, grenades and small arms fire.

~~1585.~~1568.    The April 2, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1586.~~1569.    The FTO AQI claimed responsibility for the April 2, 2005 Terrorist Attack that resulted in injury to Mr. Puopolo.

~~1587.~~1570.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Puopolo.

~~1588.~~1571.    As a result of the attack, Mr. Puopolo suffered a TBI, depressive disorder, tinnitus, PTSD, migraines, vertigo, dizziness, nausea, anxiety, and exacerbation of a previous L5S1 back injury.

~~1589.~~1572.    Mr. Puopolo received ongoing medical treatment at the James A. Haley Veteran's Hospital in Tampa, Florida; New Port Richey VA Clinic in New Port Richey, Florida; and Clearwater Vet Center in Clearwater, Florida.

1590.1573.      Plaintiff Elenor Mary Puopolo is a citizen of the United States and is domiciled in the State of Florida. She is the mother of Mr. Puopolo.

1591.1574.      Plaintiff Elenor Mary Puopolo brings an action individually, and on behalf of the anticipated Estate of William Ross Puopolo, and all heirs thereof, as its legal representative. William Ross Puopolo was the father of Mr. Puopolo.

1592.1575.      Plaintiff Anna Bernardine Fidanzato is a citizen of the United States and is domiciled in the State of Florida. She is the sister of Mr. Puopolo.

1593.1576.      Plaintiff Frank Michael Puopolo is a citizen of the United States and is domiciled in the State of Massachusetts. He is the brother of Mr. Puopolo.

1594.1577.      As a result of the April 2, 2005 Terrorist Attack, and the injuries suffered by William Joseph Puopolo, Plaintiffs Elenor Mary Puopolo, Estate of William Ross Puopolo, Anna Bernardine Fidanzato and Frank Michael Puopolo have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 85.  THE MARCH 30, 2005 ATTACK – OUTSIDE OF SCANIA

### A.      PLAINTIFF ASH REED RICHIE

1595.1578.      Plaintiff Ash Reed Richie is a citizen of the United States and is domiciled in the State of Arkansas.

1596.1579.      On March 30, 2005, Ash Reed Richie, age 21, was serving in the U.S. military in Iraq.

1597.1580.      Mr. Richie was on patrol with his unit on Route Tampa, outside of Scania, when his vehicle was struck by a remote-controlled IED.

1598.1581.     The March 30, 2005 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1599.1582.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Richie.

1600.1583.     As a result of the attack, Ash Reed Richie suffered a head injury resulting in a TBI, hearing loss and PTSD.

1601.1584.     Ash Reed Richie received extensive medical treatment for his injuries at VA medical facilities and private healthcare providers since his end of service.

1602.1585.     As a result of the March 30, 2005 Terrorist Attack, and the injuries he suffered, Ash Reed Richie has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 86. THE MARCH 26, 2005 ATTACK – AR-RUTBAH, AL ANBAR GOVERNORATE

### A.   PLAINTIFFS THE ALTY GEORGE JAHALAL FAMILY

1603.1586.     Plaintiff Alty George Jahalal is a citizen of the United States and is domiciled in the State of Massachusetts.

1604.1587.     On March 26, 2005, Alty George Jahalal, age 22, was serving in

the U.S. military in Iraq.

1605.1588.    Mr. Jahalal was on a convoy security mission with his unit on MSR Mobile, outside of Camp Korean Village in Ar-Rutbah, when his vehicle was struck by an IED. Mr. Jahalal was the driver of the lead Humvee when the IED detonated.

1606.1589.    The March 26, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1607.1590.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Jahalal.

1608.1591.    As a result of the attack, Alty George Jahalal suffered shrapnel injuries to his right forearm and right thigh, a fractured jaw, injury to the ulnar artery and ulnar nerve, other superficial shrapnel soft tissue injuries, and PTSD.

1609.1592.    Alty George Jahalal received extensive medical treatment immediately following the attack and was medically evacuated to the local base until he could be evacuated to Al Asad for surgery. He received further medical treatment at Landstuhl Regional Medical Center in Germany and the National Naval Medical Center in Bethesda, Maryland. He continues to receive treatment for his injuries at the VA.

1610.1593.    As a result of the March 26, 2005 Terrorist Attack, and the injuries he suffered, Alty George Jahalal has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of

278

earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1611.1594.    Plaintiff Phillippa Joan Myers is a citizen of the United States and is domiciled in the State of Florida. She is the sister of Alty George Jahalal.

1612.1595.    As a result of the March 26, 2005 Terrorist Attack, and the injuries suffered by Alty George Jahalal, Plaintiff Phillippa Joan Meyers has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 87. THE MARCH 18, 2005 ATTACK – SADR CITY, BAGHDAD

#### A.    PLAINTIFF KENDERIS JARIAN KING

1613.1596.    Plaintiff Kenderis Jarian King is a citizen of the United States and is domiciled in the State of Alabama.

1614.1597.    On March 18, 2005, Kenderis Jarian King, age 26, was serving in the U.S. military in Iraq.

1615.1598.    Mr. King was on a mounted patrol in Sadr City. While the patrol stopped to evaluate a local Iraqi police station, they were approached by an individual known to be a leader in the surrounding neighborhood. As the patrol spoke with the man, they were ambushed by SAF. Private First Class Lee Lewis Jr. was hit in the neck by an armor-piercing bullet fired from a sniper rifle. Mr. King ran to PFC Lewis' aid and carried him to the Humvee so cardiopulmonary resuscitation (CPR) could be administered and to transport him for medical attention. Despite all efforts to save him, PFC Lewis died from his injuries.

1616.1599.    The March 18, 2005 Terrorist Attack was planned, committed,

279

and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1617.~~1600.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. King.

~~1618.~~1601.    As a result of the March 18, 2005 Terrorist Attack, Mr. King suffered symptoms including but not limited to depression, anxiety, nightmares, and hypervigilance and was diagnosed with PTSD.

~~1619.~~1602.    Kenderis Jarian King later received medical treatment and counseling for his symptoms of PTSD at Ft. Hood, Texas, Ft. Benning, Georgia, and currently undergoes treatment at Elliot & Associates Counseling in Columbus, Georgia.

~~1620.~~1603.    As a result of the March 18, 2005 Terrorist Attack, and the injuries he suffered, Kenderis Jarian King has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 88. THE MARCH 5, 2005 ATTACK – HIT, AL ANBAR GOVERNORATE

### A.    PLAINTIFF CHRISTOPHER ANDREW HADSALL

~~1621.~~1604.    Plaintiff Christopher Andrew Hadsall is a citizen of the United States and is domiciled in the State of Colorado.

280

1622.1605.    On March 5, 2005, Christopher Andrew Hadsall, age 31, was serving in the U.S. military in Iraq.

1623.1606.    Mr. Hadsall was on foot coming back from patrol to FOB Hit when a vehicle approached the check point off Route Bronze and a VBIED was detonated, followed by rocket fire to the area. Mr. Hadsall was hit by shrapnel from the IED and suffered concussive blast forces from the VBIED and the rockets. The impact of the explosion threw him to the ground in the middle of the road. In order to get off the road and out of the line of fire, he rolled into a ditch and sustained further injuries when he came into contact with concertina wire.

1624.1607.    The March 5, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1625.1608.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hadsall.

1626.1609.    As a result of the attack, Christopher Andrew Hadsall suffered shrapnel injuries to his left arm, and both legs; laceration of the peroneal nerve in his right leg; permanent loss of movement and sensation to his right foot; detached iliotibial (IT) band in his right leg requiring reconstruction; injuries and lacerations to his right arm and left leg from impact with concertina wire; soft tissue injuries to tendons and ligaments in his left arm and legs; tinnitus; TBI; and PTSD.

1627.1610.    Christopher Andrew Hadsall was initially evaluated and

provided medical treatment at the CSH at Al Asad, then transported by helicopter to the Balad Theater Hospital, and was then medically evacuated to Landstuhl Regional Medical Center (LRMC). At Landstuhl, he underwent treatment including wound irrigation and debridement of his left arm and both legs. He was then transported to Walter Reed National Military Medical Center / Bethesda Naval Hospital and underwent further treatment of his shrapnel and laceration injuries including nerve repair surgery of his right leg and reconstruction surgery of the right IT band. He also continued to undergo irrigation and debridement surgeries of his wounds. He has continued to be treated for physical and psychological injuries at the Louis Stokes Cleveland VA Medical Center, Cleveland, OH, Ft. Wayne VA Center, Ft. Wayne, IN, and the Denver VA Clinic, Denver, Colorado.

1628.1611.    As a result of the March 5, 2005 Terrorist Attack, and the injuries he suffered, Christopher Andrew Hadsall has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**89.  THE FEBRUARY 22, 2005 ATTACK – RAMADI, AL ANBAR GOVERNORATE**

**A.    PLAINTIFF ROBERT MARION WESTOVER JR.**

1629.1612.    Plaintiff Robert Marion Westover Jr. is a citizen of the United States and domiciled in the State of Wisconsin.

1630.1613.    On February 22, 2005, Robert Marion Westover Jr., age 47, was serving in the U.S. military in Iraq.

1631.1614.    Mr. Westover was on a reconnaissance mission in the Al Anbar

governorate near Ramadi when an IED exploded under their Humvee causing him to sustain serious injuries and burns. SGT Merlin German, the gunner, was engulfed by flames from diesel fuel. He died approximately three years later from his significant injuries and burns over 97% of his body. CPL Antonio Mendoza also sustained serious injuries and burns and died several months after the attack from his injuries.

1632.1615.     The February 22, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1633.1616.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTOs AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Westover.

1634.1617.     As a result of the attack, Robert Marion Westover Jr. suffered burns to 45% of his body, fractures in both of his arms and legs, loss of fingers on both hands, ruptured eardrums, and extensive hearing damage.

1635.1618.     Robert Marion Westover Jr. received extensive medical treatment at the scene of the attack and was then air medevac'd to the hospital in Balad for burn treatments. He was then transported to Landstuhl Regional Medical Center in Germany and then returned Stateside to Brooke Army Medical Center where he stayed in the ICU for approximately 4 months. Mr. Westover has undergone approximately 37 surgeries for injuries suffered during the February 22, 2005 attack.

1636.1619.     As a result of the February 22, 2005 Terrorist Attack, and the

283

injuries he suffered, Robert Marion Westover Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

90. **THE FEBRUARY 12, 2005 ATTACK – DIYALA PROVINCE, CAMP ECHO**

   A. **PLAINTIFFS THE CHARLES ANTHONY HERNANDEZ JR. FAMILY**

1637.1620.   Plaintiff Charles Anthony Hernandez Jr. is a citizen of the United States and is domiciled in the State of New York.

1638.1621.   On February 12, 2005, Charles Anthony Hernandez Jr., age 41, was serving in the U.S. military in Iraq.

1639.1622.   Mr. Hernandez was in Camp Echo performing maintenance on a vehicle when he was attacked by mortars.

1640.1623.   The February 12, 2005 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1641.1624.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Hernandez.

1642.1625.   As a result of the attack, Charles Anthony Hernandez Jr. suffered a laceration to his head, injuries to his spine, sciatic nerve, ankle, traumatic arthritis, tinnitus,

284

TBI, PTSD, anxiety, sleep apnea, and migraines.

~~1643.~~1626.    Charles Anthony Hernandez Jr. received extensive medical treatment initially from the medic on scene, and subsequently upon his return to the United States, he has undergone surgery on his ankle, spinal injections, and years of physical therapy and medications, which are still ongoing.

~~1644.~~1627.    As a result of the February 12, 2005 Terrorist Attack, and the injuries he suffered, Charles Anthony Hernandez Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

~~1645.~~1628.    Plaintiff Vionette Hernandez is a citizen of the United States and is domiciled in the State of New York. She is the wife of Charles Anthony Hernandez Jr.

~~1646.~~1629.    Plaintiff Megan Hernandez is a citizen of the United States and is domiciled in the State of New York. She is the daughter of Charles Anthony Hernandez Jr.

~~1647.~~1630.    Plaintiff Charles Anthony Hernandez III is a citizen of the United States and is domiciled in the State of New York. He is the son of Charles Anthony Hernandez Jr.

~~1648.~~1631.    Plaintiff Chelsea Hernandez is a citizen of the United States and is domiciled in the State of New York. She is the daughter of Charles Anthony Hernandez Jr.

~~1649.~~1632.    As a result of the February 12, 2005 Terrorist Attack, and the injuries suffered by Charles Anthony Hernandez Jr., Plaintiff's wife Vionette Hernandez, daughter Megan Hernandez, son Charles Anthony Hernandez III, and daughter Chelsea

Hernandez have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 91. THE JANUARY 26, 2005 ATTACK – HADITHA, AL ANBAR GOVERNORATE

#### A.   PLAINTIFFS THE WILLIAM MICHAEL MEYERS FAMILY

~~1650.~~ 1633.      Plaintiff William Michael Meyers is a citizen of the United States and is domiciled in the State of North Carolina.

~~1651.~~ 1634.      On January 26, 2005, William Michael Meyers, age 26, was serving in the U.S. military in Iraq.

~~1652.~~ 1635.      Mr. William Michael Meyers was a passenger in a Humvee while conducting operations in Haditha when an IED struck a vehicle in his convoy. While trying to escape the area, they received small arms fire. An RPG struck the right side of their vehicle, injuring Mr. Meyers and killing Jonathan Bowling.

~~1653.~~ 1636.      The January 26, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1654.~~ 1637.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Meyers.

~~1655.~~ 1638.      As a result of the attack, William Michael Meyers suffered from blast injuries including multiple shrapnel wounds to his right elbow, right arm, and right knee, as

well as a ruptured right eardrum.

1656. 1639.       William Michael Meyers received immediate medical treatment at the FOB at the Haditha Dam before being medically evacuated to Al Asad for further evaluation and treatment. Mr. Meyers was later flown to Balad Air Base and then on to Landstuhl Regional Medical Center in Germany for evaluation, diagnostic imaging, and medical treatment of his injuries. He was then returned Stateside to the Walter Reed National Military Medical Center, Bethesda, Maryland, for further treatment of his wounds. He has continued to receive treatment for his injuries at various VA Centers.

1657. 1640.       As a result of the January 26, 2005 Terrorist Attack, and the injuries he suffered, William Michael Meyers has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1658. 1641.       Plaintiff Valerie Renee Meyers is a citizen of the United States and is domiciled in the State of North Carolina. She is the wife of William Michael Meyers.

1659. 1642.       As a result of the January 26, 2005 Terrorist Attack, and the injuries suffered by William Michael Meyers, Plaintiff Valerie Renee Meyers have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**92.  THE JANUARY 17, 2005 ATTACK – IN VICINITY OF TAL AFAR, NINEVAH GOVERNORATE**

**A.      PLAINTIFFS THE STEPHEN T. UDOVICH FAMILY**

~~1660.~~1643.      Plaintiff Stephen T. Udovich is a citizen of the United States and is domiciled in the State of Florida.

~~1661.~~1644.      On January 17, 2005, Stephen T. Udovich, age 42, was serving in the U.S. military in Iraq.

~~1662.~~1645.      Mr. Udovich was the vehicle commander in a Humvee when his vehicle was struck by an IED.

~~1663.~~1646.      The January 17, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

~~1664.~~1647.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Udovich.

~~1665.~~1648.      As a result of the attack, Stephen T. Udovich suffered ringing in his ears, headaches, confusion, disorientation, and was diagnosed with TBI and PTSD.

~~1666.~~1649.      Stephen T. Udovich received medical treatment and was evaluated by a corpsman at the aide station at FOB Al Kasik. He has also received medical and psychological treatment at the Wilmington VA Medical Center, Wilmington, Delaware and the Rockford Center, Wilmington, Delaware. He continues to receive medical and psychological treatment through Bay Pines VA Hospital, St. Petersburg, Florida.

~~1667.~~1650.      As a result of the January 17, 2005 Terrorist Attack, and the injuries

288

he suffered, Stephen T. Udovich has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1668. 1651.    Plaintiff Adam Stephen Udovich is a citizen of the United States and is domiciled in the State of New York. He is the son of Stephen T. Udovich.

1669. 1652.    As a result of the January 17, 2005 Terrorist Attack, and the injuries suffered by Stephen T. Udovich, Plaintiff Adam Stephen Udovich has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**93.   THE JANUARY 2, 2005 ATTACK – ASR AMY IN ROUTE TO FOB MCKENZIE, NORTHERN IRAQ**

**A.   PLAINTIFF JW TAYLOR**

1670. 1653.    Plaintiff JW Taylor is a citizen of the United States and is domiciled in the State of Florida.

1671. 1654.    On January 2, 2005, JW Taylor, age 25, was serving in the U.S. military in Iraq.

1672. 1655.    Mr. Taylor was in route to FOB McKenzie on ASR Amy when a command-detonated IED struck the driver's side of his Humvee.

1673. 1656.    The January 2, 2005 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQI who received material support from Iran and its Co-Defendants.

1674.1657.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQI increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Taylor.

1675.1658.      As a result of the attack, JW Taylor suffered from PTSD.

1676.1659.      JW Taylor receives medical treatment for his physical and psychological injuries at VA Joint Ambulatory Center, Pensacola, Florida.

1677.1660.      As a result of the January 2, 2005 Terrorist Attack, and the injuries he suffered, JW Taylor has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 94. THE DECEMBER 21, 2004 ATTACK – DINING FACILITY, FOB MAREZ, MOSUL

1678.1661.      On December 21, 2004, a suicide bomber entered the mess hall and approached a large group of U.S. soldiers, detonating himself and killing twenty-two people. At the time, this was the single deadliest suicide attack on American soldiers in Iraq, with fourteen soldiers killed. Seventy-two other personnel were injured in the attack carried out by a suicide bomber wearing an explosive vest and the uniform of the Iraqi security services. All the victims were in or near the Dining Hall at the FOB located next to the main U.S. military airfield at Mosul.

1679.1662.      The Iranian-supported FTO Ansar al-Islam (aka Ansar al Sunna) (AAI/AAS) immediately claimed responsibility for the attack. In its claim of responsibility, AAI claimed that the suicide bomber was a 24-year-old man from Mosul who worked at the base for two months and had provided information about the base to the group.

1680.1663.       Weeks before the attack, soldiers from the base intercepted a document that mentioned a proposal for a massive "Beirut"-type attack on U.S. forces. The reference was to the techniques, tactics, and procedures utilized in the 1983 Beirut barracks bombing funded by Iran and committed by Hezbollah and Iranian MOIS agents.

1681.1664.       In subsequent sworn Detainee Statements, individuals with knowledge of the planning and preparation of the attack, as well as those considered responsible for its coordination, admitted that they were members of t-AAI.

1682.1665.       Investigations by the U.S. Army Criminal Investigation Command (Army CID) and the Counter Improvised Explosives Targeting Program (CITP) determined that other known members of AAI/AAS were involved in the attacks planning, commission, and the subsequent media exploitation of the attack as a powerful recruiting tool. -This included:

1683.1666.       Mahmud Muhammad Gha-ud al-Jaburi – Founded the Nineveh-based AAS IED cell known as the "Tariq Ibn Ziyad Battalion" (TIZB). He was responsible for a number of high-profile attacks, including planning and ordering the 21 December 2004 attack on FOB Marez. GhuGha-ud was ultimately captured by a Mosul-based SWAT team on July 30, 2008, in the small village of Ibrahim al-Khalil less than 25 miles from FOB Marez.

1684.1667.       Khudayir Taha aka "Abu Israh" – A subordinate of Gha-ud who assisted in the planning of the 21 December 2004 attack on FOB Marez and other high-profile lethal attacks against CF and contractors, as well as Iraqi government officials. He became the leader of AAS's TIZB cell after the capture of Gha-ud. -Khudayir Taha was targeted for capture by CITP in September 2009, with his two primary residences being identified as located in the al-Somer neighborhood of Mosul, an AAI/AAS stronghold at the time, as well as in the village of Ibrahim al-Khalil, ¼ mile from the house in which Gha-ud (above) was captured. Taha was

reportedly "an excellent" AAI/AAS recruiter of foreign fighters.

1685. 1668.      Muhammad Amir Husayn Mari aka "Abu Naba'" or "Abu Duraid"

– On or about 5 January 2006, Muhammad Mari was convicted of Murder, Attempted Murder, &

Conspiracy for his role in the 21 December 2004 attack on FOB Marez, and sentenced to death by

the Central Criminal Court of Iraq. An admitted member of AAI/AAS involved in the 21 December

2004 attack on FOB Marez, Mari joined AAI2/AAS after it returned to Iraq from its Iranian-

provided safe haven that helped it regenerate from near-annihilation during Operation Viking

Hammer. Mari became responsible for AAI/AAS propaganda and administering its finances in

Mosul. Mari oversaw the creation of the videos in which, prior to the FOB Marez DFAC attack,

members of AAI/AAS detailed their plans and then released these videos in support of AAI/AAS's

claim of responsibility for the attack. In his signed confession to the Central Criminal Court of

Iraq, Mari confirmed the alliance and joint leadership of AAI/AAS, AQI and Kurdish insurgents

in Mosul.

1686. 1669.      The December 21, 2004 Terrorist Attack was planned, committed,

and/or authorized by the FTO AAI/ASS who received material support from Iran and its Co-

Defendants.

1687. 1670.      Iran, by and through its Co-Defendants, provided logistical support,

weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which

AAI/AAS increased its operational capacity and obtained the permissive environment used to kill

and injure U.S. service members in Iraq, including Plaintiffs Gregory Alan Seely, Joshua Dean

Feola, Matthew Paul Schaffer, Michael Benjamin Sims, Richard Alan Crawford, Tony Thanh

Pham, Larry L. Kaibetoney, Jr., Eli Wayne Davis, and Keith Lamont Johnson.

A.      **PLAINTIFFS THE GREGORY ALAN SEELY FAMILY**

1688. 1671.      Plaintiff Gregory Alan Seely is a citizen of the United States and

292

is domiciled in the State of Virginia.

1689. 1672.     On December 21, 2004, Gregory Alan Seely, age 20, was serving in the U.S. military in Iraq.

1690. 1673.     Mr. Seely had just finished having lunch with a friend in the FOB Marez dining hall facility (DFAC). When they had walked about thirty feet outside of the tent, a suicide bomber entered the DFAC and detonated his explosive vest. Mr. Seely's instincts prompted him to hit the ground sprawled out. He experienced the mass casualties, devastating damage and aftermath of the explosion.

1691. 1674.     As a result of the attack, Gregory Alan Seely suffers from PTSD.

1692. 1675.     Gregory Alan Seely receives ongoing treatment as needed for PTSD at the Hampton VA Medical Center.

1693. 1676.     As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Gregory Alan Seely has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1694. 1677.     Plaintiff Kendra Lyn Seely is a citizen of the United States and is domiciled in the State of Virginia. She is the wife of Gregory Alan Seely.

1695. 1678.     As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by Gregory Alan Seely, Plaintiff Kendra Lyn Seely has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages,

293

including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## B.    PLAINTIFF JOSHUA DEAN FEOLA

1696.1679.    Plaintiff Joshua Dean Feola is a citizen of the United States and is domiciled in the State of Virginia.

1697.1680.    On December 21, 2004, Joshua Dean Feola, age 22, was serving in the U.S. military in Iraq.

1698.1681.    Mr. Feola was standing outside of the FOB Marez dining hall facility (DFAC) when a suicide bomber entered the DFAC and detonated his explosive vest. The explosion caused Mr. Feola to fall to the ground. He experienced the mass casualties, devastating damage and aftermath of the explosion.

1699.1682.    As a result of the attack, Joshua Dean Feola suffered exacerbation of PTSD.

1700.1683.    Joshua Dean Feola received extensive psychological treatment at Richmond VA Medical Center (formerly known as Hunter Holmes McGuire VA Medical Center) and continues treatment there and at Richmond Vet Center.

1701.1684.    As a result of the December 21, 2004 Terrorist Attack, and the injury he suffered, Joshua Dean Feola has past and future noneconomic damages, including severe mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## C.    PLAINTIFFS THE MATTHEW PAUL SCHAFFER FAMILY

1702.1685.    Plaintiff Matthew Paul Schaffer is a citizen of the United States

294

and is domiciled in the State of Iowa.

1703.1686.    On December 21, 2004, Matthew Paul Schaffer, age 29, was serving in the U.S. military in Iraq.

1704.1687.    Mr. Schaffer and his unit had just returned from a mission. As they walked toward the FOB Marez dining hall facility (DFAC), they heard the blast when a suicide bomber detonated his explosive vest inside the tent. Mr. Schaffer assisted in the rescue and recovery of the mass casualties inside the DFAC.

1705.1688.    As a result of the attack, Matthew Paul Schaffer suffers from PTSD.

1706.1689.    Matthew Paul Schaffer received psychological treatment at the Central Iowa VA.

1707.1690.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Matthew Paul Schaffer has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1708.1691.    Plaintiff Lucia Ann Schaffer is a citizen of the United States and is domiciled in the State of Iowa. She is the mother of Matthew Paul Schaffer.

1709.1692.    Plaintiff Amy Jo Finnegan is a citizen of the United States and is domiciled in the State of Iowa. She is the sister of Matthew Paul Schaffer.

1710.1693.    As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by Matthew Paul Schaffer, Plaintiffs Lucia Ann Schaffer and Amy Jo

Finnegan have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### D.     PLAINTIFF MICHAEL BENJAMIN SIMS

1711.1694.     Plaintiff Michael Benjamin Sims is a citizen of the United States and is domiciled in the State of Washington.

1712.1695.     On December 21, 2004, Michael Benjamin Sims, age 21, was serving in the U.S. military in Iraq.

1713.1696.     Michael Benjamin Sims was in a motor pool loading materials onto a truck approximately 200 yards from the FOB Marez dining hall facility (DFAC), when a suicide bomber entered the DFAC and detonated his explosive vest. The explosion caused Mr. Sims to fall to the ground. Mr. Sims witnessed the devastating damage and the aftermath.

1714.1697.     As a result of the attack, Michael Benjamin Sims suffered exacerbation of PTSD.

1715.1698.     Michael Benjamin Sims received extensive psychological treatment at Richmond VA Medical Center (formerly known as Hunter Holmes McGuire VA Medical Center), Washington DC VA Medical Center, VA Puget Sound Health Care System and University of Washington Mental Health Counseling Center.

1716.1699.     As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Michael Benjamin Sims has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest

and post-judgment interest.

### E.    PLAINTIFF RICHARD ALAN CRAWFORD

~~1717.~~1700.    Plaintiff Richard Alan Crawford is a citizen of the United States and is domiciled in the State of Ohio.

~~1718.~~1701.    On December 21, 2004, Richard Alan Crawford, age 25, was serving in the U.S. military in Iraq.

~~1719.~~1702.    Mr. Crawford and his unit had just returned from a mission. As they walked toward the FOB Marez dining hall facility (DFAC), they heard the blast when a suicide bomber detonated his explosive vest inside the tent. Mr. Crawford assisted in the rescue and recovery of the mass casualties inside the DFAC.

~~1720.~~1703.    As a result of the attack, Richard Alan Crawford suffers from PTSD.

~~1721.~~1704.    Richard Alan Crawford received psychological treatment at Madigan Army Medical Center and Portland VA.

~~1722.~~1705.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Richard Alan Crawford has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### F.    PLAINTIFFS THE TONY THANH PHAM FAMILY

~~1723.~~1706.    Plaintiff Tony Thanh Pham, formerly known as Phi Thanh Nguyen Pham, is a naturalized citizen of the United States and is domiciled in the State of California.

297

1724.1707.    On December 21, 2004, Mr. Pham, age 28, was serving in the U.S. military in Iraq.

1725.1708.    Mr. Pham was inside the FOB Marez dining hall facility (DFAC) waiting in line to get food when a suicide bomber detonated his explosive vest.

1726.1709.    As a result of the attack, Tony Thanh Pham suffered burns on his face, head, neck, torso, hands, and leg. His finger was fractured, and eardrum membrane perforated. He sustained shrapnel wounds on his legs. He also suffered hearing loss, TBI, migraines, and PTSD.

1727.1710.    Mr. Pham received extensive medical treatment at the 332nd Air Force Theater Hospital in Balad, Iraq; Landstuhl Regional Medical Center in Landstuhl, Germany; Brooke Army Medical Center in San Antonio, Texas; VA Medical Center-Loma Linda in Loma Linda, CA; and Tibor Rubin VA Medical Center in Long Beach, California.

1728.1711.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Tony Thanh Pham has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

1729.1712.    Plaintiff Tuyen Le Pham is a naturalized citizen of the United States and is domiciled in the State of California. He is the brother of Mr. Pham.

1730.1713.    Plaintiff Danthu Thi Pham is a naturalized citizen of the United States and is domiciled in the State of Arizona. She is the sister of Mr. Pham.

1731.1714.    As a result of the December 21, 2004 Terrorist Attack, and the

injuries suffered by Tony Thanh Pham, Plaintiffs Tuyen Le Pham and Danthu Thi Pham have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### G.   PLAINTIFFS THE LARRY L. KAIBETONEY JR. FAMILY

1732.1715.      Plaintiff Larry L. Kaibetoney Jr. is a citizen of the United States and is domiciled in the State of New Mexico.

1733.1716.      On December 21, 2004, Larry L. Kaibetoney Jr., age 29, was serving in the U.S. military in Iraq.

1734.1717.      Mr. Kaibetoney was walking into the dining hall of FOB Marez, when an Iranian-affiliated suicide bomber detonated an explosive vest, and the explosion tore through the dining hall. Mr. Kaibetoney was 4-8 feet away from the suicide bomber and was knocked unconscious and severely injured by the blast.

1735.1718.      As a result of the attack, Larry L. Kaibetoney Jr. suffered multiple injuries including, but not limited to, shrapnel wound to his neck and body, right calf damage resulting in partial amputation, two punctures of the lung from shrapnel, and ball bearing shrapnel through his pinky finger and out the index finger of the right hand. He was knocked unconscious from the blast, resulting in a TBI, hearing loss and tinnitus. Mr. Kaibetoney also suffers from migraines, sleep disorders, ligament, tendon and nerve damage, as well as PTSD and depression because of the injuries sustained in the attack.

1736.1719.      Larry L. Kaibetoney Jr received extensive medical treatment at Landstuhl Regional Medical Center following the attack. He continued his treatment upon return to the U.S. at Madigan Army Medical Center at Fort Lewis and continues his medical

care to date at VA medical treatment facilities.

~~1737.~~ 1720.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Larry L. Kaibetoney Jr. has past and future noneconomic damages, including severe physic al and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~1738.~~ 1721.    Plaintiff Chani Kaibetoney is a citizen of the United States and is domiciled in the State of New Mexico. She is the wife of Larry L. Kaibetoney Jr.

~~1739.~~ 1722.    Plaintiff Leta Kaibetoney is a citizen of the United States and is domiciled in the State of New Mexico. She is the sister of Larry L. Kaibetoney Jr.

~~1740.~~ 1723.    As a result of the December 21, 2004 Terrorist Attack, and the injuries suffered by Larry Kaibetoney, Plaintiffs Chani Kaibetoney and Leta Kaibetoney have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**H.    PLAINTIFF ELI WAYNE DAVIS**

~~1741.~~ 1724.    Plaintiff Eli Wayne Davis is a citizen of the United States and is domiciled in the State of Washington.

~~1742.~~ 1725.    On December 21, 2004, Eli Wayne Davis, age 35, was serving in the U.S. military in Iraq.

~~1743.~~ 1726.    Mr. Davis was in the dining hall at FOB Marez when a suicide bomber entered and detonated his device. The explosion knocked Mr. Davis unconscious and he

sustained shrapnel injuries to his left knee and other injuries.

1744. 1727.     As a result of the December 21, 2004 Terrorist Attack, Mr. Davis sustained significant injuries due to the concussive blast forces, including shrapnel injuries to his left knee, loss of consciousness, tinnitus, and PTSD.

1745. 1728.     Mr. Davis's left knee wounds were treated at the attack scene and then he was medically evacuated to a hospital in Tikrit for further treatment. After approximately a week, he was returned to Mosul, underwent physical therapy, and after one month was returned to duty.

1746. 1729.     As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Eli Wayne Davis has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000.000.00, plus pre-judgment interest and post-judgment interest.

## I.     PLAINTIFF KEITH LAMONT JOHNSON

1747. 1730.     Plaintiff Keith Lamont Johnson is a citizen of the United States and is domiciled in the State of Virginia.

1748. 1731.     On December 21, 2004, Keith Lamont Johnson, age 35, was serving in the U.S. military in Iraq.

1749. 1732.     Mr. Johnson was seated, eating lunch in the FOB Marez dining facility when a suicide bomber entered and detonated his device.

1750. 1733.     The December 21, 2004 Terrorist Attack was planned, committed, and/or.

1751. 1734.     As a result of the attack, Keith Lamont Johnson suffered a TBI, hearing loss, and PTSD.

1752.1735.    Keith Lamont Johnson received medical treatment from a medic at FOB Marez TMC. He is still currently receiving physical and psychological care at Hunter Holmes McGuire VA Medical Center, Richmond, Virginia.

1753.1736.    As a result of the December 21, 2004 Terrorist Attack, and the injuries he suffered, Keith Lamont Johnson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 95. THE NOVEMBER 17, 2004 ATTACK – FALLUJAH

#### A.    PLAINTIFF ROY ESTRELLA

1754.1737.    Plaintiff Roy Estrella is a citizen of the United States and is domiciled in the State of California.

1755.1738.    On November 17, 2004, Roy Estrella, age 20, was serving in the U.S. military in Iraq.

1756.1739.    Mr. Estrella was providing rear security near Camp Fallujah when his Humvee was struck by an IED.

1757.1740.    The November 17, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1758.1741.    921.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr.

Estrella.

1759.1742.    As a result of the attack, Roy Estrella suffered a skull fracture, back fracture, right knee fracture, ear injuries, TBI, tinnitus, hearing loss, migraines, photophobia, gait disturbance, seizures, and PTSD.

1760.1743.    Roy Estrella received medical treatment and was put on no duty for two weeks followed by light duty for the remainder of his deployment.

1761.1744.    As a result of the November 17, 2004 Terrorist Attack, and the injuries he suffered, Roy Estrella has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 96.   THE NOVEMBER 15, 2004 ATTACK – FALLUJAH

### A.    PLAINTIFF CHRISTOPHER CORDOVA VILLACERAN

1762.1745.    Plaintiff Christopher Cordova Villaceran is a citizen of the United States and is domiciled in the State of California.

1763.1746.    On November 15, 2004, Christopher Cordova Villaceran, age 21, was serving in the U.S. military in Iraq.

1764.1747.    Mr. Villaceran was clearing houses in Fallujah when he was attacked with a grenade and SAF.

1765.1748.    The November 15, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1766.1749.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which

303

AQ and ~~AQI~~the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Villaceran.

~~1767.~~1750.　　As a result of the attack, Christopher Cordova Villaceran suffered a gunshot wound to his right shoulder, shrapnel to his right shoulder and finger, tinnitus, hearing loss, right ankle strain, a TBI, and PTSD.

~~1768.~~1751.　　Christopher Cordova Villaceran received extensive medical treatment including medications and therapy.

~~1769.~~1752.　　As a result of the November 15, 2004 Terrorist Attack, and the injuries he suffered, Christopher Cordova Villaceran has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**97. THE NOVEMBER 14, 2004 ATTACK – FALLUJAH**

**A. PLAINTIFF JARED WILLIAM BURGESS**

~~1770.~~1753.　　Plaintiff Jared William Burgess is a citizen of the United States and is domiciled in the State of California.

~~1771.~~1754.　　On November 14, 2004, Jared William Burgess, age 24, was serving in the U.S. military in Iraq.

~~1772.~~1755.　　Mr. Burgess was conducting offensive clearing operations, moving from house to house to identify and eliminate AQ terrorists barricaded inside abandoned buildings and neutralizing weapons caches along the route. He was outside the

304

door of a building when his fellow service member Corporal Dale Burger entered and was shot in the head just below his Kevlar helmet. Mr. Burgess helped recover his body.

1773.1756.    The November 14, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1774.1757.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Burgess.

1775.1758.    As a result of the attack, Jared William Burgess experienced psychological injuries, including PTSD.

1776.1759.    Jared William Burgess received treatment as an active-duty Green Beret with the 3rd Special Forces Group Embedded Behavioral Health Unit and continued psychological treatment and prescribed medications with the VA hospitals.

1777.1760.    As a result of the November 14, 2004 Terrorist Attack, and the injuries he suffered, Jared William Burgess has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 98.   THE NOVEMBER 13, 2004 ATTACK – FALLUJAH

### A.   PLAINTIFF ROBERT JOSEPH MITCHELL JR.

~~1778.~~1761.    Plaintiff Robert Joseph Mitchell Jr. is a citizen of the United States and is domiciled in the State of Arizona.

~~1779.~~1762.    On November 13, 2004, Robert Joseph Mitchell Jr., age 24, was serving in the U.S. military in Iraq.

~~1780.~~1763.    Mr. Mitchell was on patrol with his unit, clearing houses in Fallujah, when he was struck by a grenade that was thrown at him.

~~1781.~~1764.    The November 13, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and ~~AQI~~the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1782.~~1765.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and ~~AQI~~the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Mitchell.

~~1783.~~1766.    As a result of the attack, Robert Joseph Mitchell Jr. suffered shrapnel injuries to his thigh and PTSD.

~~1784.~~1767.    Robert Joseph Mitchell Jr. received medical treatment from a medic at the attack scene and additional treatment when he returned to base. He continued treatment for his injuries after his end of service at VA medical facilities.

~~1785.~~1768.    As a result of the November 13, 2004 Terrorist Attack, and the injuries he suffered, Robert Joseph Mitchell Jr. has past and future noneconomic damages,

including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**B.      PLAINTIFF ALEXANDER LESLIE NICOLL**

1786.1769.        Plaintiff Alexander Leslie Nicoll is a citizen of the United States and is domiciled in the State of Kentucky.

1787.1770.        On November 13, 2004, Alexander Leslie Nicoll, age 22, was serving in the U.S. military in Iraq.

1788.1771.        Mr. Nicoll was on patrol with his unit, clearing houses in Fallujah, when he was shot multiple times in the left leg by SAF, followed by a grenade attack.

1789.1772.        The November 13, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1790.1773.        Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Nicoll.

1791.1774.        As a result of the attack, Alexander Leslie Nicoll suffered six gunshot wounds to his left leg resulting in amputation below the knee, shrapnel wounds from the grenade attack, a collapsed lung and tinnitus. Mr. Nicoll also suffers from PTSD from the attack.

1792.1775.     Alexander Leslie Nicoll was medically evacuated from the scene and received extensive medical treatment for his injuries at Landstuhl Regional Medical Center and Walter Reed Army Medical Center. He received follow-up care at VA medical facilities after his end of service.

1793.1776.     As a result of the November 13, 2004 Terrorist Attack, and the injuries he suffered, Alexander Leslie Nicoll has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### C.     PLAINTIFF JARED WILLIAM BURGESS

1794.1777.     Plaintiff Jared William Burgess is a citizen of the United States and is domiciled in the State of California.

1795.1778.     On November 13, 2004, Jared William Burgess, age 24, was serving in the U.S. military in Iraq.

1796.1779.     Mr. Burgess was conducting offensive clearing operations, moving from house to house to identify and eliminate AQ terrorists barricaded inside abandoned buildings and neutralizing weapons caches along the route. While attempting to enter a house, he was attacked by IEDs, grenades, RPGs and SAF. As a result, Mr. Burgess was knocked unconscious and dazed. Once he regained consciousness, he assisted another Marine and collected the remains of a deceased soldier, Justin McLeese.

1797.1780.     The November 13, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who

received material support from Iran and its Co-Defendants.

1798.1781.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Burgess.

1799.1782.     As a result of the attack, Jared William Burgess suffered a TBI and experienced psychological injuries, including PTSD.

1800.1783.     Jared William Burgess was unable to receive immediate medical treatment after the attack, due to the operational tempo of continuous combat operations in Fallujah, Iraq. He continued to seek treatment as an active-duty Green Beret with the 3rd Special Forces Group Embedded Behavioral Health Unit and the VA hospitals for his TBI, psychological treatment and prescribed medications.

1801.1784.     As a result of the November 13, 2004 Terrorist Attack, and the injuries he suffered, Jared William Burgess has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### D.     PLAINTIFF STEVEN RICHARD YBARRA

1802.1785.     Plaintiff Steven Richard Ybarra is a citizen of the United States and is domiciled in the State of California.

1803.1786.     On November 13, 2004, Steven Richard Ybarra, age 20, was

serving in the U.S. military in Iraq.

1804.1787.	Mr. Ybarra was attacked while clearing houses in house-to-house combat during the Battle of Fallujah when he was shot in the leg while exiting a house in Fallujah, Iraq.

1805.1788.	The November 13, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1806.1789.	Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Ybarra.

1807.1790.	As a result of the attack, Steven Richard Ybarra suffered a gunshot wound to his left leg and PTSD.

1808.1791.	Steven Richard Ybarra received extensive medical treatment at a combat action hospital in Fallujah, Iraq. Mr. Ybarra was transferred to Landstuhl Medical Center in Landstuhl, Germany and then moved to Walter Reed Medical Center in Bethesda, Maryland.

1809.1792.	As a result of the November 13, 2004 Terrorist Attack, and the injuries he suffered, Steven Richard Ybarra has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest

and post-judgment interest.

**99.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH**

    **A.   PLAINTIFF JAMES WESLEY ADAIR**

1810.1793.    Plaintiff James Wesley Adair is a citizen of the United States and is domiciled in the State of Texas.

1811.1794.    On November 12, 2004, James Wesley Adair, age 21, was serving in the U.S. military in Iraq.

1812.1795.    Mr. Adair was on base at Camp Fallujah, when mortar rounds landed on his parked convoy that was then attacked by small arms fire.

1813.1796.    The November 12, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1814.1797.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Adair.

1815.1798.    As a result of the attack, James Wesley Adair suffered shrapnel injuries to his face, leg and the left side of his body, resulting in subsequent scarring. He also suffered a shoulder injury, tinnitus, hearing loss, migraines and PTSD from the attack.

1816.1799.    James Wesley Adair received extensive medical treatment after the attack at the Combat Support Hospital in Fallujah and has continued his treatment at VA medical facilities since his end of service.

1817.1800.    As a result of the November 12, 2004 Terrorist Attack, and the

injuries he suffered, James Wesley Adair has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 100.   THE NOVEMBER 12, 2004 ATTACK – FALLUJAH

#### A.   PLAINTIFFS THE RICHARD CHAD SANDERS FAMILY

~~1818.~~1801.      Plaintiff Richard Chad Sanders is a citizen of the United States and is domiciled in the State of Texas.

~~1819.~~1802.      On November 12, 2004, Richard Chad Sanders, age 21, was serving in the U.S. military in Iraq.

~~1820.~~1803.      Mr. Sanders was performing building clearance in Fallujah when a hand grenade was dropped and exploded on him in a stairwell.

~~1821.~~1804.      The November 12, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and ~~AQI~~the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1822.~~1805.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and ~~AQI~~the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Sanders.

~~1823.~~1806.      As a result of the attack, Richard Chad Sanders suffered shrapnel injuries to his legs, buttocks, back, and triceps, and PTSD.

~~1824.~~1807.      Richard Chad Sanders received extensive medical treatment on

312

scene to clean and remove shrapnel, and has since undergone substantial physical therapy, counseling and medications.

1825.1808.    As a result of the November 12, 2004 Terrorist Attack, and the injuries he suffered, Richard Chad Sanders has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1826.1809.    Plaintiff Richard Todd Sanders is a citizen of the United States and is domiciled in the State of Texas. He is the father of Richard Chad Sanders.

1827.1810.    As a result of the November 12, 2004 Terrorist Attack, and the injuries suffered by Richard Chad Sanders, Plaintiff's father Richard Todd Sanders has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**101. THE NOVEMBER 12, 2004 ATTACK – FALLUJAH**

**A.    PLAINTIFF ROBERT JOSEPH MITCHELL JR.**

1828.1811.    Plaintiff Robert Joseph Mitchell Jr. is a citizen of the United States and is domiciled in the State of Arizona.

1829.1812.    On November 12, 2004, Robert Joseph Mitchell Jr., age 24, was serving in the U.S. military in Iraq.

1830.1813.    Mr. Mitchell was on patrol with his unit in Fallujah when he was struck in a complex attack of SAF, grenades, RKP's and RPG's that came from a nearby

313

building rooftop.

1831.1814.    The November 12, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1832.1815.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Mitchell.

1833.1816.    As a result of the attack, Robert Joseph Mitchell Jr. suffered a gunshot wound to his right arm with continued neuropathy. Mr. Mitchell also suffers from exacerbated PTSD from the attack.

1834.1817.    Robert Joseph Mitchell Jr. received medical treatment from a medic at the attack scene and additional treatment when he returned to base. He continued treatment for his injuries after his end of service at VA medical facilities.

1835.1818.    As a result of the November 12, 2004 Terrorist Attack, and the injuries he suffered, Robert Joseph Mitchell Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## 102.  THE NOVEMBER 11, 2004 ATTACK – FALLUJAH

### A.    PLAINTIFF RALPH ERNEST ARZATE

1836.1819.    Plaintiff Ralph Ernest Arzate is a citizen of the United States and

314

is domiciled in the State of California.

1837. 1820.   On November 11, 2004, Ralph Ernest Arzate, age 22, was serving in the U.S. military in Iraq.

1838. 1821.   Mr. Arzate was engaged in the Second Battle of Fallujah when he was attacked with RPG's and struck by SAF.

1839. 1822.   The November 11, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1840. 1823.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Arzate.

1841. 1824.   As a result of the attack, Ralph Ernest Arzate suffered a gunshot wound to his right arm, shrapnel to both hands, permanent scars, PTSD, tinnitus, and a lower back injury.

1842. 1825.   Ralph Ernest Arzate received emergency medical treatment on scene, and was then transported to Camp Fallujah, where he received extensive medical treatment. Since returning to the United States, he has continued to treat with therapy, counseling, and medications.

1843. 1826.   As a result of the November 11, 2004 Terrorist Attack, and the injuries he suffered, Ralph Ernest Arzate has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and

future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 103. THE NOVEMBER 9, 2004 ATTACK – FALLUJAH

#### A. PLAINTIFFS THE DEREK DAVID MCGINNIS FAMILY

~~1844.~~ 1827.    Derek David McGinnis is a citizen of the United States and is domiciled in the State of Idaho.

~~1845.~~ 1828.    On November 9, 2004, Derek David McGinnis, age 27, was serving in the U.S. military in Iraq.

~~1846.~~ 1829.    Mr. McGinnis was in Fallujah loading injured Marines into the ambulance when they received aggressive SAF and a suicide bomber with a VBIED crashed into Mr. McGinnis's ambulance.

~~1847.~~ 1830.    The November 9, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and ~~AQI~~the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1848.~~ 1831.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and ~~AQI~~the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. McGinnis.

~~1849.~~ 1832.    As a result of the attack, Derek David McGinnis suffered an amputated leg, shrapnel injuries, a collapsed lung, TBI, an eye injury, PTSD, depression and other injuries.

~~1850.~~ 1833.    Derek David McGinnis received extensive medical treatment

316

including multiple leg surgeries and amputation, multiple eye surgeries, physical and occupational therapies for TBI, and mental health treatment and therapy for PTSD.

1851. 1834.     Plaintiff David Leroy McGinnis is a citizen of the United States and is domiciled in the State of Idaho. He is the father of Derek David McGinnis.

1852. 1835.     Plaintiff Barbara Anne McGinnis is a citizen of the United States and is domiciled in the State of Idaho. She is the mother of Derek David McGinnis.

1853. 1836.     Plaintiff Trevor Francis McGinnis is a citizen of the United States and is domiciled in the State of Idaho. He is the brother of Derek David McGinnis.

1854. 1837.     As a result of the November 9, 2004 Terrorist Attack, and the injuries suffered by Derek David McGinnis, Plaintiffs David Leroy McGinnis, Barbara Anne McGinnis, and Trevor Francis McGinnis have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

**104.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH**

**A.     PLAINTIFF SCOTT ANTHONY VIEIRA JR.**

1855. 1838.     Plaintiff Scott Anthony Vieira Jr. is a citizen of the United States and domiciled in the State of Massachusetts.

1856. 1839.     On November 9, 2004, Scott Anthony Vieira Jr., age 19, was serving in the U.S. military in Iraq.

1857. 1840.     Mr. Vieira was on patrol with his unit in Fallujah when he was attacked by an IED, SAF, and then an RPG.

1858. 1841.     The November 9, 2004 Terrorist Attack was planned, committed,

and/or authorized by the FTOs AQ and ~~AQI~~the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1859.~~1842.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and ~~AQI~~the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Vieira.

~~1860.~~1843.      As a result of the attack, Scott Anthony Vieira Jr. suffered a concussion, TBI, shrapnel wounds, hearing loss, tinnitus, fibromyalgia, chronic testicular pain, and PTSD.

~~1861.~~1844.      Scott Anthony Vieira Jr. received extensive medical treatment.

~~1862.~~1845.      As a result of the November 9, 2004 Terrorist Attack, and the injuries he suffered, Scott Anthony Vieira Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**105.  THE NOVEMBER 9, 2004 ATTACK – FALLUJAH**

**A.    PLAINTIFF KOREY PAUL KAUFMAN**

~~1863.~~1846.      Plaintiff Korey Paul Kaufman is a citizen of the United States and is domiciled in the State of Ohio.

~~1864.~~1847.      On November 9, 2004, Korey Paul Kaufman, age 28, was serving in the U.S. military in Iraq.

~~1865.~~1848.      Mr. Kaufman was on patrol with his unit in Fallujah when they

318

came under enemy fire. They were engaging the enemy when his grenade launcher was struck by enemy fire, causing a grenade to detonate and injure Mr. Kaufman.

1866.1849.     The November 9, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTOs AQ and AQIthe Zarqawi Organization who received material support from Iran and its Co-Defendants.

1867.1850.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and AQIthe Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Kaufman.

1868.1851.     As a result of the attack, Korey Paul Kaufman suffered shrapnel injuries to his right hand, resulting in the amputation of his thumb requiring surgical reattachment. The attack also exacerbated his tinnitus and PTSD.

1869.1852.     Korey Kaufman received extensive medical treatment for the injuries to his right hand. He was flown via medevac to Camp Fallujah then transferred to the Green Zone in Baghdad for surgery. He was transported to Landstuhl Regional Medical Center for additional surgery on the right hand before returning to the U.S. to have additional surgeries at Bethesda Walter Reed and Camp Pendleton Hospital in California. Since his end of service, he has continued treatment at VA medical facilities and with private healthcare providers.

1870.1853.     As a result of the November 9, 2004 Terrorist Attack, and the injuries he suffered, Korey Paul Kaufman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and

319

past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 106. THE OCTOBER 1, 2004 ATTACK – SAMARRA, SALADIN GOVERNORATE

#### A.   PLAINTIFF THE MICHAEL RICHARD DRUMMOND FAMILY

1854.   Plaintiff Michael Richard Drummond is a citizen of the United States and is domiciled in the State of New York.

1855.   On October 1, 2004 Michael Richard Drummond, age 34, was serving in the U.S. military in Iraq.

1856.   Mr. Drummond was clearing a residence in Samarra when he was attacked by SAF, RPGs and IEDs. The explosions knocked him down, causing him to briefly lose consciousness.

1857.   The October 1, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1858.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Drummond.

1859.   As a result of the attack, Michael Richard Drummond sustained significant injuries, including a TBI, PTSD, hearing loss, migraines, depression and anxiety.

320

1860.     Michael Richard Drummond received extensive medical treatment; he wears hearing aids for his hearing loss and he has been treated with counseling and medication for his mental health issues.

1861.     Plaintiff McKayla Richelle Drummond is a citizen of the United States and is domiciled in the State of New York. She is the daughter of Michael Richard Drummond.

1862.     Plaintiff Chelsey Elizabeth Storms (birth name Drummond) is a citizen of the United States and is domiciled in the State of New York. She is the daughter of Michael Richard Drummond.

1863.     As a result of the October 1, 2004 Terrorist Attack, and the injuries suffered by Michael Richard Drummond, Plaintiffs McKayla Richelle Drummond and Chelsey Elizabeth Storms have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 each, plus pre-judgment interest and post-judgment interest.

106. 107.     **THE SEPTEMBER 14, 2004 ATTACK – FALLUJAH**

A. A.     **PLAINTIFF JOSEPH WILLIAM SELLMAN**

1871.1864.     Plaintiff Joseph William Sellman is a citizen of the United States and is domiciled in the State of California.

1872.1865.     On September 14, 2004, Joseph William Sellman, age 24, was serving in the U.S. military in Iraq.

1873.1866.     Mr. Sellman was on base at Camp Fallujah when a rocket blasted the nearby office of the Commanding Officer. Mr. Sellman and others responded to the blast location where they found a deceased officer and others wounded. The blast created an

321

approximately four by eight-foot hole in the wall.

~~1874.~~1867.    The September 14, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1875.~~1868.    ~~Iran,~~Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which ~~JAM~~FTO AQ and the Zarqawi Organization increased ~~its~~their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Sellman.

~~1876.~~1869.    As a result of the attack, Joseph William Sellman suffered PTSD, tinnitus, and hearing loss.

~~1877.~~1870.    Joseph William Sellman has received extensive and ongoing mental healthcare treatment at numerous VA Healthcare Systems including Northern California– Martinez, Sacramento, Sierra Nevada, White City VA Medical Center, VA Puget Sound, San Diego, and Boise Idaho VA Medical Center. He has also been treated at Camp Pendleton and by Graham Collins, Inc.

~~1878.~~1871.    As a result of the September 14, 2004 Terrorist Attack, and the injuries he suffered, Joseph William Sellman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 107. 108.      THE AUGUST 16, 2004 ATTACK – AL-KARMAH, AL ANBAR GOVERNORATE

Formatted: Indent: Left: 0.75", No bullets or numbering

**A.   PLAINTIFFA.   PLAINTIFFS THE EDGAR ESTEBAN FUENTES FAMILY**

Formatted: Indent: Left: 1", No bullets or numbering

1879.1872.      Plaintiff Edgar Esteban Fuentes is a citizen of the United States and is domiciled in the State of California.

1880.1873.      On August 16, 2004, Edgar Esteban Fuentes, age 23, was serving in the U.S. military in Iraq.

1881.1874.      Mr. Fuentes was on patrol with his unit outside of Al-Karmah when his vehicle was struck by an IED then was attacked with SAF.

1882.1875.      The August 16, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1883.1876.      Iran,Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which JAMFTO AQ and the Zarqawi Organization increased itstheir operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Fuentes.

1884.1877.      As a result of the attack, Edgar Esteban Fuentes suffered shrapnel to his left leg, face, tongue, eye, and right hand, a TBI, PTSD, anxiety, depression and paranoia.

1885.1878.      Edgar Esteban Fuentes received extensive medical treatment and was taken to Camp Blue Diamond where he was stabilized and then transferred to Landstuhl Regional Medical Center before being returned to the U.S. for further treatment. Upon returning to the U.S., Mr. Fuentes underwent multiple surgeries on his left leg, and

323

subsequently endured months of physical therapy. Since then, Mr. Fuentes has undergone multiple back surgeries and considerable amounts of additional physical therapy, counseling and medication.

1886.1879.    As a result of the August 16, 2004 Terrorist Attack, and the injuries he suffered, Edgar Esteban Fuentes has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

1880.   Plaintiff Adriana Fuentes is a citizen of the United States and is domiciled in the State of California. She is the mother of Edgar Esteban Fuentes.

1881.    Plaintiff Gerardo Fuentes is a citizen of the United States and is domiciled in the State of California. He is the father of Edgar Esteban Fuentes.

1882.    As a result of the attack and the injuries suffered by Edgar Esteban Fuentes, Plaintiffs Adriana Fuentes and Gerardo Fuentes have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## B.    PLAINTIFF LAWRENCE ARTHUR PARKHILL

1887.1883.    Plaintiff Lawrence Arthur Parkhill is a citizen of the United States and is domiciled in the State of California.

1888.1884.    On August 16, 2004, Mr. Parkhill, age 19, was serving in the U.S. military in Iraq.

324

1889. 1885.     Mr. Parkhill was on a convoy mission in Al-Karmah headed to Camp Fallujah when his Humvee was struck by an IED followed by SAF.

1890. 1886.     The August 16, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1891. 1887.     Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Parkhill.

1892. 1888.     As a result of the attack, Mr. Parkhill suffered shrapnel wounds to his right forearm and right thigh, TBI, Tinnitus, and PTSD.

1893. 1889.     Mr. Parkhill received initial medical treatment at the Bravo Surgical Company near Fallujah, Iraq. He continues to receive treatment at the West Los Angeles VA Medical Center.

1894. 1890.     As a result of the August 16, 2004 Terrorist Attack, and the injuries he suffered, Lawrence Arthur Parkhill has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## ~~108.~~ 109.    THE AUGUST 5, 2004 ATTACK – AL-NAJAF, AL ANBAR GOVERNORATE

Formatted: Indent: Left: 0.75", No bullets or numbering

### ~~A.~~    A.    PLAINTIFF CHUDI OSMOND AREH

Formatted: Indent: Left: 1", No bullets or numbering

~~1895.~~1891.    Plaintiff Chudi Osmond Areh is a citizen of the United and is domiciled in the State of Florida.

~~1896.~~1892.    On August 5, 2004, Chudi Osmond Areh, age 24, was serving in the U.S. military in Iraq.

~~1897.~~1893.    Mr. Areh was on a routine patrol in the Al Anbar Governorate when his convoy was attacked with SAF, RPGs, and sniper fire.

~~1898.~~1894.    The August 5, 2004 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~1899.~~1895.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Areh.

~~1900.~~1896.    As a result of the attack, Chudi Osmond Areh suffered ringing in his ears and tinnitus. He also suffers from PTSD, nightmares, flashbacks, and anxiety.

~~1901.~~1897.    Chudi Osmond Areh received extensive medical treatment including therapy and medications.

~~1902.~~1898.    As a result of the August 5, 2004 Terrorist Attack, and the injuries he suffered, Chudi Osmond Areh has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and

past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 109. 110. THE JULY —13, 2004 ATTACK – AL QUAIM, AL ANBAR GOVERNORATE

Formatted: Indent: Left: 0.75", No bullets or numbering

#### A. A. PLAINTIFF JAMES ISMAEL CASTANEDA

Formatted: Indent: Left: 1.06", No bullets or numbering

1903. 1899. Plaintiff James Ismael Castaneda is a citizen of the United States and is domiciled in the State of Illinois.

1904. 1900. On July 13, 2004, James Ismael Castaneda, age 24, was serving in the U.S. military in Iraq.

1905. 1901. Mr. Castaneda was on patrol with his unit in Al Quaim when his vehicle was struck by an anti-tank mine.

1906. 1902. The July 13, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1907. 1903. Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Castaneda.

1908. 1904. As a result of the attack, James Ismael Castaneda suffered a TBI, ear perforation, injuries to both knees, left shoulder, lower back, left index finger, tinnitus, arthritis, post-traumatic headaches, and PTSD.

1909. 1905. James Ismael Castaneda received extensive medical treatment

327

including treatment at the scene, and subsequently required surgery to both knees and left shoulder followed by months of physical therapy after each surgery. Mr. Castaneda continues to treat for his injuries including therapy, counseling, and medication.

~~1910.~~1906.    As a result of the July 13, 2004 Terrorist Attack, and the injuries he suffered, James Ismael Castaneda has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### ~~110.~~ 111.    THE JULY 7, 2004 ATTACK – CAMP FALLUJAH, AL ANBAR GOVERNORATE

Formatted: Indent: Left: 0.75", No bullets or numbering

#### ~~A.~~    A.    PLAINTIFF DONALD E.E. VANDERLIP II

Formatted: Indent: Left: 1", No bullets or numbering

~~1911.~~1907.    Plaintiff Donald E. E. Vanderlip II is a citizen of the United States and is domiciled in the State of Idaho.

~~1912.~~1908.    On July 7, 2004, Donald E.E. Vanderlip II, age 18, was serving in the U.S. military in Iraq.

~~1913.~~1909.    Mr. Vanderlip was outside at his FOB, Camp Fallujah, conducting combat operations, when a rocket mortar strike occurred within meters from his location.

~~1914.~~1910.    The July 7, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1915.~~1911.    ~~Iran,~~Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr.

Vanderlip.

1916.1912.    As a result of the attack, Donald E. E. Vanderlip II suffered a TBI and hearing loss. Mr. Vanderlip also suffers from PTSD from the attack.

1917.1913.    Donald E. E. Vanderlip II received extensive medical treatment after his end of service at several VA hospitals, including but not limited to, VA medical facilities in Texas, Nevada, California, New Mexico and Idaho.

1918.1914.    As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Donald E. E. Vanderlip II has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

**B.    B.    PLAINTIFF KOREY PAUL KAUFMAN**

1919.1915.    Plaintiff Korey Paul Kaufman is a citizen of the United States and is domiciled in the State of Ohio.

1920.1916.    On July 7, 2004, Korey Paul Kaufman, age 28, was serving in the U.S. military in Iraq.

1921.1917.    Mr. Kaufman was outside at his FOB, Camp Fallujah, attending a mission planning meeting with his sergeant, when they were attacked by a mortar that came in over the fence about 30 feet from their location.

1922.1918.    The July 7, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1923.1919.    Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with

which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Kaufman.

1924.1920.     As a result of the attack, Korey Kaufman suffered a shrapnel injury to his upper left leg, tinnitus and PTSD.

1925.1921.     Korey Paul Kaufman received medical treatment from a medic at the scene of the attack for treatment of his shrapnel wounds. Since his end of service, he has received follow-up care at VA medical facilities and private health providers in Ohio.

1926.1922.     As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Korey Paul Kaufman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### C.     PLAINTIFF ROBERT JOSEPH MITCHELL JR.

1927.1923.     Plaintiff Robert Joseph Mitchell Jr. is a citizen of the United States and is domiciled in the State of Arizona.

1928.1924.     On July 7, 2004, Robert Joseph Mitchell Jr., age 24, was serving in the U.S. military in Iraq.

1929.1925.     Mr. Mitchell was on security patrol at his FOB, Camp Fallujah, when a rocket mortar strike occurred near his location.

1930.1926.     The July 7, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1931.1927.     Iran, by and through its Co-Defendants, provided logistical support,

330

weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Mitchell.

1932.1928.     As a result of the attack, Robert Joseph Mitchell Jr. suffered a head injury resulting in a TBI, shrapnel to his forehead with scarring and tinnitus. Mr. Mitchell also suffers from PTSD and migraines from the attack.

1933.1929.     Robert Joseph Mitchell Jr. received medical treatment from a medic at the attack scene and additional treatment when he returned to base. He continued to treat his injuries after his end of service at VA medical facilities.

1934.1930.     As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Robert Joseph Mitchell Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 111. 112.     THE JULY 7, 2004 ATTACK – FALLUJAH

#### A.   A.     PLAINTIFF KEVIN EDWARD DENTON

1935.1931.     Plaintiff Kevin Edward Denton is a citizen of the United States and is domiciled in the State of Arizona.

1936.1932.     On July 7, 2004, Kevin Edward Denton, age 27, was serving in the U.S. military in Iraq.

1937.1933.     Mr. Denton was on patrol with his unit in Fallujah when his vehicle was struck by a remote-controlled IED.

1938.1934.     The July 7, 2004 Terrorist Attack was planned, committed,

Formatted: Indent: Left: 0.75", No bullets or numbering

Formatted: Indent: Left: 1.06", No bullets or numbering

and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1939.1935.        ~~Iran,~~ Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Denton.

1940.1936.        As a result of the attack, Kevin Edward Denton suffered a TBI, a severe shrapnel laceration penetrating several inches into the right temporal lobe and right temporal artery, requiring a craniotomy and resulting in physical brain damage, retained shrapnel fragments and permanent scarring. He also suffered lacerations to his right arm, a shattered jaw, hearing loss and tinnitus. Mr. Denton now suffers from debilitating migraines and PTSD from the attack.

1941.1937.        Kevin Edward Denton received extensive medical treatment following the attack. He had an emergency craniotomy in Baghdad to reduce swelling before being medically evacuated to Landstuhl for additional surgeries and treatment. He was then transferred to Bethesda Naval Hospital, aka Walter Reed Medical Center for continued care. Since his end of service, Mr. Denton has continued his treatment at VA medical facilities.

1942.1938.        As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Kevin Edward Denton has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and

post-judgment interest.

### ~~112.~~ 113.      THE JULY 7, 2004 ATTACK – TAL AFAR, NINEVEH GOVERNORATE

> **Formatted:** Indent: Left: 0.75", No bullets or numbering

#### ~~A.~~   A.      PLAINTIFF JOSHUA DEAN FEOLA

> **Formatted:** Indent: Left: 1.06", Hanging: 0.13", No bullets or numbering, Tab stops: 1.19", Left

~~1943.~~1939.      Plaintiff Joshua Dean Feola is a citizen of the United States and is domiciled in the State of Virginia.

~~1944.~~1940.      On July 7, 2004, Joshua Dean Feola, age 21, was serving in the U.S. military in Iraq.

~~1945.~~1941.      Mr. Feola was conducting route clearance with his unit in Tal Afar when an IED detonated next to his vehicle, which caused him to hit his head on the bulletproof glass and lose consciousness.

~~1946.~~1942.      The July 7, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1947.~~1943.      ~~Iran,~~ Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Feola.

~~1948.~~1944.      As a result of the attack, Joshua Dean Feola suffered a concussion, TBI, hearing loss, a shoulder injury, migraines and PTSD.

~~1949.~~1945.      Joshua Dean Feola received extensive medical treatment at Hunter Holmes McGuire VA Medical Center and other VA hospitals, enduring months of physical and occupational therapy and treatment.

333

1950.1946.    As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Joshua Dean Feola has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

B.    **B.    PLAINTIFF MICHAEL BENJAMIN SIMS**

> **Formatted:** Indent: Left:  1",  No bullets or numbering

1951.1947.    Plaintiff Michael Benjamin Sims is a citizen of the United States and is domiciled in the State of Washington.

1952.1948.    On July 7, 2004, Michael Benjamin Sims, age 21, was serving in the U.S. military in Iraq.

1953.1949.    Mr. Sims was on route clearance patrol with his unit in Tal Afar when an IED detonated next to his vehicle and injured him.

1954.1950.    The July 7, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1955.1951.    Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Sims.

1956.1952.    As a result of the attack, Michael Benjamin Sims suffered shrapnel injuries, unconsciousness, a TBI, tinnitus and PTSD.

1957.1953.    Michael Benjamin Sims received extensive medical treatment

334

after he was immediately evacuated to FOB Sykes in Tal Afar. He was cleaned and his shrapnel injuries were dressed. Upon returning to the U.S., Mr. Sims has received further treatment at Hunter Holmes McGuire VA Medical Center, Washington DC VA Medical Center, VA Puget Sound Health Care System, and University of Washington Mental Health Counseling Center.

1958.1954.    As a result of the July 7, 2004 Terrorist Attack, and the injuries he suffered, Michael Benjamin Sims has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

113. 114.    THE JULY 1, 2004 ATTACK – RAMADI, AL ANBAR GOVERNORATE

> **Formatted:** Indent: Left: 0.75", No bullets or numbering

A. A.    PLAINTIFF LEONARD ELI VIGIL III

> **Formatted:** Indent: Left: 1.13", Hanging: 0.25", No bullets or numbering

1959.1955.    Plaintiff Leonard Eli Vigil III is a citizen of the United States and is domiciled in the State of California

1960.1956.    On July 1, 2004, Leonard Eli Vigil III, age 23 was serving in the U.S. military in Iraq.

1961.1957.    Mr. Vigil was on patrol with his unit in Ramadi when his vehicle was struck by an IED. All soldiers in the vehicle with him were injured, and his sergeant died on impact.

1962.1958.    The July 1, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

335

1963.1959.     Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Vigil.

1964.1960.     As a result of the attack, Leonard Eli Vigil III suffered shrapnel wounds to his left hand, a concussion, a TBI, back pain, tinnitus, and PTSD.

1965.1961.     Leonard Eli Vigil III received extensive medical treatment following the attack. He was treated for his wounds at Camp Junction City and continues his treatment for all his injuries through the VA.

1966.1962.     As a result of the July 1, 2004 Terrorist Attack, and the injuries he suffered, Leonard Eli Vigil III has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### 114. 115.   THE JUNE 4, 2004 ATTACK – SADR CITY, BAGHDAD

#### A. A   PLAINTIFFS THE GREGORY MARK BROWN FAMILY

1967.1963.     Plaintiff Gregory Mark Brown is a citizen of the United States and domiciled in the State of New Jersey.

1968.1964.     On June 4, 2004, Gregory Mark Brown, age 34, was serving in the U.S. military in Iraq when he was attacked by RPGs and IEDs.

1969.1965.     Mr. Brown was the gunner in a Humvee in a convoy of two vehicles in Sadr City when the Humvee ahead was struck by an IED followed by a volley of

336

fire from RPGs. The Humvee flew over their vehicle, and they sustained the blast forces from the IED explosion. Shortly after, while providing security at the scene, another IED detonated next to Mr. Brown's Humvee, blowing him back several feet and injuring him.

1970.1966.    The June 4, 2004 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

1971.1967.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Brown.

1972.1968.    As a result of the attack, Gregory Mark Brown suffered shrapnel wounds to his neck, a TBI, and PTSD.

1973.1969.    Gregory Mark Brown received extensive medical treatment including treatment at the CSH before being transported to Landstuhl Regional Medical Center in Germany and later Walter Reed Medical Center in Bethesda, Maryland. Mr. Brown has also received ongoing treatment for his PTSD, including a 45-day visit to Lyons VA Medical Center in New Jersey for inpatient treatment.

1974.1970.    As a result of the June 4, 2004 attack and the injuries he suffered, Gregory Mark Brown has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment

337

interest.

1975. 1971. Plaintiff Carolyn Denise Brown is a citizen of the United States and domiciled in the State of New Jersey. She is the wife of Gregory Mark Brown.

1976. 1972. Plaintiff S.L.B., a minor, represented by her legal guardians Gregory Mark Brown and Carolyn Denise Brown, is a citizen of the United States and domiciled in the State of New Jersey. She is the daughter of Gregory Mark Brown and Carolyn Denise Brown.

1977. 1973. As a result of the attack and the injuries suffered by Gregory Mark Brown, Plaintiffs Carolyn Denise Brown and S.L.B., a minor, have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 115. 116. THE MAY 29, 2004 ATTACK – RAMADI, AL ANBAR GOVERNORATE

**Formatted:** Indent: Left:  0.75", No bullets or numbering

### A. Plaintiffs The Daniel Raye Duitsman Family

1978. 1974. Plaintiff StaciAnn Duitsman is a citizen of the United States and is domiciled in the state of Virginia. She is the wife of Daniel Raye Duitsman.

1979. 1975. Plaintiff KyliAnn Duitsman is a citizen of the United States and is domiciled in the state of Virginia. She is the daughter of Daniel Raye Duitsman.

1980. 1976. Plaintiff Theron Raye Duitsman is a citizen of the United States and is domiciled in the State of Virginia. He is the son of Daniel Raye Duitsman.

1981. 1977. Plaintiff KasiLyn Duitsman is a citizen of the United States and is domiciled in the State of Virginia. She is the daughter of Daniel Raye Duitsman.

338

~~1982.~~ 1978.      Daniel Raye Duitsman is a citizen of the United States and domiciled in the State of Virginia.

~~1983.~~ 1979.      On May 29, 2004, Daniel Raye Duitsman, age 29, was serving in the U.S. military in Iraq.

~~1984.~~ 1980.      Mr. Duitsman was on patrol with his unit at an elementary school in Ramadi when his unit was attacked by RPGs and small arms fire.

~~1985.~~ 1981.      The May 29, 2004 Terrorist Attack was planned, committed and/or authorized by the ~~FTOs~~ FTO AQ and ~~AQI~~ the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~1986.~~ 1982.      ~~Iran,~~ Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Duitsman.

~~1987.~~ 1983.      As a result of the May 29, 2004 attack and the injuries suffered by Daniel Raye Duitsman, Plaintiffs StaciAnn Duitsman, KyliAnn Duitsman, Theron Raye Duitsman, and KasiLyn Duitsman have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgement interest and post-judgment interest.

### ~~116.~~ 117.      THE MAY 19, 2004 ATTACK – RAMADI, AL ANBAR GOVERNORATE

#### ~~A.~~ A.      PLAINTIFF JASON BALLMAN

~~1988.~~ 1984.      Plaintiff Jason Ballman is a citizen of the United States and is

339

domiciled in the State of North Carolina.

1989.1985.      On May 19, 2004, Jason Ballman, age 22, was serving in the U.S. military in Iraq.

1990.1986.      Mr. Ballman was on foot patrol near a hospital in Ramadi when an IED detonated.

1991.1987.      The May 19, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

1992.1988.      Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Ballman.

1993.1989.      As a result of the attack, Jason Ballman suffered lower degenerative disc disease, migraines, tinnitus, and PTSD.

1994.1990.      Jason Ballman received extensive medical treatment. He was medically evaluated on May 19, 2004. Upon return to the states, he has gone through counseling and is prescribed medication for his PTSD.

1995.1991.      As a result of the May 19, 2004 Terrorist Attack, and the injuries he suffered, Jason Ballman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-

340

judgment interest.

### ~~117.~~ 118.   THE MAY 14, 2004 ATTACK – FOB KALSU, BABIL GOVERNORATE

Formatted: Indent: Left: 0.75", No bullets or numbering

#### ~~A.~~ A.   PLAINTIFF THE FELICIA FLAKE FAMILY

Formatted: Indent: Left: 1.06", Hanging: 0.31", No bullets or numbering

~~1996.~~1992.   Felicia Flake is a citizen of the United States and is domiciled in the State of Louisiana.

~~1997.~~1993.   On May 14, 2004, Felicia Flake, age 23, was serving in the U.S. military in Iraq.

~~1998.~~1994.   Ms. Flake was working in the feeding tent when the incoming attack alarm sounded. As she ran to the containerized kitchen to get her weapons, mortars hit the structure, knocking Ms. Flake unconscious. Upon regaining consciousness, she ran to the bunker.

~~1999.~~1995.   The May 14, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~2000.~~1996.   ~~Iran,~~ Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Ms. Flake.

~~2001.~~1997.   As a result of the attack, Ms. Flake suffered shrapnel injuries to her arm and back, and PTSD.

~~2002.~~1998.   Felicia Flake received medical treatment initially at the scene of the attack and then at VA clinics in Ft. Bliss, Texas and Slidell, Louisiana.

2003.1999.     Plaintiff Monique Ortiz-Williams is a citizen of the United States and is domiciled in the State of Louisiana. She is the sister of Felicia Flake.

2004.2000.     As a result of the May 14, 2004 Terrorist Attack, and the injuries suffered by Felicia Flake, Plaintiff Monique Ortiz-Williams has past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

118. 119.     THE MAY 12, 2004 ATTACK – KARBALA, KARBALA GOVERNORATE

    A.     A.     PLAINTIFF JAMES GERALD ELLIOTT

2005.2001.     Plaintiff James Gerald Elliott is a citizen of the United States and is domiciled in the State of Texas.

2006.2002.     On May 12, 2004, James Gerald Elliott, age 34, was serving in the U.S. military in Iraq.

2007.2003.     Mr. Elliott was on patrol with his unit at the site of the al-Mukhayyam Mosque in Karbala when he was attacked with IEDs, RPGs and SAF.

2008.2004.     The May 12, 2004 Terrorist Attack was planned, committed, and/or authorized by the Special Groups and FTO Hezbollah who received material support from Iran and its Co-Defendants.

2009.2005.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which the Special Groups increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr.

342

Elliott.

~~2010.~~2006.      As a result of the attack, James Gerald Elliott suffered injuries to his face from concrete pieces from an explosion, basilar skull fracture, concussion, tinnitus, a TBI and PTSD.

~~2011.~~2007.      James Gerald Elliott received extensive medical treatment from the medic at the scene of the attack. Upon returning to the U.S., Mr. Elliott received further treatment at Washington DC VA Medical Center, White River Medical Center, University of Maryland Neurology Ambulatory Center, Dallas VA Medical Center, and John L. McClellan Memorial Veterans Hospital.

~~2012.~~2008.      As a result of the May 12, 2004 Terrorist Attack, and the injuries he suffered, James Gerald Elliott has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~119.~~ **120.**      **THE APRIL 21, 2004 ATTACK – MAHMOUDIYA, BAGHDAD GOVERNORATE**

~~A.~~ **A.**      **PLAINTIFF DESMON KEITH COSS**

~~2013.~~2009.      Plaintiff Desmon Keith Coss is a citizen of the United States and is domiciled in the State of Tennessee.

~~2014.~~2010.      On April 21, 2004, Desmon Keith Coss, age 23, was serving in the U.S. military in Iraq.

~~2015.~~2011.      Mr. Coss was attacked while traveling to Fallujah, near Joint Operational Area Iron, when an IED detonated on his convoy.

2016.2012.	The April 21, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

2017.2013.	Iran, Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Coss.

2018.2014.	As a result of the attack, Desmon Keith Coss suffered shrapnel injuries to his right side, face, knee and thigh. He also suffered a head injury resulting in a TBI, right ear tinnitus and debris in his right eye resulting in diminished vision. Mr. Coss now suffers from scarring and PTSD from the attack.

2019.2015.	Desmon K. Coss received extensive medical treatment following the attack at Baghdad Hospital and was then transported to Landstuhl Regional Medical Center. After his end of service, he has continued his treatment at VA medical facilities.

2020.2016.	As a result of the April 21, 2004 Terrorist Attack, and the injuries he suffered, Desmon Keith Coss has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~120.~~ 121.   THE APRIL 19, 2004 ATTACK – GHERAI'AT, BAGHDAD

Formatted: Indent: Left: 0.75", No bullets or numbering

~~A.~~ A.   PLAINTIFFS THE JIMMY PRESTON LAUDERDALE JR. FAMILY

Formatted: Indent: Left: 1", Hanging: 0.38", No bullets or numbering

~~2021.~~2017.   Plaintiff Jimmy Preston Lauderdale Jr. is a citizen of the United States and is domiciled in the State of Louisiana.

~~2022.~~2018.   On April 19, 2004, Jimmy Preston Lauderdale Jr., age 19, was serving in the U.S. military in Iraq.

~~2023.~~2019.   Mr. Lauderdale was the gunner in a vehicle on route clearance in the Gherai'at neighborhood of Baghdad when his vehicle was struck by an IED.

~~2024.~~2020.   The April 19, 2004 Terrorist Attack was planned, committed, and/or authorized by Jaysh al-Mahdi (JAM) and FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~2025.~~2021.   Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which JAM increased its operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Lauderdale.

~~2026.~~2022.   As a result of the attack, Jimmy Preston Lauderdale Jr. suffered a TBI in addition to injuries to his back, and PTSD.

~~2027.~~2023.   Jimmy Preston Lauderdale Jr. received extensive medical treatment, and has undergone substantial amounts of physical therapy, counseling and medications.

~~2028.~~2024.   As a result of the April 19, 2004 Terrorist Attack, and the injuries he suffered, Jimmy Preston Lauderdale Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and

345

past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

2029.2025.     Plaintiff Jimmy Lauderdale Sr. is a citizen of the United States and is domiciled in the State of Arizona. He is the father of Jimmy Preston Lauderdale Jr.

2030.2026.     Plaintiff Bobby Lauderdale is a citizen of the United States and is domiciled in the State of Oklahoma. He is the brother of Jimmy Preston Lauderdale Jr.

2031.2027.     As a result of the April 19, 2004 Terrorist Attack, and the injuries suffered by Jimmy Preston Lauderdale Jr., Plaintiff's father Jimmy Lauderdale Sr., and brother Bobby Lauderdale, have  past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

## 121. 122.     THE APRIL 9, 2004 ATTACK – "THE GOOD FRIDAY AMBUSH" – ABU GHRAIB, BAGHDAD GOVERNORATE

2032.2028.     At approximately 1230hrs on April 9, 2004, five vehicles of the 724th armed with crew-served weapons escorted a convoy of seventeen fuel trucks and two bobtail tractors operated by U.S. defense contractor KBR. The convoy was assigned an urgent mission to deliver fuel from Camp Anaconda to Baghdad International Airport.

2033.2029.     En route, and less than two kilometers from their destination, the convoy ran through a well-planned, large scale ambush that included improvised explosive devices, rocket-propelled grenades and small arms.

2034.2030.     The attack killed six members of the convoy, including Plaintiff Gregory Ronald Goodrich, and civilian drivers Steve Hulett, Tony E. Johnson, Jeffrey Parker,

346

Jack Montague, and Steven Fisher. Twelve soldiers and four contractor drivers were wounded. Another four men were missing in action, later determined to have been kidnapped, including civilian contractors William Bradley (whose remains were found in January 2005), and Tommy Hamill (who later escaped after twenty-seven days of captivity). Two U.S. Army soldiers were also abducted, SGT Elmer Krause (whose body was recovered on April 23) and PFC Keith Matthew Maupin (who was held for an undetermined amount of time before his body was found in late March 2008). One missing civilian, Timothy Bell, has never been found.

2035.2031.    The April 9, 2004 Terrorist Attack was planned, committed, and/or authorized by JAM and FTO Hezbollah who received material support from Iran and its Co-Defendants.

2036.2032.    Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which JAM increased its operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Plaintiffs Bryan Christopher Watson, Gregory Ronald Goodrich, Michael James Bachman, and Shawn Edward Kirkpatrick.

A.  **A.    PLAINTIFF BRYAN CHRISTOPHER WATSON**

2037.2033.    Plaintiff Bryan Christopher Watson is a citizen of the United States and is domiciled in the State of Pennsylvania.

2038.2034.    On April 9, 2004, Bryan Christopher Watson, age 26, was serving in the U.S. military in Iraq.

2039.2035.    Mr. Watson was assisting with the emergency fuel transport mission to the Baghdad Airport when the convoy was attacked.

347

2040.2036.     As a result of the attack, Bryan Christopher Watson suffered a gunshot wound to the right arm and the back of his neck. He also suffered a right knee injury, lower back strain and permanent numbness in his thumb and index finger of his right hand from the attack.

2041.2037.     Bryan Christopher Watson was transported to Landstuhl Regional Medical Center for extensive treatment of his injuries and received additional care at Walter Reed Army Medical Center. Since his end of service, Mr. Watson has continued to treat with private healthcare providers.

2042.2038.     As a result of the April 9, 2004 Terrorist Attack, and the injuries he suffered, Bryan Christopher Watson has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## B.   B.   PLAINTIFFS THE GREGORY RONALD GOODRICH FAMILY

> Formatted: Indent: Left: 1.06", No bullets or numbering

2043.2039.     Plaintiff Gregory Ronald Goodrich was a citizen of the United States and was domiciled in the State of Illinois at the time of his death.

2044.2040.     On April 9, 2004, Gregory Ronald Goodrich, age 35, was serving in the U.S. military in Iraq.

2045.2041.     Mr. Goodrich was assisting with the emergency fuel transport mission to the Baghdad Airport when the convoy was attacked.

2046.2042.     Gregory Ronald Goodrich was killed in the attack.

2047.2043.     Plaintiff Barbara Goodrich is a citizen of the United States and is

348

domiciled in the State of Wisconsin. She is the mother of Gregory Ronald Goodrich.

2048.2044.    Plaintiff Barbara Goodrich brings an action individually, and on behalf of the Estate of Gregory Ronald Goodrich, and all heirs thereof, as its legal representative.

2049.2045.    As a result of the April 9, 2004 Terrorist Attack, and the injuries suffered by, including the conscious pain and suffering and, ultimately, the death of Gregory Ronald Goodrich, Plaintiff Barbara Goodrich, has severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Gregory Ronald Goodrich's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Gregory Ronald Goodrich, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

### C. C.          PLAINTIFF MICHAEL JAMES BACHMAN

**Formatted:** Indent: Left: 1.06", Hanging: 0.31", No bullets or numbering

2050.2046.    Plaintiff Michael James Bachman is a citizen of the United States and is domiciled in the State of Illinois.

2051.2047.    On April 9, 2004, Michael James Bachman, age 24, was serving in the U.S. military in Iraq.

2052.2048.    Mr. Bachman was assisting with the emergency fuel transport mission to the Baghdad Airport when the convoy was attacked.

2053.2049.    As a result of the attack, Michael James Bachman suffered a gunshot wound to the left arm which then lodged in his chest. The bullet traveled through his shoulder to his neck, causing permanent nerve damage and scarring. Mr. Bachman also suffers from PTSD from the attack.

2054.2050.    Michael James Bachman was evacuated to Landstuhl Regional

349

Medical Center for extensive surgery to treat his gunshot wounds and continued his care at Walter Reed Army Medical Center. Since his end of service, he has received treatment from the VA Illiana Health Care System and other VA medical facilities.

~~2055.~~2051.     As a result of the April 9, 2004 Terrorist Attack, and the injuries he suffered, Michael James Bachman has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### D.    PLAINTIFF SHAWN EDWARD KIRKPATRICK

~~2056.~~2052.     Plaintiff Shawn Edward Kirkpatrick is a citizen of the United States and is domiciled in the State of Illinois.

~~2057.~~2053.     On April 9, 2004, Shawn Edward Kirkpatrick, age 26, was serving in the U.S. military in Iraq.

~~2058.~~2054.     Mr. Kirkpatrick was assisting with the emergency fuel transport mission to the Baghdad Airport when the convoy was attacked.

~~2059.~~2055.     As a result of the attack, Shawn Edward Kirkpatrick suffered gunshot wounds to his legs, long thoracic nerve damage, bullet fragments in both knees and legs, right ankle and right knee strain, hearing loss, and tinnitus. Mr. Kirkpatrick also suffered a TBI, headaches and PTSD from the attack.

~~2060.~~2056.     Shawn Edward Kirkpatrick received extensive medical treatment at the Balad Air Base where his wounds were stabilized. He was then medically evacuated to Landstuhl Regional Medical Center. He has continued his treatment at VA medical facilities since his end of service.

~~2061.~~2057.     As a result of the April 9, 2004 Terrorist Attack, and the injuries he

suffered, Shawn Edward Kirkpatrick has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

122. **123.**      **THE APRIL 8, 2004 ATTACK – FALLUJAH**

A. **A.**          **PLAINTIFFS THE JUSTIN WADE SMITH FAMILY**

2062.2058.     Plaintiff Justin Wade Smith is a citizen of the United States and is domiciled in the State of New Mexico.

2063.2059.     On April 8, 2004, Justin Wade Smith, age 22, was serving in the U.S. military in Iraq.

2064.2060.     Mr. Smith was on patrol with his unit in Fallujah when he was an attacked by an RPG wounding him.

2065.2061.     The April 8, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

2066.2062.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Smith.

2067.2063.     As a result of the attack, Justin Wade Smith suffered a blast and shrapnel injuries to his legs and lower back injury, as well as hearing loss, tinnitus, anxiety, depression and PTSD.

2068.2064.     Justin Wade Smith received extensive medical treatment

immediately following the attack at the Bravo Surgical Company. Upon returning to the U.S., Mr. Smith received further treatment at Sam Rayburn Memorial Veterans Center, El Paso VA Health Care System, South Texas Veterans Health Care System, Dallas VA Medical Center, Olin E. Teague Veterans' Center, and VA Eastern Colorado Healthcare System.

2069.2065.     As a result of the April 8, 2004 Terrorist Attack, and the injuries he suffered, Justin Wade Smith has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest

2070.2066.     Plaintiff Richard Clarence Smith is a citizen of the United States and is domiciled in the State of Kansas. He is the father of Justin Wade Smith.

2071.2067.     Plaintiff Loriann Bibby is a citizen of the United States and is domiciled in the State of Texas. She is the mother of Justin Wade Smith.

2072.2068.     As a result of the April 8, 2004 Terrorist Attack, and the injuries suffered by Justin Wade Smith, Plaintiffs Richard Smith and Loriann Bibby have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 123. 124.     THE APRIL 4, 2004 ATTACK – "THE BLACK SUNDAY          ATTACK" – SADR CITY, BAGHDAD

2073.2069.     On April 4, 2004, 1st Platoon, C Company of the "2-5" regiment 1st Cavalry Division, of the United States Army ("the 2-5") was on patrol in Sadr City. At approximately 1700hrs, 1st Platoon was ordered to patrol past the Sadr Bureau and report back on

**Formatted:** Indent: Left: 0.75", No bullets or numbering

its observations.

~~2074.~~2070.        At approximately 1800 hours, 1st Platoon reported that they were being attacked and that a sergeant had been shot and was critically wounded. The platoon tried to break contact and moved further into Sadr City. When two of their vehicles were disabled by the intense incoming fire, the platoon was forced to take cover and advised to remain in place until a rescue force could reach them. They reported being attacked by insurgents all around them, including from the rooftops, with SAF, RPGs~~,~~, pipe bombs, Molotov cocktails, and IEDs. Platoon was under attack and pinned in the center of Sadr City, Baghdad.

~~2075.~~2071.        Soon after 1st Platoon reported that it was under attack and pinned down, it was reported that multiple groups of insurgents were attacking police stations throughout Sadr City. Initial reporting indicated that five Iraqi police stations were overrun by armed insurgents identified as "Mahdi Army."

~~2076.~~2072.        The attack on 1st Platoon launched a series of attacks against the 2-5 Cavalry and the 2-37 Armor Company (and other units), as they tried to rescue 1st Platoon in Sadr City on April 4, 2004, now known commonly as "Black Sunday."

~~2077.~~2073.        The attack was perpetrated by a large number of JAM militants embedded within the city who used complex tactics involving small arms, RPGs, and IEDs to attack multiple U.S. troops The assailants used sophisticated ambush tactics, including blocking routes to funnel the convoys into "a kill zone."

~~2078.~~2074.        After all four of 2-5's QRF convoys were attacked and forced out of Sadr City, a fifth attempt to rescue the trapped platoon was initiated, this time supported by the 2-37 Armor Company. As the tank company moved towards the location of 1st Platoon it was attacked by men dressed in police uniforms, one of which killed a member of the tank company.

2079.2075.   Finally, the 2-37 Armor Company was able to reach the trapped platoon, collect their dead and wounded, and ~~returned~~return them to Camp War Eagle.

2080.2076.   The initial attack on 1st Platoon, and the various ambushes of the rescue convoys that attempted to enter Sadr City, lasted approximately 8 hours. During that time, the 2-5 ~~an~~and 2-37 suffered at least seven killed in action and fifty-three wounded in action.

2081.2077.   The April 4, 2004 Terrorist Attack was planned, committed, and/or authorized by JAM and FTO Hezbollah who received material support from Iran and its Co-Defendants. JAM claimed responsibility for the April 4, 2004 Terrorist Attack.

2082.2078.   ~~Iran,~~Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which JAM increased its operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Plaintiffs Mr. Panimboza, Michael Timm, Peter Baah, and Michael J. LeVasseur, Jr.

2083.2079.   Defendants Iran, IRGC, MOIS, Bank Melli and Bank Markazi have been found civilly liable for the Black Sunday Attack. *See Estate of Fishbeck, et al., v. Islamic Republic of Iran, et al.*, Case No. 1:18-cv-2248-CRC (DDC 2023), at ECF 127, 136 & 137.

### A.   A.   PLAINTIFFS THE FABRIZZIO PANIMBOZA FAMILY

2084.2080.   Plaintiff Fabrizzio Panimboza, formerly known as Nestor Fabricio Panimboza Mendez, is a citizen of the United States and is domiciled in the State of Florida.

2085.2081.   On April 4, 2004, Fabrizzio Panimboza, age 24, was serving in the U.S. military in Iraq.

2086.2082.   Mr. Panimboza was in the rear of a Light Medium Tactical Vehicle (LMTV) in the Quick Reaction Force (QRF) convoys that entered Sadr City on April 4, 2004.

2087.2083.   JAM fighters ambushed Mr. Panimboza's convoy with IEDs,

354

followed by RPGs and SAF. Two men in the convoy, SPC Robert R. Arsiaga and SPC Israel Garza were killed in the attack.

2088.2084.     As a result of the Black Sunday Terrorist Attack, Fabrizzio Panimboza suffered bullet wounds to his left leg, face, and nose, hearing loss, back injury and pain, vertigo, tinnitus, migraines, and was later diagnosed with a TBI. He also sustained PTSD from the attack including symptoms of depression, anxiety, and other symptoms.

2089.2085.     Following the attack, Fabrizzio Panimboza received medical treatment for his wounds. Several weeks after the attack, he began suffering from flashbacks and nightmares, and was provided counseling and medication to assist in sleeping. Since returning from Iraq, he has continued to undergo medical treatment for his injuries, including physical therapy, counseling, and treatment for TBI and PTSD.

2090.2086.     As a result of the Black Sunday Attack, and the injuries he suffered, Fabrizzio Panimboza has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

2091.2087.     Plaintiff Fabricio Sebasttian Panimboza is a citizen of the United States and is domiciled in the State of Utah. He is the son of Fabrizzio Panimboza.

2092.2088.     Plaintiff Lydia Isabel Young is a citizen of the United States and is domiciled in the State of Florida. She is the mother of Fabrizzio Panimboza.

2093.2089.     Plaintiff Wilson Alberto Panimboza Mendez is a citizen of the United States and is domiciled in the State of Florida. He is the brother of Fabrizzio Panimboza.

2094.2090.     Plaintiff Xavier Augusto Panimboza Mendez is a citizen of the

355

United States and is domiciled in the State of Missouri. He is the brother of Fabrizzio Panimboza.

2095.2091.    As a result of the April 4, 2004  Terrorist Attack, and the injuries suffered by Fabrizzio Panimboza, Plaintiffs Fabricio Sebasttian Panimboza, Lydia Isabel Young, Wilson Alberto Panimboza Mendez, and Xavier Augusto Panimboza Mendez have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### B.   B.    PLAINTIFF MICHAEL TIMM

**Formatted:** Indent: Left:  1.06",  No bullets or numbering

2096.2092.    Plaintiff Michael Timm is a citizen of the United States and is domiciled in the State of Florida.

2097.2093.    On April 4, 2004, Michael Timm, age 22, was serving in the U.S. military in Iraq.

2098.2094.    Mr. Timm was riding in an open-back LMTV within the QRF convoy on route to the pinned down platoon in Sadr City, Baghdad, when JAM ambushed it with SAF, RPGs, and IEDs.

2099.2095.    As a result of the Black Sunday Attack, Michael Timm suffered a gunshot wound that went through his left forearm and into his right forearm, shrapnel injuries to his right knee, scarring and arthritis. He also now suffers from PTSD.

2100.2096.    Michael Timm was medically evacuated to Landstuhl then to Fort Hood back in the United States. He has received extensive medical treatment including multiple surgeries, therapy, and medications. He still has retained shrapnel in his knee.

2101.2097.    As a result of the Black Sunday Attack, and the injuries he suffered, Michael Timm has past and future noneconomic damages, including severe physical and mental

pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

### C.   C.   PLAINTIFF PETER BAAH

2102.2098.   Plaintiff Peter Baah is a citizen of the United States and is domiciled in the State of New York.

2103.2099.   On April 4 2004, Peter Baah, age 23, was serving in the U.S. military in Iraq.

2104.2100.   Mr. Baah was riding in an open-back LMTV within the QRF convoy on route to the pinned down platoon in Sadr City, Baghdad, when JAM ambushed it with SAF, RPGs, and IEDs.

2105.2101.   As a result of the Black Sunday Attack, Peter Baah sustained a gunshot wound to his right hand, causing his trigger finger to be partially amputated. He also suffered shrapnel wounds to his right middle finger and left thigh. He now suffers from PTSD and migraines.

2106.2102.   Peter Baah was medically evacuated to Landstuhl, Germany then sent back to the United States. He has received extensive medical treatment including multiple surgeries, therapy, and medications.

2107.2103.   As a result of the Black Sunday Attack, and the injuries he suffered, Peter Baah has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

357

D. **D.** **PLAINTIFFS THE MICHAEL J. LEVASSEUR JR. FAMILY**

Formatted: Indent: Left: 1.13", No bullets or numbering

2108.2104.    Plaintiff Michael J. LeVasseur Jr. is a citizen of the United States and is domiciled in the State of Washington.

2109.2105.    On April 4, 2004, Michael J. LeVasseur Jr., age 19, was serving in the U.S. military in Iraq.

2110.2106.    Mr. LeVasseur was serving as a Crewman with the 2-37 Armor Company when it entered Sadr City, and rescued 1st Platoon. JAM attacked his vehicle with SAF, RPGs, and IEDs. He was struck in the head by explosive debris during the attack.

2111.2107.    As a result of the Black Sunday Attack, Michael J. LeVasseur Jr. suffered back and neck injuries as well as a head injury resulting in a TBI. He also suffers from arthritis and PTSD because of the attack.

2112.2108.    Michael J. LeVasseur Jr. received extensive medical treatment following the attack. Immediately following the attack, a medic treated him seen by for the injury to his head. Soon after, he was treated for combat stress and PTSD and ultimately honorably discharged due to health reasons.

2113.2109.    After his deployment, he treated at several VA medical facilities, including, but not limited to, facilities in Montana, Minneapolis and Puerto Rico.

2114.2110.    As a result of the Black Sunday Attack, and the injuries he suffered, Michael J. LeVasseur Jr. has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

2115.2111.    Plaintiff Kimberly LeVasseur is a citizen of the United States and is domiciled in the State of Arizona. She is the mother of Michael J. LeVasseur Jr.

2116.2112.    Plaintiff Zerick McClinn is a citizen of the United States and is domiciled in the State of Minnesota. He is the son of Michael J. LeVasseur Jr.

2117.2113.    Plaintiff Melissa Odden is a citizen of the United States and is domiciled in the State of Minnesota. She is the sister of Michael J. LeVasseur Jr.

2118.2114.    Plaintiff Jami Howe is a citizen of the United States and is domiciled in the State of Washington. She is the sister of Michael J. LeVasseur Jr.

2119.2115.    As a result of the April 4, 2004 Terrorist Attack, and the injuries suffered by Michael J. LeVasseur Jr., Plaintiffs Kimberly LeVasseur, Zerick McClinn, Melissa Odden and Jami Howe have past and future noneconomic damages, including severe mental anguish, extreme emotional pain and suffering, loss of solatium, loss of consortium, and past and future economic damages, including loss of services, in an amount of no less than $20,000,000.00 for each of them, plus pre-judgment interest and post-judgment interest.

### 124. 125.    THE JANUARY 24, 2004 ATTACK – KHALIDIYAH, AL ANBAR GOVERNORATE

#### A. A.    PLAINTIFFS THE JASON KRISTOFFER CHAPPELL FAMILY

2120.2116.    Plaintiff Jason Kristoffer Chappell was a citizen of the United States and was domiciled in the State of Texas at the time of his death.

2121.2117.    On January 24, 2004, Jason Kristoffer Chappell, age 22, was serving in the U.S. military in Iraq.

2122.2118.    Mr. Chappell was on patrol with his unit near the Khalidiyah Bridge when a vehicle-borne improvised explosive device (VBIED) detonated, killing Mr. Chappell and several others.

Formatted: Indent: Left: 0.75", No bullets or numbering

Formatted: Indent: Left: 1.13", No bullets or numbering

2123.2119.     Jason Kristoffer Chappell was killed in the attack.

2124.2120.     The January 24, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

2125.2121.     Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which FTO AQ and the ZarwaiZarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Chappell.

2126.2122.     Plaintiff Stephanie R. Davis is a citizen of the United States and is domiciled in the State of Colorado. She is the spouse of Jason Kristoffer Chappell.

2127.2123.     Plaintiff Stephanie R. Davis brings an action individually, and on behalf of the Estate of Jason Kristoffer Chappell, and all heirs thereof, as its legal representative.

2128.2124.     As a result of the January 24, 2004 Terrorist Attack, and the injuries suffered by, including the conscious pain and suffering and, ultimately, the death of Jason Kristoffer Chappell, Plaintiff Stephanie R. Davis has severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Jason Kristoffer Chappell's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Jason Kristoffer Chappell, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

360

~~125.~~ **126.**     **THE JANUARY 8, 2004 ATTACK – FALLUJAH**

~~A.~~ **A.**          **PLAINTIFFS THE CHRISTOPHER ALLEN GOLBY FAMILY**

~~2129.~~2125.     Plaintiff Christopher Allen Golby is a citizen of the United States and was domiciled in the State of Colorado at the time of his death.

~~2130.~~2126.     On January 8, 2004, Christopher Allen Golby, age 26, was serving in the U.S. military in Iraq.

~~2131.~~2127.     Mr. Golby was on a medevac mission with his unit in Fallujah when the Black Hawk C5- medical helicopter in which he was a passenger was shot down.

~~2132.~~2128.     Christopher Allen Golby was killed in the attack.

~~2133.~~2129.     The January 8, 2004 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

~~2134.~~2130.     ~~Iran,~~Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which **FTO** AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to attack and kill U.S. service members in Iraq, including Christopher Allen Golby.

~~2135.~~2131.     Plaintiff Sonya Marie Golby is a citizen of the United States and is domiciled in the State of Indiana. She is the wife of Christopher Allen Golby.

~~2136.~~2132.     Plaintiff Sonya Marie Golby brings an action individually, and on behalf of the Estate of Christopher Allen Golby, and all heirs thereof, as its legal representative

~~2137.~~2133.     Plaintiff Sean Ford is a citizen of the United States and is

domiciled in the State of Indiana. He is the stepson of Christopher Allen Golby.

2138.2134.   As a result of the January 8, 2004 Terrorist Attack, and the injuries suffered by, including the conscious pain and suffering and, ultimately, the death of Christopher Allen Golby, Plaintiffs Sonya Marie Golby and Sean Ford have severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Christopher Allen Golby's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Christopher Allen Golby, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

126. 127.   **THE DECEMBER 28, 2003 ATTACK – QARYAT ASH SHABABI, SALAH AL-DIN GOVERNORATE**

A.   A.   **PLAINTIFFS THE ERNESTO MANUEL BLANCO FAMILY**

2139.2135.   Plaintiff Ernesto Manuel Blanco was a citizen of the United States and was domiciled in the State of Texas at the time of his death.

2140.2136.   On December 28, 2003, Ernesto Manuel Blanco, age 28, was serving in the U.S. military in Iraq.

2141.2137.   Mr. Blanco was conducting a support mission for a scout platoon when an IED exploded hitting his vehicle.

2142.2138.   Ernesto Manuel Blanco was killed in the attack.

2143.2139.   The December 28, 2003 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization, who received material support from Iran and its Co-Defendants.

2144.2140.   Iran, Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance,

with which FTO AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Blanco.

2145.2141.    Plaintiff Carmen Blanco-Jimenez is a citizen of the United States and is domiciled in the State of North Carolina. She is the sister of Ernesto Manuel Blanco.

2146.2142.    Plaintiff Carmen Blanco-Jimenez brings an action individually, and on behalf of the anticipated Estate of Ernesto Manuel Blanco, and all heirs thereof, as its legal representative.

2147.2143.    As a result of the December 28, 2003 Terrorist Attack, and the injuries suffered by, including the conscious pain and suffering and, ultimately, the death of Ernesto Manuel Blanco, Plaintiff Carmen Blanco-Jimenez has severe mental anguish, extreme emotional pain and suffering, medical expenses, funeral expenses, loss of Ernesto Manuel Blanco's society, services, companionship, comfort, protection, instruction, advice and counsel, loss of earnings, income, interest, and net accumulation to the estate of Ernesto Manuel Blanco, and his survivorship, in an amount of no less than $35,000,000.00 for each of them and the Estate, plus pre-judgment interest and post-judgment interest.

### 127. 128.    THE DECEMBER 23, 2003 ATTACK – 9 NISSAN DISTRICT, BAGHDAD

#### A.    A.    PLAINTIFF GARY DWAYNE BETHEL

2148.2144.    Plaintiff Gary Dwayne Bethel is a citizen of the United States and is domiciled in the State of Kentucky.

2149.2145.    On December 23, 2003, Gary Dwayne Bethel, age 38, was serving in the U.S. military in Iraq.

2150.2146.    Mr. Bethel was the driver of a Humvee on patrol in Baghdad

when they were stopped by some locals who claimed to have been robbed. After investigating, the patrol started to move out when an IED exploded next to his vehicle.

~~2151.~~ 2147.     The December 23, 2003 Terrorist Attack was planned, committed, and/or authorized by JAM and the FTO Hezbollah who received material support from Iran and its Co-Defendants.

~~2152.~~ 2148.     Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which JAM increased its operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Bethel.

~~2153.~~ 2149.     As a result of the attack, Gary Dwayne Bethel suffered injuries to his right shoulder, right knee, right ankle, a TBI, and has PTSD.

~~2154.~~ 2150.     Gary Dwayne Bethel received extensive medical treatment. He has undergone surgery on his right shoulder and right knee and years of Physical Therapy and medications. Mr. Bethel continues to receive medical treatment.

~~2155.~~ 2151.     As a result of the December 23, 2003 Terrorist Attack, and the injuries he suffered, Gary Dwayne Bethel has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

~~128.~~ **129.     THE NOVEMBER 2, 2003 ATTACK – FALLUJAH**     *Formatted: Indent: Left: 0.75", No bullets or numbering*

~~A.~~ **A.     PLAINTIFF SCOTT RICHARD PARKS**     *Formatted: Indent: Left: 1.06", No bullets or numbering*

~~2156.~~ 2152.     Plaintiff Scott Richard Parks, formerly known as Scott Richard Mathwig, is a citizen of the United States and is domiciled in the State of Oklahoma.

364

2157. 2153.      On November 2, 2003, Mr. Parks, age 22, was serving in the U.S. military in Iraq.

2158. 2154.      Mr. Parks was a passenger in a helicopter transporting troops to Baghdad Airport when the helicopter was shot down by two shoulder fried fired surface-to-air missiles, causing it to crash near Fallujah, Al Anbar Governorate.

2159. 2155.      The attack killed 16 U.S. soldiers and wounded 26, including Scott Richard Parks.

2160. 2156.      The November 2, 2003 Terrorist Attack was planned, committed, and/or authorized by the FTO AQ and the Zarqawi Organization who received material support from Iran and its Co-Defendants.

2161. 2157.      Iran, by and through its Co-Defendants, provided logistical support, weapons, personnel, training, funding, safe-haven, and expert knowledge/assistance, with which AQ and the Zarqawi Organization increased their operational capacity and obtained the permissive environment used to kill and injure U.S. service members in Iraq, including Mr. Parks.

2162. 2158.      As a result of the attack, Mr. Parks suffered neck, spine, and right leg fractures, a right shoulder injury, concussion, TBI, a collapsed lung, scarring, and PTSD.

2163. 2159.      Mr. Parks received extensive medical treatment at 21st Combat Support Hospital in Baghdad; Landstuhl Regional Medical Center in Landstuhl, Germany; Walter Reed Army Hospital in Bethesda, Maryland; Reynolds Army Community Hospital in Ft. Sill, Oklahoma; Comanche County Memorial Hospital in Lawton, Oklahoma; and he continues to receive treatment for his physical and psychological injuries through the VA Oklahoma City Health Care System.

2164.2160.      As a result of the November 2, 2003 Terrorist Attack, and the injuries he suffered, Scott Richard Parks has past and future noneconomic damages, including severe physical and mental pain and suffering and loss of enjoyment of life, and past and future economic damages, including medical expenses, lost income and benefits, loss of earning capacity, in an amount of no less than $20,000,000.00, plus pre-judgment interest and post-judgment interest.

## VII.    ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM

2165.2161.    At no time during the Relevant Period, nor due to actions of United States and Coalition Forces in Iraq, did the United States declare war or enact an Authorization for the use of military force against Iran, nor did the United States or Coalition Forces engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces or U.S. nationals, including Plaintiffs.

2166.2162.    At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces and U.S. nationals, including Plaintiffs.

2167.2163.    At no time relevant to this Action did the operatives of Hezbollah, the IRGC, the IRGC-QF, the Special Groups, Ansar al Islam and/or other Iranian-sponsored terrorists who killed and injured Plaintiffs carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

2168.2164.    The specific attacks alleged herein were all carried out by terrorists and terrorist organizations, including designated FTOs, SDGTs, SDTs, and/or SDNs (all with the substantial and material support of Defendants), and not by armed forces of recognized

366

governments or military forces.

2169.2165.    The conduct of Iran, IRGC, IRGC-QF, Hezbollah, Al Qaida, Ansar al Islam, the Special Groups and/or other Iranian-supported terrorists, including the FTOs, SDGTs, SDTs, and/or SDNs, including those responsible for perpetrating the Terrorist Attacks which resulted in the injuries or deaths of Plaintiffs, violated the laws of armed conflict (including, e.g., AAH operatives masquerading as members of U.S. armed forces, targeting civilians and torturing and executing defenseless hostages), and the widespread and intentional attacks upon U.S. nationals (including Plaintiffs), British, Iraqi, and other civilians and United Nations personnel, constituted a substantial, rather than an incidental, part of their objectives and conduct.

2170.2166.    The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

2171.2167.    The acts of the IRGC, IRGC-QF, Hezbollah, the Special Groups, Al Qaida and/or Ansar al Islam (including the FTOs, SDGTs, SDTs, and/or SDNs responsible for perpetrating the Terrorist Attacks) that injured or killed Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States and the United Nations by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

2172.2168.    The acts of Iran, the IRGC, IRGC-QF, Hezbollah, Al Qaida, Ansar al Islam, Special Groups and/or other Iranian-sponsored terrorists that injured the Plaintiffs were acts of torture, hostage taking and extrajudicial killing as defined by 28 U.S.C. §§ 1605A(h)(2) and

1605A(h)(7), and acts of international terrorism as defined by of 18 U.S.C. § 2331.

2173.2169.   The Terrorist Attacks at issue here were acts of international terrorism that were enabled by Defendant'sDefendants' provision of massive financial and material support and resources as defined by 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A, which caused the injuries to and/or deaths of Plaintiffs. Without Iran's provision of such material support, on the scale that such support was provided, the IRGC, IRGC-QF, Hezbollah, the Special Groups, Al Qaida, Ansar al Islam and/or other Iranian proxies would not have been unable to conduct the thousands of acts of international terrorism on the scale and with the lethality they perpetrated, including the Terrorist Attacks, which caused the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

**VIII.  THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS**

2174.2170.   As discussed herein, Iran has a long history of materially supporting the Special Groups, Al Qaida, Ansar al Islam, and other terrorists, including the FTOs, SDGTs, SDTs, SDNs and/or other Iranian-sponsored terrorists responsible for the Terrorist Attacks that killed or injured Plaintiffs. Simply put, Iran is no stranger to supporting terrorist attacks perpetrated by the world's most notorious and violent terrorist organizations against U.S. nationals, and sharing with those groups the specific intent to terrorize, kill or cause severe bodily and emotional harm.

2175.2171.   Here, Iran provided material support and resources to the Terrorist Groups and their affiliates, including the FTOs, SDGTs, SDTs, SDNs and other terrorists who perpetrated the Terrorist Attacks which killed or injured Plaintiffs.

2176.2172.   These individuals who committed, and the Terrorist Groups who carried out, the Terrorist Attacks alleged herein were directly and materially supported by Iran and/or its Agents & Proxies. This material support included, but is not limited to, expert advice, training, intelligence, funding, munitions, weapons, raw materials, logistical support, command and control,

368

diplomatic cover, permissive environment, operational authority, safe passage and sanctuary in areas within Iraq (and in Iran and Lebanon) controlled either by Hezbollah/IRGC-QF trained, equipped, and directed Shia Special Groups, and/or in areas within Iraq controlled by Iranian-supported Sunni elements including, but not limited to, Al Qaida and Ansar al Islam.

~~2177.~~ 2173.    Without Iran's support, the Terrorist Groups and their affiliates, including FTOs, SDGTs, SDTs, and/or SDNs, responsible for the Terrorist Attacks which resulted in Plaintiffs being killed or injured would not have been able to carry out such Terrorist Attacks with the scale and lethality in which they were perpetrated.

## IX.    CLAIMS FOR RELIEF

~~2178.~~ 2174.    Plaintiffs bring the following claims against all Defendants.

### FIRST CLAIM FOR RELIEF

**AGAINST ALL DEFENDANTS ON BEHALF OF EACH PLAINTIFF PERSONALLY INJURED BY DEFENDANTS' ACTS, OR THE PROVISION OF MATERIAL SUPPORT FOR SUCH ACTS, THAT RESULTED IN PERSONAL INJURY OR DEATH UNDER 28 U.S.C. § 1605A(c)**

~~2179.~~ 2175.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

~~2180.~~ 2176.    This First Claim for Relief is asserted by those Plaintiffs herein who were personally injured by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts, and such acts or provision of material support or resources were committed by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

~~2181.~~ 2177.    The Terrorist Attacks that injured Plaintiffs or their family members occurred in Iraq.

~~2182.~~ 2178.    Iran is, and was at all times relevant, a State Sponsor of Terrorism within

369

the meaning of § 1605A(h)(6).

2183.2179.    At the time of the attacks in which they or their family members were injured, Plaintiffs or their attacked family members were U.S. nationals, members of the U.S. armed forces, and/or employees or contractors of the U.S. government acting within the scope of their employment.

2184.2180.    Plaintiffs are currently nationals of the United States, members of the U.S. armed forces, employees or contractors of the United States government acting within the scope of their employment, or the legal representatives of one of the foregoing.

2185.2181.    Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah, the IRGC-QF, and the Terrorist Groups who planned, conspired and committed extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that injured the Plaintiffs.

2186.2182.    Defendants intended that the material support and resources they provided to the Terrorist Groups be used to commit deliberated killings in Iraq. The killings committed by the Terrorist Groups were not authorized by a previous judgments pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Nor were these killings lawful under international law.

2187.2183.    Defendants' own acts, as well as their provision of material support and resources for such acts, of extrajudicial killing, torture, and hostage-taking were intended to inflict, and would reasonably result in, severe personally injury and emotional distress to the Plaintiffs.

2188.2184.    As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, Plaintiffs identified in the foregoing paragraphs endured

severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses including medical expenses and lost income.

2189.2185.    Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, and any economic losses determined by the trier of fact.

2190.2186.    Defendants are jointly and severally liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss.

2191.2187.    Defendants and their agents routinely relied upon and controlled IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah to provide material support and resources to the Terrorist Groups responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs. Each individual competent entity within Iran's terrorism network worked to advance Iran's regional goals and shared an objective of supporting and committing terrorism against Americans in Iraq, thus, Defendants are equally and vicariously liable for the personal injuries caused by others, including their agents and proxies, IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah.

2192.2188.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

2193.2189.    **WHEREFORE**, each Plaintiff demands that judgment be entered against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses including medical expenses and lost income, loss of solatium, and loss of services, in addition to pre- and post-judgment interest, punitive damages, and attorney's fees.

371

**SECOND CLAIM FOR RELIEF**

**AGAINST ALL DEFENDANTS ON BEHALF OF THE ESTATES AND HEIRS OF
DECEDENT-PLAINTIFFS FOR DEFENDANTS' ACTS, OR PROVISION OF
MATERIAL SUPPORT AND RESOURCES FOR SUCH ACTS, THAT RESULTED IN
DEATH UNDER 28 U.S.C. § 1605A(c)**

~~2194.~~2190.   Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

~~2195.~~2191.   This Second Claim for Relief is asserted by the Estates of Decedent

Plaintiffs identified herein, by and through their legal representatives, on behalf of the

Decedents and Decedents' heirs. Decedent Plaintiffs herein were personally injured and

killed by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the

provision of material support or resources for such acts, and such acts or provision of

material support or resources were committed by officials, employees, or agents of

Defendants while acting within the scope of their office, employment, or agency.

~~2196.~~2192.   The Terrorist Attacks that injured and killed the Decedent Plaintiffs

occurred in Iraq.

~~2197.~~2193.   Iran is, and was at all times relevant, a State Sponsor of Terrorism within

the meaning of § 1605A(h)(6).

~~2198.~~2194.   At the time of the attacks in which they were killed or mortally injured,

Decedent Plaintiffs were U.S. nationals, members of the U.S. armed forces, and/or employees or

contractors of the U.S. government acting within the scope of their employment.

~~2199.~~2195.   Decedent Plaintiffs identified in the foregoing paragraphs were grievously

injured and killed as a result of Defendants' provision of material support (within the meaning of

§ 1605A(h)(3)) to Hezbollah, the IRGC-QF, and the Terrorist Groups who planned, conspired and

committed extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that

372

caused the Decedents' deaths.

2200.2196.    Defendants intended that the material support and resources they provided to the Terrorist Groups be used to commit deliberated killings in Iraq. The killings committed by the Terrorist Groups were not authorized by a previous judgmentsjudgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Nor were these killings lawful under international law.

2201.2197.    Defendants' own acts, as well as their provision of material support and resources for such acts, of extrajudicial killing, torture, and hostage-taking were intended to inflict, and would reasonably result in, the severe personal injury and death of the Decedent Plaintiffs.

2202.2198.    As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, the Decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately leadled to their deaths.

2203.2199.    Defendants are jointly and severally liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, and/or pain and suffering of the Decedents prior to their deaths, and any pecuniary loss (or loss of income or accumulations to the estates).

2204.2200.    Defendants and their agents routinely relied upon and controlled IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah to provide material support and resources to the Terrorist Groups responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs. Each individual competent entity within Iran's terrorism network worked to advance Iran's regional goals and shared an objective of supporting and committing terrorism against Americans in Iraq, thus, Defendants are equally and vicariously liable for the personal injuries caused by others,

including their agents and proxies, IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah.

~~2205.~~2201.    Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

~~2206.~~2202.    **WHEREFORE**, each Plaintiff demands that judgment be entered against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses including medical expenses and lost income, loss of solatium, and loss of services, in addition to pre- and post-judgment interest, punitive damages, and attorney's fees.

### THIRD CLAIM FOR RELIEF

**AGAINST ALL DEFENDANTS ON BEHALF OF THE RELATIVES OF PLAINTIFFS INJURED OR KILLED AS A RESULT OF DEFENDANTS' ACTS, OR PROVISION OF MATERIAL SUPPORT FOR SUCH ACTS, RESULTING IN LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c)**

~~2207.~~2203.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

~~2208.~~2204.    This Third Claim for Relief is asserted by the family members and relatives of the Plaintiffs herein who were personally injured and/or killed by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts, and such acts or provision of material support or resources were committed by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

~~2209.~~2205.    The Terrorist Attacks that injured and killed the family members of ~~theses~~these Plaintiffs occurred in Iraq.

~~2210.~~2206.    Iran is, and was at all times relevant, a State Sponsor of Terrorism within

374

the meaning of § 1605A(h)(6).

2211.2207.    At the time of the attacks in which their family members were injured or killed, Plaintiffs or their attacked family members were U.S. nationals, members of the U.S. armed forces, and/or employees or contractors of the U.S. government acting within the scope of their employment.

2212.   Plaintiffs are currently nationals of the United States, members of the U.S. armed forces, employees or contractors of the United States government acting within the scope of their employment, or the legal representatives of one of the foregoing.

2213.2208.    Defendants intended that the material support and resources they provided to the Terrorist Groups be used to commit deliberated killings in Iraq. The killings committed by the Terrorist Groups were not authorized by a previous judgmentsjudgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Nor were these killings lawful under international law.

2214.2209.    Defendants' own acts, as well as their provision of material support and resources for such acts, of extrajudicial killing, torture, and hostage-taking were intended to inflict, and would reasonably result in, severe emotional distress on the Plaintiffs.

2215.2210.    As a direct and proximate result of Defendants' acts, the families of individuals, identified in the foregoing paragraphs as injured or killed as a result of Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking, have suffered loss of solatium, severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe mental and physical manifestations, as well as other harms to be set forth to the trier of fact.

2216.2211.    Defendants are jointly and severally liable for the full amount of Plaintiffs'

375

damages.

2217.2212.   Defendants and their agents routinely relied upon and controlled IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah to provide material support and resources to the Terrorist Groups responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs. Each individual competent entity within Iran's terrorism network worked to advance Iran's regional goals and shared an objective of supporting and committing terrorism against Americans in Iraq, thus, Defendants are equally and vicariously liable for the personal injuries caused by others, including their agents and proxies, IRGC-QF, IRISL, Mahan Air, KAA, and Hezbollah.

2218.2213.   Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against DefendantDefendants pursuant to 28 U.S.C. § 1605A(c).

2219.2214.   **WHEREFORE**, each Plaintiff demands that judgment be entered against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses including medical expenses and lost income, loss of solatium, and loss of services, in addition to pre- and post-judgment interest, punitive damages, and attorney's fees.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

a) Judgment for all Plaintiffs against Defendants, jointly and severally, for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, emotional injuries, economic losses, including medical expenses and lost income, and loss of solatium, in amounts to be determined at trial;

b) Judgment for Plaintiff Estates against Defendants, jointly and severally, for compensatory damages for the extrajudicial killing of the decedents, including, but not

376

limited to, physical injury, extreme mental anguish, pain and suffering, economic

losses, including loss of support, financial and otherwise, and any pecuniary loss (or

loss of income to the estates) in amounts to be determined at trial;

c)  Judgment for all Plaintiffs against Defendants, jointly and severally, for punitive

damages in an amount to be determined at trial;

    i.      Punitive damages are warranted in this case because:

        1.   The conduct of Defendants and their agents demonstrates a policy

of encouraging, supporting and directing a campaign of thousands

or tens of thousands of deadly acts of terrorism directed at civilians

and peacekeeping forces, and in particular against U.S. nationals,

such that the monstrous character of the Terrorist Attacks is obvious.

Specifically, Defendants focused ~~its~~their finances, infrastructure,

agents and instrumentalities to support, encourage and increase the

infliction of maximum pain and suffering on innocent people and

their families;

        2.   The conduct of Defendants and their agents demonstrates that ~~it~~

~~harbors~~they harbor a deep-seated and malicious hatred of the United

States and that Defendants intentionally committed terroristic

murder and extrajudicial killings, torture and hostage taking of

American civilians and peacekeeping servicemen and

servicewomen;

        3.   The conduct of Defendants and their agents is extreme and

outrageous such that it demonstrates an undeniable intent to do harm

and inflict severe physical and emotional distress, even on those not present at the site of the acts;

4. The Terrorist Attacks described herein and that which the Plaintiffs experienced are among the most heinous acts of deliberate violence;

5. The Defendants, their agents, and all others, should be unquestionably deterred from committing similar acts in the future;

6. Defendants still publicly deny their role in the Terrorist Attacks and disclaim even their mere presence in Iraq during the Relevant Period;

7. Defendants took purposeful and concerted steps to deny, conceal, and mask their role in the Terrorist Attacks;

8. Defendants knowingly violated U.S. and international sanctions, laws, and treaties to effectuate their purposeful campaign of terror;

9. Defendants have built their system of terrorism such that they act through agents and instrumentalities of their state to perpetrate and perpetuate terrorism;

10. Defendants have commodified and privatized terrorism such that the core function of their agents, proxies and instrumentalities are sufficiently distinct and commercial, and not merely governmental.

d)  ~~pre~~Pre-judgment and post-judgment interest;

e)  Plaintiffs' costs and expenses;

f)  Plaintiffs' attorney's fees; and

g)  Such other and further relief as the Court finds just and equitable.

378

Dated: ~~September 11, 2023~~ March 21, 2024

Respectfully Submitted,

/s/ Christopher G. Paulos
Christopher G. Paulos
DC Bar No. 1615782
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7067
Facsimile: (850) 436-6067
Email:   cpaulos@levinlaw.com
*Counsel for Plaintiffs*

379